**FILED**

October 25, 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____Belinda Gamez_____

DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Case No. 3:23-CR-01842-DB-4 |
| | . | |
| Plaintiff, | . | El Paso, Texas |
| | . | |
| v. | . | |
| | . | |
| JESUS GERARDO RAMOS, | . | |
| | . | Thursday, August 31, 2023 |
| Defendant. | . | 10:14 a.m. |
| . . . . . . . . . . . . . . . . | . | |

TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
BEFORE THE HONORABLE MIGUEL A. TORRES
UNITED STATES MAGISTRATE COURT JUDGE

APPEARANCES:

For the Government:        United States Attorney's Office
                          BY: KYLE MYERS, ESQUIRE
                          700 East San Antonio Street
                          Suite 200
                          El Paso, Texas 79901

For the Defendant:        Robert J. Perez, Attorney at Law
                          BY: ROBERT J. PEREZ, ESQUIRE
                          221 North Kansas, Suite 1103
                          El Paso, Texas 79901

Deputy Clerk:             Fidel Morales
                          United States District Court
                          525 Magoffin Avenue, Suite 105
                          El Paso, Texas 79901

Transcription Service:    Liberty Transcripts
                          9107 Topridge Drive
                          Austin, Texas 78750
                          (847) 848-4907
                          www.libertytranscripts.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**LIBERTY TRANSCRIPTS**
**(847) 848-4907**

2

I N D E X

Page

Case called
Argument by Mr. Myers                                    35
Argument by Mr. Perez                                    37
Court's Ruling - Motion To Detain Granted                39
End of Proceedings                                       40
Certificate of Transcriber                               40

WITNESSES FOR THE GOVERNMENT:

MARK CERVANTES
  Direct Examination by Mr. Myers                         4
  Cross-Examination by Mr. Perez                         18

WITNESSES FOR THE DEFENDANT:

(None)

|  | Marked | Received |
|---|---|---|
| EXHIBITS FOR THE GOVERNMENT: | | |
| (None) | | |
| EXHIBITS FOR THE DEFENDANT: | | |
| (None) | | |

**EL PASO, TEXAS, THURSDAY, AUGUST 31, 2023, 10:14 A.M.**

THE CLERK:  United States Magistrate Court for the Western District of Texas, sitting in El Paso; the Honorable Judge Miguel A. Torres presiding.  United States Magistrate Court is now in session.  You may be seated.

THE COURT:  All right.  Good morning.

The Court calls EP:23-M-2665, United States of America versus Jesus Gerardo Ramos.  We're here for a preliminary and detention.  Let me have announcements, please.

MR. MYERS:  Your Honor, Good morning.

Kyle Myers for the Government.

THE COURT:  Good morning.

MR. PEREZ:  Good morning, Your Honor.

Robert Perez for Mr. Ramos.

THE COURT:  Mr. Perez, Good morning.  We're proceeding on both, correct?

MR. PEREZ:  That's correct.

THE COURT:  Okay.  Pursuant to the Due Process Protection Act, the Government is put on notice as to it's disclosure obligations under the Supreme Court precedent of Brady vs. Maryland.  A failure to comply with those obligations could result in sanctions on the Government.  A written notice to this effect will follow this hearing.

Call your first witness, please.

MR. MYERS:  Your Honor, the Government calls Mark

Cervantes (phonetic) to the stand.

THE COURT:  All right.  Good morning.

MR. CERVANTES:  Good morning.

MARK CERVANTES, GOVERNMENT'S WITNESS, SWORN

THE COURT:  Have a seat, please.  All right, you may proceed.

MR. MYERS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MYERS:

Q    Good morning, sir.

A    Good morning.

Q    Would you please state your name for the record?

A    Mark Cervantes.

Q    Common spelling?

A    Yes.

Q    Mr. Cervantes, where do you work?

A    I work for U.S. Customs and Border Protection here in El Paso, Texas.

Q    And how long have you worked for Customs and Border Protection?

A    Nineteen years.

Q    And what do you do for Customs and Border Protection?

A    I am an enforcement officer.  I enforce immigration laws. And any individuals coming across the border that violate immigration laws, I present them in court just like this one.

Q    Now, are you also a task force officer?

A    I am.

Q    What is a task force officer?

A    I am deputized with the Federal Bureau of Investigation here in El Paso, Texas, with extra authority of Title 18 and 21.

Q    And have -- are you involved in the investigation or prosecution of the United States of America versus Jesus Gerardo Ramos?

A    I am.

Q    And how are you involved?

A    I am co-case agent to the investigation.

Q    Have you seen Mr. Ramos before?

A    Yes.

Q    Did you see him the day of his arrest?

A    I did.

Q    Are you able to identify him in court?

A    Yes, I am.

Q    Would you please identify him for the Court, please?

A    Yes.  He's seated on the first defense counsel table. He's the only one wearing a blue jumpsuit.  And he's got an interpreter headset inside his ears and hanging over -- under his chin.

        MR. MYERS:  Your Honor, let the record reflect that the witness has identified Mr. Ramos as the defendant number

one in this case.

THE COURT:  The record will so reflect.

BY MR. MYERS:

Q    When was Mr. Ramos arrested?

A    August 21st, 2023.

Q    And where did this offense occur?

A    Here in El Paso, Western District of Texas.

Q    Okay.  Now, prior to this, was there an investigation into a person, I guess, you knew as Fernanda (phonetic)?

A    Yes.

Q    Okay.  Who is Fernanda?

A    Fernanda is a Mexican national.  She resides in Guadalajara, Mexico.  She is a member of the Cartel Jalisco Nueva Generacion, specifically provides and/or purchases firearms for the cartel.

Q    Now, prior to August 21st, 2021, had you personally investigated Fernanda for -- in connection with some drug seizures --

A    Yeah.

Q    -- the FBI had made?

A    Yes.

Q    Now, as that investigation progressed, is she in contact with an undercover agent?

A    She is.

Q    Now, during these conversations with the undercover agent

-- or let me ask you this.  When did these conversations occur?

A    Approximately a month ago, month and a -- maybe a little over a month ago.

Q    Okay.  Prior --

A    Prior to --

Q    -- to August 21st?

A    That's correct, yes.

Q    Okay.  And what are, like, the nature of these conversations between Fernanda and the undercover agent?

A    It's specifically the willingness of Fernanda to purchase military-grade weaponry, belt fed machine guns, grenades, AK-47s, and sniper rifles, 50 -- 50 caliber sniper rifles.

Q    Now, did she make a deal with the undercover agent?

A    Yes.

Q    And what is that deal?

A    The deal is for her to purchase 20 AK-47 assault rifles and two 50 caliber sniper rifles for a total of $66,000.

Q    Now, prior to August 21st, 2023, does Fernanda have someone send a -- excuse me, send a down payment?

A    Yes.

Q    And how much of the down payment is sent?  Excuse me.

A    Three thousand dollars.

Q    Okay.  So -- and then basically here, it's ATF is working the investigation with you, correct?

A      Yes.

Q      Is ATF providing real weapons for this undercover operation?

A      Yes.

Q      Prior to this operation, had those weapons been examined by an ATF agent?

A      Yes.

Q      And was there a determination about whether these weapons were manufactured in Texas?

A      Yes.

Q      And what was that determination?

A      That they were manufactured in Illinois and Florida.  And they were -- that determination was made in August of this year.

Q      Okay.  And therefore, they had affected interstate commerce.

A      Correct.

Q      Okay.  Now, is Fernanda herself going to come pick up these weapons?

A      No.

Q      What is the understanding of what's going to happen?

A      The understanding is she would have individuals in Mexico cross the border and pick them up so that they can be exported to Mexico.

Q      On Monday, August 21st, 2023, does Fernanda provide any

information about who's going to come pick up the weapons?

A    Yes.

Q    What information does she provide?

A    She provides a phone number to an individual that would be picking up the weapons.  She also states that there would be a second individual that would be crossing the border to pick up the weapons, as well.

Q    Does she give a phone number for this first person?

A    Yes.

Q    Now, do you recognize -- or do you do research on that phone number?

A    We did, yes.

Q    And what did you find out when you --

A    We found out the subscriber to the phone number, which was a Mexican-based number out of Juarez, Mexico, was determined to be an individual that was a resident of the United States but was living in Mexico.  He was a former cop in Juarez, a municipal cop, more specifically.  He was under investigation in 2012 for facilitating firearms to cartels in Mexico.

Q    Let's take a break.

A    Okay.

Q    Hold on right there.  That person's name?

A    Rene Hernandez-Cordero, defendant number two in this case.

Q    Okay.  Now, when you did research on Mr. Hernandez-Cordero, did you find some background information on an old investigation?

A    Yes.

Q    And you had researched the debrief?

A    Yes.

Q    Now, you have not had a chance to verify the accuracy of this debrief?

A    Correct.

Q    But what was the information provided about Mr. Hernandez?

A    More specifically, the information was that Mr. Hernandez-Cordero was a police officer in charge of Juarez City Hall.  He was involved in purchasing and selling weapons to both cartels in Mexico and also Sicarios.  He was involved in handling police officers in Mexico that would send those -- traffic -- send those firearms to different cartels.

Q    Okay.  Now fast forward to 2023.  Had you seen Mr. Hernandez's information before, his phone number?

A    Yes.

Q    And where did you see Mr. Hernandez's phone number?

A    We were up on WhatsApp and trap and trace registers on Fernanda's phone.  And he was -- that phone number that Fernanda had provided us on the day of the deal had been in high volume contact with Fernanda prior to the deal and on the

day of the deal.

Q   Okay.  Now, now that you kind of have that information, the undercover operation is going to start in earnest, correct?

A   Correct.

Q   What is the first -- where is the first meeting place?

A   The first meeting place was at a Circle K gas station off of Dyer Street here in El Paso, Texas.

Q   Now, is that where the weapons were?

A   There was one weapon there.  But the majority of the weapons that was a part of the deal were in a second location.

Q   Now, who's at this gas station at the time the undercover agent arrives?

A   The defendant, Mr. Gerardo, is present.  Mr. Ramos.  And eventually, Mr. Hernandez-Cordero was also arriving along with two undercover agents with ATF.

Q   Okay.  Now during this time, does the undercover agent have a conversation with Mr. Ramos and Mr. Hernandez?

A   Yes.

Q   What's the nature of that conversation?

A   The nature of the conversation was they greeted each other.  They made an understanding of what they were going to be purchasing and/or receiving.  There was a picture that was displayed to Mr. Ramos and Mr. Hernandez-Cordero.

     The picture contained the aforementioned weapons that was

part of the deal.  They were laid on a tarp what appeared to be in a storage facility.  They both agreed that those were the items that they were going to be purchasing and/or picking up.  And they agreed to meet at a secondary location.

Q    Okay.  So the undercover agent is specifically showing Mr. Ramos here a photograph of weapons?

A    Yes.

Q    All right.  Now, is there also an exchange of $63,000?

A    Yes.

Q    Who has the $63,000?

A    Defendant number two, Mr. Hernandez-Cordero.

Q    And how does the undercover agent verify or see that money?

A    Mr. Hernandez-Cordero had the money inside the center console of the white Ford Bronco that he drove across the border with.

Q    Okay.  Did Mr. Hernandez declare that money at the port of entry?

A    He did not.

Q    All right.  Did Mr. Hernandez and Mr. Ramos, did they arrive in the same car or separate cars?

A    Two separate cars.

Q    Okay.  So now the next step is to go from the gas station to the storage unit?

A    Yes.

Q    Okay.  What happens next?

A    They all get in their own vehicles and they trans -- they convoy to the second location, but only Mr. Hernandez in his white Bronco and the two undercover agents in their vehicle arrive at the storage facility.

Q    What happens to Mr. Ramos?

A    We believe he might have gotten lost.

Q    Okay.

A    For a short period.

Q    Let's focus on Mr. Hernandez for a second --

A    Okay.

Q    -- at the storage facility.  While at the storage facility, is there a further meeting between Mr. Hernandez and the undercover?

A    Yes.

Q    What happens?

A    They agree to meet at the storage facility.  They then enter the storage facility and they convoy to a storage unit within the facility.  Within that storage unit are the weapons, fully functional weapons that were going to be purchased.

At that time, the money was provided to the undercover agents, and Mr. Hernandez-Cordero moved his vehicle to the storage unit, backed it up to the storage unit, and then began to take possession of the weapons, and then put -- placed them

in his white Ford Bronco.

Q    During that time, what happens?

A    At that time, agents with the ATF then approach the defendant number two, Mr. Hernandez-Cordero, and place him under arrest.

Q    All right.  Now, does Mr. Hernandez waive his right to an attorney?

A    He does.

Q    Do you -- are you one of the people that speak with Mr. Hernandez

A    Yes.

Q    Okay.  Is this interview recorded?

A    Yes.

Q    And what happens during this interview?  What does Mr. Hernandez say?

A    Mr. Hernandez says that he was told to cross the border. He was given $63,000 that he brought from Mexico.  Then he was told to arrive at a gas station to purchase the firearms from another individual.  The firearms would then be given to the individual that he claimed was driving the F150 which was Mr. Ramos.

Once the firearms were delivered to Mr. Ramos, Hernandez would then return to Mexico along with Mr. Ramos.  They would coordinate a meet.  Mr. Hernandez would then receive the weapons from Mr. Ramos and then provide it to the individuals

that had originally sent him to the deal.

Q    Okay.  So I want to make sure I understand this because this is coming form Mr. Hernandez, correct?

A    Yes.

Q    And that the only role I guess in this part of the scheme is Mr. Ramos is just going to carry the weapons across the border?

A    Yes.

Q    Okay.  Now, while kind of this is going on, I guess other agents are trying to track down Mr. Ramos?

A    Yes.

Q    Okay.  Do they eventually find him?

A    Yes.

Q    Does -- is he placed under arrest?

A    Yes.

Q    Does he -- is he read his Miranda warnings?

A    Yes.

Q    Is he interviewed?

A    Yes.

Q    Is he -- are you a part of that interview?

A    No.

Q    Is that interview recorded?

A    Yes.

Q    Have you reviewed those -- that recording?

A    I have.

Q    Okay.  Now, during the initial part of the recording, does Mr. Ramos say anything about weapons?  Or what does he say?

A    He says that he was just told by his brother, Alfredo (phonetic), to come across the border and pick up some items. He doesn't say specifically what items they were, but he was unaware of what he was picking up.

Q    Okay.  Now, does an agent go back and later confront him with information about -- from the undercover?

A    Yes.

Q    What -- how is Mr. Ramos confronted with information?

A    The undercover agent advised the agent conducting the interview that Mr. Ramos was provided with a photograph of the aforementioned weapons.  And Mr. Ramos then stated yes, I'll take -- they'll fit into my truck.

Q    Now, does the agent conducting the interview confront Mr. Ramos with this information?

A    Yes.

Q    Then what happens after he's confronted with that information?

A    Mr. Ramos then confirms that he was there to pick up the weapons, and identifies his brother, Alfredo, as a cop in Mexico.

Q    What else does he say?

A    He says that he was provided with some information and

also shows agents phone forwarded messages that he claims he did not know who the original sender was of the location and the duties of which he was supposed to conduct on August 21st.

Q    Okay.  Now, had someone with Homeland Security Investigations -- well, let me ask you this.  To export these weapons from the United States to Mexico, is a license required?

A    Yes.

Q    And has someone done research on Mr. Ramos or Mr. Hernandez as to whether they have a license?

A    Yes.

Q    Does Mr. Ramos or Mr. Hernandez have a license to export these kind of firearms from the United States to Mexico?

A    No.

Q    And doing so would be a felony?

A    Yes.

Q    Further, do -- are these weapons, these type and amount of weapons helpful in a drug trafficking organization?

A    Yes.

Q    How do they further a drug trafficking conspiracy?

A    They -- these weapons are not easily accessible in Mexico.  Therefore, they rely on U.S. -- U.S. based weapons to be exported to Mexico to support themselves and arm themselves against rival cartels in Mexico to further their drug distribution enterprise.

Q    And that even affects their drug trafficking operations here in the United States?

A    Absolutely.

Q    Which is also a felony?

A    Yes.

        MR. MYERS:  Your Honor, I pass the witness.

        THE COURT:  Mr. Perez?

                     CROSS-EXAMINATION

BY MR. PEREZ:

Q    Agent Cervantes, how long have you been with ATF?

A    FBI.

Q    You're with FBI?

A    Yes.

Q    Okay.  I thought you said you were with Customs and Border Protection.

A    So, my parent agency is Customs and Border Protection. But I'm a task force officer with the FBI.

Q    And you're designated on the ATF, as well?

A    No.

Q    Okay.  I thought you were deputized with ATF?

A    No.

Q    Okay.  So you don't have anything to do with them.

A    Well, they're a partner agency in this case.

Q    Okay.  They're just a partner agency.  All right.  So my understanding is an investigation's been taking place for a

while.

A      Yes.

Q      That actually started in Mexico with conversations that were taken from ths lady, Fernanda?

A      Yes.

Q      I imagine she's been on the radar for a while.

A      Yes.

Q      And you said they've listened to the telephone conversations that she has had?

A      We haven't listened -- we haven't been up on any wires. We haven't listened to any conversations.

Q      So where'd they get the information from Fernanda?

A      This was based on text messages and then forwarded -- forwarded voice messages.

Q      Okay.  So there were text messages and forwarded voice messages --

A      Right.

Q      -- that were intercepted?

A      Not live.  I wasn't privileged to any live.  I wasn't talking to her directly, nor was I part of any live communication between her and an undercover agent.

Q      Understood.  But those communications were intercepted.

A      Yes.

Q      Who did the interceptions -- who were they being sent to?

A      The undercover agent.

Q    Okay.  So the messages from Fernanda were not being sent to Hernandez-Cordero?

A    There were phone calls and/or messages that were sent to Mr. Hernandez-Cordero.

Q    Okay.  So Fernanda actually, you have the physical evidence where she's communicating with Hernandez-Cordero?

A    Yes.  It's not live information.  It's basically information that was received basically said whether she sent him a message and/or video.  But we're not privileged to the contents of it.

Q    Okay.  You don't have anything that Fernanda sent to Jesus Gerardo Ramos, do you?

A    We don't know -- I personally don't know Mr. Ramos' number, so I can't tell you if that's the case.

Q    But you were absolutely able to identify the information being sent to the other gentleman.  Isn't that correct?

A    Yes.

Q    But you have not been able to identify a single communication that went to my client.

A    Not yet.

Q    Okay.  Well, you don't know that it's there.

A    I don't.  I don't know Mr. Ramos' phone number.

Q    You've been part of this investigation for how long?

A    Over a year.

Q    And in that period of over a year, if you had phone

numbers from the United States, you'd investigate those numbers, wouldn't you?

A    Absolutely.

Q    Well, as part of that investigation, did his number ever come up, anything identifying or tying him to this?

A    I don't know his phone number.  Databases that I used to identify Mr. Hernandez's phone number were successful. Sometimes there are databases that don't have that information available to us.  We obviously get subpoenas for that matter. But in this case, I did not -- to this day, I've not identified Mr. Ramos' phone number.

Q    Have you investigated this matter, like you say, for over a year?

A    Yes.

Q    So you have different faces that you can connect to this, correct?

A    Yes.

Q    So you had people on Juarez that you suspected were part of this.  Isn't that correct?

A    Yes.

Q    You had names of people in Juarez that were supposed to be part of this.  Isn't that correct?

A    Correct.

Q    You had addresses that were supposed to be connected to this.  Isn't that correct?

A    Correct.

Q    This gentleman doesn't appear in any of that investigation, to your knowledge?

A    Not yet.

Q    Unless you can track and trace a phone to him.

A    Correct.

Q    And to this point, you have been unable to do so.

A    No.

Q    You have not, correct?

A    Not yet.

Q    Now, this gentleman doesn't show up until the very day of the arrest.  Isn't that correct?

A    That's correct.

Q    Prior to that, you had never seen or heard anything of him?

A    No.

Q    You didn't even know who he was.

A    No.

Q    But you did know who Rene Hernandez-Cordero was.  Isn't that correct?

A    That's correct.

Q    In fact, you knew how he was because you'd investigated him prior.

A    Can you rephrase that question?

Q    You had prior debriefs and information concerning that

gentlemen --

A    Yes.

Q    -- isn't that correct?

A    It was privileged information about him, yes.

Q    So other people had given you privileged information saying that Rene Hernandez-Cordero is doing certain things for the cartel.  Isn't that correct?

A    Correct.

Q    So you had information already coming from different sources pointing to that gentleman.  Isn't that correct?

A    Correct.

Q    And again, during that entire period of time and all of the different investigations that you're looking at, Ramos doesn't come out anywhere, does he?

A    No.

Q    Now, the day of the meeting at the gas station --

A    Yes, sir.

Q    Who was talking to who to get to the gas station?

A    The undercover agent is talking to the individual in Mexico.

Q    Okay.  And the individual in Mexico was not Jesus Gerardo Ramos, is it?

A    No.

Q    Okay.  At some point, a conversation's being listened to with a -- with Hernandez-Cordero?

A    I'm not sure if the undercover agent made contact with Mr. Hernandez-Cordero during the day of the operation.

Q    Well, how did he know where to go?

A    Because they were both tasked to -- as the locations of where to go.

Q    How was Hernandez-Cordero given the location of where to go?

A    He had provided the address by the individual in Mexico.

Q    The individual in Mexico gave the address to him?

A    To Mr. Hernandez-Cordero.

Q    Okay.  How do you know that?

A    Because they told us.

Q    Who's they?

A    Mr. Hernandez-Cordero.

Q    Okay.  And Gerardo Ramos didn't have any communications from Mexico directly naming where to do, did he?

A    Communications from whom?  From anybody?

Q    Anybody.

A    Yes.

Q    He had communications with Hernandez-Cordero on where to go, correct?

A    Mr. Ramos did?  Okay.  I'm getting confused here.

Q    Who told Mr. Ramos where to go?

A    An individual in Mexico he said was named Alfredo, his brother.

Q    Okay.  Do you have information on -- from telephones showing that this gentleman was given directions on where to go?

A    Yes.

Q    Okay.  Now, my understanding is when people showed up at the gas station --

A    Yes.

Q    -- the person with the money is Hernandez-Cordero, right?

A    Correct.

Q    He has the entire quantity of money, doesn't he?

A    Correct.

Q    He's also a person, and the only person, who went to the storage unit, isn't he?

A    To the storage unit, yes.

Q    This gentleman didn't know where to go, and for all you know he was lost.

A    He knew he had to go to the storage unit.  He just never made it.

Q    Okay.  I repeat, you don't know why he didn't go to the unit, do you?

A    Don't know.

Q    Okay.  It could have been because he was lost, as you said, correct?

A    Correct.

Q    But it also could be because he had nothing to do with

this.  Isn't that also correct?

A    He was told, or he told agents that he was there to pick up the firearms.

Q    Okay.  When he originally talked to the agents, he told them he didn't know anything about this, didn't he?

A    Originally, yes.

Q    He originally told them that his brother had told him I want you to go pick some things up for me.  Isn't that correct?

A    That's correct.

Q    And he originally said he didn't know what those items were.  Isn't that correct?

A    Originally, during the interview, yes.

Q    And if firearms are to be smuggled into Mexico of this type, you should have a hidden compartment of some sort.  Isn't that correct?

A    That's not technically correct.

Q    Okay.  Would you stick them in the back of a pickup and drive south?

A    That's what Mr. Ramos told the undercover agent he was going to do.

Q    That is inherently ridiculous, isn't it?

A    Like I said, I don't know.  There are incidences where I've seen vehicles literally just with -- dumped with firearms being ready to be taken into Mexico.

Q    Okay. So you've actually had cases where somebody's driving with a pickup truck with 50 calibers in the back?

A    I've had one instance where an individual had 20 SCAR assault rifles and 30 Glock pistols without concealment in the vehicle.

Q    In the back of a pickup?

A    Not a pickup.

Q    Okay. Now, my understanding is that according to what your investigation you're saying is going to happen, that this gentleman is supposed to be there to get the weapons and to drive them south.

A    That's correct.

Q    Okay. However, you also testified that the guns were being loaded into the Bronco.

A    Yes.

Q    Okay. So if he's supposed to drive the weapons, why don't they wait for him to get there so they can load the weapons in his vehicle?

A    I'm not sure what the idea was, and just to go into the unit independently without Mr. Ramos.

Q    Okay. That also doesn't make sense with him being in integral part of taking the weapons south. Isn't that correct?

A    Can you repeat the question?

Q    It's not consistent that he's supposed to be the person

that's going to drive the guns south, he should be there to get the guns loaded in his vehicle.  That didn't happen, did it?

A    That did not happen.

Q    Okay.  So he didn't have any money on him, did he?

A    No.

Q    Those conversations that happened at the gas station you said --

A    Yes.

Q    -- between the undercovers and for sure Rene Hernandez-Cordero, correct?

A    There was also communication with Mr. Ramos.

Q    But for sure, we're talking about Hernandez-Cordero.

A    I'm not sure --

Q    The conversations.  Are they recorded in some kind of fashion?

A    Yes.

Q    Okay.  The conversations where you say the weapons are being discussed and pictures are being shown, those are being recorded?

A    Yes.

Q    Okay.  Recorded how?

A    The undercover agent had technology on his person.

Q    Okay.  Was it a body cam?

A    I'm not sure the exact specifics of the -- the

electronics that he had on his possession.  But we also had a helicopter in the air.

Q    Okay.  So we'll be able to see I guess with cameras from somewhere and listen to what was actually going on.  Isn't that correct?

A    You should, yes.

Q    So if he's a bystander to the conversation, we'll be able to see that, as well.  Isn't that correct?

A    If he's a bystander?

Q    Yes.

A    I'm not sure what you mean by that.

Q    Well, if two people are having a conversation that we're having, if I'm close to you and we're having that conversation, but somebody is over where th interpreter is, that would be a bystander.

A    Mr. Ramos was not a bystander.

Q    How close was he?

A    He was direct -- directly involved in the conversations with Mr. -- with Mr. Hernandez and the undercover agent.

Q    Did you listen to those?

A    I'm sorry?

Q    Did you listen to those conversations?

A    I did not listen to the conversations.  But I did speak with the undercover agent, and he provided me with his -- well, what happened, what took place.

Q    Okay.  You haven't heard them yourself?

A    No.

Q    You're relying on what somebody said to you.

A    The undercover agent, yes.

Q    Okay.  And so we'll be able to hear exactly what was said and by whom --

A    You should.

Q    -- by listening to those --

A    Yes, sir.

Q    Okay.  But you can't testify directly from your personal knowledge with respect to what happened?

A    No.

Q    Did you check and see what Gerardo Ramos' crossing record into Mexico is?

A    A little bit, yes.

Q    How often does he go over there?

A    Maybe about twice, three times a month, approximately.  His last crossing was the day of the -- the day of the operation.  But again, I would basically say maybe two to three times a month.

Q    Okay.  You checked that, didn't you?

A    I'm sorry?

Q    You checked, though, didn't you?

A    I did, yes.

Q    Okay.  That would be important if he's somebody that's

coming back and forth frequently across the border.  Isn't that correct?

A    Important?

Q    Yeah.

A    I'm not sure what you mean.

Q    Well, if you're going to get somebody to drive south, if they have infrequent trips, that tells you something, doesn't it?

A    It depends on the totality of the circumstances.

Q    Okay.  But if they have a lot of trips going over there, that may tell you that they may live over there?

A    Of course.  It depends on a lot of things.

Q    Okay.  And this gentleman, as we already said, he does not have a lot of trips going south, does he.

A    Again, I don't know --

Q    Two to three --

A    -- what you mean --

Q    -- times a month.

A    -- by that.  Maybe two to three times a month.

Q    And he is a legal permanent resident?

A    Yes.

Q    You checked his criminal history?

A    That I did not check.

Q    You didn't check to see if he's involved with any kinds of offenses?

A     Didn't check, sir.

Q     Okay.  But you are familiar that he is a legal permanent resident?

A     Yes.

Q     And if he had had a criminal record, he would likely be deported.  Isn't that correct?

A     Depends on the criminal action -- the criminal conduct or whether he'd be convicted or not.

Q     Okay.  If he has convictions and they're serious, he's not going to be able to stay here, correct?

A     That's correct.

Q     But he's been here for how many years?

A     I don't know the exact date on how long he's been a resident.

Q     Over 20?

A     Don't know.  I said I don't know, sir.

Q     You really didn't investigate him to see what his criminal history is or if you have other reports about criminal conduct with respect to this gentleman, did you?

A     Not yet.

Q     But you have that concerning Hernandez-Cordero.

A     Yes.

Q     And you have that concerning Fernanda.

A     You're correct.

Q     And you have that concerning other people in Mexico

involving this specific offense, correct?

A    Correct.

Q    Now, you say that there were text messages.  Did you see any text messages on his phone?

A    I did not.

Q    Okay.  But your understanding is whatever messages that he had were messages that had been sent to somebody else and then they were forwarded to him.

A    That's correct.

Q    So he's not directly involved with the people who are giving instructions.  Isn't that correct?

A    That's correct with those messages.

Q    He's down the line somewhere.  We just don't know yet, correct?

A    Correct.

Q    Gerardo Ramos never saw any actual real gun, did he?

A    He had weapons in his car.  In his truck, I'm sorry.

Q    Jesus Gerardo Ramos had weapons in his truck?

A    Yes, sir.

Q    I thought that the only person with a truck was the one with the Bronco.

A    When Mr. Ramos showed up to the deal, he had enough weapon parts to build ten AR assault rifles.

Q    He had parts where?

A    Laying in his truck, in the back seat of his truck.

Q    That's not anywhere in the criminal complaint, is it?

A    No.

Q    You didn't testify to any of that earlier, did you?

A    I wasn't asked whether he showed up with any weapons or not.

Q    Okay.  It would be important to your investigation?

A    It's very important.

Q    Okay.  Was there a camera at the storage unit?

A    Yes.

Q    And I guess were the conversations at the storage unit also being recorded?

A    They should be.  Yes, sir.

Q    Okay.  So we'd be able to listen in if they're even discussing this gentleman or not.  Isn't that correct?

A    That's correct.

          MR. PEREZ:  Okay.  That's all the questions I have, Your Honor.

          THE COURT:  All right.  Any other questions?

          MR. MYERS:  No, Your Honor.

          THE COURT:  All right.  Mr. Cervantes, you can step down, sir.

          THE WITNESS:  Thank you.

       (Witness excused)

          THE COURT:  Any other witnesses or evidence?

          MR. MYERS:  Your Honor, we proffer the information

in the pretrial services report and the addendum, and we rest.

THE COURT:  Okay.  Very well.  Any witnesses or evidence?

MR. PEREZ:  No, Your Honor.  All we have is what's in the pretrial services report.  It's not been verified that this gentleman lives at the address at 7332 Oriley Lane.  And the gentleman with whom he lives, that he verified that he actually lives in the United States.

THE COURT:  All right.  Thank you very much.

Pretrial, can you provide me with that?  I don't have a copy of that addendum.

PRETRIAL OFFICER:  Yes, Your Honor.

THE COURT:  And you can just come up.

(Pause)

THE COURT:  I'm going to get this back to just after the hearing, okay?

PRETRIAL OFFICER:  Yeah.

THE COURT:  All right.  Let me hear argument, please, as to both preliminary and detention.

MR. MYERS:  Yes, Your Honor.  For probable cause, I'll say that I guess from the questioning I'm getting a kind of a sense of he didn't know anything about this or maybe he didn't know what he was doing was wrong.  Then why lie at the post arrest statement?

He's shown a photograph of the guns with the

undercover.  He knows what he's picking up.  He lies to the agents and tells them oh, I was just picking up stuff, I don't know what it was.  It's a great statement about his intent, that he was there to commit a crime and do something illegal.

Now, I do think he should be detained for two reasons, Your Honor.  First, we think he's a risk of flight.  He's a legal permanent resident.  He's got significant ties to Mexico even though he lives here.  He can simply just live this case out -- live his life out of Mexico and not return to the United States.  He's going to get deported if he's convicted of this.  I think it's a strong case against Mr. Ramos.

Second, he's a danger to the community.  Firearms are inherently dangerous.  He knows these are going to Mexico.  And the nature and circumstances I think speak to this is not innocent gun ownership.  This is not one weapon.  This is 20 assault rifles and two 50 caliber rifles that are going south.

From that, you can tell what these guns are going to be used for, and shows that he is a danger not only to this community but the community in Mexico, as well.

THE COURT:  Let me ask you, before you sit down, I wasn't clear on this.  So this police officer, Don Juarez (phonetic).

MR. MYERS:  Yes.

THE COURT:  Is that this defendant's sibling or the

other -- Mr. Hernandez-Cordero's sibling?

MR. MYERS:  The police officer in Mexico is Mr. Ramos' brother.

THE COURT:  And this is an individual that according to the testimony you believe is facilitating the procurement of weapons for multiple criminal organizations down there?

MR. MYERS:  I guess for Mr. Hernandez is the person that he is a retired police officer.

THE COURT:  Okay.  I may have gotten confused about it.

MR. MYERS:  Okay.  And he is the one that was accused of recruiting other --

THE COURT:  I see.

MR. MYERS:  -- police officers.  Mr. Ramos' brother is a current municipal officer.  And we believe that's the connection of how he gets recruited into this.

THE COURT:  All right.  Thank you.  Mr. Perez?

MR. PEREZ:  Your Honor, with respect to probable cause, I understand it's a very low threshold.  So I'm not going to belabor that point.  However, I think to the extent that it has some bearing on the tension, I will impress those matters.

And what we heard is it's very possible that this gentleman thought that he was there to get something and he didn't know what.  It's very possible that he overheard them

talking about guns and decided he wanted no part of it, and is the reason that he doesn't go to the storage unit, and the reason they think he might be lost.

Now, if he's inherent in the operation, I submit that the guns would have been noted in his truck, and they would have been waiting for him to get there so they could load the guns in his truck. They don't wait. They go ahead and start loading them into the Bronco.

This gentleman doesn't have any of the money. This gentleman doesn't have any of the communications that are happening with the people directly involved with this. There's an investigation that's already gone on for over a year. They cannot tell me that they have anything directly connecting this gentleman to that offense.

So in the grand scheme of things, if there's probable cause, I think what they're showing here is that his role is miniscule, if any role at all. For those reasons, I believe that a bond is warranted, specifically because he's probably a danger as well if he were to get back to Mexico because as they testified, this lady Fernanda is part of the Jalisco Nueva Generacion. There's nothing that they have tying him to that organization.

Now, if he's going to be sent over there with an operation that's apparently a failed operation, his life's at risk. He's not going to want to go over there for any reason

whatsoever.  So I'm asking that the Court grant the bond in the amount that's set forth in the pretrial services report.

I don't know that he'll even be able to make that.  But it has sufficient protections to ensure that he gets to court.  It's a corporate surety bond, and it has conditions.  And I believe that there are conditions in this case which the Court can fashion a bond such that he is not going to be a flight risk and where he is not a danger to the community.  He never had a gun, he never has been, as far as we know never had any criminal record.

THE COURT:  He showed up to this meet with components for ten assault rifles, right?  I mean, that was the evidence that we heard.  It's not in the complaint, I'll give you that.

MR. PEREZ:  It's not in the complaint.  And I just --

THE COURT:  But that was the testimony, right?

MR. PEREZ:  I know that he said that.  But I mean, it's I don't know where that comes from because I can't -- it's not in the complaint.  And I haven't seen any discovery with respect to what was actually found.

THE COURT:  All right.

MR. PEREZ:  That's all I have, Your Honor.

THE COURT:  Thank you very much.  All right.  The Court will find probable cause.  With regard to detention, the

Court is going to grant the Government's motion to detain.  I just, I mean, he's showing up to a gun meet for a lot of weapons including a couple of Barrett rifles, I think.  And he's showing up with components for ten very serious firearms.  So I'm going to find by clear and convincing evidence that he represents a danger to the community, and I'm granting the Government's motion to detain.

(Whereupon, at 10:53 a.m. the hearing was adjourned.)

* * * * *

**CERTIFICATION**

I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          October 25, 2023

DIPTI PATEL, CET-997

LIBERTY TRANSCRIPTS