1              UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF TEXAS

3                   EL PASO DIVISION

4    UNITED STATES OF AMERICA     )  No. EP-23-CR-1842-DB
                                  )
5    vs.                          )  El Paso, Texas
                                  )
6    RENE HERNANDEZ CORDERO (3)   )  May 1, 2024

7

8              VOLUME 2 OF 6 VOLUMES

9                    JURY TRIAL

10         BEFORE THE HONORABLE DAVID BRIONES

11       UNITED STATES DISTRICT JUDGE, and a jury.

12

13

14   A P P E A R A N C E S:

15   FOR THE GOVERNMENT:   MR. KYLE MYERS &
                           MS. SHANNON HOLDERFIELD
16                         Assistant United States Attorneys
                           700 E. San Antonio, Suite 200
17                         El Paso, Texas  79901

18

19   FOR THE DEFENDANT:    MR. RAY GUTIERREZ
                           Attorney at Law
20                         11623 James Grant Drive
                           El Paso, Texas  79936

21

22

23

24      Proceedings reported by stenotype.  Transcript produced by

25   computer-aided transcription.

 1      (Esperanza Gallegos & Barbara Espinosa sworn to interpret
 2      Spanish into English.)
 3          (Defendant present; venire panel present; open court.)
 4              THE COURT:  Good morning, everyone.
 5              I am David Briones, United States District Judge for
 6      the Western District of Texas, sitting here in El Paso.
 7              And we are here this morning to select a jury for a
 8      criminal case.  We should have gotten started yesterday, but we
 9      didn't have enough jurors.  So out of an abundance of caution,
10      I think we got a few extra that we usually wouldn't bring in,
11      but we do want to pick a jury today.  Like I said, we should
12      have started yesterday.
13              As I indicated, we are here to select a jury for a
14      criminal case.
15              If the clerk will please call the case.
16              THE CLERK:  EP-23-CR-1842, United States of America
17      versus Rene Hernandez Cordero.
18              MR. MYERS:  Your Honor, good morning.  Kyle Myers and
19      Shannon Holderfield for the Government.  Ready to proceed.
20              MR. GUTIERREZ:  Good morning, Your Honor.  Ray
21      Gutierrez on behalf of the defendant Rene Hernandez Cordero.
22      Ready to proceed.
23              THE COURT:  Thank you, gentlemen.  Thank you.
24
25

1          <u>VOIR DIRE EXAMINATION OF THE JURY PANEL</u>

2     <u>BY THE COURT</u>:

3          Ladies and gentlemen, I wish I could tell you that

4     we're going to finish this trial this week, but I'm really not

5     sure.  We're going to try.  We may have to go into next week.

6     And that is because we should have gotten started yesterday.

7          So does the scheduling of this trial pose a big

8     problem to any of you?  Anyone have a problem on the first row?

9          I'm going to go by rows.  We have four rows.  Row

10    Number 1, Row Number 2, Row Number 3, and Row Number 4.

11         Does the scheduling of this trial pose a substantial

12    problem to any of you?  Anyone on the first row?  And if you do

13    respond, talk into the microphone, and talk loud enough so we

14    all can hear you.  Everything is being recorded, so we need to

15    hear you.

16         Again, does the scheduling of this trial pose a

17    substantial problem to any of you in Row Number 1?  Row

18    Number 2?

19         THE JUROR:  Juror Number 19, Iris Alcala.  I'm an

20    educational diagnostician, so I have students that I have to

21    test for the State of Texas.  And I have deadlines that I need

22    to meet this week and next week.

23         THE COURT:  And when is it?  This week or next week?

24         THE JUROR:  This week and next week, the rest of May.

25         THE COURT:  You are Juror Number 22, was it?

1           THE JUROR:  19.

2           THE COURT:  19.  Okay.  I'm going to go ahead and

3    excuse you, Ms. Alcala.  You may be excused, ma'am.

4           Anyone have a problem with the scheduling of this

5    trial in Row Number 2?

6           THE JUROR:  Juror 31.  My name is Mary Burciaga.  I am

7    a teacher, and I am also testing this month.  Tomorrow we start

8    our testing.

9           THE COURT:  Number 31, Ms. Burciaga?

10          THE JUROR:  Yes, sir.

11          THE COURT:  Okay.  Ms. Burciaga, I'm going to go ahead

12   and excuse you.

13          THE JUROR:  Thank you.

14          THE COURT:  You're free to leave.

15          LAW CLERK:  Judge, we have one in the front row.

16          THE COURT:  Yes.

17          THE JUROR:  Juror Number 6, Ignacio Alvarado.  My wife

18   works for the State, for CPS.  At the moment she is out of town

19   on a work-related matter in Dallas.  For this week, because I'm

20   only the sole parent at the moment, there might be issues with

21   my children, as far as arranging for school and extracurricular

22   activities.

23          Next week and throughout the rest of the month I'll be

24   fine.

25          THE COURT:  I'm sorry, Mr. Alvarado.  I'm not going to

1    excuse you.  You will remain.

2            Anyone else have a problem on Row Number 1, 2, or 3

3    with the scheduling of this trial?

4            THE JUROR:  Juror Number 36.  My name is Oswaldo Soto.

5    I'm a teacher as well.  We have finals testing.  And on top of

6    that, I'm in charge of the Chaparral tennis team, the district

7    tennis tournament for the Region 3.  And it's scheduled for

8    tomorrow and Friday.

9            THE COURT:  What's your number, Mr. Soto?  36, was it?

10            THE JUROR:  Yes, sir.

11            THE COURT:  I'm sorry, sir.  I'm not going to excuse

12    you.  You may stay.

13            Anyone else have a problem in Row Number 1, 2, or 3 or

14    4?

15            THE JUROR:  Juror Number 44, Erik Valadez.  I do have

16    my daughter's college graduation to attend to May 10th from

17    Texas State.  We plan to start the drive May 9th to San Marcos,

18    Texas.

19            THE COURT:  That's next Friday.  Right?

20            THE JUROR:  We start the drive on Thursday.  The

21    graduation ceremony is on Friday.

22            THE COURT:  I don't anticipate we're going to be going

23    that long.  If at all, we may go a day or two into next week,

24    if we do.  We're going to try to finish this week.  So...

25            THE JUROR:  I will be available.

1          THE COURT:  I'm sorry not to excuse you, sir.

2          Anyone else have a problem with the scheduling of this

3    trial?

4          THE JUROR:  Juror 49, Philip Leyva.  I am a college

5    student.  I have finals all of this week and next week.  And I

6    will be out of the country from May 24th until June 8th.

7          THE COURT:  Okay, Mr. Leyva.  I will excuse you.

8    You're free to leave, sir.

9          Anyone else on any row have a problem?

10          THE JUROR:  Juror 25.  I'm also a college student, and

11    I actually have a final today at 5:30, and two more finals

12    throughout the week 'til May 11th.

13          THE COURT:  You're Number 25?

14          THE JUROR:  Yes.

15          THE COURT:  You're Juror Number 25?

16          THE JUROR:  Yes.

17          THE COURT:  Ms. Banda?

18          THE JUROR:  Yes.

19          THE COURT:  Okay, Ms. Banda.  I'll go ahead and excuse

20    you.  You're free to leave, ma'am.

21          I'm going to give you some principles that govern the

22    conduct of this trial and, really, all criminal trials.

23          The burden of proof is on the Government and never

24    shifts to the defendant.  The Government must prove the

25    defendant guilty beyond a reasonable doubt.  And if it fails to

1   do so, then the jury must return a verdict of not guilty.

2            There is a presumption that the defendant is innocent

3   and that presumption persists until he or she has been proven

4   guilty.

5            The jury is the sole judge of the credibility of the

6   witnesses and the weight to be given their -- these witnesses.

7            I, as the judge, will rule on matters of law and

8   evidence.  In other words, I will make a determination of what

9   evidence is proper for your consideration.

10           The evidence which you will consider will be the

11  testimony of all the witnesses and any documents or other

12  exhibits that are admitted into evidence during this trial.

13           You are undergoing a voir dire examination at this

14  time.  The purpose of the voir dire examination is, one, to

15  enable the Court to determine whether you are a proper juror

16  for this case.  If you're not a proper juror, you will be

17  excused for cause.

18           But it's also to enable the attorneys for the

19  Government and the defendant to exercise their individual

20  judgment with respect to peremptory challenges.  Those are

21  challenges for which a reason need not be given.  Please

22  remember that you are under oath.

23           Ladies and gentlemen, I am required to read to you the

24  Indictment that issued in this case.  I will caution you, this

25  Indictment is very detailed.  It's not proof of any wrongdoing

1    at all.  Whatever the Government puts in the Indictment it must
2    prove at trial.  So the Indictment is not proof of any
3    wrongdoing whatsoever.
4        And I will also caution you that the initial
5    Indictment named four different people.  There's only person on
6    trial in this case today, and that is Rene Hernandez Cordero.
7        I caution you.  I'm going to read other names.  But
8    really, you should disregard them in determining whether the
9    Government has proven, or will prove to you, that the defendant
10   committed the crimes alleged in the Indictment.  And again, the
11   Indictment is not proof of any wrongdoing whatsoever.
12       The Grand Jury charges at times material to this
13   Indictment on or about the dates and approximate times stated
14   below:
15       Introduction.
16       Maria del Rosario Navarro-Sanchez, Brian Alexis
17   Muñoz-Castro, Rene Hernandez Cordero, Jesús Gerardo Ramos,
18   co-conspirator 1 and co-conspirator 2 are part of an
19   organization that smuggles firearms into the Republic of Mexico
20   and controlled substances into the United States.  The
21   organization uses couriers to smuggle controlled substances,
22   mainly kilogram quantities of methamphetamine and Fentanyl,
23   from Mexico into the Western District of Texas.  Once inside
24   the Western District of Texas the majority of the controlled
25   substances are then smuggled to different cities throughout the

1    United States.

2            The organization uses various brokers, such as

3    co-conspirator 1, to purchase weapons in the United States.

4    The organization often uses drugs or drug profits to fund these

5    purchases.  Those weapons are then smuggled into the Republic

6    of Mexico.

7            Firearms are an integral part of a drug trafficking

8    organization's success.  Trafficking of firearms feeds an

9    organizational need to protect and expand the criminal

10   enterprise through firearm-related violence.  Firearms are used

11   to protect drug trafficking routes, illicit proceeds profits

12   from drugs, and drug processing locations.

13           Effective March the 9th of 2020, the Commerce Control

14   List, located at Title 15 Code of Federal Regulations,

15   Section 774, details commodities, software, and technology

16   subject to criminal -- subject to control of the United States

17   Department of Commerce, Bureau of Industry and Security,

18   pursuant to the Export Control Reform Act, Title 50,

19   United States Code, Chapter 58.

20           The Commerce Control List will be referred to as CCL.

21           The CCL is part of the Export Administration

22   Regulations located in Title 15, Code of Federal Regulations,

23   Section 730 and so forth.

24           Firearms are designated as controlled items in

25   Section 774, Appendix Supplement Number 1 of the CCL.

1    According to Title 15, Code of Federal Regulations,

2    Section 736.2, a person may not export an item subject to the

3    EAR to another country if exporting that item to that country

4    requires a license.

5            The drug conspiracy.

6            Muñoz-Castro began work for Navarro-Sanchez starting

7    approximately August of 2022.  Navarro-Sanchez would coordinate

8    the delivery of methamphetamine and Fentanyl pills from Mexico

9    into the United States through the El Paso ports of entry.

10   Navarro-Sanchez would have Muñoz-Castro pick up the narcotics

11   from different couriers around the El Paso area.

12           Muñoz-Castro would unload the narcotics, store the

13   narcotics, and then deliver the narcotics to other couriers who

14   would take the narcotics to different cities throughout the

15   United States.

16           On March 30th, 2023, Navarro-Sanchez, while in the

17   Republic of Mexico, orchestrated the delivery of approximately

18   2 kilograms of methamphetamine.  Navarro-Sanchez had

19   Muñoz-Castro deliver the approximate 2 kilograms of

20   methamphetamine to another person.  That transaction occurred

21   within the Western District of Texas.

22           On March 31st, 2023, FBI agents tracked the movements

23   of CC- -- co-conspirator 2, CC-2.  Agents observed CC-2 drive

24   to a gun store in El Paso, Texas, and leave without making a

25   purchase.  Shortly thereafter, agents observed CC-2 travel to

another gun store in El Paso, Texas.  Agents observed CC-2 carrying a large box.  CC-2 had purchased a few firearms parts.

Shortly thereafter, agents observed CC-2 interact with Muñoz-Castro.  Agents then followed Muñoz-Castro away from the parking lot to his residence.

Agents searched another residence used by Muñoz-Castro and found approximately 2.5 kilograms of methamphetamine, approximately 300 grams of Fentanyl, $6,480 in drug proceeds, two cellphones, firearm parts, and ammunition.

Agents observed CC-2 as he attempted to cross the border back into the Republic of Mexico.  Agents stopped -- Customs agents stopped and searched CC-2's vehicle.  Customs agents found a 16-inch barrel for an AR-style rifle and a butt stock for an AR-type rifle concealed in the engine area of the vehicle.

The firearms smuggling scheme.

Navarro-Sanchez and Muñoz-Castro also coordinated the trafficking of weapons from the United States to Mexico.  This organization used CC-1 to collect firearms in the United States.  CC-1 purchased firearms through private sellers or straw purchases.  CC-1 would buy the firearms, provide the firearms to Muñoz or another courier, who would then have the weapons exported to the Republic of Mexico.

For example, on February 13th, 2023, CC-1 and Muñoz-Castro engaged in a WhatsApp text conversation.  CC-1

1   sent Muñoz-Castro a picture of several firearms that CC-1 could

2   sell.  In a separate WhatsApp conversation, Muñoz-Castro

3   forwarded those photographs to Navarro-Sanchez.

4        From the pictures sent, Navarro-Sanchez selects one of

5   the firearms and instructs Muñoz-Castro to arrange the purchase

6   of that weapon.

7        In mid-summer of 2023, agents with the Bureau of

8   Alcohol, Tobacco, Firearms, and Explosives, ATF, intercepted

9   communications of Navarro-Sanchez.  During the conversations,

10   agents learned that Navarro-Sanchez agreed to purchase twenty

11   AK-47-type firearms and two Barrett .50 caliber rifles for

12   $66,000.

13        On August 15th, 2023, Navarro-Sanchez caused $3,000 to

14   be wired to a person within the Western District of Texas as

15   down payment for the firearms.

16        On August the 21st, 2023, Hernandez Cordero, that is

17   the defendant in this case, did not declare the money as he

18   entered the United States.

19        On August 21st, and in separate vehicles, Hernandez

20   Cordero and Ramos arrived at a gas station located within the

21   Western District of Texas to receive the twenty AK-47 type

22   firearms and the two Barrett .50 caliber BMG rifles.  At the

23   gas station, Hernandez Cordero and Ramos viewed a photograph of

24   the weapons they were set to receive.

25        In August of 2023, the ATF interstate nexus expert

1   reviewed the descriptors of the firearms.  ATF personnel

2   determined the firearm was not manufactured in the State of

3   Texas; therefore, affected interstate commerce.

4        Hernandez Cordero intended to provide payment for the

5   weapons, while Ramos would be tasked with smuggling the weapons

6   across the border.

7        A license is required to export these type of firearms

8   from the United States to the Republic of Mexico.  Neither

9   Hernandez Cordero, Ramos, Muñoz-Castro, or Navarro-Sanchez have

10  a license to export firearms.

11       Count One of the Indictment.

12       The general allegations to this Indictment are alleged

13  and fully incorporated here by reference.

14       Beginning on or about August 1st, 2022, and continuing

15  through to include August 21st, 2023, in the Western District

16  of Texas, the Republic of Mexico and elsewhere, Defendants

17  Maria del Rosario Navarro-Sanchez, Brian Alexis Muñoz-Castro,

18  Rene Hernandez Cordero, intentionally -- knowingly,

19  intentionally, and unlawfully conspired, combined,

20  confederated, and agreed together, and with others to the Grand

21  Jury known and unknown, to commit offenses against the

22  United States, in violation of Title 21, United States Code,

23  Section 846.  That is to say, they conspired to possess a

24  controlled substance, which offense involved methamphetamine, a

25  Schedule II Controlled Substance, with intent to distribute

1  same, contrary to Title 21, United States Code,

2  Section 841(a)(1) in the quantities set forth below.

3          Quantity of controlled substance involved in the

4  conspiracy.

5          The quantity of methamphetamine involved in the

6  conspiracy and attributable to each defendant as a result of

7  each Defendant's own conduct, and as a result of the conduct of

8  other conspirators reasonably foreseeable to each defendant is

9  as follows:

10          Defendant Maria del Rosario Navarro-Sanchez, 500 grams

11  or more of a mixture or substance containing a detectable

12  amount of methamphetamine.

13          Brian Alexis Muñoz-Castro, 500 grams or more of a

14  mixture or substance containing a detectable amount of

15  methamphetamine.

16          Rene Hernandez Cordero, 500 grams or more of a mixture

17  or substance containing a detectable amount of methamphetamine.

18          All in violation of Title 21, United States Code,

19  Section 846.

20          Count Two.

21          The general allegations of this Indictment are alleged

22  and fully incorporated here by inference.

23          That beginning on or about August 1st, 2022, and up to

24  and including August 21st, 2023, in the Western District of

25  Texas, the Republic of Mexico and elsewhere, Defendants Maria

1    del Rosario Navarro-Sanchez, also known as Chayo and Fernanda,

2    Brian Alexis Muñoz-Castro, and Rene Hernandez Cordero,

3    knowingly, intentionally, and unlawfully conspired, combined,

4    confederated and agreed together, and with others to the Grand

5    Jury known and unknown, to commit offenses against the

6    United States, in violation of Title 21, United States Code,

7    Section 846.  That is to say, they conspired to possess a

8    controlled substance, which offense involved -- I'm not going

9    to try to pronounce it for you, because it's a chemical name --

10   otherwise known as Fentanyl, a Schedule II Controlled

11   Substance, with intent to distribute, in violation of Title 21,

12   United States Code, Section 841(a)(1) in the quantities set

13   forth below:

14          Quantity of controlled substance involved in the

15   conspiracy.

16          The quantity of the mixture or substance containing --

17   again, otherwise known as Fentanyl -- involved in the

18   conspiracy and attributed to each -- attributable to each

19   defendant as a result of each Defendant's own conduct, and as a

20   result of the conduct of other conspirators reasonably

21   foreseeable to each defendant as follows:

22          Maria del Rosario Navarro-Sanchez, 400 grams or more

23   of a mixture or substance containing a detectable amount of --

24   otherwise known as Fentanyl.

25          Brian Alexis Muñoz, 400 grams or more of a mixture or

1    substance containing a detectable amount of -- otherwise known

2    as Fentanyl.

3        Rene Hernandez Cordero, 400 grams or more of a mixture

4    or substance containing a detectable amount of -- otherwise

5    known as Fentanyl.

6        All in violation of Title 21, United States Code,

7    Section 846.

8        Count Three.

9        The general allegations of this Indictment are

10   re-alleged and fully incorporated here by reference.

11       Beginning on or about August 1st, 2022, and up to and

12   including August 21st, 2023, in the Western District of Texas,

13   the Republic of Mexico and elsewhere, Defendants:

14       Maria Del Rosario Navarro-Sanchez, Brian Alexis

15   Muñoz-Castro, Rene Hernandez Cordero, Jesús Gerardo Ramos

16   knowingly, intentionally, and unlawfully conspired, combined,

17   confederated, and agreed with others to the Grand Jury known

18   and unknown, to commit offenses against the United States, in

19   violation of Title 18, United States Code, Section 932.  That

20   is to say, they conspired to purchase firearms in and otherwise

21   affecting interstate commerce for, on behalf of, or at the

22   request and demand of another person, knowing or having

23   reasonable cause to believe that such other person intends to

24   use, carry, possess, and sell and otherwise dispose of the

25   firearm in furtherance of a felony, to wit:  Smuggling of goods

from the United States, under 18 United States Code,

Section 554, and a drug trafficking crime, as charged in Counts

One and Two as defined in Section 932(a), all in violation of

Title 18, United States Code, Section 932(a),(b), and (c).

Count Four of the Indictment.

The general allegations of this Indictment are

re-alleged and fully incorporated here by reference.

That beginning on or about August 1st, 2022, up to and

including August 21st, 2023, in the Western District of Texas,

the Republic of Mexico, and elsewhere, the Defendants Maria del

Rosario Navarro-Sanchez, Brian Alexis Muñoz-Castro, Rene

Hernandez Cordero, and Jesús Gerardo Ramos knowingly,

intentionally, and unlawfully conspired, combined,

confederated, and agreed together, and with others to the Grand

Jury known and unknown, to commit offenses against the

United States, in violation of Title 21 -- Title 18, excuse

me -- United States Code, Section 933.  That is to say, they

conspired to ship, transport, transfer, cause to be transported

or otherwise disposed of any firearm to another person in and

otherwise affecting interstate commerce, knowing or having

reasonable cause to believe that the use, carrying, and

possession of a firearm by the recipient would constitute a

felony, to wit:  Smuggling of goods from the United States

under Title 18, United States Code, Section 554, and a drug

trafficking crime, as charged in Counts One and Two as defined

1    in Sections 932(a), all in violation of Title 18, United States

2    Code, Section 933(a)(1), (a)(3), and (b).

3           Mr. Rene Hernandez Cordero is not named in Count Five,

4    Count Six, or Count Seven, so I'm going to go to Count Eight.

5           The general allegations in this Indictment are

6    re-alleged and fully incorporated here by reference.

7           That on or about August 21st, 2023, in the Western

8    District of Texas and the Republic of Mexico, defendant Rene

9    Hernandez Cordero, together with others known and unknown to

10   the Grand Jury, did knowingly combine, conspire, confederate

11   and agree to commit certain offenses against the United States,

12   to wit:  To knowingly concealing more than $10,000 in currency

13   and other monetary instruments on a person and in a conveyance,

14   with the intent to evade a currency reporting requirement under

15   Title 31, United States Code, Section 5316, and did transport

16   and attempt to transport and move such currency and monetary

17   instruments from a place outside of the United States to a

18   place inside of the United States, in violation of Title 31,

19   United States Code, Section 5332.

20           Manner and means.

21           It was part of the conspiracy that Rene Hernandez

22   Cordero used a money courier, who would travel from Juárez,

23   Mexico, with a sum of money exceeding $10,000 concealed on his

24   person or a conveyance, in order to transport the money into

25   the United States without declaring the money at the port of

1    entry.

2            Overt acts.

3            In furtherance of the conspiracy and to achieve the

4    objects thereof, Hernandez Cordero committed and caused to be

5    committed the following overt acts in the Western District of

6    Texas.

7            Overt Act Number 1.  On August 21st, 2023, Hernandez

8    Cordero, while in the Republic of Mexico, possessed

9    approximately $60,000;

10           Overt Act Number 2.  On August 21st, 2023, Hernandez

11   Cordero sent a picture of the money in his possession to

12   co-defendants Navarro-Sanchez.  Hernandez Cordero -- to the

13   defendant -- co-defendant Navarro-Sanchez.  Hernandez Cordero

14   was waiting for someone to cross the money into the

15   United States;

16           Overt Act Number 3.  On August 21st, 2023, Hernandez

17   Cordero, while in the Republic of Mexico, provided the $60,000

18   to another person, co-conspirator Number 3;

19           Overt Act Number 4.  On August 21st, 2023, Hernandez

20   Cordero entered the United States at the Paso del Norte Port of

21   Entry at approximately 4:15 p.m.  Approximately 15 minutes

22   later, CC-3 entered the United States at the Paso del Norte

23   Port of Entry.  Neither Hernandez Cordero nor CC-3 declared the

24   $60,000 upon entering the United States;

25           Overt Act Number 5.  On August 21st, 2023, in the

1  Western District of Texas, CC-3 provided the $60,000 to

2  Hernandez Cordero.

3          Now as I indicated earlier, there's a lot of details

4  in the Indictment which, as I indicated also, is not proof of

5  any wrongdoing.

6          I have already read the Indictment to you.  If I was

7  to send you to deliberate after reading the Indictment, you

8  would have to come back with a not guilty verdict because you

9  have not heard any evidence.  And as I indicated, the

10 Indictment is not evidence of any wrongdoing at all.

11         Mr. Myers, if you will introduce yourself and who is

12 with you at counsel table, sir.

13         MR. MYERS:  Yes, Your Honor.  Good morning.

14         My name is Kyle Myers.

15         This is Shannon Holderfield.

16         This is Special Agent Martha Zayas with the ATF.

17         And this is Special Agent Michael Janowski with the

18 Federal Bureau of Investigation.

19         THE COURT:  Do any of you know the attorneys --

20         You may be seated.

21         -- the attorneys for the Government, Mr. Myers and

22 Ms. Holderfield, in any capacity?  Socially?  Professionally?

23 Or otherwise?  Anyone on the first row?

24         Yes, sir.

25         THE JUROR:  Juror Number 7, James Karam.  I know Kyle

```
1   Myers.
2           THE COURT:  I'm sorry.  What's your number?
3           THE JUROR:  Juror 7.
4           THE COURT:  Mr. Karam?
5           THE JUROR:  Yes, sir.
6           THE COURT:  Oh, yeah.  You are an attorney?
7           THE JUROR:  I'm sorry?
8           THE COURT:  You're an attorney?
9           THE JUROR:  No, sir.
10          THE COURT:  Oh, I'm sorry.  Your wife is an attorney.
11          THE JUROR:  My wife is an attorney.
12          THE COURT:  How do you know him?  Professionally or
13  socially?
14          THE JUROR:  Socially.
15          THE COURT:  Does the fact that he's representing the
16  Government here influence you in any way?  Are you likely to
17  favor him because you know him?
18          THE JUROR:  Possibly.  I would be biased --
19  non-biased, I mean.
20          THE COURT:  Would you be biased or non-biased?
21          THE JUROR:  Non-biased.
22          THE COURT:  Okay.  Thank you, sir.  You may be seated.
23          Anyone else know the attorneys for the Government,
24  Mr. Myers and Ms. Holderfield?  Anyone on Row 2?  Row 3?  Row 4
25  or 5?
```

```
1              I'm sorry, Mr. Myers.  Who were the agents?
2              MR. MYERS:  Special Agent Zayas and Special Agent
3   Janowski.
4              THE COURT:  I'm sorry?
5              MR. MYERS:  Zayas.  And Special Agent Janowski.
6              THE COURT:  Are they listed in the witness list?
7              MR. MYERS:  They are, Your Honor.
8              THE COURT:  Ladies and gentlemen, the Government has
9   indicated that they will more than likely call the following
10  potential witnesses:
11             Juan Acevedo, Special Agent FBI.
12             Uriel Acosta, Special Agent FBI.
13             Charles Bachhuber, Special Agent Homeland Security
14  Investigations.
15             Gustavo Benavides, Special Agent Bureau of Alcohol,
16  Tobacco, and Firearms, ATF.
17             Jeff Bond, Bureau of Industry and Security,
18  United States Department of Commerce.
19             Mark Cervantes, Customs and Border Protection officer,
20  FBI task force agent.
21             Steve Clagett, C-L-A-G-E-T-T, Bureau of Industry and
22  Security, United States Department of Commerce.
23             Pablo Delgado.
24             Patrick Doolin, Special Agent FBI.
25             There's some more.  But up to there, any of you know
```

1     or think you may know any of these witnesses that the

2     Government will call?  Anyone on Row Number 1?  Row Number 2?

3     Row 3 or 4?

4              I will continue.

5              Jose Esqueda, Customs and Border Protection officer.

6              Bradley Fleming, chemist for the DEA.

7              Irma Gamez, Special Agent DEA.

8              Ramon Guzman, Customs and Border Protection officer.

9              Ernesto Herrera, Special Agent ATF.

10             Michael Janowski, Special Agent FBI.

11             Michael Jenk, Air Interdiction Agent, Customs and

12    Border Protection.

13             Dawn Kawasaki, Senior Export Compliance Specialist,

14    Bureau of Industry and Security, United States Department of

15    Commerce.

16             Rasmin Michael, chemist, DEA.

17             Brian Alexis Muñoz-Castro.  He's one of the

18    co-defendants.  He will testify, according to the Government.

19             Brian Rolfe, Bureau of Industry and Security,

20    United States Department of Commerce.

21             Casey Thompson, Special Agent DEA.

22             Now, do any of you know any of these potential

23    witnesses for the Government that I've mentioned?  Anyone on

24    Row Number 1?  Row Number 2?

25             THE JUROR:  Your Honor, Juror Number 27.  You

```
 1    mentioned a name --
 2              THE COURT REPORTER:  I'm sorry, sir.  I can't hear
 3    you.
 4              THE COURT:  What's your number?
 5              THE JUROR:  Juror 27.
 6              THE COURT REPORTER:  Can you repeat your answer,
 7    please?
 8              THE JUROR:  Sure.  You mentioned Air Interdiction
 9    Agent for CBP.  I am a contractor for them, and I may know the
10    witness.
11              THE COURT:  The fact that you may know them, does that
12    influence you in any way in this case?
13              THE JUROR:  No, Your Honor, it won't.
14              THE COURT:  If they were to testify, and you're one of
15    the jurors and you recognize them as knowing them, would that
16    influence you in any way?  Would you be likely to favor him or
17    her?
18              THE JUROR:  It won't.
19              THE COURT:  In any way?
20              THE JUROR:  No, Your Honor.  It won't.
21              THE COURT:  You can be fair and impartial to both the
22    Government and the Defense?
23              THE JUROR:  I can be fair.  Yes, Your Honor.
24              THE COURT:  Thank you, sir.
25              Anyone else in any row know any of the potential
```

1    witnesses that I have mentioned, or think you may know them?

2              Mr. Gutierrez --

3              MR. GUTIERREZ:  Yes, sir.

4              THE COURT:  -- if you'll introduce yourself and your

5    client to the jury.

6              MR. GUTIERREZ:  May it please the Court, opposing

7    counsel, Jurors.

8              My name is Ray Gutierrez.  I'm an attorney here in

9    El Paso, Texas.  My client is Rene Hernandez Cordero.

10             THE COURT:  You may be seated.

11             Ladies and gentlemen of the panel, do any of you know

12   the attorney for the defendant in this case, Ray Gutierrez?  Do

13   any of you know him or think you may know him, either

14   professionally, socially, in any capacity?  Anyone on Row

15   Number 1?  Row Number 2?  3 or 4?

16             Mr. Gutierrez has introduced you to the defendant Rene

17   Hernandez Cordero.  Do any of you know the defendant in this

18   case, Rene Hernandez Cordero?

19             Anyone on the first row?  Second row?  Third or

20   fourth?  Thank you.

21             Do any of you work -- you yourself, personally.  My

22   next question is as to close friends or family.

23             Do any of you work or have worked before as -- in a

24   law enforcement agency, whatever agency, as long as it's law

25   enforcement.

1          Anyone on the first row?

2          Yes, sir.

3          THE JUROR:  Juror 11, Hector Treviño.  I used to work

4    for CBP in the Houston field office.  I don't work there no

5    more.  I got relieved of duty in 2009.

6          THE COURT:  2009?  That was a long time ago.

7          THE JUROR:  Yes, sir.

8          THE COURT:  Can you be fair and impartial to both the

9    Government and the Defense?

10          THE JUROR:  I can try.

11          THE COURT:  That's not good enough, Mr. Treviño.  You

12    have to be impartial to serve on the jury, so I'm going to go

13    ahead and excuse you.

14          THE JUROR:  Thank you.

15          THE COURT:  You're free to go, Mr. Treviño.

16          THE JUROR:  Thank you.

17          THE COURT:  Anyone else, Row Number 1, has ever worked

18    for or working for a law enforcement agency?  Second row?

19    Third row?  Or fourth row?

20          THE JUROR:  Good afternoon, Your Honor.  Juror

21    Number 54.  I just work for DHSI as a deputy director there.

22    And I've worked with a lot of these agencies who made the

23    arrests here in the county and throughout the State of Texas.

24          THE COURT:  Okay.  You are Mr. Fierro?

25          THE JUROR:  Yes, sir.

```
 1              THE COURT:  Mr. Fierro, I'm going to go ahead and
 2    excuse you.  You're free to leave, sir.
 3              Many of you have indicated in the questionnaire that
 4    you filled out that you have close friends or relatives that
 5    have worked or are working for law enforcement.
 6              I don't want to go into any of you individually
 7    because we do have the questionnaire.
 8              My question to you is:  Can you be fair and impartial
 9    in this case, even though you know or have relatives in law
10    enforcement?  Can you treat the Defense and the Government in
11    an impartial manner and determine guilty or not guilty in a
12    non-biased way?
13              Any of you have a problem with that?  Row Number 1?
14    Row Number 2?  Row Number 3?  Row Number 4?
15              THE JUROR:  Juror 45, Maria Elsa Lopez.
16              THE COURT:  I'm sorry.  What's your number?
17              THE JUROR:  45.
18              THE COURT:  Ms. Lopez?
19              THE JUROR:  Yes, sir.
20              THE COURT:  Yes, ma'am.
21              THE JUROR:  Okay.  My uncle and my cousin, they are --
22    my uncle was with the Customs.  And my cousin, he's a sheriff.
23    And I would really not be fair in this case.
24              THE COURT:  That would influence you in this case?
25              THE JUROR:  Yes.  I will not, because I have lost
```

1  family because of drugs.

2          THE COURT:  Okay, Ms. Lopez.  I'm going to go ahead

3  and excuse you.  You're free to leave.

4          You heard Ms. Lopez mention that she has a problem

5  because her family had problems with drugs.

6          I'm going to ask you:  Do any of you have a problem

7  because of the fact that you may have family or close friends

8  or family that have been affected by drugs?  Any of you have a

9  problem with that?  Anyone on the first row?  Second row?

10  Third row?

11          THE JUROR:  Juror Number 30.  My name is Andrew

12  Williams.  My daughter's mom has six families that have drugs

13  right now.

14          THE COURT:  I'm sorry.  What's your number?

15          THE JUROR:  Juror Number 30.

16          THE COURT:  Mr. Williams.  Yes, I got you here.  You

17  would have a problem because of that?  Would that affect you in

18  reaching a verdict?

19          THE JUROR:  I have a lot of information behind it, and

20  lots of folks splitting up and watching what she did,

21  distributing.  I'm kind of one-sided towards that.

22          THE COURT:  Okay, Mr. Williams.  I'm going to go ahead

23  and excuse you, sir.  You're free to leave.

24      (Pause in the proceedings; open court.)

25          THE COURT:  I'm sorry for the delay, but I can't find

1    what I wanted to ask you.

2              Once the jury has been sworn in, and before you start

3    your -- hearing testimony, I will give you a set of

4    instructions of what to look out for during the trial.

5              At the end of the trial, I'll also give you the final

6    set of instructions before you go deliberate.

7              And one of the instructions that I will give you at

8    the beginning of the trial:  The burden of proof is on the

9    Government until the very end of the case.  The defendant has

10    no burden to prove his innocence or to present any evidence or

11    to testify.  Since the defendant has a right to remain silent,

12    the law prohibits you in arriving at your verdict from

13    considering that the defendant may not have testified.

14              Now, some of you have indicated in the questionnaire

15    that you would have a problem with that.  If you do, we need to

16    know now.

17              Any of you have a problem following that instruction?

18    Any of you in the first row?

19              THE JUROR:  Juror Number 13, Sam Brunk.  I'm one of

20    the people who wrote that that would maybe predispose me to

21    think that the defendant was guilty.  I'm not sure if it would.

22    I'm not sure if I can be -- I'm not sure that I can be fair,

23    but I'm not sure.

24              THE COURT:  You would have a problem with it?  You

25    would not follow the instructions?

```
 1                THE JUROR:  I would do the best to follow the
 2      instructions, Your Honor, but I did write that.  So I was -- it
 3      was an honest response.
 4                THE COURT:  You would have a problem?  You can't serve
 5      on the jury, Mr. Brunk.  I'm going to go ahead and excuse you.
 6                THE JUROR:  Okay.  Thank you.
 7                THE COURT:  You're free to leave, sir.
 8                THE JUROR:  Thank you.
 9                THE COURT:  Anyone else in the first row have a
10      problem following the instruction that I have read to you?
11      Anyone in the second row?
12                THE JUROR:  Juror 17, Cynthia Aldaco.  I don't believe
13      I could be fair if I was unable to hear both sides this
14      morning.
15                THE COURT:  Okay.  Okay, Ms. Aldaco.  I'll go ahead
16      and excuse you, ma'am.
17                THE JUROR:  Thank you.
18                THE COURT:  You're free to leave.
19                Anyone else have a problem following the instruction
20      that I just gave you?  Row Number 2?
21                THE JUROR:  Juror Number 20, Rodolfo Martinez.  I
22      don't think it would be fair for -- not to listen to both
23      sides.
24                THE COURT:  Okay.  You would have a problem, in other
25      words?
```

1          THE JUROR:  Yes.

2          THE COURT:  Okay.  I'm excusing you, Mr. Martinez.

3    You're free to leave, sir.

4          THE JUROR:  Juror 29, Denise Michelle Alvidrez.

5          THE COURT:  Ms. Alvidrez?

6          THE JUROR:  Yes, sir.

7          THE COURT:  You would have a problem following the

8    instruction?

9          THE JUROR:  Yes.  I would have to hear both sides.

10          THE COURT:  Okay.  I'll go ahead and excuse you,

11    Ms. Alvidrez.  You're free to leave, ma'am.

12          THE JUROR:  Thank you, sir.

13          THE JUROR:  Juror Number 32, William Andrew Jacobo.  I

14    share the same sentiment of not being able to hear both sides

15    of the case.

16          THE COURT:  Okay.  You may be excused, Mr. Jacobo.

17    You're free to leave, sir.

18          THE JUROR:  Thank you.

19          THE COURT:  Anyone else in Row 1 and 2 have a problem

20    following the instruction?  Row Number 3?  And Row Number 4?

21          THE JUROR:  Juror Number 52, Joshua Ivan

22    Garcia-Sotelo.  I don't believe I can remain without bias if I

23    don't hear both sides.  And row 4 wasn't reached on the

24    previous question, so I wasn't sure if I could speak up

25    independently, but I did have a grandfather that worked as an

1  officer and stuff in Mexico who lost his life over this.  So I

2  believe that would affect me as well.

3          THE COURT:  Okay, Mr. Garcia-Sotelo.  I'm excusing

4  you, sir.

5          Anyone else in any row have a problem following the

6  instructions that I read to you?

7          THE JUROR:  Juror Number 38.  I would have to hear

8  both sides of the instruction -- of the trial individuals.

9          THE COURT:  What's your number again?

10          THE JUROR:  Juror Number 38.

11          THE COURT:  Mr. Thompson?

12          THE JUROR:  Yes.

13          THE COURT:  Okay.  You may be excused, Mr. Thompson.

14          THE JUROR:  Hello.  I'm Juror 24.  I would have a

15  problem.  My name is Alejandra Rocha.

16          THE COURT:  You would have a problem, ma'am?

17          THE JUROR:  Yes.  I would have to listen to both

18  sides.

19          THE COURT:  Okay.  You may be excused, then.

20          Anybody else have a problem abiding by the instruction

21  that I have read to you?  It's part of our constitution from

22  the very beginning.

23          THE JUROR:  Juror Number 4, Jennifer Barraza.  For me,

24  it's essential to listen to both sides in order to be fair.

25          THE COURT:  Okay, Ms. Barraza.  I'm excusing you,

```
 1   ma'am.
 2              Do any of you know any of the other members of this
 3   panel?  Any of you know each other?
 4              I presume no.
 5              For whatever reason, any reason whatsoever, that you
 6   feel you could not be fair and impartial, I need to know, for
 7   whatever reason.
 8              Let me go by rows.  Row Number 1, over here.
 9              THE JUROR:  Immanuel Hernandez, Juror Number 5.  I
10   would -- both sides of the story --
11              THE COURT REPORTER:  I'm sorry, sir.  I can't hear
12   you.
13              THE JUROR:  I would like to hear both sides of the
14   story in order to be fair.
15              THE COURT:  You're Mr. Hernandez?
16              THE JUROR:  Yes, sir.
17              THE COURT:  Okay, Mr. Hernandez.  I'm excusing you.
18              Anyone else have a problem being fair and impartial
19   for whatever reason in this case?  Either for the Government or
20   for the Defense, either one.
21              THE JUROR:  Juror Number 41, Ivonne Moriel.  And yes,
22   I feel that I could not be fair.
23              THE COURT:  Okay, Ms. Moriel.  I'm going to go ahead
24   and excuse you, ma'am.  You're free to leave.
25              THE JUROR:  Juror Number 47, Kaitlyn Mullins.  I would
```

```
 1   also be pretty biased in this case.
 2              THE COURT:  Okay, Ms. Mullins.  I will excuse you,
 3   ma'am.
 4              THE JUROR:  Your Honor, Number 59.  I could not be
 5   fair with this.  In 2019, my son had a -- was assaulted, and I
 6   just can't go through this.
 7              THE COURT:  Okay.  Mr. Duran?
 8              THE JUROR:  Yes, sir.
 9              THE COURT:  You're free to leave, Mr. Duran.
10              THE JUROR:  Thank you, sir.
11              LAW CLERK:  Judge, we have another.
12              THE JUROR:  Graciela Sanchez, Number 22.  I need to
13   hear yes or yes, both sides, so I can be fair.
14              THE COURT:  Okay, Ms. Sanchez.  I'm excusing you,
15   ma'am.
16              THE JUROR:  Thank you.
17              THE JUROR:  I'm Juror Number 50, Nancy Lord.  I would
18   not be fair.  I would need to hear both sides.
19              THE COURT:  Okay, Ms. Lord.  I'm excusing you, ma'am.
20         Mr. Myers, I'm going to allow you to ask some
21   questions, if you have any questions.
22              MR. MYERS:  Thank you, Your Honor.
23              VOIR DIRE EXAMINATION OF THE JURY PANEL
24   BY MR. MYERS:
25         I just have one question.  I don't mean to pick on
```

 1    you, sir.  Number 33, Mr. Armendáriz.

 2           In your juror questionnaire you indicated that you

 3    would never believe police officers if they are witnesses.

 4           THE JUROR:  Yeah.  I mean, I just got to hear the

 5    whole story for that.  You know, I mean, with everything going

 6    on nowadays, I just have to get the full story on everything,

 7    and just can't take anything just how it comes at you.

 8           MR. MYERS:  Fair enough.  But I mean, like no matter

 9    what, you'll never believe them, or I'm going to sit and listen

10    to them and then I'll make a judgment?

11           THE JUROR:  Yeah, The second option.  Yeah.

12           MR. MYERS:  That's all the questions I have,

13    Your Honor.

14           THE COURT:  Very well.

15           Mr. Gutierrez --

16           MR. GUTIERREZ:  Thank you, Your Honor.

17           THE COURT:  -- I'll give you an opportunity, sir.

18           MR. GUTIERREZ:  I have several questions.

19                 VOIR DIRE EXAMINATION OF THE JURY PANEL

20    BY MR. GUTIERREZ:

21           Juror Number 18, in your jury [sic], you said that you

22    needed the defendant to testify.  Can you explain that?

23           THE JUROR:  I would need to hear like both sides.

24           MR. GUTIERREZ:  You would?

25           THE JUROR:  Yes.

```
 1              THE COURT:  In other words, you couldn't follow the
 2    instruction?
 3              THE JUROR:  I can follow the instructions, but I would
 4    like to hear both sides.
 5              THE COURT:  You can either follow the instructions or
 6    you can't.  If you have a problem with it, I need to excuse
 7    you.
 8              THE JUROR:  I don't have a problem.
 9              THE COURT:  Let me read it to you again, because this
10    is very important, ladies and gentlemen.
11              THE JUROR:  Yes.
12              THE COURT:  The burden of proof is on the Government
13    until the very end of the case.  The defendant has no burden to
14    prove his innocence or to present any evidence or to testify.
15              Since the defendant has a right to remain silent, the
16    law prohibits you in arriving at your verdict from considering
17    that the defendant may not have testified.
18              Now, would you be able to follow that instruction,
19    ma'am?
20              THE JUROR:  Yes, sir.
21              THE COURT:  Okay.  Thank you very much.
22              Anything else, Mr. Gutierrez?
23              MR. GUTIERREZ:  I do, Your Honor.
24              Juror Number 28.  Hi, ma'am.
25              You also, in your survey, in your questionnaire, you
```

1    stated that you needed the defendant to testify.

2              THE JUROR:  Yes.  I think I can follow the directions.

3    I should be fine.

4              MR. GUTIERREZ:  If the defendant does not testify, you

5    will not hold it against him?

6              THE JUROR:  No.

7              THE COURT:  Okay.  Thank you, ma'am.

8              The next question is to everyone.

9              The mere fact that a certain person may have

10   association with another defendant is not enough for a

11   conspiracy theory.

12             Does anybody have a problem with that?  I'll start

13   with the first row.  Second row?  Third row?  Fourth row?

14   There we go.

15             THE COURT:  I'm going to give them an instruction on

16   conspiracy, but not at this point, Mr. Gutierrez.

17             MR. GUTIERREZ:  I understand, Your Honor.  I just want

18   to make sure that we don't have an issue right now while we're

19   picking the jurors.  Is it allowed?

20             THE COURT:  I'll allow you, but it's going to be your

21   last question.

22             MR. GUTIERREZ:  Yes, Your Honor.

23             THE JUROR:  Juror 39.  Maria Firebaugh.

24             Could you please repeat the question for me one more

25   time?

```
1              MR. GUTIERREZ:  Yes, ma'am.  The mere fact that a
2    certain person may have an association with another, is that --
3    will that influence you in any way?
4              THE JUROR:  It probably will.
5              MR. GUTIERREZ:  So you would not be fair if there was
6    an association only?
7              THE JUROR:  Yeah.  I wouldn't be fair.
8              THE COURT:  I don't know how you determine that.
9    Everybody would probably have a problem, Mr. Gutierrez.
10             You're Number 39, ma'am?
11             THE JUROR:  Yes, sir.
12             THE COURT:  You're free to leave.  Ms. Firebaugh?
13             THE JUROR:  Yes.
14             THE COURT:  You're free to leave, ma'am.
15             THE JUROR:  Thank you.
16             THE COURT:  Ladies and gentlemen of the panel, I want
17   you to look around, see where you're at.  We're going to take a
18   30-minute recess, okay, because we need to do stuff here in the
19   courtroom.  30 minutes, and then you will come back --
20   hopefully not more than that -- and you will be seated right
21   where you are now.  So that's why I say to look and see where
22   you're at, because you have to be seated right where you are.
23             With that, we'll be in recess for the next 30 minutes.
24        (Recess taken 10:36 to 11:22 a.m.)
25             THE COURT:  Thank you for your patience, ladies and
```

1  gentlemen of the panel.

2        The clerk is going to read the names of the 12 jurors,

3  and there will be two alternates.

4        If your name is called, the officer will seat you in

5  the jury box.

6        You may proceed.

7        JURY CLERK:  Number 2, Araceli Myra Jimenez, is Juror

8  Number 1.

9        3, Hector Alejandro Vasquez Adame, is Juror Number 2.

10       6, Ignacio Alvarado, III, is Juror Number 3.

11       8, Isaac Julian Garcia, is Juror Number 4.

12       10, Francesca Angelica Medrano, is Juror Number 5.

13       21, Thelma Ruelas Acosta, is Juror Number 6.

14       23, Emily Marie Montelongo, is Juror Number 7.

15       27, Ramon Gutierrez, is Juror Number 8.

16       36, Oswaldo Ivan Soto, is Juror Number 9.

17       43, Carla Dennisse Olivas, is Juror Number 10.

18       44, Erick Valadez, is Juror Number 11.

19       48, Edna Loya, is Juror Number 12.

20       55, Mary Ann Quintana, is Alternate Number 1.

21       60, Shepherd N. Han, is Alternate Number 2.

22       THE COURT:  Will you please stand up so you can take

23  the oath.

24     (The oath was administered to the jury; all answered, "I

25  do.")

```
 1              THE COURT:  You may be seated.

 2              Ladies and gentlemen, the rest of the panel, I want to

 3    thank you for your service this morning.

 4              Do they have to call in?

 5              JURY CLERK:  May 15th.

 6              THE COURT:  May 15th.  So you've got a couple of

 7    weeks.

 8              So at this time you're being excused, ladies and

 9    gentlemen.  You're free to leave.  Thank you very much for your

10    service this morning.

11              All rise for the jury.

12         (Venire panel out; open court.)

13              THE COURT:  Ladies and gentlemen of the jury, before

14    we get started, I need to give you that first set of

15    instructions that I made reference to.  The attorneys will then

16    give an opening statement, and I think by that time we'll be

17    ready for lunch.

18              Members of the jury, now that you have been sworn, I

19    will give you some preliminary instructions to guide you in

20    your participation in this trial.

21              It will be your duty to find from the evidence what

22    the facts are.  You and you alone are the judges of the facts.

23    You will then have to apply to those facts the law as the Court

24    will give it to you.  You must follow the law whether you agree

25    with it or not.
```

1          Perform these duties fairly.  Do not let any bias,

2    sympathy, or prejudice that you may feel towards one side or

3    the other to influence you in any way.

4          Nothing the Court may say or do during the course of

5    trial is intended to indicate, nor should be taken by you as

6    indicating what your verdict should be.

7          The evidence from which you will find the facts will

8    consist of the testimony of witnesses, documents, and other

9    exhibits that may be admitted during the course of the trial.

10         When the lawyers agree to a fact that they stipulate

11   to, it means that both sides agree that this is a fact and they

12   don't have to bring any more evidence into that.

13         Certain things are not evidence and must not be

14   considered by you.  Statements, arguments, and questions by the

15   lawyers are not evidence.  Objections to questions are not

16   evidence.  Lawyers have an obligation to their client to make

17   an objection when they feel certain evidence being offered is

18   improper under our rules of evidence.

19         You should not be influenced by the objection or by

20   the Court's ruling on the objection.  If the objection is

21   sustained, ignore the question.  If it is overruled, you treat

22   the answer just like you would any other answer.  If you are

23   instructed that some item of evidence is received for a limited

24   purpose only you must follow that instruction.

25         Testimony that the Court has excluded or told you to

disregard is not evidence and must not be considered by you.

Anything you may have seen or heard outside this courtroom is not evidence.  You are to decide the case solely on the evidence presented here in the courtroom.

There are two kinds of evidence, direct and circumstantial.  Direct evidence is direct proof of a fact such as the testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

I will give you further instructions on these, as well as other matters, at the end of the testimony.  But you -- bear in mind that you may consider both direct and circumstantial evidence.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or to reject.

I will give you more instructions on this for determining the credibility of witnesses at the end of the testimony.

As you know, this is a criminal case.  There are three basic rules about a criminal case that you must bear in mind.

First, the defendant is presumed innocent until proven guilty.  The Indictment against the defendant, brought by the Government, is only an accusation and nothing more.  It is not proof of guilt or anything else.  The defendant, therefore,

1  starts with a clean slate.

2  Second, the burden of proof is on the Government until

3  the very end of the case.  The defendant has no burden to prove

4  his innocence or to present any evidence or to testify.  Since

5  the defendant has a right to remain silent, the law prohibits

6  you in arriving at your verdict from considering that the

7  defendant may not have testified.

8  Third, the Government must prove the Defendant's guilt

9  beyond a reasonable doubt.

10  I will also give you further instructions on

11  reasonable doubt at the end of the testimony.

12  A few words about your conduct as jurors.  During the

13  course of trial, do not speak with any witnesses or with the

14  defendant or with any of the lawyers in this case.  Please do

15  not talk with them about any subject whatsoever.  You may be

16  unaware of the identity of everyone connected to the case;

17  therefore, in order to avoid even the appearance of

18  impropriety, do not engage in any conversation with anyone in

19  or about the courtroom or the courthouse.

20  It is best if you remain in the jury room during

21  breaks in the trial with anyone -- with anyone else not your

22  family.  In addition, during the course of the trial, do not

23  talk about this trial with anyone else.  Not your family, not

24  your friends, not the people with whom you work.  Also, do not

25  discuss this case among yourselves until I have instructed you

1    on the law and you have gone to the jury room to make your

2    decision at the end of the trial.  Otherwise, without knowing

3    it, you may start forming opinions before the trial is over.

4    It is important that you wait until all the evidence is

5    received and you have heard my instructions on the rules of law

6    before you deliberate among yourselves.

7         You are jurors.  And as jurors, you must decide this

8    case based solely on the evidence presented here within the

9    four walls of this courtroom.  This means that during the trial

10   you must not conduct any independent research about this case,

11   the matters in this case, the individuals, or anyone else

12   involved in the case.

13        In other words, you should not consult dictionaries or

14   reference materials, search the Internet, websites or blogs, or

15   use any other electronic tools to obtain information about this

16   case or to help you decide the case.  Please do not try to find

17   out information from any source outside this courtroom.

18        I know many of you use your cellphones, the Internet,

19   other tools of technology.  But you also must not talk anyone

20   at any time about this case or those tools to communicate -- or

21   use those tools to communicate electronically with anyone about

22   the case.  This includes your family, your friends.  You may

23   not communicate with anyone about this case through any means,

24   including your cellphone, through e-mail, Blackberry, iPhone,

25   text messaging, Snapchat, Twitter, or any blog or website

1  including Facebook, Google, Myspace, LinkedIn, or YouTube.  You

2  may not use any similar technology of social media, even if I

3  have not specifically mentioned it here.

4       I expect that you will inform this Court if you become

5  aware of any other juror violating these rules.  A juror who

6  violates these restrictions jeopardizes the fairness of these

7  proceedings and a mistrial could result and the entire trial

8  process must begin again.

9       I will give you a road map of the entire course of

10  this trial.  First, the Government will make an opening

11  statement, which is simply an outline to help you understand

12  the evidence as it is admitted.

13       Next, the Defendant's attorney may, but does not have

14  to, make an opening statement.  Or he may make an opening

15  statement later during the course of trial.

16       The Government will then present its witnesses, and

17  counsel for the defendant may cross-examine the witnesses.

18       Following the Government's case the defendant may, if

19  he wishes, present witnesses whom the Government may

20  cross-examine.

21       If the defendant decides to present evidence, the

22  Government may introduce rebuttal evidence.

23       After all the evidence is in, the attorneys will

24  present their closing arguments to summarize and interpret the

25  evidence for you, and the Court will instruct you on the law.

1          After that, you will retire to deliberate on your

2   verdict.

3          The trial will now begin.

4          The Government may make an opening statement.

5          MS. HOLDERFIELD:  Ready to proceed, Your Honor.

6                    OPENING STATEMENT

7   BY MS. HOLDERFIELD:

8          Your Honor, Counsel, Members of the Jury.  Good

9   morning.

10         I want to reintroduce myself.  My name Shannon

11  Holderfield, and this is my co-counsel Kyle Myers.  We are

12  representing the United States of America in this case.

13         Thank you for serving as our jury this week.  We

14  appreciate you giving your attention and consideration to this

15  case.

16         Ladies and gentlemen, this case is about guns, drugs,

17  and money, the trifecta of the drug trafficking organizations.

18  Throughout this trial, you will hear a lot of names, you will

19  see a lot of evidence; but the key takeaway is that the

20  defendant, Rene Hernandez Cordero, is connected to guns, drugs,

21  and money.

22         On August 21st, 2023, the defendant entered the

23  United States through the Paso del Norte Port of Entry.

24  Earlier in the day the defendant had received instructions from

25  his boss Maria del Rosario Navarro-Sanchez, also known as Chayo

1  or Fernanda, to meet a man at a Circle K in Northeast El Paso

2  for the shipment of twenty AK-47-style rifles and two .50

3  caliber Barretts to be smuggled back into Mexico for a payment

4  of $66,000.

5          Unbeknownst to Hernandez Cordero or Chayo, she had

6  coordinated with an ATF undercover agent for the shipment of

7  those firearms.  And as part of this coordination, Chayo

8  provided the undercover agent Hernandez Cordero's phone number

9  so that they could arrange a pickup for the firearms.

10          However, before the defendant crossed into the

11  United States, the evidence will show that he picked up the gun

12  money while in Mexico.  He then sent a picture of that money to

13  Chayo, while he waited for someone else to cross the money into

14  the United States.

15          Chayo would then send that photograph of the money to

16  the undercover agent, to show that the money was en route.

17          The evidence will also show that when Hernandez-

18  Cordero crossed, he did not have the money with him nor did he

19  declare anything to the Customs and Border Protection officers.

20          In fact, the evidence will reveal that before he

21  crossed into El Paso, he coordinated with another

22  co-conspirator to take that gun money from him.  That

23  co-conspirator would drive the money separately, crossing at

24  the Paso del Norte Port of Entry several minutes after

25  Hernandez Cordero, and then meet him in El Paso to give him the

1    money.

2          Video evidence will show the defendant, undercover

3    agents, and another co-defendant driving a Ford F150 meet at a

4    Circle K in Northeast El Paso, right before they all drove in

5    tandem to a storage facility to pick up the 22 firearms.

6          You will also see the defendant examine the firearms,

7    pay for them, move some into a storage bin, and then load them

8    into his Ford Bronco, right before he was arrested.

9          Now, the defendant is the one that's on trial today.

10   However, the evidence we will show you shows a much larger

11   conspiracy of narcotics and firearms smuggling and how the

12   Defendant's direct involvement into guns, drugs, and money fit

13   into that conspiracy.

14         You will hear more about Hernandez Cordero's boss,

15   Chayo, a member of an organization that smuggled guns into

16   Mexico, and drugs, mostly methamphetamine and Fentanyl, into

17   the United States.

18         Once inside the United States, those drugs were then

19   smuggled to different cities throughout the country.

20         Chayo also coordinates shipments of firearms from the

21   United States to Mexico utilizing different couriers to

22   complete the jobs.

23         ATF agents, FBI agents, and task force officers will

24   walk you through the entire investigation from the very

25   beginning.  However, in early 2023, a separate ATF

investigation into a man straw purchasing firearms was under
way, while the FBI was investigating a firearms and drug
smuggling network.

You will hear how, in the spring of 2023, after both
methamphetamine and Fentanyl were seized from a house belonging
to a narcotics and firearms stash house operator, and his
cellphone was searched, that the FBI and ATF realized that the
firearms and the drugs were all connected to the same woman,
Chayo; that the merging of those two investigations would later
lead to the gun buy on August 21st, 2023, and the arrest of the
defendant.

A co-defendant, the stash house operator directly
associated with the drug trafficking organization, will
testify; someone who communicated directly with Chayo and
helped move narcotics into the United States and firearms into
Mexico.

You will also hear testimony of how drug trafficking
organizations operate, why they conduct business the way they
do, and why guns are integral to their organizations.

You will also learn through the evidence that none of
the people associated with this organization had licenses to
export firearms into Mexico.

After the defendant was arrested on August 21st, the
evidence will show that after an executed search warrant on his
phone he was not just involved in firearms, but he knew about

1    the unlawful distribution of narcotics, and that the firearms

2    were intended to further the goals of the drug trafficking

3    organization.

4          Ladies and gentlemen, we have guns, drugs, and money

5    woven throughout this entire case.  A few minutes ago,

6    Judge Briones read you the law.  He explained to you what we,

7    as the United States, must prove to you beyond a reasonable

8    doubt for you to find the defendant guilty on the five counts

9    presented in the Indictment.

10          As Judge Briones explained, the defendant has been

11   charged with two counts of conspiracy to possess a controlled

12   substance with the intent to distribute, conspiracy to straw

13   purchase firearms, conspiracy to traffic in firearms, and

14   conspiracy to bulk cash smuggle.

15          We are confident that once you hear all the testimony

16   in this case and have the opportunity to consider all the

17   evidence, you will find that the defendant is deeply entrenched

18   in guns, drugs, and money, and that he's guilty of all charges.

19          Thank you.

20          THE COURT:  Do you wish to proceed, Mr. Gutierrez?

21          MR. GUTIERREZ:  I would, Your Honor.  If I may?

22          May it please the Court, Jurors, opposing Counsel.

23                       OPENING STATEMENT

24   BY MR. GUTIERREZ:

25          We're gathered here today to address a matter of

1  utmost importance.  A case involving allegations of drug

2  conspiracy and implicit exportation of narcotics to Mexico.

3  The charges before us are serious and the burden of proof rests

4  squarely on the Prosecution's side.

5        The allegation is my client, an individual who stands

6  accused, has been charged with conspiring to distribute

7  controlled substances and exporting firearms.  These charges

8  carry severe penalties.  The Government alleges that my client

9  was an active participant in the criminal enterprise.

10        The framework:

11        As we embark on this trial, I implore you to keep an

12  open mind.  We shall challenge the Government's evidence

13  narrative.  Our defense will focus on several key points.

14        Lack of direct evidence:

15        The Prosecution must prove beyond a reasonable doubt

16  that my client knowingly and intentionally conspired to commit

17  these crimes.  We contend that there's no direct evidence

18  leading them to the alleged conspiracies.

19        Circumstantial evidence:

20        The Government's case relies heavily on circumstantial

21  evidence:  Phone call records, surveillance footage, witness

22  statements.  But remember, circumstantial evidence can be

23  misleading.  It can require careful scrutiny and

24  interpretation.

25        I -- during the voir dire, I kind of talked about the

1  mere presence at the scene of an event, even with knowledge

2  that a crime is being committed, or that the mere fact that the

3  certain persons may have associated with each other and may

4  have assembled together and discussed common aims and

5  interests, does not necessarily establish proof of the

6  existence of a conspiracy.

7           Presumption of innocence:

8           My client is presumed innocent until proven guilty.

9  It is the Prosecution's duty to demonstrate his guilt, not our

10 obligation to prove innocence.

11          We will challenge every piece of evidence presented

12 here today.  There is a human element behind these charges of

13 real people, individuals and families, dreams and

14 vulnerabilities.  Let's not forget the human element that our

15 lives, these lives, have been affected.

16          The road ahead:

17          In the coming days you will hear testimony, examine

18 exhibits, and weigh the weight of the arguments.  Our defense

19 will show the flaws of the Government's case and the importance

20 of justice tempered with compassion.

21          In conclusion, ladies and gentlemen, justice demands

22 that we look beyond the surface, beyond the headlines, and seek

23 the truth.  My client deserves a fair trial and it's your duty

24 to ensure that justice prevails.

25          As we proceed, keep an open heart and discerning mind.

```
 1            Thank you.
 2            THE COURT:  Mr. Myers, I'm going to be addressing
 3   myself to you because you are lead counsel.
 4            How many witnesses do you have here?
 5            MR. MYERS:  I have two here and I think two waiting
 6   outside, Your Honor.
 7            THE COURT:  Bring them all in and we'll swear them.
 8            MR. MYERS:  Yes, sir.
 9       (Mr. Myers steps out for his witnesses.)
10            MR. MYERS:  I only had one outside.  I apologize.
11            THE COURT:  Very well.
12            Proceed to swear them.
13            THE CLERK:  Please raise your right hand.
14       (Witnesses duly sworn; all answered "I do.")
15            THE CLERK:  You may lower your hands.
16            THE COURT:  I need your name, sir.
17            THE WITNESS:  Gus Benavides, Your Honor.  Gus
18   Benavides.
19            THE COURT:  And your name, ma'am?
20            THE WITNESS:  Martha Zayas, Your Honor.
21            THE COURT:  And you are Agent Janowski?
22            THE WITNESS:  Yes, sir.
23            THE COURT:  Are you invoking the Rule?
24            MR. GUTIERREZ:  Yes, Your Honor.
25            THE COURT:  Okay.  The Rule has been invoked.  You
```

1    probably know what that means anyway.  Right?  I need to inform
2    you on the record.
3            It means that you may not discuss this case with
4    anyone, especially if there's another witness, but you may not
5    discuss this case with anyone until this trial is over or until
6    after you have testified.
7            You are permitted to talk to the attorneys about the
8    case, the attorneys for the Government, the attorneys for the
9    Defense.  Otherwise, no one else.  Okay?
10           Who's going to be your first witness?
11           MR. MYERS:  Special Agent Benavides, Your Honor.
12           THE COURT:  We have a little bit of time, we can take
13   it up.  If you'll take a seat up here --
14           THE WITNESS:  Yes, sir.
15           THE COURT:  -- Agent Benavides.
16           You may proceed.
17           MR. MYERS:  Thank you, Your Honor.
18                 GUS BENAVIDES, GOVERNMENT'S WITNESS, SWORN
19                          DIRECT EXAMINATION
20   BY MR. MYERS:
21   Q.  Good afternoon, sir -- or good morning.
22   A.  Good morning, sir.
23   Q.  Will you please state your full name for the record?
24   A.  Gus Benavides.
25   Q.  Mr. Benavides, where do you work?

1    A.   I'm a Senior Special Agent with Bureau of Alcohol, Tobacco,
2    Firearms, and Explosives.
3    Q.   And how long have you been a special agent with the ATF?
4    A.   I'm approaching my 24th year, sir.
5    Q.   Okay.  And in those 24 years, what crimes have you
6    investigated as a special agent with the ATF?
7    A.   All ranges of crimes that ATF is involved in.  Mostly
8    including the alcohol, tobacco, firearms, and explosives.  And
9    also cases involving the illegal trafficking of firearms.
10   Q.   Okay.  As a special agent, what roles or assignments have
11   you had?
12   A.   I've been a case agent for 24 years.  And currently, I'm
13   assigned to the Enhanced Undercover Program that ATF has out of
14   Washington, D.C.
15   Q.   What is a case agent?
16   A.   A case agent is how we begin -- or after we receive our
17   training at our academy, the first job you have is to be a case
18   agent.  You're an investigator, and you investigate the
19   different violations of federal law as it pertains to the
20   charges that we file under our agency, which is alcohol,
21   tobacco, firearms, and explosives.
22   Q.   And when you say AOC, what was -- what does that acronym
23   stand for?
24   A.   EUP?
25   Q.   EUP.  Sorry.

1    A.  Yes, sir.  EUP is the Enhanced Undercover Program that the

2    ATF has.  It's a category of selected experienced agents where

3    we primarily work undercover operations in an undercover

4    capacity.

5    Q.  Okay.  Now in order to become a special agent, can you walk

6    the jury through what kind of training or experience you had to

7    become a special agent in the first place?

8    A.  Yes, sir.  I have previous experience in military.  I got

9    hired to become a special agent in 2001.  Our academy is in

10   Georgia, in Glynco, Georgia.  And it consists of approximately

11   six months of training.  It's broken down into two separate

12   courses, the first one being CITP, Criminal Investigator

13   Training Program.  And then once you graduate that, you move on

14   to ATF specific training, and that's called the special agent

15   basic training.

16   Q.  And during this basic training, what kind of things do you

17   learn?

18   A.  We learn everything that falls within our jurisdiction and

19   our purview to investigate, as far as from the beginning of

20   investigations all the way through complex multi-defendant

21   investigations and how to process those cases through the

22   judicial system.

23   Q.  Now, you also mentioned that you were currently an

24   undercover agent.

25   A.  That's correct.

Benavides - Direct by Mr. Myers

1    Q.  And how long have you worked as an undercover agent?

2    A.  22 years, approximately, sir.

3    Q.  And was there any training associated with just becoming an

4    undercover agent?

5    A.  Yes, sir.  As it stands currently, if I'm correct, ATF is

6    the only frontline law enforcement agency that allows their

7    agents to work undercover as soon as you graduate the academy.

8    After your six months' training we are, as agents, allowed to

9    work in an undercover agent capacity of some form.

10           After that, there's two different levels as you gain

11   experience to move on to the -- what it is, the Enhanced

12   Undercover Program now.

13   Q.  What are those two different levels?

14   A.  So you know, most agents -- I would say the majority of

15   agents don't do undercover.  They have -- they're qualified to

16   do undercover work, but most of them don't.

17           The few that do select, or choose to do undercover, we

18   have to do numerous operations throughout the years.  And then

19   at some point years later, you can go to the two-week advanced

20   undercover school.  And that's a very intense deep training for

21   agents working undercover.  That's the second phase.

22           Even after that, then the Enhanced Undercover Program

23   that ATF has in D.C., in Washington, D.C., consists of about 25

24   or 30, like I said, very well-trained agents that work

25   undercover around the country.  And I'm part of that program.

1    Q.  You're part of that program?

2    A.  Yes, sir.

3    Q.  And have you ever been an instructor or provided any

4    training for that program?

5    A.  Yes, sir.  Regularly.

6    Q.  What kind of trainings have you provided?

7    A.  So we provide training for our upcoming agents.  I go to

8    the academy and train the special agent basic program for

9    brand-new agents, like I explained earlier.

10            The last two weeks of new agent training is undercover

11   operations.  And so us in that category -- not all of us -- but

12   they'll take us separately to do scenario-based training.

13            And then for our second-level two-week undercover

14   school, I'm also an instructor there.

15   Q.  Now, is undercover work dangerous?

16   A.  It's very dangerous.

17   Q.  And what are the dangers associated with undercover work?

18   A.  Well, you're exposing yourself without any type of

19   protection and body armor or anything like that.  Most law

20   enforcement operations, as you are aware of, you know, the

21   officers are wearing vests and are well protected.

22            In undercover work, you don't have a vest.  You're

23   dealing with people engaged in illegal activities.  A lot of

24   them belong to violent criminal organizations.  And so we have

25   to be good at our craft to be able to -- to conduct these

Benavides - Direct by Mr. Myers

1   operations.

2   Q.   Now it's not just any undercover work, is it?  Generally

3   undercover work is focused on probably alcohol or firearms,

4   correct?

5   A.   Well, for me -- well, primarily as an agency, it's mostly

6   firearms and explosives, yes.

7   Q.   Okay.

8   A.   Very few alcohol and tobacco investigations.

9   Q.   So the subject matter itself is dangerous?

10  A.   Absolutely.  Yes, sir.

11  Q.   Okay.  Now, have you had any experience investigating

12  trafficking organizations involving Mexican cartels?

13  A.   Absolutely.  Yes, sir.

14  Q.   What kind of experience have you had?

15  A.   I've worked multiple investigations throughout the country,

16  a lot here in the southwest border, California, Denver.  Just

17  different cities around the country involving suspects that

18  are, you know, involved in criminal organizations that their

19  job is to purchase firearms in quantity to move down south of

20  the border into Mexico and even further south.

21  Q.   Now in your particular experience, I guess, what are some

22  of the things you do to keep yourself safe as an undercover

23  agent?

24  A.   Well, it's just -- you know, we train a lot.  We train a

25  lot.  If we feel that a certain investigation or certain

1    suspects we're meeting, we can bring a second undercover agent

2    and sometimes a third undercover in.  So in numbers, we protect

3    ourselves.

4           A lot of times undercover work you're by yourself.

5    But like I said, when you -- depending on how the investigation

6    is proceeding, and especially if we have a lot of unknowns, as

7    in this investigation, you know, we would bring other

8    undercover agents to work alongside with us -- or with me,

9    rather.

10   Q.  Well, in addition to that, you've got to look the part,

11   you've got to act the part?

12   A.  Oh, absolutely.  Yes, sir.

13   Q.  And what does that mean to you?

14   A.  Well, it depends who the suspects are, how -- you know, if

15   I'm going to talk in Spanish.  I'm fluent in Spanish.  Or if

16   I'm working in, you know, downtown Chicago, you've got to look

17   the part and you've got to play a certain role to -- to

18   convince the suspects that you are, in fact, a criminal such as

19   them, or suspects such as them.

20   Q.  You mentioned Spanish.  Are you a fluent Spanish speaker?

21   A.  Yes, sir.

22   Q.  Okay.  And I guess is speaking Spanish an important role,

23   or important part of your undercover work?

24   A.  For me it is, yes, sir.

25   Q.  And why is it so important for you?

Benavides - Direct by Mr. Myers

1  A.  Well, because I'm fluent -- there's very few of us in the
2  Enhanced Undercover Program that are fluent in the Spanish
3  language, so we are used -- not primarily.  But a lot of my
4  cases are in the Spanish language.
5  Q.  Okay.  Now also when you're using language, I guess there
6  are more unique things you need to know when it comes to
7  firearms?
8  A.  Yes.  There's a lot of the -- when you're negotiating and
9  planning out with the suspects, a lot of times we use code
10  words or monikers instead of just calling out exactly the
11  contraband or whatever.  You know, whatever the -- whatever
12  you're negotiating, a lot of times code words are used instead
13  of utilizing the proper name for firearms, per se.
14  Q.  Now, why are code words used when investigating suspects?
15  A.  Well, it seems that suspects use code words because you
16  think they are, you know, basically hiding their true intent,
17  especially if the Government's, you know, listening in or an
18  undercover agent is talking to them.  But the code words are
19  very similar in most of cases I've worked.  I mean, certain
20  things are called certain things.
21  Q.  Can we walk through some examples?
22  A.  So for example, you know, in this case particularly, an
23  AK-47 rifle, or AK-47 machine gun, we call them *cuerno de*
24  *chivos*.  That's based on the way the magazine goes into the
25  AK-47.  It folds, and it looks like a goat's horn.  So in

1    Spanish, in Mexico, it's very commonly called an AK-47, a

2    *cuerno de chibo.*

3    Q.  What other code words have you used?

4    A.  *Fierros* or *fierritos* is a common term that's used to talk

5    about firearms.  In general, firearms.  You know, you say *ando*

6    *buscando fierros.*  You know, I'm looking for firearms.

7    Q.  Well, *fierros* doesn't mean firearms in English, does it?

8    A.  It does not.

9    Q.  What does it mean?  What's the literal translation?

10   A.  Metal or steel.

11   Q.  Okay.  What other code wording?

12   A.  *Manzanas.*

13   Q.  What are -- *manzanas*, in the Spanish/English translation,

14   would be?

15   A.  Apples.

16   Q.  But I guess in context, what would you be referring to?

17   A.  *Manzanas* is a very common term used in the Spanish language

18   to identify hand grenades, hand grenades that you throw.

19   They're the smooth military M67 grenades.

20   Q.  Do you know how to say -- what would be the Spanish words

21   for short and long?

22   A.  *Corto o grande.*

23   Q.  Okay.  And -- now, have you ever used those in the

24   undercover context for firearms?

25   A.  Yes, sir.

1    Q.  And what would short refer to?

2    A.  So in this particular investigation, short was -- the

3    firearms that the suspect requested were AK-47-style firearms.

4    But they had a folding stock that folds underneath, and so it

5    shrinks the size of the weapon.  It still pulls open.  It's

6    still a shoulder-fired rifle.  But when we say short, *las*

7    *cortitas*, because you can make the -- the buttstock, you can

8    fold it underneath and it, in fact, makes the rifle shorter.

9    Q.  And long?

10   A.  Long are also just -- you know we have, again in this case,

11   two very large firearms that were purchased by the suspects.

12   And we're talking -- these were probably three and a half feet

13   long, four feet long.

14   Q.  Okay.  What are some code words that are used for

15   ammunition?

16   A.  In this case, the lady I was talking to, she referred to

17   ammunition as *cachuates para los chivitos.*  So peanuts for the

18   goats, basically, were -- she was referencing ammunition for

19   the AK-47 rifles.

20   Q.  Okay.  Now I guess you're kind of leading us into the

21   suspect, the lady that you were talking to as part of this

22   investigation.

23           As far as you know, what was that lady's nickname?

24   A.  She identified herself to me as Fernanda.

25   Q.  Okay.  Now, you were introduced to her as part of an

1    ongoing investigation?

2    A.   Yes.

3    Q.   And what were you acting as?

4    A.   My role was to be a firearms source of supply based here in

5    the United States.

6    Q.   What does that mean?

7    A.   That means that I'm engaged in the business of selling

8    firearms here in the United States.

9    Q.   Okay.  Now, did you -- have you ever met Fernanda in

10   person?

11   A.   No, sir.

12   Q.   How did you end up communicating with Fernanda?

13   A.   So I was asked to assist in this investigation by the case

14   agents.  And they -- a phone number was provided to me.

15   Q.   Now, I guess you don't have any real -- as part of the

16   undercover operation, were you briefed on, like, a long-term

17   investigation, or are you brought in for a specific purpose?

18   A.   More specific purpose.  I knew that there was a long-term

19   investigation going on.  The ATF case agent contacted me once

20   they reached the point of someone in Mexico was interested in

21   acquiring firearms.  So I was asked to come and assist in an

22   undercover capacity.

23   Q.   Now, were you able to make contact with Fernanda?

24   A.   I did.

25   Q.   And how many times do you think you communicated with

1  Fernanda?

2  A.  Numerous, probably.  The communication lasted approximately

3  three and a half weeks.  And I had several phone calls with her

4  and numerous, numerous text messages were exchanged between the

5  two of us.

6  Q.  Now as an undercover agent, do you generally understand

7  how, like, drug -- or excuse me -- firearms trafficking

8  organizations work?

9  A.  Yes.

10 Q.  I guess can you just kind of give us a general overview of

11 exactly how do firearms organizations -- firearms smuggling

12 organizations work?

13 A.  Yes.  Normally -- and it changes, right?  It just depends

14 on the organization.  But normally, in this case for example,

15 the actual purchaser was in Mexico.  And as she told me, she

16 was in Guadalajara.

17      Through our communication she advised that she could

18 not cross into the U.S., but have people that worked for her in

19 Juárez and in El Paso.  And that I was to meet them to provide

20 the firearms, once we agreed on a price and an amount.

21      So normally, there's the actual buyer.  And then you

22 have workers in between that probably move the money from

23 Mexico to the United States.  And then finally, you would have

24 the courier, who's going to be basically the transporter of the

25 firearms and/or money.

1    Q.  Now in your investigative work, are you familiar with the
2    term of compartmentalization?
3    A.  Yes, sir.
4    Q.  What does that term mean to you?
5    A.  That's exactly what I just said.  Basically,
6    compartmentalization is if you're a courier for the
7    organization, that's going to be the level you're at.  You're
8    going to be told what to do, when to do it, where to go pick
9    up, where to go deliver, and you get paid for that service.
10            One level up would be, like, a manager, per se.  And
11    that manager would run the courier or several couriers at the
12    time.  And then above the manager would be the actual
13    purchaser.  And then obviously, the chain keeps getting higher
14    and higher.
15    Q.  In the kind of scenario you gave, does the courier have, I
16    guess, permission to ask questions or try to figure out what's
17    going on?
18    A.  It depends on the organization.  But no.  Normally, they
19    are paid a fee to do a certain job or a certain task.
20    Q.  Is there a purpose in limiting a courier to that
21    information only which they need to know?
22    A.  Yes.
23    Q.  What is that purpose?
24    A.  Well, for them not to -- if they get arrested, for them not
25    to provide information on the organization.

1    Q.   Okay.  Now, you said you had experience with investigating

2    Mexican cartels.

3    A.   That's correct.

4    Q.   And you also testified that the woman, Fernanda, had said

5    that she was from Guadalajara?

6    A.   That's correct.

7    Q.   Now, the -- I guess the -- the way you guys were

8    communicating over was WhatsApp?

9    A.   It was over WhatsApp, yes, sir.

10   Q.   And the number that was provided for Fernanda, was that a

11   Mexican phone number or a United States phone number?

12   A.   A Mexican telephone number.

13   Q.   And do you know the area code, or do you remember the area

14   code from which she was communicating to you?

15   A.   It was a Guadalajara or Jalisco state area code.

16   Q.   Now in your training and experience, do you know what

17   cartel is associated with Guadalajara or the state of Jalisco?

18   A.   Yes, sir.  It's -- the Cartel Jalisco Nueva Generación

19   dominates and controls the state of Jalisco.

20   Q.   Okay.  And that's typically known as CJNG?

21   A.   That's correct.

22   Q.   Their initials?

23   A.   That's correct.

24   Q.   Okay.  Now, are firearms important for cartels?

25   A.   Very important.

1    Q.   Why are firearms important for cartels?

2    A.   That is how they -- that's how they rule and dominate areas

3    of the country of Mexico.  There's constant fighting between

4    rival cartels and fighting with the Government in Mexico, so

5    firearms are very important.  That is the power.  That is the

6    tool they need -- aside from money -- the tool they need to

7    keep their illicit business moving forward.

8    Q.   Okay.  There should be a screen in front of you.  I'm going

9    to show you some exhibits that have not yet been admitted into

10   evidence.  I want to see if you recognize them.

11          I would like to show you what's been marked as

12   Government's Exhibit Number 1F.

13          THE CLERK:  Give me a second, Mr. Myers.

14          MR. MYERS:  Oh, sorry.

15   BY MR. MYERS:

16   Q.   Do you recognize Government's Exhibit 1F?

17   A.   Yes, sir.

18   Q.   And does the Government's 1F fairly and accurately depict

19   the person that you remember from August 21st, 2023?

20   A.   Yes, sir.

21          MR. MYERS:  Your Honor, I offer to admit Government's

22   Exhibit 1F to the jury.

23          THE COURT:  Any objection?

24          MR. GUTIERREZ:  No objections, Your Honor.

25          THE COURT:  Government's Exhibit 1F will be admitted.

 1          MR. MYERS:  All right.  May I publish to the jury,
 2  Your Honor?
 3          THE COURT:  You may.
 4  BY MR. MYERS:
 5  Q.  Who is depicted in Government's Exhibit 1F?
 6  A.  That is the defendant Ramos.
 7  Q.  Okay.  Now, how do you know Mr. Ramos?
 8  A.  Mr. Ramos I met on the day of the arrest.  He was the --
 9  he -- who I would identify as the courier in this
10  investigation.  He was here in El Paso.  He was going to
11  transport the firearms into Juárez, Mexico, after the purchase
12  was conducted and finalized.
13  Q.  So this is the low man on the totem pole, as you were
14  talking about earlier?
15  A.  Yes, sir, I believe so.
16  Q.  Okay.  Now, was there any other person that came with
17  Mr. Ramos on August 21st, 2023?
18  A.  There was another person in a separate vehicle, yes.
19  Q.  Do you see that person here in the courtroom today?
20  A.  Yes, sir.
21  Q.  Could you please identify him by an article of clothing
22  that he may be wearing?
23  A.  He's sitting behind you, sir, at the Defense table, in a
24  white long-sleeved shirt with a tie.
25  Q.  Did you eventually learn that person's name?

1    A.  Yes.

2    Q.  And what is that person's name?

3    A.  Rene Hernandez Cordero.

4         MR. MYERS:  Your Honor, may the record reflect that

5    the witness has identified the defendant?

6         THE COURT:  The record will so reflect.

7    BY MR. MYERS:

8    Q.  Okay.  So bottom line up front, I guess, what is happening

9    on August 21st, 2023?

10   A.  So August 21st was a culmination of, you know, planning,

11   negotiating, discussing the purchase of twenty AK-47 rifles and

12   two Barrett .50 caliber rifles.  All that negotiation had

13   occurred with this lady we talked about earlier, who identified

14   herself, again, as Fernanda.

15        On August 21st, she sent these two individuals to pay

16   for the firearms and, in fact, take the firearms back to

17   Mexico -- or to Juárez.

18   Q.  Now this transaction, firearms transaction, did that take

19   place in El Paso, Texas?

20   A.  Yes, sir.

21   Q.  And is that within the Western District of Texas?

22   A.  Yes, sir.

23   Q.  I'd like to show you what's now been admitted as

24   Government's Exhibit 5AE.

25        And I would also like to show you Government's

1   Exhibit 5AF.

2           Do you recognize Government's Exhibit 5AE?

3   A.  I do.

4   Q.  And 5AF?

5   A.  Yes, sir.

6   Q.  And are those a fair and accurate depiction of some of the

7   weapons that were attempted to be sold on August 21st, 2023?

8   A.  Yes, sir.

9           MR. MYERS:  Your Honor, I'd offer Government's

10  Exhibit 5AE and 5AF into evidence.

11          MR. GUTIERREZ:  No objections.

12          THE COURT:  5AE and what?

13          MR. MYERS:  5AF.

14          THE COURT:  Government's Exhibits 5AE and 5AF will be

15  admitted.

16          MR. MYERS:  May I publish to the jury, Your Honor?

17          THE COURT:  Yes, you may publish.

18  BY MR. MYERS:

19  Q.  Would you please -- we're looking at Government's

20  Exhibit 5AF, for the record.

21          Would you please describe for the jury what we're

22  looking at?

23  A.  Yes, sir.  That photograph was taken post-arrest, after the

24  two subjects were arrested.  So it -- the original picture,

25  some of these firearms were already loaded into a vehicle.  But

Benavides - Direct by Mr. Myers

1    the picture depicts there -- or should be depicting -- twenty
2    AK-47 rifles, the short ones we spoke about, and the two
3    Barrett .50 caliber rifles which are sitting in the back there
4    on the boxes.
5    Q.  Now, are these normal weapons intended like for, like,
6    self-defense?
7    A.  No.  The AK-47 rifle is very common.  It is very common.
8    But you know, these are -- these firearms are weapons of war.
9    AK-47 is widely used around the world in combat situations.
10   And the .50 caliber rifle is -- I mean, I wouldn't say it's for
11   defense purposes at someone's home, no.  That's definitely made
12   to penetrate vehicles, penetrate through walls.  So that is
13   definitely a military-grade-type weapon.
14   Q.  Now in your investigation of cartels, are cartels or cartel
15   members interested in certain types of weapons?
16   A.  Yes, sir.
17   Q.  What particular interests are shown by cartel members?
18   A.  Well, as time has evolved, it seems like they're getting --
19   the calibers are growing.  The -- as far as bigger bullets,
20   more powerful.  Again, because it's just a combat situation
21   down there.  The cartels are fighting each other.  So the more
22   firepower you have the stronger you are.
23          AK-47s, AR-15s at one point, were the big thing.  And
24   they still are.  They get smuggled all the time.  But those are
25   very common in Mexico.  The Barrett .50 caliber, a little

1    harder to get because it costs more and they're harder to

2    conceal.  So -- you know, they are definitely wanted in Mexico,

3    especially if the money is there and they can pick a person.

4    Q.  Now in the United States, is it relatively easy to get

5    weapons?

6    A.  Yes.

7    Q.  Is that the same for Mexico?

8    A.  No.

9    Q.  Let me put it this way.  Is it easy to legally get weapons

10   in Mexico?

11   A.  No, sir.

12   Q.  Can you kind of describe the situation in Mexico, as far as

13   obtaining a weapon legally?

14   A.  That's correct.

15   Q.  Like how difficult is it?

16   A.  Oh.  My understanding -- I'm not an expert on the laws of

17   Mexico.  But my understanding is, there is a location in Mexico

18   City where you have to request a permit through the Government

19   of Mexico.  And some people are allowed and provided a license

20   to carry firearms.

21        My understanding is that it's very difficult to get,

22   and you have to prove reasons why you need a firearm to carry

23   legally in Mexico.

24   Q.  Is that one of the reasons most of the firearms are

25   smuggled from the United States?

1  A.  Yes, sir.

2  Q.  Now when you export these items, when you move these

3  firearms from the United States to Mexico, are there any

4  controls on that?

5  A.  No, sir.

6  Q.  Okay.  Do you need a license to export firearms from the

7  United States?

8  A.  Legally, yes, you do.

9  Q.  Okay.  And -- but now, you kind of put the emphasis on

10 legally.  I guess there's also smuggling techniques to cross

11 these weapons illegally?

12 A.  Correct.

13 Q.  Okay.  Now in this instance, in this undercover operation,

14 were you discussing with Fernanda and the defendant or

15 Mr. Ramos the legal exportation of firearms?

16 A.  No, that was never discussed.  It was -- she basically told

17 me that she was going to have people here locally, because she

18 couldn't cross into the United States, that would purchase the

19 firearms and *brincarlas* over the bridge, or over to the Mexican

20 side.  To jump them over.

21         THE COURT:  Mr. Myers, let me interrupt you, but it's

22 time for lunch.

23         MR. MYERS:  Yes, sir.  I'm hungry, too.

24         THE COURT:  Ladies and gentlemen of the jury, we've

25 arranged for you to have lunch here.  You don't have to remain

1    in the jury room.  That's where lunch is going to be.  You

2    don't have to remain there for the whole hour and 15 minutes

3    that we're going to take.  You may go wherever you want to, but

4    just be back in time.  And follow the instructions I gave you.

5    Do not talk to anybody, really.

6              So we'll be in recess until 1:30.

7         (Recess taken 12:15 to 01:32 p.m.)

8              THE COURT:  Good afternoon, everyone.  You may

9    continue, Mr. Myers.

10             MR. MYERS:  Thank you, Your Honor.

11   BY MR. MYERS:

12   Q.  Special Agent Benavides, when we left for lunch, you were

13   walking us through the undercover operation on August 21st,

14   2023.

15   A.  Yes.

16   Q.  And now before that date -- well, let me go back.

17             As part of an undercover operation, what are the

18   points of doing these things in the first place, if they're so

19   dangerous?

20   A.  Well, it's to -- to identify as many people as possible in

21   this illegal scheme, in this situation the gun trafficking

22   scheme.  All we had at the point of -- before the undercover

23   operation, was Fernanda, in Mexico.  That's the only person

24   that I was talking to.  So the objective of the undercover

25   operation is to identify additional suspects, identify

1    additional persons that may be involved, in an effort to

2    enforce the laws of the United States.

3    Q.  Now this is part of a criminal investigation, correct?

4    A.  Yes.

5    Q.  And since it is part of a criminal investigation, do you

6    take steps to preserve what you're doing?

7    A.  Yes.

8    Q.  What things do you do?

9    A.  So all the communications with text messaging through

10   WhatsApp has been recorded.  Phone calls were recorded, audio

11   recorded.  And then the undercover meeting, or the transaction

12   occurred, and the two suspects were recorded both in audio and

13   video.

14   Q.  And I guess before today's trial you and I have met,

15   correct?

16   A.  Yes, sir.

17   Q.  And we have reviewed those recordings?

18   A.  Yes, we did.

19   Q.  Okay.  I'd like to -- those recordings we also had

20   translated, correct?

21   A.  Yes, sir.

22   Q.  Have you had a chance to look at those translations?

23   A.  Yes, I have.

24   Q.  Now, did you create those translations?

25   A.  I did not.

1    Q.  All right.  But they were done by another Spanish

2    interpreter.  But you're fluent in Spanish?

3    A.  Yes, sir.

4    Q.  Were those acceptable translations of the recordings?

5    A.  Yes, they are.

6    Q.  Okay.  Now, when did you start making recordings?

7    Approximately what date?

8    A.  July 27th is when the first communication through WhatsApp

9    was initiated.

10   Q.  And those were text messages?

11   A.  Text messages, correct.

12   Q.  And recordings.  Do you recall the first recording date?

13   A.  The first telephone call was the following day, July 28th

14   of 2023.

15   Q.  Okay.  I'd like you to look at -- if you'd look at your

16   screen.  We won't play them quite yet, but we have Government's

17   Exhibit 5D.

18        Is that an accurate phone call you had with Fernanda?

19   A.  Yes, it is.

20   Q.  And you had previously listened to that, correct?

21   A.  Yes, sir.

22   Q.  And I'd like to also show you Government's Exhibit 5E.

23   This is a translation of that recording?

24   A.  Yes, it is.

25   Q.  All right.

```
 1              MR. MYERS:  Your Honor, I'd offer 5D and 5E into
 2   evidence.
 3              THE COURT:  B and C was it?
 4              MR. GUTIERREZ:  No objections.
 5              THE COURT:  I can't find them here.  What was it?  5D?
 6              MR. MYERS:  5D and 5E.
 7              THE COURT:  And 5E?
 8              MR. MYERS:  Yes.
 9              THE COURT:  Government's Exhibits 5D and 5E will be
10   admitted -- are hereby admitted.
11              MR. MYERS:  All right.
12   BY MR. MYERS:
13   Q.  Similar to Government's Exhibit 5F, which is a phone call
14   on July 29th, have you heard that recording before?
15   A.  Yes, sir, I have.
16   Q.  Is that a fair and accurate recording of your conversation
17   with Fernanda?
18   A.  Yes, it is.
19   Q.  Government's Exhibit 5G.  Is that an acceptable translation
20   of that phone call?
21   A.  Yes, it is.
22              MR. MYERS:  Your Honor, we'd offer 5F and 5G into
23   evidence.
24              MR. GUTIERREZ:  No objections, Your Honor.
25              THE COURT:  Government's Exhibits 5F and 5G are hereby
```

Benavides - Direct by Mr. Myers

1  admitted.

2  BY MR. MYERS:

3  Q.  Similarly, we listened to Government's Exhibit 5H before?

4  A.  Yes, sir.

5  Q.  Is that a fair and accurate recording of a phone call you

6  had with Fernanda on August 11th, 2023?

7  A.  Yes, it is.

8  Q.  And 5I, is that an acceptable translation of that

9  recording?

10  A.  Yes, it is.

11        MR. MYERS:  Your Honor, I'd offer 5H and 5I into

12  evidence.

13        MR. GUTIERREZ:  No objections, Your Honor.

14        THE COURT:  Government's Exhibits 5H and 5I will be

15  admitted.

16  BY MR. MYERS:

17  Q.  You and I have listened to Government's Exhibit 5J, a phone

18  call with Fernanda from August 14th, 2023?

19  A.  Yes, sir.

20  Q.  Is 5J an accurate recording of that phone call?

21  A.  Yes, it is.

22  Q.  Government's Exhibit 5K.  Is that an accurate or acceptable

23  translation of Government's Exhibit 5J?

24  A.  Yes, it is.

25        MR. MYERS:  Your Honor, we'd offer 5J and 5K into

1  evidence.

2          MR. GUTIERREZ:  No objections.

3          THE COURT:  Government's Exhibits 5J and 5K will be

4  admitted.

5  BY MR. MYERS:

6  Q.  We have Government's Exhibit 5L, a phone call with Fernanda

7  on August 19th.

8          Is that a fair and accurate recording of a phone call

9  you had with Fernanda on August 19th?

10  A.  Yes, it is.

11  Q.  And Government's Exhibit 5N.  Is that an acceptable

12  translation of Government's Exhibit 5L?

13  A.  Yes, sir.

14          MR. MYERS:  Your Honor, I'd offer Government's

15  Exhibits 5L and 5M into evidence.

16          MR. GUTIERREZ:  No objection.

17          THE COURT:  Government's Exhibits 5L and 5M will be

18  admitted.

19  BY MR. MYERS:

20  Q.  Government's Exhibit 5N is a phone call of you and Fernanda

21  on August 21st, correct?

22  A.  Yes, sir.

23  Q.  Is that a fair and accurate recording of a phone call you

24  had with Fernanda on August 21st?

25  A.  Yes, it is.

Benavides - Direct by Mr. Myers

1   Q.  Government's Exhibit 5O is a translation of that phone
2   call.  Is this an acceptable transcript of that, or acceptable
3   translation of Government's Exhibit 5N?
4   A.  Yes, it is.
5           MR. MYERS:  Your Honor, I'd offer Government's
6   Exhibits 5N and 5O into evidence.
7           MR. GUTIERREZ:  No objections, Your Honor.
8           THE COURT:  Government's Exhibits 5N and 5O will be
9   admitted.
10  BY MR. MYERS:
11  Q.  There's a second phone call on August 21st, which is
12  labeled as Government's Exhibit 5P.
13          Have you heard that Government's exhibit before?
14  A.  Yes, sir.
15  Q.  Is it a fair and accurate recording between you and
16  Fernanda on August 21st, 2023?
17  A.  Yes, it is.
18  Q.  Government's Exhibit 5Q.  Is this an acceptable translation
19  of that exhibit?
20  A.  Yes, it is.
21          MR. MYERS:  Your Honor, I offer Government's
22  Exhibits 5P and 5Q into evidence.
23          MR. GUTIERREZ:  No objection.
24          THE COURT:  Government's Exhibits 5P and 5Q will be
25  admitted.

Benavides - Direct by Mr. Myers

1    BY MR. MYERS:

2    Q.  Have you listened to Government's Exhibit 5R, a recording

3    of you and Mr. Hernandez Cordero, from August 21st, 2023?

4    A.  Yes, I have.

5    Q.  Is that a fair and accurate recording that you had with

6    Mr. Hernandez?

7    A.  Yes, sir.

8    Q.  And if we look at Government's Exhibit 5S, is this an

9    accurate or acceptable translation of the Government's

10   exhibit -- of that previous exhibit?

11   A.  Yes, it is.

12           MR. MYERS:  Your Honor, I'd offer Government's

13   Exhibits 5R and 5S into evidence.

14           MR. GUTIERREZ:  No objection.

15           THE COURT:  Government's Exhibits 5R and 5S will be

16   admitted.

17   BY MR. MYERS:

18   Q.  Now in addition to recording the phone calls, did you

19   record anything else?

20   A.  Yes, sir.  The undercover meeting, the undercover

21   transaction with firearms, was recorded as well.

22   Q.  Okay.  Have you reviewed Government's Exhibit 5T?

23   A.  Yes, sir.

24   Q.  Is that one of those videos that you just previously told

25   the jury about?

1    A.  Yes, it is.

2    Q.  And how many -- I guess there was a long meeting.  So how

3    many videos are there of the recording of the meeting?

4    A.  Of the meeting on August 21st?

5    Q.  Yes.

6    A.  I had two recorders, and I believe my partner had an

7    additional audio/video recorder, and possibly just an audio

8    recorder.

9    Q.  Okay.  So it's recorded several different ways?

10   A.  Yeah, that's correct.  Yes, sir.

11   Q.  Now -- but for our purposes, we've identified three videos

12   that kind of run the length?

13   A.  Yes, sir.

14   Q.  Okay.  And so even though you had multiple recordings, are

15   they kind of duplicative of each other?

16   A.  They're exactly the same thing, yes, sir.

17   Q.  Why do you have multiple ways of recording the same event?

18   A.  To capture the event.  And for our purposes we have

19   malfunctions sometimes, and so we carry two, sometimes three

20   recorders, in case a recorder fails on us.  So it's a backup to

21   a backup, if you will.  They're all originals, but they

22   essentially can capture the same thing, sometimes from

23   different angles.  But it captures the same conversations and

24   such.

25   Q.  When they're saved, you know when they're saved from the

Benavides - Direct by Mr. Myers

1    recorder, is it all one video or are they set up in different
2    videos?
3    A.  It's set up in different videos, depending on the type of
4    recorder we're using.
5    Q.  Okay.  Government's Exhibit 5T is Undercover Video 1.
6    Government's Exhibit 5V is Undercover Video 2.  And
7    Government's Exhibit 5X is Undercover Video 3.
8            Have you had a chance to review those videos?
9    A.  Yes, I have.
10   Q.  Do they fairly and accurately record the events of
11   August 21st, 2023?
12   A.  Yes, they do.
13   Q.  Now on those, I guess there's audio, correct?
14   A.  Yes.
15   Q.  And those are in the Spanish language?
16   A.  Yes, sir.
17   Q.  Now, Government's Exhibit 5U is a translation of
18   Government's exhibit -- of the Undercover Video 1.
19           Have you ever had a chance to review that translation?
20   A.  Yes, I have.
21   Q.  Is that an acceptable translation?
22   A.  Yes, it is.
23   Q.  Government's Exhibit 5W is a translation of undercover
24   Video 2.
25           Have you had a chance to review Government's

1   Exhibit 5W?

2   A.  Yes, sir.

3   Q.  Is it an acceptable translation?

4   A.  It is.

5   Q.  And Government's Exhibit 5Y, is a translation of Undercover

6   Video 3?

7           Have you had a chance to review that transcript?

8   A.  Yes, sir, I have.

9   Q.  Is that also an acceptable transcript?

10  A.  Yes, it is.

11          MR. MYERS:  Your Honor, I'd offer into evidence

12  Government's Exhibits 5T, U, V, W, X, and Y.

13          MR. GUTIERREZ:  No objections, Your Honor.

14          THE COURT:  Government's Exhibits 5T, 5U, 5V, 5W, 5X,

15  and Y are hereby admitted.

16  BY MR. MYERS:

17  Q.  Now in addition to recordings carried on your body, were

18  there any other cameras that were staged in this operation?

19  A.  Yes.  There was a camera staged in the -- inside the

20  storage facility.

21  Q.  Now, recalling that kind of -- the picture of the firearms

22  with the Barrett caliber, was the camera set up in there?

23  A.  It was.  It was set up in a storage unit behind the

24  firearms in the back wall.

25  Q.  All right.  Was there any audio linked to those videos?

1    A.  There was not.

2    Q.  Okay.  So this is just capturing whatever happened at the

3    storage unit?

4    A.  That's correct.  It's a live feed to the arrest team.

5    Q.  Okay.  Now, and have you -- those are labeled as

6    Government's Exhibit 5Z, which is Storage Unit Video 1, and

7    Government's Exhibit 5AA, which is Storage Unit Video 2.

8            Have you reviewed those videos?

9    A.  Yes, I have.

10   Q.  Do they fairly and accurately depict the events of the

11   storage unit on August 21st, 2023?

12   A.  Yes, they do.

13           MR. MYERS:  Your Honor, I'd offer Government's

14   Exhibits 5Z and 5AA into evidence.

15           MR. GUTIERREZ:  Your Honor, we have -- we do have an

16   objection.

17           THE COURT:  I can't hear you.  Talk into the

18   microphone.

19           MR. GUTIERREZ:  Sorry.  I do have an objection.  I

20   believe 5AA is not a complete video.

21           THE COURT:  Mr. Myers?

22           MR. MYERS:  It's a complete video.  It purportedly cut

23   off in the end.  But I can inquire with the witness, if you

24   would like more information.

25           THE COURT:  No, I'm going to admit.  The objection is

1    overruled.

2                Government's Exhibits 5Z, and 5AA are hereby admitted.

3    BY MR. MYERS:

4    Q.  Okay.  Now, let's go back to late July.

5                You are communicating with Fernanda, correct?

6    A.  Yes, sir.

7    Q.  All right.  And what are -- what services are you offering

8    Fernanda?

9    A.  I told her that I am a -- in the business -- engaged in the

10   business of selling firearms in the United States, and I was

11   informed by -- that she was interested in making a large

12   purchase of firearms.

13               MR. MYERS:  At this point in time, Your Honor, I would

14   like to publish to the jury Government's Exhibit 5F and 5G.

15               THE COURT:  You may.

16          (Phone call played.)

17   BY MR. MYERS:

18   Q.  Is this your first conversation of substance with Fernanda?

19   A.  Yes, it is.

20   Q.  What are some of things you noticed right off the bat with

21   that conversation?

22   A.  She was very knowledgeable in the different types of

23   firearms and calibers.  She knew exactly what military

24   nomenclature.  An M240 is a military-grade American rifle -- or

25   machine gun, rather.  She showed a lot of knowledge in what she

1    wanted to purchase.  Obviously, you heard she wanted a list of

2    prices and quantities I had on hand, and then she would pick

3    and choose exactly what she wanted first.

4              It appeared to me -- and obviously, she stated in the

5    phone call that she's been in -- she's been in the business for

6    several years.  And so she understood that the higher caliber,

7    the more expensive rifles, is exactly what they cost.  And she

8    admitted that.

9    Q.  Now there's also a difference where she wants them in

10   Mexico, but you guys talk about that's not the prices you were

11   quoting.

12             Do you remember that part of the conversation?

13   A.  Yes, sir.

14   Q.  Why is there a difference of price between the

15   United States and Mexico?

16   A.  Well, she would have to order someone if -- she would have

17   to pay to have them, like she said, *brincar* over the border.

18   So someone that's going to be obviously an upcharge to have

19   those delivered in Mexico.

20             I instructed her -- I told her, rather, that I only

21   delivered to the United States.  And then that's why she wanted

22   prices.  Because then she would have to pay someone to pick

23   them up, take them over the border, and she would have to take

24   into consideration that price to see what her profit margin was

25   going to be at the end.

1  Q.  Now, weapons that are transferred illegally in the

2  United States versus weapons transferred illegally in Mexico,

3  is there a difference in price?

4  A.  Yes.

5  Q.  Now here, ultimately, you do reach a deal with Fernanda,

6  correct?

7  A.  Yes.

8  Q.  What is that deal, ultimately, that's reached?

9  A.  So the deal she -- she basically tells me that she wants to

10  prove that she's serious.  She wants to conduct several of

11  these transactions, and she says, How many AK-47s can you put

12  in El Paso, and I'll buy them?

13  Q.  Okay.  What's the final price?  What are you selling for

14  how much?

15  A.  We agree on twenty AK-47s at $1500 apiece, and two Barrett

16  .50 caliber rifles at $18,000.

17  Q.  And total?

18  A.  $66,000.

19  Q.  Now if you were to sell those guns in Mexico, would they

20  fetch a higher price?

21  A.  Absolutely, yes, sir.

22  Q.  Now in this conversation, there's also the use of code

23  words, words that seem out of context, correct?

24  A.  Yes, sir.

25  Q.  I think you had mentioned one.  And if we look on Page 1 of

Benavides - Direct by Mr. Myers

1   Government's Exhibit 5G -- and I'll highlight it.  She says,
2   *Los chivitos*, *los cacahuates para los chivitos*.
3          What is she talking about here?
4   A.  *Chivitos*, as I stated earlier, is a code word or a slang
5   term to describe AK-47-type firearms.
6          And *los cachuates para los chivitos* means ammunition
7   for those rifles.
8   Q.  Okay.  Now, you slip back and forth between using coded
9   language and not coded language.
10  A.  Yes.
11  Q.  Why is that?
12  A.  So we started in -- you know we started in code, but she
13  actually is the one that started talking in M240s, Minimis.
14  Those are the official names for these firearms.  So I went
15  back and forth between saying *cuerno de chivos* for an AK-47.
16  But she knew the actual nomenclature for the bigger belt-fed
17  machine guns that she was interested in getting prices for.
18  Q.  If we look on Page 2, you're discussing -- oh.  And I guess
19  when we look at this Government's Exhibit 5G, on the left-hand
20  side, SA4155, who is that?
21  A.  That's me, sir.
22  Q.  Is that your badge number?
23  A.  That is my badge number.
24  Q.  Okay.  Now, you're discussing the -- on Page 2 of
25  Government's Exhibit 5G -- the transfer of firearms, where this

Benavides - Direct by Mr. Myers

1   is going to happen.  Why is this important?

2   A.  Well, she wanted them on the border, just to be able to

3   have people nearby, as I gave her options of where she wanted

4   them.  She initially said Los Angeles, and then she decided

5   here in El Paso.

6   Q.  And the mention of the phone calls, she makes sounds that

7   she could not come into the United States?

8   A.  That's correct.  She tells me that on numerous occasions.

9   Q.  Okay.  Now would she be a prohibited person, then?  Could

10  she own or legally possess firearms in the United States?

11  A.  No, sir.

12  Q.  Okay.  Now as part of the investigation, I guess what --

13  what are you trying to figure out, or what kind of information

14  are you trying to get from her at this point in time?

15  A.  Well, obviously, just by that phone call and immediately

16  talking about all these different calibers or firearms, I knew

17  she was engaged in the business of trafficking.

18          My job at that point is to try to identify additional

19  co-conspirators, or defendants, suspects here locally, since

20  she stated she had people working for her here in the El Paso

21  and Juárez area.

22  Q.  Okay.  If we look on Page 3 of Government's Exhibit 5G, you

23  guys start talking about little apples.  Do you recall this

24  part of conversation?

25  A.  Yes.

1    Q.   Okay.  Now when you're talking to her, does she know

2    exactly what you're talking about when you say *manzanitas*?

3    A.   Yes.

4    Q.   And what do you kind of have to explain to her?

5    A.   So there's different types of grenades.  That's why I said

6    this is the kind we throw, an actual hand grenade.  Those are

7    called the *manzanita*s.  They're round.  They're military-grade

8    grenades.  And I told her those are the ones that the guy --

9    the user is going to have to throw the -- flick the tab off and

10   be able to throw with his hand.

11        Contrary, there's also other -- in Spanish we call

12   them *papas*, *lanza papas*.  And those are grenades that are fired

13   through a 40mm grenade launcher.  So I was distinguishing

14   between the two, and she seemed to understand what *manzanas*

15   were.

16   Q.   Now in her response she says *granadas*, which I guess in

17   Spanish would have multiple meanings, correct?

18   A.   Yes, sir.

19   Q.   What are some of the multiple meanings?

20   A.   Fruits -- pomegranates, fruits.

21   Q.   But in this context what is she discussing?

22   A.   Oh, grenades.  We're talking about hand grenades for sure.

23   Q.   Okay.  And then I guess you verify that by following up.

24   You say exactly the -- well, the translation becomes "The --

25   the guy removes the mother and throws it with his arm."

1          But what is the colloquialism or slang that you're

2    using?

3    A.  Well, did he -- the hand grenades have a spoon on them and

4    a spool, and you pull the pin out and you throw it.  And that's

5    what I was referencing to when I said *"la madre.  "Le quitas la*

6    *madre,"* and you throw it.

7    Q.  Okay.  Now where do you leave things off with this first

8    phone call, and what's happened?

9    A.  She's very interested in prices and quantities and exactly

10   the types of firearms I could get.  She's asking for a list, to

11   see exactly what she wants to purchase after the list is

12   provided.

13   Q.  Now, do you provide her a list?

14   A.  I do.

15   Q.  What kind of firearms are on that list?

16   A.  I -- the list that I provided included AR-15 rifles, AK-47

17   rifles, Barrett .50 caliber rifles, M240 belt-fed machine guns,

18   which is what she requested.  FN Minimis, which are also 5.56

19   caliber belt-fed machine gun, a case of grenades.

20          So I gave her a fairly long list of items that are

21   hard to get ahold of.

22   Q.  Now ultimately, she picks AK-47s and Barrett caliber

23   rifles -- or .50 caliber rifles, excuse me.

24   A.  Yes, sir.

25   Q.  What was your understanding?  Is this just like going to be

1    her one-time purchase?

2    A.   No.  She told me numerous times that she wanted to buy

3    twenty AK-47s to -- basically as a -- as a trial run.  And then

4    later on we continue to do business with bigger -- bigger

5    orders and more firearms.

6    Q.   So in a firearms trafficking organization is there an

7    element of trust that needs to be established?

8    A.   Yes.

9    Q.   And is trust important?

10   A.   Yes.

11   Q.   And why is it important?

12   A.   Well, a lot of this is done by word of mouth or by -- you

13   know, obviously her and I were in different countries

14   negotiating a deal, and so it's important.  You've got to have

15   trust at some point to make these transactions happen.

16   Q.   She has to trust that what -- are you going to steal her

17   money?

18   A.   Right.

19   Q.   Can you really deliver?  Like, what kind of trust does she

20   have to learn from you?

21   A.   She has to know that I can provide the firearms that I'm

22   telling her I can provide.

23   Q.   Okay.  Now, you have a second -- well, multiple phone

24   calls.  But the next phone call here we have on August 11th.

25   And I would like to publish Government's Exhibit 5H and 5I to

1    the jury, Your Honor.

2              THE COURT:  You may.

3        (Phone call played.)

4    BY MR. MYERS:

5    Q.  All right.  Who's the boss, you or her?

6    A.  She's the boss.

7    Q.  Okay.  Does she let you know that?

8    A.  I'm sorry?

9    Q.  Did she let you know that?

10   A.  Yes, she did.

11   Q.  Now, so I guess what's going on in this conversation,

12   there's some kind of dispute or mistrust going on?

13   A.  Right.  So previous to this conversation, she had agreed to

14   pay $3,000 down payment.  I told her that my firearm cache was

15   either in Illinois or Tampa, Florida, and that I needed money

16   upfront to be able to move them, which is normal.  Right?  I'm

17   not going to move firearms to the border for free for anyone,

18   if they don't show up.

19              She had initially --

20   Q.  Let me stop you right there.  There are text messages that

21   you're referencing with Fernanda?

22   A.  Yes.  It's through text messages.  Yes, sir.

23   Q.  Okay.  So now this $3,000 down payment, I'm sorry.  You

24   were saying?

25   A.  No.  And so that was -- she initially had agreed to pay it,

1    and then at some point changed her mind.  And that's what led

2    to this phone call.

3    Q.  Okay.

4    A.  To discuss it again and go over exactly why a down payment

5    is required.

6    Q.  Now I guess also in this phone call, too, we're seeing

7    those concepts of trust play out, right?

8    A.  Yes, sir.

9    Q.  And what -- where are we seeing that concept play out in

10   this phone call?

11   A.  I'm sorry?

12   Q.  Where are we -- how is that concept of trust playing out in

13   the phone call?

14   A.  Well, I told her that if -- you know in the role that I'm

15   playing as a gun trafficker in the United States, that I'm not

16   going to, you know, steal $3,000 from anyone.  My job as an

17   undercover, and in the role that I'm portraying, is to make

18   money just like she is.  But I need a $3,000 down payment to

19   move the firearms from Florida to El Paso or Los Angeles or

20   wherever she wanted it.  In this case we agreed on El Paso.

21   Q.  Now if we look on Page 3 of Government's Exhibit 5I, I kind

22   of highlighted this section here.  And translated, she says,

23   "Once you deliver...once you deliver and I pay you, it's my

24   business how I cross them and bring them."

25   A.  Yes, sir.

Benavides - Direct by Mr. Myers

1  Q.  Okay.  And she's talking about firearms here?

2  A.  That's exactly what she's talking about.  Yes, sir.

3  Q.  Okay.  Now, is this also like the concept of

4  compartmentalization we saw?

5  A.  Yes, sir.

6  Q.  And can you kind of explain how -- why is this evidence of

7  compartmentalization?

8  A.  Well, it's clear that she has people working for her.

9  She's already stated that she's not going to come over to take

10  the firearm cache.  So she's going to hire someone, or has

11  people here that are going to bring the money, pay me for them,

12  and then someone else is going to traffic them back into

13  Mexico.

14  Q.  Why wouldn't she just tell you that information, though,

15  how she's going to cross them or how she plans to do that?

16  A.  Most people don't.  I mean that's their business, and

17  they're not going to divulge exactly how they're going to do

18  it.  It's basically a gun transaction.  And as you heard in the

19  phone call, she's saying, You bring them.  I'm going to pay

20  you.  And then what I do with them afterwards is my business.

21  How I cross them is my business.  And who I cross them with is

22  my business.

23  Q.  Is this a way to protect her organization from law

24  enforcement?

25  A.  Yes, it is.

1    Q.  And how so?

2    A.  Well, the -- in the compartmentalization portion of how

3    they operate, some people know each other and some people don't

4    know each other.  Most people are tasked with a certain job and

5    they get paid for that job.

6            And then as the guns keep moving south, someone else

7    might take them.  So for example, someone would pay them here,

8    and I would turn them over to that person or maybe someone

9    else.  And then that person may hand them off to someone else.

10   That's their business.

11           And she would never divulge that to me as far as who

12   and, you know, how many people are involved in the chain.

13   Q.  Okay.  The next conversation we have happens on August 14.

14   This --

15           MR. MYERS:  And, Your Honor, I would like to publish

16   Government's Exhibits 5J and 5K to the jury.

17           THE COURT:  You may publish.

18       (Phone call played.)

19   BY MR. MYERS:

20   Q.  All right.  In this recording, Government's Exhibit 5J,

21   what -- what are you trying to coordinate with Fernanda?

22   A.  We recorded -- previous to this phone call, when she agreed

23   to give the $3,000 down payment, the phone call was to

24   coordinate exactly how she wanted to send the money.  She asked

25   for a card, and I told her to send the money via Western Union.

1   Q.  I would like to show you an exhibit that's not been
2   previously admitted.  Government's Exhibit 5C.
3       Do you recognize Government's Exhibit 5C?
4   A.  Yes, sir, I do.
5   Q.  And is this a photograph that Fernanda sent you?
6   A.  Yes, it is.
7       MR. MYERS:  Your Honor, I'd offer Government's
8   Exhibit 5C into evidence.
9       MR. GUTIERREZ:  No objection.
10      THE COURT:  Government's Exhibit 5C will be admitted.
11      MR. MYERS:  May I publish to the jury, Your Honor?
12      THE COURT:  You may.
13  BY MR. MYERS:
14  Q.  Now, Government's Exhibit 5C.  What are we looking at?
15  A.  We are looking at a receipt, a Western Union receipt with
16  the code on top, which she circled.  This is a photograph that
17  Fernanda took in Mexico -- or in Guadalajara, I assume, since
18  the address there is Zapopan, Jalisco, Mexico.
19      She sent that to me to show me that the money had been
20  sent through Western Union to an undercover agent in El Paso.
21  Q.  Okay.  We would assume that the hand down there is
22  Fernanda's hand?
23  A.  I would assume so, yes, sir.
24  Q.  Okay.  So she sent you this, and you -- you already pointed
25  it out.  The address is what we had discussed before.  It's

Benavides - Direct by Mr. Myers

1  from -- from the state of Jalisco?

2  A.  Yes.

3  Q.  All right.  Now, the -- it's kind of hard to read, but the

4  beneficiary is a Lorena Marie González?

5  A.  That's correct, yes.

6  Q.  Who is that?

7  A.  An undercover agent, an ATF undercover agent, in El Paso.

8  Q.  So just someone to receive the cash?

9  A.  That's correct.  Yes, sir.

10  Q.  All right.  Below that it's going to be the remitter, and

11  it's Jose Fernando.  I think the real name is Mungia.  Who is

12  that person?

13  A.  I never dealt with that person.  My understanding is that

14  it's a very close associate of Fernanda.

15  Q.  Okay.  Now is that unusual, I guess, in firearms

16  organizations, for other people's names to be used?

17  A.  No.  In fact it's very common where different people's

18  names are used, in the sense to avoid law enforcement

19  detection.  They use different names, different people's names.

20  They pay people to send money for them, and it's just to elude

21  law enforcement.

22  Q.  Okay.  Are they just trying to keep their names off of

23  paper, off of documentation?

24  A.  Yes, sir.  That's correct.

25  Q.  If we go back and we look at Government's Exhibit 5K, I've

Benavides - Direct by Mr. Myers

1  noticed you began each phone call with, like, kind of this
2  introductory statement.  You're saying what your badge number
3  is, what time it is, and the day it is.  And then you also give
4  the phone number that you're calling.  And in this case so far
5  they've all ended in which number?
6  A.  In 9, yes, sir.
7  Q.  2319?
8  A.  Yes, that's correct.  2319 is the last four.  Yes, sir.
9  Q.  Now, why are we given that introduction for every phone
10  call?
11  A.  That's how we train, sir.  That's how we capture any
12  undercover recording that is made.  We introduce ourselves.  In
13  this case, my badge number.  We give the date and time to
14  capture when those conversations happen.
15  Q.  Okay.  In addition to recording the time, you're also
16  dictating the number which you called?
17  A.  Yes.
18  Q.  Is it important to take down that phone number?
19  A.  Yes.
20  Q.  Why is it important?
21  A.  Well, so there's no question later, you know, of what
22  number I called.  In this case, at this point in the
23  investigation, that is the only number I've had for her, for
24  Fernanda.
25  Q.  Now as like an investigation, as an investigator, a phone

1    number is an important piece of evidence?

2    A.  Very important, yes, sir.

3    Q.  Why are they important pieces of evidence?

4    A.  Well, we could -- phone numbers at times are used to

5    exploit different information in intelligence and identifying

6    other people.  Such as, you know, in the instance of the

7    receipt, you know, we got a name of a second individual that we

8    did not know prior to that.

9         And the phone numbers are used the same.  We are able,

10   as the Government, to exploit some numbers and hopefully get

11   who the phone number belongs to.

12   Q.  Okay.  So that phone number, in conjunction with other

13   evidence, can help you understand the organization better?

14   A.  Yes, sir.  It provides information and intelligence.  Yes,

15   sir.

16   Q.  Okay.

17        MR. MYERS:  Your Honor, I would like to publish to the

18   jury Government's Exhibits 5L and 5N.

19        THE COURT:  You may.

20     (Phone call played.)

21   BY MR. MYERS:

22   Q.  All right.  What's going on in this recording on

23   August 19th, 2023?

24   A.  So she had previously wanted to discuss how the delivery of

25   firearms were going to take place.  She's interested -- she's

1    in Mexico.  She's already said she's not coming over here.  She

2    needs to know how the transaction is going to occur so she can

3    pass that information to people above her and people below her

4    who are actually going to conduct the transaction.

5    Q.   Now, at a certain point in time you asked for a phone

6    number?

7    A.   Yes.

8    Q.   Why are you asking for a phone number?

9    A.   Again, to try to identify who the local -- who the local

10   people are, in an effort to expand this investigation.

11   Q.   And whose number do you think she's going to provide?

12   A.   She is going to provide me a number of whoever is in

13   charge, who works for her locally, that's going to handle the

14   transfer of firearms.

15   Q.   Does she give you that number?

16   A.   She does.

17   Q.   Eventually?

18   A.   Eventually, yes.

19   Q.   Okay.  Now on this August 19th recording, when she -- when

20   you ask for it, did she have a number to provide you or does --

21   she doesn't want to provide you the number?

22   A.   She did not provide me the number that day.

23   Q.   Okay.  Now, I'm going to show you a Government's exhibit

24   that's not yet been admitted.  That's Government's Exhibit 5AC.

25          Do you recognize Government's Exhibit 5AC?

1    A.  I do.

2    Q.  Let's scroll down.  All right.  What is Government's

3    Exhibit 5AC?

4    A.  Those are the -- that is the identification of the firearms

5    that are maintained and owned by ATF that we used in this

6    reversal operation.

7              MR. MYERS:  Your Honor, I offer Government's

8    Exhibit 5AC into evidence.

9              MR. GUTIERREZ:  No objection.

10             THE COURT:  Government's Exhibit 5AC will be admitted.

11   BY MR. MYERS:

12   Q.  Now, in that --

13             MR. MYERS:  May I publish to the jury, Your Honor?

14             THE COURT:  You may.

15   BY MR. MYERS:

16   Q.  In that phone call we heard you told Fernanda something to

17   the effect, like, your material is in Chicago and it's on its

18   way.  But in reality, what was going on?

19   A.  We were discussing firearms.  That's all we ever discussed

20   were firearms.

21   Q.  No, no.  Not that.  I mean, the -- in reality, you're not

22   really going to sell her weapons.  Like undercover

23   operational-wise, like what is going on?

24   A.  Oh, we're building our time frame to conduct this arrest

25   operation.  At this point dealing with a person in Mexico and

Benavides - Direct by Mr. Myers

1    several unknown people here locally, they are in El Paso or

2    Juárez.  It's a very tense situation for us, for our agency,

3    and for, you know, FBI also.  This was a joint operation, and

4    this is very tense.  We're going to bring out very powerful

5    weapons that are fully functioning to a location in a parking

6    lot in El Paso to transfer to unknown people that are working,

7    from what we believe, with a very dangerous criminal

8    organization.

9    Q.   Okay.  So now this list of firearms in 5AC, these are real

10   legitimate working firearms?

11   A.   Yes, they are.

12   Q.   So if these got out on the street, lots of problems?

13   A.   That's correct, yes, sir.

14   Q.   Okay.  Now in an operational sense you have a deal, you're

15   expecting someone to come pick them up.  And you're not an

16   agent from here in El Paso, are you?

17   A.   That's correct.

18   Q.   Okay.  So you have to kind of have to get a team together?

19   A.   That's right.

20   Q.   What kind of operational things do you have to set up?

21   A.   Well, this is -- this is a huge operation.  ATF, we flew in

22   a tactical team from out of town.  For us as an agency, this is

23   as risky as it gets.  Again, we're dealing with unknown

24   persons.  We don't know if they are coming armed.  We don't

25   know if it's going to be one person or eight people showing up.

1    We don't know if one car is going to show up or four cars that
2    are going to show up.
3          So at this point, this is a very dangerous situation,
4    a very tense situation.  Our tactical team was requested by the
5    case agent and the supervisor, ATF supervisor here.  So we flew
6    an entire team to assist with this operation because we know
7    that, you know, if one of these firearms gets lost, we're going
8    to have some serious issues.  And again, there was a lot of
9    unknowns, so we have to prepare for a very tense arrest.
10   Q.  What's the date that you and Fernanda agreed upon to
11   transfer these firearms?
12   A.  August 21st of 2023.
13   Q.  And what's supposed to, I guess, generally --
14   operationally, what's supposed to happen on August 21st?  What
15   are you planning for?
16   A.  So the plan was -- the story I was pitching to her was
17   let's meet.  Let me meet your people.  Again, we call that a
18   pre-meet.
19         So these firearms are staged in a storage unit
20   warehouse, as the photographs that were shown earlier.  The
21   idea is to have a pre-meet location.  Like I said earlier, not
22   only to see the money as you heard in the phone call, I want to
23   make sure that they have the money to conduct the transaction.
24         If they don't have the money, then we're not going to
25   move to phase two and take them where the firearms are, to

Benavides - Direct by Mr. Myers

1    avoid a ripoff or to avoid us getting robbed.

2            In this sense again, we're playing with a lot of

3    unknowns from a very risky organization.  We don't know if one

4    guy is showing up or five guys are showing up.  That's the

5    reason for a pre-meet.

6            In my mind, and the way we briefed it, was we're going

7    to have a pre-meet to meet these unknown persons and try to

8    identify as many co-conspirators, lay-off vehicles, maybe

9    countersurveillance vehicles.  She seemed to be -- you know,

10   have people here.  She said that numerous times, so our goal

11   was try to identify as many as possible.

12   Q.  Now, you've never met Fernanda?

13   A.  No, sir.

14   Q.  Prior to August 21st, 2023, you'd never met Mr. Ramos or

15   Mr. Hernandez, correct?

16   A.  That's correct.  Yes, sir.

17   Q.  So when you're doing these undercover operations, how do

18   you know that you're not dealing with someone who is there

19   unintentionally or unknowingly?

20   A.  We talk.  We engage in conversation to make sure that they

21   are not, like you said, not just there.

22            And that's another reason for the pre-meet.  We don't

23   ever want to take -- I shouldn't say ever, but we don't ever

24   try to take suspects to a location where we are bringing

25   product out, in this case the firearms, not knowing who we're

1    dealing with.

2            Again, it's just part of our job.  It's part of the

3    gathering intelligence, conducting surveillance.  We try to

4    identify even countersurveillance.  Some of these operations

5    there's a lot of vehicles involved.

6    Q.  Okay.  I would like to show you another exhibit that has

7    not been admitted into evidence.  I would like to show you

8    Government's Exhibit 5B.

9            Do you recognize Government's Exhibit 5B?

10   A.  Yes, I do.

11   Q.  Is this a map of the area of the transactions?

12   A.  Yes, sir, it is.  Yes, sir.

13           MR. MYERS:  Your Honor, I'd offer Government's

14   Exhibit 5B into evidence.

15           MR. GUTIERREZ:  No objections, Your Honor.

16           THE COURT:  Government's Exhibit 5B will be admitted.

17           MR. MYERS:  May I publish to the jury, Your Honor?

18           THE COURT:  You may publish.

19   BY MR. MYERS:

20   Q.  What are we looking at in Government's Exhibit 5B?

21   A.  So this is an aerial photograph of the pre-meet location.

22   And that's going to be on the top right of the map, or on the

23   top right of the photograph.

24           And on the left -- or on the bottom left --

25   correction.  On the bottom left is the storage unit facility

Benavides - Direct by Mr. Myers

1    where the arrest ended up happening.  So the pre-meet location

2    to try to meet people, try to identify other vehicles, other

3    persons, and to see the money, happen at the Circle K there

4    where you have the cursor.  Yes, sir.  Right there.

5    Q.  Okay.  So I kind of highlighted this section.

6    A.  Yes.

7    Q.  Actually, you know, if you touch that screen right there, I

8    think it will mark on the exhibit.

9    A.  Here?  There we go.

10   Q.  Okay.  So this area that you've indicated that's kind of

11   towards the top on the right, this is the pre-meet you've been

12   talking about?

13   A.  Yes, sir.

14   Q.  And operationally, what's going to happen at the pre-meet

15   location?

16   A.  There again, like I explained, we are -- as an agency, we

17   are trying to make sure that the suspects are ready with the

18   money.  And that is for officer safety reasons, to avoid me and

19   my partner getting robbed of twenty AK-47s and two Barrett .50

20   cals.  We want to see the money before we take them to this

21   location where the firearms are being stored and to identify

22   additional co-conspirators.

23   Q.  Now on the day of August 21st, 2023, are you working this

24   undercover operation alone?

25   A.  No, sir.

Benavides - Direct by Mr. Myers

1    Q.   Who else is involved?

2    A.   Another agent, another ATF agent, agent Badge Number 5578.

3    Q.   And so there's another undercover agent with you?

4    A.   That's correct.

5    Q.   Are you the only two law enforcement agents out there?

6    A.   No, sir.

7    Q.   Who else is out there?

8    A.   There is the entire ATF field office.

9             FBI had a lot of assets out there.

10            I know we had Customs and Border Protection air

11   surveillance.  I believe it was an airplane.  It may have been

12   a helicopter.

13            We had an ATF tactical team from out of town that flew

14   in to effect the arrest.  So there were a lot of assets on the

15   ground, a lot of people.  There was a lot of logistics

16   happening on that day.

17   Q.   Okay.  So let's break it down a little bit.  And then when

18   you said the ATF field office, these are special agents like

19   yourself?

20   A.   Oh, yes.  I'm sorry.  Yes, sir.

21   Q.   And are they conducting surveillance?

22   A.   Yes, sir.

23   Q.   And what are they surveilling?

24   A.   They're surveilling the entire area.  Again, this is a

25   high, tense situation.  And we have a lot of surveillance

Benavides - Direct by Mr. Myers

1   people out there in unmarked vehicles just trying to identify

2   additional co-conspirators that we do not know about.  And also

3   again, for officer safety reasons.

4         We don't know if the suspects are coming armed or not.

5   And we know nothing about them.  All we know is that we're

6   going to meet unknown people.  And we don't know, again, if

7   it's going to be one or five or six or eight of them.  So we

8   have a lot of unmarked surveillance units all in and around the

9   Circle K area trying to find additional suspects and vehicles.

10  Q.  Now here on Government's Exhibit 5B, in the bottom

11  left-hand corner, this is where the storage unit facility is?

12  A.  That's correct.  Yes, sir.

13  Q.  And this is where the weapons are located?

14  A.  That is correct.  Yes, sir.

15  Q.  Okay.  Now, you had talked about a special response team.

16  Is this where they're at?

17  A.  Yes.  That's where they are -- that's where they're hidden.

18  Yes.

19  Q.  Okay.  So now August 21st, 2023, what time is this deal

20  supposed to take place?

21  A.  We had agreed at 1:00 p.m. in the afternoon.  Approximately

22  1:00 p.m. we were going to meet and conduct the transaction.

23  Q.  Okay.  Now, does this transaction take place at 1:00 p.m.?

24  A.  It does not.

25  Q.  Do you know why it doesn't take place at 1:00 p.m.?

Benavides - Direct by Mr. Myers

1    A.   She told me -- Fernanda told me earlier that morning that

2    she actually flew into Juárez to bring half of the money.  So

3    she was in Juárez and had provided the money.

4        Her local associate did not have the entire amount of

5    money to purchase everything, so she flew in with the

6    additional half of the money -- of the funds.  And apparently

7    they were having some issues crossing it, in the sense of it

8    was just --

9        MR. GUTIERREZ:  Objection, Your Honor.  Lacks personal

10   knowledge, 602.

11       THE COURT:  Mr. Myers?

12       MR. MYERS:  This is what Fernanda is telling him.

13   It's not really offered for the truth of the matter asserted.

14   He's just telling the conversation.  It could be true; it can

15   be false, but this is what Fernanda is telling him.

16       THE COURT:  Overruled.

17       You may answer.

18       THE WITNESS:  Thank you.

19   BY MR. MYERS:

20   Q.  You can continue.

21   A.  So yes.  The text message communication, Fernanda is

22   telling me she's having issues bringing the money over to the

23   United States side.  And she --

24   Q.  You don't know if that's true or not?

25   A.  We don't know.  We just know that the 1:00 deadline has

1    come and gone, and she keeps extending to 4:00, 5:00.  She

2    wanted some more time.

3           And it's common.  That is a common thing that happens

4    during these operations.

5    Q.  Now during this time, do you receive the number of the

6    person who you're supposed to coordinate with?

7    A.  I do.

8    Q.  Okay.  And whose number do you receive?

9    A.  I receive a contact folio through my -- on my phone through

10   WhatsApp.  And it's labeled Sr. Fros, S-R, space, F-R-O-S.

11   Q.  Okay.  And whose phone number does that belong to?  Who do

12   you end up talking to?

13   A.  Rene Hernandez Cordero, sitting at the table back there.

14   Q.  The defendant?

15   A.  Yes, sir, the defendant.

16          MR. MYERS:  Your Honor, I would like to publish to the

17   jury Government's Exhibit 5N and 5O.

18          THE COURT:  You may.

19     (Phone call played.)

20   BY MR. MYERS:

21   Q.  All right.  At the beginning of this phone call in

22   Government's Exhibit 5O, you're dialing a new number?

23   A.  That's correct.  Yes, sir.

24   Q.  All right.  Now, this number ends in 2414?

25   A.  That's correct, yes, sir.

Benavides - Direct by Mr. Myers

1   Q.  How did you get this number?

2   A.  She text messaged me earlier that morning.  And that's when

3   she informed me she was in Juárez, and that to use that number

4   from here forward to complete the sale.

5   Q.  Okay.  And the area code that goes along with it is 6-5-6.

6   Are you familiar with that area code?

7   A.  Yes, sir.  I believe that is a Juárez area code, yes.

8   Q.  Now you had been discussing money, I guess, also at this

9   point again kind of like you previously discussed?

10  A.  Yes.

11  Q.  Does she also end up sending you a photograph?

12  A.  She does.

13  Q.  Okay.

14          MR. MYERS:  Your Honor, I would like to enter an

15  exhibit that's not yet been admitted into evidence.  And it's

16  going to be Government's Exhibits 8H and 8I.

17  BY MR. MYERS:

18  Q.  Special Agent Benavides, do you recognize Government's

19  Exhibit 8H?

20  A.  I do.

21  Q.  Is this a photograph of your phone?

22  A.  It is a photograph in my phone.  Yes.

23  Q.  And does this fairly and accurately show a conversation or

24  part of one you had with Fernanda?

25  A.  Yes, sir.

Benavides - Direct by Mr. Myers

1    Q.  And Government's Exhibit 8I -- oops -- is that a

2    translation of that brief conversation?

3    A.  Yes, it is.

4              MR. MYERS:  Your Honor, I'd offer Government's

5    Exhibits 8H and 8I into evidence.

6              MR. GUTIERREZ:  No objection.

7              THE COURT:  Government's Exhibits 8H and 8I will be

8    admitted.

9              MR. MYERS:  May I publish to the jury Your Honor?

10             THE COURT:  You may publish.

11   BY MR. MYERS:

12   Q.  What are we looking at in Government's Exhibit 8H?

13   A.  That is a photograph that Fernanda sent me earlier in the

14   day.  As we were discussing, you know, she was telling me about

15   the money being crossed over.

16             That photograph depicts a large bundle of

17   United States currency sitting in a center console of a vehicle

18   later determined to be driven by the defendant.

19             MR. GUTIERREZ:  Objection, Your Honor.  Facts not in

20   evidence -- or assumes facts.

21             THE COURT:  I'll sustain the objection.

22   BY MR. MYERS:

23   Q.  Okay.  So you had -- this photograph of money is of what

24   Fernanda sent you?

25   A.  Yes.

Benavides - Direct by Mr. Myers

1    Q.  Or -- is it a photograph or a video?

2    A.  It's like a two-second video.  There's no words or

3    anything.  It's just a quick two-second quick video that she

4    sent me.

5    Q.  And what's the purpose of sending you this quick video of

6    cash?

7    A.  To let me know the money was, in fact, in route to conduct

8    the transaction.

9    Q.  All right.  Now eventually, you meet with Mr. Hernandez?

10   A.  I do.

11   Q.  And what car was he driving?

12   A.  He was driving a white Ford Bronco.

13   Q.  And you were able to look inside that white Ford Bronco?

14   A.  I have, yes.

15            MR. MYERS:  Your Honor, I would like to show the

16   witness some exhibits that have not yet been admitted into

17   evidence.

18            THE COURT:  You may.

19   BY MR. MYERS:

20   Q.  Government's Exhibit 8F.

21            Do you recognize Government's Exhibit 8F?

22   A.  Yes, sir, I do.

23   Q.  Does that fairly and accurately depict the inside of

24   Mr. Hernandez' vehicle?

25   A.  Yes, it does.

Benavides - Direct by Mr. Myers

1   Q.  I would like to show you Government's Exhibit 8G.  Is this

2   another angle of that same inside of that vehicle?

3   A.  Yes, it is, sir.

4           MR. MYERS:  Your Honor, I offer Government's

5   Exhibits 8F and 8G into evidence.

6           MR. GUTIERREZ:  No objections, Your Honor.

7           THE COURT:  Government's Exhibit 8F and 8G will be

8   admitted.

9           MR. MYERS:  May I publish to the jury, Your Honor?

10          THE COURT:  You may publish.

11  BY MR. MYERS:

12  Q.  If we look at Government's Exhibit 8F inside Mr. Hernandez'

13  vehicle what do you notice?

14  A.  I notice that handle.  It's a Ford Bronco SUV.  It's a

15  handle, I'm assuming to hang on if you're driving off road.

16  But that is a very distinct color of orange.  That photograph

17  was taken post-arrest after Mr. Cordero was arrested.

18  Q.  Did it look familiar to you?

19  A.  It does.  It looks like the same vehicle of the photograph

20  in the small two-second video that she sent me.

21  Q.  If we go and look -- go back and look at Government's

22  Exhibit 8H, do you still see that same orange trim?

23  A.  Yes, I do.

24  Q.  So whose vehicle do you think it is that Fernanda sent you?

25          MR. GUTIERREZ:  Objection, Your Honor.  Facts not in

 1   evidence.  The fact that this vehicle -- it could be other

 2   vehicles that have the same make and model and the same style.

 3   There's no way for the officer to be able to testify that that

 4   is the same vehicle.

 5           THE COURT:  I'll sustain the objection.

 6           MR. GUTIERREZ:  Thank you, Your Honor.

 7           MR. MYERS:  Your Honor, I would like to publish

 8   Government's Exhibit 5R -- no, excuse me -- 5P and 5Q into

 9   evidence -- publish to the jury, excuse me.

10           THE COURT:  5P and 5Q, they have not been admitted --

11   oh, I'm sorry, they have.  I stand corrected.  Yeah, they were

12   admitted.  You may publish.

13           MR. MYERS:  Thank you, Your Honor.

14      (Phone call played.)

15   BY MR. MYERS:

16   Q.  What are you discussing in phone call Exhibit 5Q?  What's

17   going on?

18           THE COURT:  Mr. Myers, let me interrupt you.

19           MR. MYERS:  Yes, sir.

20           THE COURT:  It's time for our afternoon break.

21           So we'll be in recess for the next 15 minutes.

22      (Recess taken 3:01 to 03:18 p.m.)

23           THE COURT:  Mr. Myers, you may continue.

24           MR. MYERS:  Thank you, Your Honor.

25

Benavides - Direct by Mr. Myers

1   BY MR. MYERS:

2   Q.  Special Agent Benavides, on August 21st, 2023, did Fernanda

3   provide -- finally provide you with the number of the person

4   that you were supposed to get in contact with?

5   A.  Yes, she did.

6   Q.  What did you do with that phone number?

7   A.  I placed a phone call to that phone number.

8           MR. MYERS:  Your Honor, I would like to publish

9   Government's Exhibits 5R and 5S into evidence -- or publish to

10  the jury, excuse me.

11          THE COURT:  You may.

12      (Phone call played.)

13  BY MR. MYERS:

14  Q.  Here in the beginning of Government's Exhibit 5R, you

15  didn't kind of dictate the number this time?

16  A.  Right.

17  Q.  Okay.  Why didn't you do that, or was that just a mistake?

18  A.  No.  It was just an oversight.  We were sitting in a

19  parking lot waiting for this deal to happen.  It was just an

20  oversight.

21  Q.  Okay.  Now in that, you say that this is a followup with an

22  unknown person.  But when we created the exhibit, we attributed

23  certain voices to Hernandez Cordero?

24  A.  Yes, sir.

25  Q.  Okay.  How do you know the person on the other end of that

Benavides - Direct by Mr. Myers

1    line is Hernandez Cordero?

2    A.  Because he answered the telephone.  And as you see here, as

3    we push forward, when he arrived at the Circle K, he placed the

4    phone call to me from that same number.  And that's how we

5    ended up meeting at the Circle K.

6    Q.  Now also Mr. Hernandez Cordero, in this phone call, does he

7    say what kind of car he's driving?

8    A.  He did.  He said he's in a Ford Bronco.

9    Q.  Now -- and when the deal actually goes down, what car was

10   Mr.- -- what vehicle was Mr. Hernandez Cordero driving?

11   A.  A white Ford Bronco.

12   Q.  So this is how you're putting two and two together?

13   A.  Yes, sir.

14   Q.  All right.  So at the time, on August 21st, you don't know

15   who it is.  But later you learn?

16   A.  We don't know who it is.  All I know, he said "We just

17   crossed."  So at this point we're expecting more than one

18   person.  And obviously, he states that two vehicles are coming.

19   Q.  Okay.  Now what two vehicles are coming, according to

20   Mr. Hernandez Cordero?

21   A.  The vehicle he's in, the white Ford Bronco, and then a Ford

22   F-150.

23   Q.  Now in this phone call, he mentioned that there's going to

24   be somebody else in there.  Do you remember what -- what

25   exactly Mr. Hernandez Cordero said?

Benavides - Direct by Mr. Myers

1    A.   Yes.   He said that he was bringing the money for the

2    transaction, and that I would give the items to the person in

3    the F-150.

4    Q.   Okay.   So now he doesn't say -- does he use a code word, a

5    known code word for specifically the firearms?

6    A.   I'm trying to find it here.

7    Q.   I think you're looking for it here on this highlighted

8    section.

9    A.   Yeah.   He just says, "I'm in a Ford Bronco.   The guy you're

10   going to give the stuff to is in a Ford F-150 -- or an F-150."

11   Q.   So this stuff or things, it could be anything, correct?

12   A.   Correct.

13   Q.   All right.   Now the address here, the 1001 -- or 10001

14   Dyer, what is that address?

15   A.   That is the Circle K.   That is the address to the Circle K

16   that I passed on to Fernanda.

17   Q.   Okay.   Is this the address of the pre-meet that we had

18   discussed, that map?

19   A.   That's correct.

20   Q.   All right.

21        MR. MYERS:   I'd like to publish to the jury

22   Government's Exhibit 5T, Your Honor.

23        THE COURT:   You may.

24   BY MR. MYERS:

25   Q.   All right.   Before we view Government's Exhibit 5T, what is

Benavides - Direct by Mr. Myers

1  Government's Exhibit 5T?

2  A.  It should be an undercover video, or an audio/video

3  recording of the undercover transaction with the defendant and

4  suspect Ramos.

5  Q.  Okay.  At the beginning of the video, where -- where are

6  you going to be?

7  A.  I am the driver of the vehicle.  We are -- I'm the primary

8  undercover agent, and then my partner is the secondary

9  undercover agent.  I'm driving the undercover vehicle at the

10  time.  We are parked at the Circle K waiting for their arrival.

11      (Video played.)

12  BY MR. MYERS:

13  Q.  Looking here in the video, 3 mintues and 50 seconds, what

14  exactly is going on?

15  A.  We -- myself and my partner exit the vehicle.  We're just

16  waiting on the arrival.  I open the hatchback to the undercover

17  vehicle, I believe doing something with some equipment back

18  there, to make sure it was on.

19  Q.  Now, is there any items in particular that you have with

20  you?  Let me pause it.

21      (Video paused.)

22  BY MR. MYERS:

23  Q.  Is there any particular items that you have with you in the

24  undercover vehicle?

25  A.  Yes.  We brought one AK-47 to show to the -- to the unknown

Benavides - Direct by Mr. Myers

1   persons that were coming, just to validate that we were ready.
2   And I also had a photograph to show them of additional firearms
3   staged in the storage facility.  But we did have one there in
4   the undercover vehicle.
5   Q.  Let's get back to watching the video in Government's
6   Exhibit 5T.  I'll fast-forward.
7       (Video continued.)
8   BY MR. MYERS:
9   Q.  All right.  We're at the six-minute mark on the video.  I
10  guess you kind of heard yourself mentioning the white Bronco?
11  A.  Yes, sir.  We saw -- or my partner saw the white Bronco or
12  a white Bronco on the turning lane on Dyer Street.
13  Q.  Okay.
14      (Video continued.)
15          MR. MYERS:  I'll pause at the 7 minute 41 second mark.
16  BY MR. MYERS:
17  Q.  You were on the phone right there?
18  A.  Yes, sir.
19  Q.  Who were you speaking with?
20  A.  I was speaking with the defendant.
21  Q.  And what was said during that brief transaction right
22  there?
23  A.  He pulled up right next to us, right to the left of me, and
24  so I saw him.  Still we don't know if that was him or not.  We
25  assumed it was him.  And he called me, and I could see him on

Benavides - Direct by Mr. Myers

1    the telephone.  So I told him, "It's you in the Bronco.  I'm

2    right next to you."

3    Q.  We'll go back to playing Government's Exhibit 5T.

4        (Video continued.)

5            MR. MYERS:  I'll pause at the 12 minute and 33 second

6    mark.

7    BY MR. MYERS:

8    Q.  I guess it's hard to have the translation and the video at

9    the same time, but could you walk the jury through your

10   conversation with Mr. Hernandez?

11   A.  Yes.  So he's -- he remained in the vehicle, as you saw.

12   We're having a conversation in -- through the window.  He tells

13   me that he's waiting for the other person to show up in the

14   F-150.

15           During the whole time he's texting other people.  And

16   I think at some point -- at one point he gets on the phone and

17   calls people.  No idea who he's talking to, but I -- we discuss

18   the firearms that they're going to pick up.

19           I tell them that there's going to be twenty AK-47s and

20   two Barrett .50 caliber rifles?

21   Q.  To be fair, I mean, you didn't say the words AK-47s or

22   Barrett .50 caliber, correct?

23   A.  Correct.  I used the slang term *cuernitos*.  *Cuernitos de*

24   *chibo* or *cuernitos*.  Yes.

25   Q.  And for the .50 calibers, do you recall how you referred to

Benavides - Direct by Mr. Myers

1  them?

2  A.  I think I said *las grandes cinquentas*, or something to that

3  effect.  *Cinquentas grandes.*

4  Q.  Now, you've -- we do have a transcript, Government's

5  Exhibit 5T.  You've reviewed that transcript?

6  A.  Yes, I have.

7  Q.  Okay.  And does it correlate with your memory of the

8  conversation you had with Mr. Hernandez?

9  A.  Yes, sir.

10  Q.  Okay.  Now, you also -- what is it about Mr. Hernandez'

11  voice that you can -- or that you don't hear on the video?

12  A.  Well, he's sitting a little distant from me.  I think the

13  vehicle is still on, so it's hard to understand some of what

14  he's saying.  But you know, after I tell him what he's going to

15  pick up, what he's purchasing, I show him a photograph of the

16  firearms staged.  He seems a little nervous.  He seems a little

17  nervous.  I mean quite frankly, I was nervous.

18  Q.  Okay.  Now, after this, what's going to happen once we

19  start going back to viewing the video?  What's the jury going

20  to see?

21  A.  So at this point he says -- I show him the photograph that

22  you showed earlier depicting the firearms staged in the storage

23  facility.

24       At some point he makes contact with the other

25  individual, the other defendant.  And he tells me that the

1    other defendant is parked at a different Circle K, and he's

2    going to leave to go bring him back.  So...

3    Q.  Okay.  Who is this other defendant?  I mean eventually, you

4    learn who he is?

5    A.  Yes, defendant Ram- --

6    Q.  Who is it?

7    A.  Defendant Ramos, Jesús Ramos.

8    Q.  All right.  Now, is Mr. Hernandez going to leave the

9    7-Eleven -- or the Circle K, excuse me -- at any point in time

10   during this video?

11   A.  Yes, he does.

12   Q.  Okay.  Do you know where he goes?

13   A.  He tells me that he's going to go meet with the other

14   defendant who's parked at a different Circle K.  He doesn't

15   know the area.

16        I think my partner at one point says, Well, send me

17   the address.

18        And he says no.  No.  I'm just going to go, you know,

19   pick him up, or go grab him, go get him.

20   Q.  And does Mr. Hernandez drive away from the area?

21   A.  Yes, he does.

22   Q.  Going back to Government's Exhibit 5T.

23      (Video played.)

24   BY MR. MYERS:

25   Q.  Now as we're watching Government's Exhibit 5T, you see

1    Mr. Hernandez speaking on the phone?

2    A.  Yes, sir.

3    Q.  Do you know who he's speaking with?

4    A.  I don't.  He made several phone calls, and I think several

5    text messages.  I couldn't tell you who he was talking to.

6    Q.  Also in the video, you had mentioned earlier in the video,

7    *La señora*?

8    A.  Yes.

9    Q.  Who were you referring to?

10   A.  So he asked me if I had met *la señora*, and he was referring

11   to Fernanda.

12          I told him that I just knew her through telephone

13   conversation, but never met her, but was looking to conduct

14   future business transactions with her.

15   Q.  So it appeared that he was referencing the person you had

16   been negotiating this deal with?

17   A.  Yes, sir, I believe so.

18      (Video continued.)

19          MR. MYERS:  Your Honor, I would like to publish

20   Government's Exhibit 5V to the jury.

21          THE COURT:  I don't have it as being admitted.  5V.

22   That's the second video?

23          MR. MYERS:  Video Number 2, yes, Your Honor.

24   BY MR. MYERS:

25   Q.  Have you reviewed Government's Exhibit 5V?

Benavides - Direct by Mr. Myers

1   A.  Yes, sir.

2   Q.  Does it fairly and accurately depict the undercover meet

3   that you had with Mr. Hernandez Cordero?

4   A.  Yes, it does.

5           MR. MYERS:  Your Honor, I offer Government's

6   Exhibit 5V into evidence.

7           THE COURT:  Any objection?

8           MR. GUTIERREZ:  No objections, Your Honor.

9           THE COURT:  Government's Exhibit 5V will be admitted,

10  and you may publish.

11          MR. MYERS:  Thank you, Your Honor.

12      (Video played.)

13  BY MR. MYERS:

14  Q.  I've paused Government's Exhibit 5V at the 1 minute

15  30 second mark.  You just had a conversation with

16  Mr. Hernandez?

17  A.  Yes, sir.

18  Q.  And what was that conversation about?

19  A.  That's when he explains to me that the -- the other unknown

20  suspect was at a different Circle K and that he wanted to go

21  pick him up.

22          My partner, the other undercover ATF agent, asked him

23  to send him a message.  And he said, He just doesn't know the

24  area, so I'm going to get him, and he left.

25  Q.  And your other partner, what color shirt was he wearing?

Benavides - Direct by Mr. Myers

1    A.   He's wearing a white T-shirt with a gold necklace on.

2    Q.   All right.  We briefly see him in these videos?

3    A.   Yes.

4    Q.   Now, what about the money?  Do you know anything about the

5    money at this point in time?

6    A.   I don't know if he has the money yet.  He's left.  I

7    haven't seen the money.  I don't know if he has the money on

8    him or not at this point.

9         (Video continued.)

10   BY MR. MYERS:

11   Q.   All right.  We heard you talking to somebody.  Who were you

12   talking to?

13   A.   I'm talking to the entire team, primarily -- based on our

14   training, we talk through the wire, is what we call it.  We

15   don't have radios in there to communicate with them, to the

16   team that's out there, to the surveillance team.  So I'm giving

17   an update through the wire to the team, so they can listen in

18   to what's happening, why he's leaving.  I'm updating them on,

19   you know, the conversation and why he's leaving.

20        My partner, at the same time, I believe, is texting

21   some of the case agents also on the side.  That is our only

22   mode, you know, to be able to get information out to the

23   surveillance units.

24   Q.   Okay.  Now we'll fast-forward here to these parts of the

25   video, but we're going to skip over.

1          What do you do at the 7-Eleven [sic] until the

2    vehicles show up?

3    A.  We just sit there and wait.  We stayed there the entire

4    time.

5    Q.  All right.  If we start back up on Government's Exhibit 5V

6    at the 7 minute and 23 second mark, this is kind of about where

7    Mr. Hernandez, he is about to return?

8    A.  Yes, sir.

9        (Video played.)

10   BY MR. MYERS:

11   Q.  If we pause here at the 8 minute mark, you've just had a

12   conversation with Mr. Hernandez.  What was the conversation

13   about?

14   A.  Yes.  He tells me that the other person is there.  We still

15   don't know who the second person is.  We assume it's that F-150

16   in the video, but we don't know.  We haven't made contact with

17   that person.

18          So I talk to the defendant, and he said they're ready

19   to go.

20          I told him that I told Fernanda that I wanted to see

21   the money, to make sure they were ready before the transaction

22   was finalized, and he complies with that.  He opens --

23   Q.  But what happens next?

24   A.  He opens the center console and pulls up a clear plastic

25   bag containing a large sum of United States currency.

1    Q.  Did it look like the currency that we saw in that other

2    text message that Fernanda sent you?

3    A.  Yes, it did.

4           MR. GUTIERREZ:  Your Honor, I'm going to object to

5    speculative.

6           THE COURT:  I'll sustain the objection.

7    BY MR. MYERS:

8    Q.  Now as a preview, before we get back to looking at

9    Government's Exhibit 5V, what's going to happen in the next

10   part of the video here?

11   A.  So at this point, we still have not met the second suspect.

12   As I'm talking to this defendant, the second suspect walks over

13   to my partner and generally just says, Hey, I'm here to pick up

14   some things from you guys.

15          My partner makes that known to me.  And you'll see in

16   the video the second suspect, Ramos, starts walking back to his

17   vehicle, which is now that F-150 in the video.

18          At that point, this defendant honks at him and says,

19   Bring them back, or something.  So you'll hear the horn on his

20   Bronco get hit, and I actually yell at the person, Hey, come

21   back here.

22      (Video continued.)

23   A.  That's the second suspect there walking to talk to my

24   partner.

25      (Video continued.)

Benavides - Direct by Mr. Myers

1  BY MR. MYERS:

2  Q.  Government's Exhibit 5V.  I'm going to let it play on mute.

3       Now, where are you?  You're driving in your vehicle.

4  Where are you headed?

5  A.  We are headed -- now that I've seen the money, we're headed

6  now to the location, to the storage facility, to finalize this

7  firearms transaction.

8  Q.  Now, something -- are all parties going to make it to the

9  storage facility?

10  A.  That was the plan.  But --

11  Q.  What happens?

12  A.  So as we depart, the Ford Bronco stays pretty close to me,

13  behind me.  The F-150 somehow, as he left Circle K, allowed

14  traffic to get between him and the Bronco.  And you'll see it's

15  only about a block and a half away.  We drive down to the

16  storage facility.  I pull into the dirt driveway.  The Bronco

17  follows in, and the F-150 continues driving southbound on Dyer.

18  Q.  Can you describe the driveway to this -- to this storage

19  facility?

20  A.  Yes.  It's right off of Dyer Street.  It's just like a

21  gravel, fairly long, maybe 100 yards, 75 yards, I'm guessing.

22  But just a long dirt road, the kind of driveway into the

23  storage facility.

24  Q.  Now operationally, does the ATF have control of this

25  storage facility?

Benavides - Direct by Mr. Myers

1   A.  100 percent control of it.  Yes.

2   Q.  Okay.  And how do you have 100 percent control of this

3   storage facility?

4   A.  We have numerous, numerous -- our tactical team is in

5   there.

6        We have an agent controlling the gate, or at least

7   standing in the office.

8        There were no civilians.  There were no citizens in

9   there.  Even the employees, managers, they were all asked to

10  leave and to assist in the operation.

11       We had complete control of the location.

12  Q.  Now, does this gate -- do you have the ability to lock the

13  gate?

14  A.  Yes.  It's a manual gate.  And you'll see in the video my

15  partner, once we arrive, gets out of the undercover vehicle and

16  goes and opens the gate manually.

17  Q.  Now, is there a purpose -- the gate, is it eventually

18  locked once you travel through it?

19  A.  Yes.  Once we go in, we lock the gate.  Yes.  My part- --

20  Q.  Why is the gate locked?

21  A.  Again, for safety reasons.  If these firearms are able to

22  get in a car, if -- and someone drives off, we need to make

23  sure that they cannot get out.  Ad- --

24  Q.  Okay.  No, please continue.

25  A.  Additionally, measures were made for the safety that we

Benavides - Direct by Mr. Myers

1    don't lose these firearms.  Not only was the gate locked, but

2    we didn't want -- well, the reason the gate was locked is so

3    civilians couldn't come in.  I mean obviously, they don't know

4    we locked it.  And now it's a secure -- it's a secure area for

5    us to conduct the operation.

6            Additionally, we had tactical team members

7    operating -- I believe it was two big U-Hauls at the time of

8    arrest -- that were going to be moved to certain locations also

9    to block anyone from coming or leaving the location.

10   Q.  Now, who are the parties -- or who are the individuals that

11   make it past the gate?

12   A.  Just the defendant sitting behind you at this point -- oh.

13   Myself, my partner in our vehicle, and then the Ford white --

14   the white Ford Bronco with the defendant.

15   Q.  So what happened to Mr. Ramos?  Is he locked out of the

16   facility?

17   A.  Yes.  He drives away.  We actually wait for him for a few

18   minutes at the gate before we go in.  I think we waited about

19   four, four and a half minutes for him.  I believe the defendant

20   was trying to get ahold of him.  I'm not for certain.  I think

21   someone -- you know, they were trying to guide him back.  But

22   we just -- after four minutes we decided to go in, and he never

23   made it in.  The F-150 never made it in.

24   Q.  All right.

25            (Video continued.)

Benavides - Direct by Mr. Myers

1    BY MR. MYERS:

2    Q.  All right.  If we look here at the 17 minute, 23 second

3    mark, what is the jury looking at?

4    A.  Okay.  So I am pulling into -- right immediately next to

5    the left of me is going to be the storage facility where the

6    unit -- where these firearms are staged.

7    Q.  Okay.

8         (Video continued.)

9    BY MR. MYERS:

10   Q.  Now, you reviewed Government's Exhibit 5W?

11   A.  Yes, sir.

12   Q.  And that was a transcript of Government's Exhibit 5V?

13   A.  Yes, sir.

14   Q.  And was it an acceptable translation of the conversations

15   you had with Mr. Hernandez and Mr. Ramos?

16   A.  Yes, sir.

17        MR. MYERS:  Your Honor, I'd offer also into evidence

18   Government's Exhibit 5W, if I haven't already.

19        THE COURT:  I think it's been admitted.

20        MR. MYERS:  It has been admitted?  All right.

21        THE COURT:  5W?

22        MR. MYERS:  5W.

23        THE COURT:  Yeah.  It's been admitted.

24        MR. MYERS:  Okay.  Apologies.

25

 1    BY MR. MYERS:

 2    Q.  Also, too, when you were speaking with Mr. Ramos, you're

 3    showing him your phone.  What were you telling Mr. Ramos and

 4    Mr. Hernandez when they're at the Bronco at the 7-Eleven [sic]?

 5    A.  I again tell Mr. Ramos that they're picking up twenty

 6    AK-47s and two Barretts, two long -- we used code.  I forget

 7    exactly what word we used.  But you know, tell them we're

 8    picking up twenty AKs, the short ones, and two large .50

 9    caliber rifles.  And then I show them the same picture from my

10    phone that I showed to defendant Cordero.

11    Q.  Okay.

12        MR. MYERS:  Your Honor, I would like to publish to the

13    jury Government's Exhibit 5X.

14        THE COURT:  You may.

15    (Video played.)

16    BY MR. MYERS:

17    Q.  If we pause Government's Exhibit 5X at the 57 second mark,

18    what did the jury view there?

19    A.  So they viewed me exiting the undercover vehicle and

20    unlocking the storage facility.

21        The defendant Cordero parked immediately to my right.

22    My partner gets out of the vehicle.  The defendant gets out of

23    his vehicle.  By the time he makes it to the door, I already

24    have the doors open, and all the firearms are laid out on the

25    floor, as the picture you saw earlier.

Benavides - Direct by Mr. Myers

1    Q.  And why are you doing that?

2    A.  Just to show him that the firearms were there.  And really,

3    I mean, to calm everyone's nerves.  I think he was nervous.  We

4    were all nervous.  What was going to happen?  That normally

5    eases everyone's tension.  He knows he's got a large amount of

6    money, so he's nervous.  You know, he's nervous that he's got

7    money.  He wants to make sure the product is there.  And so

8    that's why I opened it, so he can view those pretty quick.

9    Q.  Now in the video, I heard you ask about money.

10   A.  Yes.

11   Q.  What did you ask him?

12   A.  So I told him -- he looked at them and he immediately said,

13   Hey, can we use some of those bins?

14        We had some bins, just random stuff staged in the

15   storage unit.  There were some gray bins back there.

16        And he said, Hey, can we use some of those bins to put

17   the firearms in?

18        And I said, Yeah, no problem.  But I said, Why don't

19   you give the money to my partner so he can start counting it.

20   And then, you know, we can start getting -- you know, packing

21   the rifles and such.

22   Q.  Now in the preview, in the next couple of minutes we're

23   going to see in Government's Exhibit 5X -- what is the jury

24   going to see?

25   A.  So he provides the clear plastic baggie that he showed me

Benavides - Direct by Mr. Myers

1    at the Circle K.  He provides it to my partner.  And that
2    contains -- he tells me it contains $63- -- or $60,000.  And he
3    pulls out an additional $3,000 from his wallet and hands it to
4    my partner.
5            The total amount for the firearms was $66,000.
6    Fernanda had already paid a 3,000 down payment, so 63,000 were
7    due.  There was $60,000 in a clear plastic bag and he pulled
8    out 3,000 from his wallet and gave them all to my partner.
9        (Video continued.)
10   A.  At this point my partner has got the bag with the money.
11       (Video continued.)
12   BY MR. MYERS:
13   Q.  If we pause Government's Exhibit 5X at the two minute
14   mark -- I don't think we say it directly on video -- but what
15   was happening?  What was Mr. Hernandez reaching for?
16   A.  He provided -- he pulled out his wallet and pulled out 30
17   $100 bills and then handed them over to my partner.
18       (Video played.)
19   BY MR. MYERS:
20   Q.  All right.  Would you kind of explain to the jury what
21   happened in the last part of Government's Exhibit 5X?
22   A.  Yes, sir.  Once payment was made and the transaction was
23   finalized, the second undercover agent moved our vehicle out of
24   the way.  The defendant was able to back in his Ford Bronco on
25   his own.  He exited his Ford Bronco.  He opened the tailgate to

Benavides - Direct by Mr. Myers

1    his Bronco.

2          And I had moved the bin that he asked for earlier, and

3    I placed it in front of the guns, in front of the firearms.

4    And he loaded five of the AK-47s into the plastic bins, and

5    then we -- we loaded the tote onto the tail end of his Bronco.

6          At that point the transaction was finalized.  They had

7    paid for it.  They were receiving the shipment.  And at that

8    point it was time for me to gain my separation so an arrest

9    could be conducted.

10   Q.  All right.  That loud bang we heard in the video, what was

11   that?

12   A.  Those are diversionary devices that are used by tactical

13   teams to cause confusion during arrest operations.

14   Q.  Now, I think you previously testified that earlier in the

15   day there are other cameras staged in this area?

16   A.  Yes, sir.

17   Q.  And where were those other cameras?

18   A.  There was one camera staged in the unit.  And that was

19   staged by the tactical team, so they can get a live feed as

20   things were progressing.

21   Q.  And those would be Government's Exhibits 5Z and 5AA?

22   A.  Yes, sir.

23          MR. MYERS:  Your Honor, I would like to publish those

24   exhibits to the jury.

25          THE COURT:  Yes, you may.

Benavides - Direct by Mr. Myers

1          (Video played.)

2      BY MR. MYERS:

3      Q.  We're starting at the 2 minute mark of Government's

4      Exhibit 5Z.

5              Who are we going to see first?

6      A.  That's me opening the door to the -- to the warehouse.

7      Q.  And there's no audio to this exhibit, correct?

8      A.  There is no audio, correct.  The sole purpose for this was,

9      like I said, for the tactical team, who was staged two doors

10     down, to have a live feed of the actions that were happening in

11     there.

12     Q.  All right.  Now if we pause Government's Exhibit 5Z at the

13     2 minute and 34 second mark, how many people are on video?

14     A.  There's three people.

15     Q.  And to your furthermost right, who is on that video -- or

16     who's on that side of the screen?

17     A.  To the farthest right is the defendant Cordero.

18     Q.  Who is in the middle?

19     A.  That is my partner ATF agent.

20     Q.  And who is on the other side?

21     A.  That's me.

22              There, my partner goes to retrieve the one AK-47 that

23     we have in our vehicle.  So you see him bring it in, and that

24     will be the twenty AK-47s.  There's the rifle.  So now we have

25     twenty AK-47s.

Benavides - Direct by Mr. Myers

1   Q.   Now in the audio version that we listened to, what part is
2   this that you're asking Mr. Hernandez Cordero about?
3   A.   To go get the money.  At this point, he has seen the
4   merchandise, and now we need to start counting the money.
5   Q.   All right.  If we pause Government's Exhibit 5Z at the
6   3 minute twenty second mark, your partner is in the white
7   shirt?
8   A.   That's correct, sir.
9   Q.   What is in his hand?
10  A.   The clear plastic bag containing $60,000.
11  Q.   If we pause Government's Exhibit 5Z at 3 minutes
12  45 seconds, to the left of the screen you just see the brim of
13  a hat, some hands.  Whose hands and whose hat is that?
14  A.   That is the defendant, defendant Cordero's.  He's standing
15  there.
16  Q.   What is he doing at this point in time?
17  A.   He's counting the money from his wallet.  Like I said, 30
18  $100 bills is what he provided.  He's counting it there.  Yeah.
19  Q.   Now what's happening now, at this point in time?
20  A.   So he's paid for the firearms.  In a sense, this
21  transaction is complete now.  He's just going to move his
22  vehicle and start loading the firearms into his vehicle.
23  Q.   Does this video continue on Government's Exhibit 5AA?
24  A.   Yes, sir.
25           MR. MYERS:  May I publish to the jury, Your Honor?

Benavides - Direct by Mr. Myers

1           THE COURT:  You may.

2        (Video played.)

3    BY MR. MYERS:

4    Q.  If we pause at the 58 second mark of Government's

5    Exhibit 5AA, what was Mr. Hernandez Cordero doing prior -- just

6    prior to this moment?

7    A.  He loaded five AK-47s onto the plastic bins.

8    BY MR. MYERS:

9    Q.  I'll continue with Government's Exhibit 5AA.

10        (Video played.)

11   BY MR. MYERS:

12   Q.  Is that the flash bang?

13   A.  Yes, sir.

14   Q.  Okay.  Now, the video abruptly ends.  Is that on purpose?

15   A.  Yes, it is.

16   Q.  And why is that?  Do you know?

17   A.  Well, that was a decision made by the tactical team.  Just

18   to avoid tactics being -- you know, I guess, you know, being

19   put on YouTube maybe.  I don't know.  But normally when they do

20   these, once the arrest is effected, the video gets shut.

21   Q.  Now, what ended happening to Mr. Hernandez Cordero?

22   A.  So as you saw, the distractionary diversion devices are

23   deployed.  So there's one -- I believe there's one or two in

24   the unit, there's one on outside the unit.  And those, like I

25   said, are just made to confuse the people.  As you see me, I

Benavides - Direct by Mr. Myers

1   gained separation.  We don't know to this point who we're

2   dealing with.  We don't know if they're armed, and that's why

3   these tactics are used.

4           I gained my separation.  And the arrest team, the

5   special response team, exits from two doors down and they

6   effect the arrest of Mr. Cordero.

7   Q.  I would like to show you some photographs that have not yet

8   been admitted into evidence.  I would like to show you

9   Government's Exhibit 5AB.

10          Do you recognize the first page of Government's

11  Exhibit 5AB?

12  A.  Yes, sir.

13  Q.  Do you recognize the second page of Government's

14  Exhibit 5AB?

15  A.  I do.

16  Q.  And do you recognize the third page of Government's

17  Exhibit 5AB?

18  A.  Yes, sir.

19  Q.  Are these screenshots from the body camera that you were

20  wearing?

21  A.  Yes, correct.

22  Q.  Do they fairly and accurately depict what happened that

23  day?

24  A.  Yes, they do.

25          MR. MYERS:  Your Honor, I'd offer Government's

Benavides - Direct by Mr. Myers

1    Exhibit 5AB in evidence.

2                THE COURT:  5AB was it?

3                MR. MYERS:  Yes, Your Honor.

4                THE COURT:  There being no objection?

5                MR. GUTIERREZ:  No objection, Your Honor.

6                THE COURT:  Government's Exhibit 5AB will be admitted.

7    BY MR. MYERS:

8    Q.  I would like to show you what's been marked as Government's

9    Exhibit 5AD.

10                Special Agent Benavides, do you recognize Government's

11    Exhibit 5AD?

12    A.  Yes, sir.  That's the photograph of the vehicle and the

13    storage unit after the arrest was made.

14    Q.  Does it fairly and accurately depict the condition of the

15    storage unit after the arrest?

16    A.  Yes, sir.

17                MR. MYERS:  Your Honor, I'd offer into evidence

18    Government's Exhibit 5AD.

19                MR. GUTIERREZ:  No objection.

20                THE COURT:  Government's Exhibit 5AD will be admitted.

21    BY MR. MYERS:

22    Q.  I'd like to show you Government's Exhibit 5AF -- excuse

23    me -- 5AG.

24                Does Government's Exhibit 5AG fairly and accurately

25    depict Mr. Hernandez's Bronco after the arrest?

1  A.  Yes, sir.

2          MR. MYERS:  Your Honor, I offer Government's

3  Exhibit 5AG into evidence.

4          MR. GUTIERREZ:  No objection.

5          THE COURT:  Government's Exhibit 5AG will be admitted.

6  BY MR. MYERS:

7  Q.  I would like to show you Government's Exhibit 5AH.

8          Does this fairly and accurately depict the firearms in

9  that gray bin?

10 A.  Yes, they do -- it does.

11         MR. MYERS:  Your Honor, I offer Government's

12 Exhibit 5AH into evidence.

13         MR. GUTIERREZ:  No objections, Your Honor.

14         THE COURT:  Government's Exhibit 5AH will be admitted.

15 BY MR. MYERS:

16 Q.  I would like to show you Government's Exhibit 5AI.

17         Does Government's Exhibit 5AI fairly and accurately

18 depict Mr. Hernandez Cordero's Bronco?

19 A.  Yes, it does.

20         MR. MYERS:  Your Honor, I offer Government's

21 Exhibit 5AI into evidence.

22         MR. GUTIERREZ:  No objection.

23         THE COURT:  Government's Exhibit 5AI will be admitted.

24 BY MR. MYERS:

25 Q.  I would like to show you what's been marked as Government's

Benavides - Direct by Mr. Myers

1  Exhibit 5AJ.  Do you recognize the vehicle depicted in
2  Government's Exhibit 5AJ?
3  A.  I do.
4  Q.  Does this fairly and accurately depict Mr. Ramos's truck?
5  A.  Yes, it does.
6          MR. MYERS:  Your Honor, I'd offer Government's
7  Exhibit 5AJ into evidence.
8          MR. GUTIERREZ:  No objection.
9          THE COURT:  Government's Exhibit 5AJ will be admitted.
10 BY MR. MYERS:
11 Q.  And I would also like to show you 5AK.
12          Does this fairly and accurately depict the rear of
13 Mr. Ramos's truck?
14 A.  Yes, it does.
15          MR. MYERS:  Your Honor, I offer Government's
16 Exhibit 5AK into evidence.
17          MR. GUTIERREZ:  No objection.
18          THE COURT:  Government's Exhibit 5AK will be admitted.
19          MR. MYERS:  Permission to publish those photographs,
20 Your Honor?
21          THE COURT:  You may.
22 BY MR. MYERS:
23 Q.  If we look at Government's Exhibit 5AB, who is on the first
24 page of Government's Exhibit 5AB?
25 A.  That is the defendant Cordero sitting at the Bronco -- in

1  his Bronco at the pre-meet location at the Circle K.

2  Q.  The second page of Government's Exhibit 5AB, who is

3  depicted in this photo?

4  A.  That is another defendant, another suspect, Ramos.  That is

5  also at the Circle K right around the same time I show him the

6  picture of the firearms that they are to pick up.

7  Q.  And on the third page of Government's Exhibit 5AB?

8  A.  That is a still photo of my video recording of suspect

9  Cordero handling one of the AK-47s and putting it in the

10  plastic bin.

11  Q.  If we look at Government's Exhibit 5AD, what is depicted

12  here?

13  A.  That is exactly how the scene looked immediately after the

14  suspect Cordero-Hernandez -- Hernandez Cordero's arrest.

15  Q.  If we look at Government's Exhibit 5AG, what is the jury

16  looking at in this photograph?

17  A.  Those are the plastic bins.  And inside the bins are five

18  AK-47s that the defendant loaded into there -- into the bins.

19  Q.  If we look at Government's Exhibit 5AH, what is the jury

20  looking at here?

21  A.  Those are the AK-47s in the plastic bin inside the

22  Defendant's vehicle Ford Bronco.

23  Q.  Who loaded those weapons into the bin?

24  A.  The defendant did.

25  Q.  If we look at Government's Exhibit 5AI, what is this a

Benavides - Direct - Cross by Mr. Gutierrez

1  photograph of?

2  A.  That is a photograph of the vehicle driven by the

3  defendant.

4  Q.  And if we look at Government's Exhibit 5AJ?

5  A.  That is a photograph of the vehicle driven by defendant

6  Ramos.

7  Q.  And what are we looking at in Government's Exhibit 5AK?

8  A.  It's the same vehicle driven by defendant Ramos.

9         MR. MYERS:  Your Honor, I pass the witness.

10        THE COURT:  Mr. Gutierrez?

11        MR. GUTIERREZ:  Thank you, Your Honor.

12                    CROSS-EXAMINATION

13  BY MR. GUTIERREZ:

14  Q.  Mr. Benavides, you first started off talking about your

15  history, your knowledge, and everything that --

16        THE COURT:  Get the microphone closer to you, please,

17  sir.

18  BY MR. GUTIERREZ:

19  Q.  -- and everything you've done to get to where you are now,

20  correct?

21  A.  Yes.

22  Q.  Your specialty and this type of activity and such, correct?

23  A.  Yes, sir.

24  Q.  And you talked about the organization of the different --

25  the compartment, as was mentioned earlier?

1    A.  Yes, sir.

2    Q.  Okay.  And the courier, are the low end of the entire

3    thing, as you explained it?

4    A.  Yes.

5    Q.  And the couriers aren't given information.  They're just

6    told to do something.  Is that correct, what you said?

7    A.  Yes.  In most situations, yes.

8    Q.  Okay.  And a courier, if the courier doesn't do what

9    they're supposed to, what usually happens to them?

10   A.  I mean, it depends on the situation.  But most couriers are

11   getting paid for a service, right?  So there's benefit to the

12   courier for doing what he or she is doing.

13   Q.  Okay.  And you have no information of anybody getting paid

14   for what they were doing here today -- or on August 21st?

15   A.  At that point, I don't have any -- yeah.  Somebody is

16   getting paid to do a certain service.

17          And talking to Fernanda, she makes -- several times

18   tells me, I need to know what the price of firearms are,

19   because he have to pay someone to transport them over the

20   bridge, or *el brinco*, and then getting them further south into

21   Mexico.

22          I don't know -- go ahead.

23   Q.  But you yourself don't know if they were paid to do this

24   service?

25   A.  That's correct.  I'm going off what she told me, yes.

Benavides - Cross by Mr. Gutierrez

1    Q.   Thank you.

2         Okay.  Do the organizations threaten these people if

3    they don't do a certain job?

4    A.   I'm sure.  Yes, they can.

5    Q.   What kind of threats would be an example of an organization

6    threatening a courier not to do something?

7    A.   I don't know.  I'm sure it varies from not violent to

8    violent, but I couldn't tell you.

9    Q.   And you've done this a lot, so you -- you actually know?

10   A.   Yes.

11   Q.   Right?  You actually know what kind of threats the

12   organization can provide to make the courier or the other

13   people --

14   A.   Sure.

15   Q.   -- do what they're supposed to do?

16   A.   I think it's part of the -- part of the business they're

17   in, right?

18   Q.   Okay.  And what is that?  What are those threats, in your

19   experience, your knowledge, you know about this?

20   A.   There could be -- there could be death threats.  There

21   could be a monetary threat.  They can threaten family members.

22   I mean, it's just a -- it's a variety of threats that could

23   occur.

24   Q.   Okay.  Thank you.

25         You talked about in Mexico -- that a person in Mexico

1    can actually buy firearms if they get a license in Mexico,

2    correct?

3    A.  Yes.  That is what I've been told.  I don't know the

4    Mexican laws, per se.  But my understanding is there is a legal

5    way to possess a firearm in Mexico.

6    Q.  Right.  And you testified to that, that there's a

7    possible -- your knowledge that there's a legal way of doing it

8    in Mexico, correct?

9    A.  Yes.

10   Q.  Okay.  And during this entire time did you have an

11   opportunity to -- strike the question.

12           Did you have cooperation with the Mexican authorities

13   in any of this investigation?

14   A.  I did not, no, sir.

15   Q.  Okay.  Have you, in the past, had cooperation with the

16   Mexican authorities in your other cases?

17   A.  So I have not.  I, as an undercover agent, my sole purpose,

18   me personally, is to be an undercover, is to -- there's case

19   agents involved.  There's intelligence analysts involved that

20   handle that part of the investigation.

21   Q.  Right.

22   A.  So I don't know.  I couldn't tell you if someone was

23   speaking to the Mexican authorities.  I certainly was not

24   speaking to anyone in Mexico.

25   Q.  Right.  But in your past experience, it is plausible that

Benavides - Cross by Mr. Gutierrez

1    the U.S. Government can get assistance from the Mexican

2    authorities?

3    A.  Yes.

4    Q.  Okay.  Now do you have any information of the defendant

5    Rene Hernandez Cordero, if he had a license in Mexico to be

6    able to purchase such arms?

7    A.  I don't have that information.  The case agent would have

8    that type of information.

9    Q.  Okay.  So again, it is plausible that he could have this

10   license in Mexico?

11   A.  Yes.  I mean, it's -- yes.

12   Q.  And during this entire investigation, Rene -- the defendant

13   Rene Hernandez Cordero has been in Mexico throughout this

14   entire event, correct?

15   A.  I don't -- I don't know where he's been, sir.  I mean, I

16   met him that day 20 minutes before he was arrested.

17   Q.  Very good.  So prior to that arrest, you have no idea where

18   Mr. Cordero -- Mr. Hernandez Cordero has been, the defendant?

19   A.  Yeah.  I didn't know -- we didn't know who he was.

20   Q.  Okay.  Then you started going to the investigation of July

21   29th, 2023, with Fernanda, correct?

22   A.  Yes.

23   Q.  And since July 29th, 2023, you just testified that you had

24   no clue of defendant Rene Hernandez Cordero?

25   A.  That's correct.

Benavides - Cross by Mr. Gutierrez

1   Q.  He was not a target of any investigation until August 21st,

2   2023, when he got arrested?

3   A.  No.  I believe there was information, but I don't know to

4   what extent.  We didn't know who was showing up, so we didn't

5   know if he was involved in this or not.  I believe there's

6   information from previous intelligence where his name has

7   popped up.

8   Q.  Okay.  To your knowledge, he was not a target until you saw

9   him that day that you arrested him?

10  A.  He was a person of interest who may be involved or could

11  possibly show up to pick up these firearms.  So yes, he was on

12  the radar, possibly one of several that could show up.

13  Q.  Okay.  You testified you did not know who the defendant was

14  until he showed up on August 21st, 2023.

15          Are you now changing that story that you now know he

16  was of interest?

17  A.  No.  No.  No.  During the -- during our briefing with the

18  case agent there was several possibles.  I mean, there was

19  members of Fernanda, maybe family members, but we didn't know

20  who was showing up that day to the transaction.

21  Q.  Okay.  You also mentioned -- you stated that Fernanda was

22  worried, or she wanted to -- her profit margin.  She was

23  interested in her profit margin?

24  A.  Correct.

25  Q.  Profit margin.  Can you explain to the jury what a profit

Benavides - Cross by Mr. Gutierrez

1   margin is?

2   A.  Yes.  So profit margin is -- you know, she wants to take

3   into account how much the firearms cost.  And then ultimately,

4   she's got to pay certain people.  So at the end of the day, you

5   know, depending what her price is, if she's going to sell these

6   guns or she's buying them for someone else.  I don't know if

7   she's selling them or she's going to keep them for someone

8   else.  But at that point, you know, there's a profit margin.

9   She says it in one of the phone calls.  She's got to know the

10  numbers to make sure it's worth it for her.

11  Q.  Normally, a profit margin is when they're going to resell

12  something?

13  A.  Okay.

14  Q.  If you're going to keep something there is no profit,

15  correct?

16  A.  Sure.

17  Q.  Okay.  So when you mentioned profit margin, or she

18  mentioned profit margin, it would allude that she was trying to

19  resell these items?

20  A.  Right.

21  Q.  Okay.  Thank you.

22  A.  Okay.

23  Q.  Now, she never used codes.  She called the weapons as they

24  were.  You're the one that mentioned codes, correct?

25  A.  Fair.  Yes, sir.

Benavides - Cross by Mr. Gutierrez

1  Q.  Okay.  These weapons that were listed, these were all
2  weapons provided by the Government, correct?
3  A.  Yes.
4  Q.  Now these weapons in the pictures don't show that they have
5  what's called a magazine, correct?
6  A.  Correct.
7  Q.  A magazine -- if you can explain to the jury what a
8  magazine is?
9  A.  A magazine is what contains the rounds of ammunition for a
10  rifle to be shot.
11       Semi-automatic pistols, semi-automatic rifles, some --
12  I mean unless they're belt-fed machine guns, normally require a
13  magazine.  So you load the ammunition into the magazine.  The
14  magazine is inserted into the rifle; and, therefore, you can
15  shoot.  You know, most -- magazine, especially an AK-47, are 30
16  rounds.  They have a capacity of approximately 30 rounds.
17  Q.  Right.  And all these items, the twenty and the two, had no
18  magazine, correct?
19  A.  The twenty did not.  I believe the two had magazines in the
20  case.  Yeah, I believe so.  I could be mistaken, but, yeah, we
21  did not bring magazines for the AK-47s; that's correct.
22  Q.  So without the magazines, these weapons were not
23  functional, correct?
24  A.  No.  The weapons are fully-functioning firearms, but we did
25  not provide magazines.

Benavides - Cross by Mr. Gutierrez

1   Q.  That weapon could not be used immediately because it didn't

2   have a magazine, right?

3   A.  Correct.  And that's --

4   Q.  Thank you.

5   A.  Okay.

6   Q.  The defendant Rene Hernandez Cordero, when you first met

7   him -- and he left because he said he was going to get the

8   other guy.

9   A.  Yes, sir.

10   Q.  Do you remember that?

11   A.  Yes.

12   Q.  You had air surveillance during that time, correct?

13   A.  That's correct.

14   Q.  And do you know where he actually went and parked?

15   A.  I just saw this video, and he drove a couple of blocks.  He

16   stayed in the vicinity.  I think he went into, like, a

17   residential area and parked for a short amount of time.

18   Q.  Right.

19   A.  And then returned.

20   Q.  Okay.  While he was parked -- you had his phone records,

21   right, after the post-arrest and all that.  After he was

22   parked, do you know who he called during that time frame?

23   A.  I do not.  The case agent would have that information.

24   Q.  Okay.  All right.

25          Going back to Fernanda, have you 100 percent

1    identified who Fernanda is?

2    A.  I have not.  I believe the case agents have.

3    Q.  Okay.  I mean, have they -- did they get phone records in

4    order to pin that this is her number?  Do you know?

5    A.  I don't know that.  Again, I don't know.  My -- I wasn't

6    involved in that part of the investigation.

7    Q.  You're not aware if they did, like, a voice exemplar to see

8    if it was her?

9    A.  I do not know, sir.  The case agents will be able to answer

10   that question.

11   Q.  Very good.  Thank you.

12           During the August 11th phone call with Fernanda, you

13   still did not know who defendant Rene Hernandez Cordero was,

14   correct?

15   A.  We didn't know who was coming to the meeting.  Correct,

16   yes.

17   Q.  August 4th, still didn't know who the defendant Rene

18   Hernandez Cordero was, correct?

19   A.  We did not know who was going to show up.  Correct, yes,

20   sir.

21   Q.  August 19th, you still did not know?

22   A.  That's correct.

23   Q.  Thank you.  You still did not know who the defendant Rene

24   Hernandez Cordero was?

25   A.  Yes, sir.  That's correct.

1    Q.   Okay.  When you met the defendant Rene Hernandez Cordero,

2    did he tell you that he just came to leave the money and that

3    was it?  That was his activity?

4    A.   He said that.  Yes, he did.

5    Q.   Okay.  And when you wanted to show him the actual AK, did

6    he tell you, I don't want to see it?

7    A.   Something to that effect, yes.  He did not want to see it,

8    and he was not shown the actual AK-47.

9    Q.   And the recording actually shows that he said he was doing

10   a favor of bringing the money.  He was doing somebody a favor

11   for bringing the money?

12   A.   Something to that effect, yes.  He was bringing the money,

13   is what he said he was doing.  He was delivering the money.

14   Q.   Okay.  In the video it actually is unclear.  But isn't it

15   true that the defendant Rene Hernandez Cordero told you that he

16   didn't know what the quantity of what the arms were?

17   A.   Yes.  He figured -- when I told him there was twenty AKs

18   and two Barretts, he said something to the effect of, I

19   think -- I thought they were less.

20   Q.   Right.  Okay.  So he didn't know exactly what?

21   A.   That's fair, yeah.

22   Q.   In the 5T video you state "unknown subjects."

23   A.   Yes.

24   Q.   Right?

25        So you still, even though Rene -- the defendant Rene

1    Hernandez Cordero was there in person with you, for you he was
2    still an unknown subject?
3    A.  He was an unknown subject in the sense that, again, we had
4    met a minute earlier, a couple of minutes earlier.  If you
5    listen to the entire video, I think I explain to the case agent
6    as I'm talking through the wire -- and actually, I say I think
7    it's one of the guys that we briefed earlier today.
8    Q.  When the F-150 pulled up, finally, the driver comes out of
9    the car and doesn't go directly to the defendant Rene Hernandez
10   Cordero, correct?
11   A.  That's true.
12   Q.  He actually went to the guy in the white T-shirt, the other
13   undercover, correct?
14   A.  Yeah.  I believe he went into the store.  And then he came
15   out of the store and walked over to my partner, correct.
16   Q.  Okay.  So he didn't even recognize the defendant Rene
17   Hernandez Cordero?
18   A.  That's fair.  That's correct, yes.
19   Q.  When they finally back up the vehicle and the defendant
20   puts five of the arms in the bin --
21   A.  Yes, sir.
22   Q.  -- you actually help him put them in the truck?
23   A.  Yes.  I help him carry the bin out to the truck, yes, sir.
24   Q.  And then he got arrested?
25   A.  That's correct.

1  Q.  Okay.  There was a bang fire, like shots fired, and you
2  called it a flash bang?
3  A.  That's the a flash bang, is what they're called.  It's a
4  distractionary diversion device, is the actual word for it.
5  Yes.
6  Q.  Is it something that's being fired out of a pistol?
7  A.  No.  No.  No.  Those are -- those could be thrown as, like,
8  a tactical team enters into a room.  You see it in movies a
9  lot.  They throw it and it makes a distraction.
10          In this case they're remote activated.  So we have had
11  a specialist remote activate it.  They had two in the warehouse
12  behind, like, where the bins were.  And I believe there was one
13  over -- I guess to the left of the -- by the brick wall or the
14  concrete wall, we had one out there.
15  Q.  This time of the arrest, actually there's a video that's
16  longer, that actually shows the agents coming in for his
17  arrest, and him falling on the ground and the bang making the
18  sparks off the concrete.
19          Do you recall seeing that video?
20  A.  I'm sorry.  Explain that again.
21  Q.  Right.  His arrest, the video -- and I believe it's 5X,
22  where it's the storage video, there's no sound?
23  A.  Okay.
24  Q.  And you're saying it's being operated remotely?
25  A.  Yes, sir.

1    Q.  I've actually seen where he's being arrested.  The agents

2    are coming in.  The fire -- or there's something shot, sparks

3    off the concrete, and the defendant goes on the ground.

4         Have you not seen that?

5    A.  I have not seen that video, sir.

6    Q.  Okay.  I was wondering why that video was incomplete.

7    A.  Oh.  I haven't seen that video at all.  The video that was

8    shown is the video that I've seen.

9    Q.  Okay.  You testified that the storage shed was 100 percent

10   secured, in 100 percent control of the storage facility?

11   A.  Yes, sir.

12   Q.  And the shed was 100 percent controlled by the agency as

13   well?

14   A.  Yes, sir.

15   Q.  The defendant only received five of the weapons, put them

16   in the bin, and put them in the truck before he got arrested,

17   correct?

18   A.  That's correct.

19   Q.  Would you agree with me that technically, he was only in

20   control of five weapons that were put in his truck?

21   A.  Well, he was holding three more, and he had paid for all of

22   them.  So...

23   Q.  Well, contract law, if I give you money --

24   A.  Okay.

25   Q.  -- for a truck, and until I pick up that truck, there's not

1    a deal.  Do we understand that?

2    A.  Okay.

3    Q.  Okay.  So if he was in control of five weapons that were

4    put in his bin and he got arrested, technically he was only in

5    control of five weapons.

6             Would you agree with that?

7    A.  That's fair.  I mean...

8    Q.  Okay.  Thank you.

9             Did you get any information of the flash bang, if the

10   defendant Rene Hernandez Cordero was injured?

11   A.  Not from the flash bang.  Yes.

12   Q.  What was he injured from?

13   A.  I believe he was -- he was hit by a less lethal projectile.

14   That's what you're referring to?

15   Q.  Yes.  And why was he fired upon with that?

16   A.  Again, that's a -- the tactical team did that, sir.  I

17   don't know.

18   Q.  So he was fired upon?

19   A.  With a less lethal weapon used to gain compliance, is what

20   those are used for.  Yes, sir.

21   Q.  And he was injured?

22   A.  I don't know.  I mean...

23   Q.  Okay.  Thank you.

24   A.  Yes, sir.

25             THE COURT:  Mr. Gutierrez, I'm going to have to break

1    up for the evening.

2            MR. GUTIERREZ:  Yes, Your Honor.

3            THE COURT:  You may continue your cross-examination in

4    the morning.

5            MR. GUTIERREZ:  Thank you, Your Honor.

6            THE COURT:  It's been a long day, ladies and gentlemen

7    of the jury, but I want to remind you of all the instructions

8    that I gave you.

9            Please don't do anything to jeopardize us from

10   completing this trial.

11           We will be in recess until 9:00 tomorrow morning.

12       (Proceedings concluded 4:45 p.m.; continued in Volume 3.)

13                        * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

Voir Dire Examination by the Court ..........................3
Voir Dire Examination by Mr. Myers ........................34
Voir Dire Examination by Mr. Gutierrez ...................35

Jury Called ...............................................39

Jury Sworn ................................................39

Venire Panel Excused ......................................40

Instructions of the Court .................................40

Opening Statement by Ms. Holderfield ......................46

Opening Statement by Mr. Gutierrez ........................50

GOVERNMENT'S EVIDENCE

WITNESSES:

GUS BENAVIDES:

Direct Examination by Mr. Myers  ..........................54
Cross-Examination by Mr. Gutierrez .......................148

```
1                        GOVERNMENT'S EXHIBITS

2     NO.     DESCRIPTION                              ADMITTED

3     1F      Photograph of Jesus Gerardo Ramos             68

4     5AB     Screenshots from Undercover Video            144

5     5AC     Firearm Information                          104

6     5AD     Photograph of storage unit                  144

7     5AE     Photograph, Barcelona Address Search 12      71

8     5AF     Photograph, Barcelona Address Search 13      71

9     5AG     Photograph of bin in Bronco                 144

10    5AH     Photograph of firearms in bin               145

11    5AI     Photograph of Hernandez' Bronco             145

12    5AJ     Photograph of Ramos' truck (front)          146

13    5AK     Photograph of Ramos' truck (back)           146

14    5B      Map of area                                 108

15    5C      Down payment                                 99

16    5D      Fernanda phone call 7-29                     78

17    5E      Translation of 5D                            78

18    5F      Fernanda phone call 7-29                     78

19    5G      Translation of 5F                            78

20    5H      Fernanda phone call 8-11                     79

21    5I      Translation of 5H                            79

22    5J      Fernanda phone call 8-14                     80

23    5K      Translation of 5J                            80

24

25
```

| | GOVERNMENT'S EXHIBITS | |
|---|---|---|
| NO. | DESCRIPTION | ADMITTED |
| 5L | Fernanda phone call 8-19 | 80 |
| 5M | Translation of 5L | 80 |
| 5N | Fernanda phone call 8-21 | 81 |
| 5O | Translation of 5N | 81 |
| 5P | Fernanda second phone call 8-21 | 81 |
| 5Q | Translation of 5P | 81 |
| 5R | Hernandez phone call 8-21 | 82 |
| 5S | Translation of 5R | 82 |
| 5T | Undercover Video 1 | 85 |
| 5U | Translation of 5T | 85 |
| 5V | Undercover Video 2 | 85 |
| 5W | Translation of 5V | 85 |
| 5X | Undercover Video 3 | 85 |
| 5Y | Translation of 5X | 85 |
| 5Z | Storage Unit Video 1 | 87 |
| 5AA | Storage Unit Video 2 | 87 |
| 8F | Photograph inside Hernandez Bronco 1 | 117 |
| 8G | Photograph inside Hernandez Bronco 2 | 117 |
| 8H | Undercover Conversation with Fer | 115 |
| 8I | Translation of 8H | 115 |