UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

UNITED STATES OF AMERICA     )   No. EP-23-CR-1842-DB
                             )
vs.                          )   El Paso, Texas
                             )
RENE HERNANDEZ CORDERO (3)   )   May 2, 2024


VOLUME 3 OF 6 VOLUMES

JURY TRIAL

BEFORE THE HONORABLE DAVID BRIONES

UNITED STATES DISTRICT JUDGE, and a jury.


A P P E A R A N C E S:

FOR THE GOVERNMENT:   MR. KYLE MYERS &
                      MS. SHANNON HOLDERFIELD
                      Assistant United States Attorneys
                      700 E. San Antonio, Suite 200
                      El Paso, Texas  79901


FOR THE DEFENDANT:    MR. RAY GUTIERREZ
                      Attorney at Law
                      11623 James Grant Drive
                      El Paso, Texas  79936


     Proceedings reported by stenotype.  Transcript produced by computer-aided transcription.

(Esperanza Gallegos and Barbara Espinosa sworn to interpret Spanish into English.)

(Defendant present; open court.)

THE COURT:  Good morning, everyone.

Members of the jury, I told you we would start promptly at 9:00, and that didn't happen.  We had trouble with one of the computers, so we needed to get help.  But we're ready to go now.

Ready to proceed, Mr. Gutierrez?

MR. GUTIERREZ:  Yes, Your Honor.

THE COURT:  You may.

MR. GUTIERREZ:  Thank you.

May it please the Court, Jurors, opposing counsel.

Your Honor, I would like to request a Defense Exhibit 1A.  I've had an opportunity to speak with the Agent Benavides and opposing counsel to review the video.

CROSS-EXAMINATION (Cont'd.)

BY MR. GUTIERREZ:

Q.  Mr. Benavides, have you had a chance to look at the video that I'm about to present to the Court?

A.  Yes, I have.

Q.  Does it accurately depict what it portrays to be?

A.  Yes, it does.

MR. GUTIERREZ:  At this moment, Your Honor, I move to enter Defense Exhibit 1.

THE COURT:  You're moving for -- to admit it?

MR. GUTIERREZ:  To admit it as well.  Yes, Your Honor.

THE COURT:  Okay.  No objection?

MR. MYERS:  No objection.

THE COURT:  Defendant's Exhibit 1 will be admitted.

MR. GUTIERREZ:  May I publish this to the jury, Your Honor?

THE COURT:  You may publish it.

MR. GUTIERREZ:  Thank you, sir.

(Video played.)

BY MR. GUTIERREZ:

Q.  Mr. Benavides, you've seen the video, correct?

A.  Yes.

THE COURT:  Speak into the microphone, please.

BY MR. GUTIERREZ:

Q.  You saw the video, correct?

A.  Yes, sir.

Q.  And that accurately depicts what happened on August the 21st, 2023, correct?

A.  Yes, that's correct.

Q.  That's actually the video that was in the shed, correct?

A.  In the warehouse, yes, sir.

Q.  Okay.  Yesterday you testified that you did not see any other videos than the cut version, yesterday.  Do you recall that?

A.   No.   This video I believe was presented yesterday, and that's what I was testifying to, this same exact video.

Q.   Okay.   This video has an ending, which the video that was presented yesterday did not have an ending.

Do you recall that?

A.   I believe it's the exact same video.

Q.   Okay.   It is the exact same video until the last couple of minutes.

Do you recall that?

A.   The last couple of minutes?

Q.   Or seconds.   In other words -- okay.

MR. GUTIERREZ:   Government's Exhibit 5AA.   Your Honor, I would like to present that.   I guess I would ask for the Government to show their video.   It's already been offered as evidence, and it has been presented to the jurors as well.

THE COURT:   You want to publish it again?

MR. GUTIERREZ:   Yes, Your Honor.

THE COURT:   Are you prepared to do that, Mr. Myers?

MR. MYERS:   Yes, Your Honor.

(Video played.)

BY MR. GUTIERREZ:

Q.   Mr. Benavides, this was the video that was shown yesterday.

A.   I don't see it on my screen, sir.

Oh, here we go.   We're good now.   Thank you.

(Video continued.)

BY MR. GUTIERREZ:

Q.   I guess my memory does not serve me well.  I did not see the last part, where he was being shot at and --

A.   That was played yesterday, sir.

MR. GUTIERREZ:   I apologize.  But if everybody else's memory does not remember that last part of the shooting, then I would ask for them to take that into consideration.

Okay.  I'll move on.

BY MR. GUTIERREZ:

Q.   Mr. Benavides, you talked about that before August 21st, on the debriefing before the event happened, all the organizations get together and they talk about what's going to go down; is that correct?

A.   The day of the morning of the operation, yes, sir.

Q.   So on August 21, 2023, everybody in the morning got together and they talked about how events were going to happen?

A.   Yes.  We discussed an operational plan to effect an arrest later that day.

Q.   Okay.  And that day, August 21st, in the morning, is when you had multiple possible carriers; is that correct?

A.   That's correct, yes.

Q.   Okay.  And so on August 20th you had no knowledge of the defendant Rene Hernandez Cordero.

Is that safe to say?

A.   Personally I did not have, yes.  The case agents might

have, or they probably did.  I did not.

Q.  All right.  Just you.  I'm talking about yourself.

A.  Yes.  Correct.

Q.  Okay.  In the video, it shows that defendant Rene Hernandez Cordero picks up five weapons without the magazine, puts them in a bin, and you help him put them in his truck, correct?

A.  Yes.

Q.  Okay.  And yesterday, we -- I compared this to a contract, because it was a buy and sell of anything, correct?

A.  Yes.

Q.  And we've established that the five guns that were in his vehicle, he became in control.  Anything in the shed was in control of the Government.

        Do you recall that testimony?

A.  Yes, I remember the conversation.  Uh, yes.

Q.  Okay.

A.  Yes.

Q.  Hold on.  There's a second part of the question.  Okay.

        And then you said, Well, he grabbed three more in his arms.

A.  Correct.

Q.  Okay.  But those three is when the arrest happened and he puts them back on the floor?

A.  That's correct.

Q.  Okay.  Now the shed, the floor, is still in 100 percent

control of the Government, correct?

A.   The entire location is in 100 percent of the Government for safety reasons, yes, sir.

Q.   Specifically the shed, right?  We made a distinction that the floor of the shed was the Government, the vehicle is Mr. Cordero?

A.   Okay.  Yes.

Q.   So as if you were in a grocery store and you get a box of cereal, you look at it and you put it on the shelf, it still belongs to the store, correct?

         Is that a good analogy?

A.   If I paid for it, I don't know.  I think we're splitting hairs.  But I mean...

Q.   Technically it still belongs to the grocery store, correct?

A.   If I paid for it, I don't know if it belongs to me or the grocery store at that point.

Q.   Well, you haven't left the store yet?

A.   Fair.  Correct.  Yes.

Q.   Okay.

         MR. GUTIERREZ:  Nothing further, Your Honor.  I pass this witness.

         THE COURT:  Redirect?

         MR. MYERS:  Please.

REDIRECT EXAMINATION

BY MR. MYERS:

Q.   Special Agent Benavides, remember yesterday we talked about compartmentalization?

A.   Yes, sir.

Q.   I guess our law enforcement agency is also compartmentalized?

A.   That's correct.

Q.   How so?

A.   So for example, in my position in this investigation, I was responsible for doing the undercover, right?

We have case agents involved.

We have intelligence research specialists involved.

In this particular case we had several agencies involved.

Everyone has a job and a duty to do that day to prevent, you know, bad things from happening, from firearms getting out of our control, per se.

Q.   So you're kind of focused on a specialized task?

A.   Yes, sir, I definitely am.

Q.   All right.  Now yesterday, you recall the questions that Mr. Gutierrez asked you about, When is the first time you had heard about Hernandez Cordero?

A.   Yes, sir.

Q.   And I think there was something that you wanted to explain

about that.  What was that?

A.   Yes.  So the morning of, when we have the operational briefing, as it was briefed by the case agents, they did have several possible persons that could possibly show up that were somehow linked to the female I was talking to in Mexico.

But in reality, we did not know who was showing up. We didn't have a name.  We didn't have -- like I testified yesterday, we didn't know if I was going to meet with one person or six persons or eight persons or two cars or one car. So to me, it was an unknown.

At that point, as an undercover, I'm going into this scenario not knowing who I'm going to meet.

Q.   Okay.  Now when Mr. Hernandez Cordero is briefed as a potential suspect the morning of the 21st, you don't know why, or the background of why, correct?

A.   I do not, no, sir.

Q.   Okay.

MR. MYERS:  Your Honor, I would like to publish Government's exhibit -- or re-publish Government's Exhibit --

THE COURT:  You may.

MR. MYERS:  -- 5V to the jury.

(Video played.)

BY MR. MYERS:

Q.   Do you recall this part of the video?

A.   Yes, I do.

Q.   Just to re-orient, is this the first time I think you met

with Mr. Hernandez before he left?

A.   Yes.  I believe so, yes.

Q.   Okay.

         MR. MYERS:  And for the record, I would like to

fast-forward to the 3 minute and 30 second mark.

     (Video played.)

BY MR. MYERS:

Q.   Okay.  What are you talking about there?

A.   I'm discussing -- like I said, I was transmitting the

information, or the up-to-date intelligence we had.

         And I remember seeing the Defendant's photograph, as

one of the possible persons that may show up, earlier that

morning during the operational briefing.

Q.   And this one, I guess, were you -- who were you talking to?

Or were you just talking into the mic or...

A.   Yeah.  I'm talking into the mic, yes.  Everyone is

listening in.  It's a live wire -- well, everyone -- the

majority of people are listening.  We had surveillance units

and such that are listening in.  So that's my only way of

communication to them.

         My partner, like I testified yesterday, probably

texted the case agents at the same time.

Q.   And the Martha that you were referencing in this video, who

is that?

A.   Special Agent Zayas.

          MR. MYERS:  Your Honor, I pass the witness.

          MR. GUTIERREZ:  No further questions for this witness.

          THE COURT:  Very well.

          You may be excused.

          THE WITNESS:  Thank you, sir.

          THE COURT:  You're free to leave.

          THE WITNESS:  Thank you.

          THE COURT:  Call your next witness.

          MR. MYERS:  Your Honor, the Government calls Special
Agent Zayas to the stand.

          THE COURT:  You're still under oath.

          THE WITNESS:  Okay.

          MR. MYERS:  May I proceed?

          THE COURT:  You may proceed.

          MARTHA ZAYAS, GOVERNMENT'S WITNESS, SWORN

                   DIRECT EXAMINATION

BY MR. MYERS:

Q.   Good morning.

A.   Good morning.

Q.   Would you please state your full name for the record?

A.   Martha Zayas.

Q.   And, Ms. Zayas, where do you work?

A.   I'm a special agent with the Bureau of Alcohol, Tobacco,
Firearms, and Explosives.

Q.   Otherwise known as ATF?

A.   Yes, sir.

Q.   Special Agent Zayas, how long have you been with the ATF?

A.   Since September of 2021.

Q.   Prior to being with the ATF, do you have any law enforcement experience?

A.   I do.  I was a police officer in Arizona for approximately eight years.

Q.   I'm sorry.  I couldn't hear that last part.

A.   I was a police officer in Arizona for approximately eight years.

Q.   And prior to that?

A.   Prior to that I was a correctional officer.

     And prior to that I was a full-time student at the university.

Q.   Okay.  And as part of being a special agent with the ATF, did you go through the same training that Special Agent Benavides testified to yesterday?

A.   To similar training, correct.  So the initial training, since he's part of the undercover program, I haven't received any of that training.  But I did go to the Federal Law Enforcement Training Center in Georgia for approximately six months.

     During that time, I completed the criminal investigator training program and the ATF special agent basic

training.

Q.   And in addition to being a special agent, I guess are you one of the case agents for this investigation?

A.   I am.

Q.   And is this a joint investigation?

A.   It is.

Q.   Who were the agencies involved in this investigation?

A.   We have -- so it's going to be the case agent on the ATF side.

Janowski, Special Agent Janowski, is the case agent with FBI.

We have had agents from DEA, Customs and Border Protection, and Homeland Security also assisting.

Q.   Now when you began this investigation, were all of these groups working together at the initial part of your investigation?

A.   No, sir.

Q.   Okay.  Would you kind of explain to the jury how your part of the investigation began?

A.   Okay.  In January of 2023, so last year, January, ATF received information which initiated an investigation into the activities of a subject by the name of Pablo Delgado for violations of Title 18, 922(g)(1) for possession of a firearm by a prohibited person.

Q.   Let me stop you right there.

Mr. Delgado is a convicted felon?

A.   Yes, sir.

Q.   Okay.  I'd like to show you an exhibit that's not yet been admitted into evidence.  I would like to show you Government's Exhibit 1B.

Do you recognize Government's Exhibit 1B?

A.   I do.

Q.   Who is photographed there?

A.   That's Pablo Delgado.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 1B into evidence.

MR. GUTIERREZ:  No objections, Your Honor.

THE COURT:  What is it, 1B?

MR. MYERS:  1B.

THE COURT:  Government's Exhibit 1B will be admitted.

MR. MYERS:  May I publish to the jury?

THE COURT:  You may publish.

BY MR. MYERS:

Q.   Who are we looking at here?

A.   This is Pablo Delgado, the person that we were investigating in January of 2023.

Q.   And now, you mentioned that he is a possible felon in possession of firearms.

And that's why he was being targeted at first?

A.   Correct.

Q. Okay. So how do you know that he's a felon?

A. So we reviewed judgments, criminal judgments. So those are court documents which notated that Delgado had received a felony conviction in October of 2022.

So by the time that we were investigating Pablo Delgado, which is a couple of months after he would have been a prohibited person under that statute, for being a felon in possession of firearms.

Q. Now in addition to being a felon in possession of firearms, did you suspect him of any other criminal activity?

A. We do.

Q. What is that criminal activity?

A. Straw purchasing and trafficking in firearms.

Q. Okay. So what is a straw purchase?

A. A straw purchase is when someone purchases a firearm on behalf of somebody who is isn't legal -- legally able to possess a firearm, or for someone who doesn't want their name associated to that transaction of a firearm.

Q. Okay. Let's go back and talk about purchasing of firearms.

What is an FFL?

A. FFL is a license which gun stores have to be able to sell firearms. It stands for Federal Firearms Licensee.

Q. So if I go to -- I don't know, like -- what are some of the large commercial stores that have an FFL?

A. Here locally you can go to Cabela's, Academy. Those are

the bigger stores.  I can go to Walmart.  All those stores will have, aside from selling other stuff that they sell, they have a license through ATF, which is that FFL, Federal Firearms Licensee, giving them access to legally be able to sell different types of firearms.

Q.  Now if I wanted to go into Cabela's and buy a firearm, what is the FFL required to do?

A.  So there's a form that they're required to have the person who's attempting to purchase a firearm -- it's a form that you have to submit.  This form is an ATF Form 4473.  It's got -- it will ask you some biographical information like name, date of birth, address.

And then after that, certain questions are asked to see if -- to give the FFL knowledge as to if this person is able to legally possess a firearm or not.  And then that's how they know if they're able to, like, transfer a firearm to the individual attempting to acquire the firearm.

Q.  So what are kind of some of the questions on this ATF form that I have to fill out?

A.  So there's several questions.  But some of them would include, Are you a drug user?  Have you ever been convicted of a felony?  Are you purchasing this firearm on behalf of somebody else?

Just various questions that would -- based on your answers -- would let the FFL or the store know.  And then also

they go through your background. And then once you pass the background check through that form, then everything is good. Then you're -- the store is able to -- to provide the firearm over.

Q. Now a person that's Pablo Delgado, a prohibited person, a felon, can't buy a firearm. So what would happen if he goes into the store and fills out that form?

A. If he goes into the store, he fills out the form.

Q. And he's truthful. He's truthful when he fills it out.

A. And he's truthful. So when that question comes up, Are you a felon or have you ever been convicted of a felony?

He says -- if he's truthful, he would say -- at that point he would say "yes," because he's a felon.

Therefore, based on those questions, the store is able to see that that person doesn't -- doesn't qualify for the acquisition of the firearm.

Q. It would be illegal to sell Mr. Delgado a firearm?

A. Correct.

Q. Now what if Mr. Delgado went in there and lied on the form and said, I'm not a felon. I'll check the "no" box.

What would happen?

A. In that case, at that point the FFL, from looking at the form, can't tell if they're a felon or not. And so that information is then submitted through -- it's the FBI that does the background investigation on the individual. They go

through their background.  And that felony conviction is very likely -- sometimes instantly.  But it's very likely to come up quickly to where the FFL would receive notification.  It's called a denial.  This person would be denied the firearm.

At that point the FFL doesn't know necessarily why this individual is being denied, but they would explain to the individual, Hey, I can't give you the firearm based on the results.

Q.  So if Mr. Delgado wants to get a firearm from Cabela's, for example, how does he get around that form?

A.  So to get around that form -- and this is where a straw purchase -- the straw purchase comes into play.

Delgado can look for an associate, a relative, someone who he knows would be legal -- legally able to go fill out the form, purchase that firearm for him.  And then once that person comes out, they exchange firearms.

Usually that person gets a fee.  They'll charge whatever it is that they charge, but they'll exchange.  And then that way, Delgado can purchase a firearm through a straw purchase.  That's the term of a straw.

Q.  Okay.  So the person who's able to buy the firearm, I'm not buying it for myself, that's the straw purchaser?

A.  Correct.

Q.  Okay.  Now when you're investigating Pablo Delgado for that scheme, are we talking about one weapon or multiple weapons?

A.  We're talking about multiple weapons.

Q.  Okay.  Now, do you have experience investigating firearms trafficking organizations?

A.  I do.

Q.  Do you have experience investigating firearms with regards to drug cartels?

A.  I do.

Q.  All right.  So when you see that someone is purchasing -- possibly purchasing multiple firearms, what do you begin to suspect?

A.  I begin to suspect that this person is either trafficking these firearms.  And because of the vicinity to Mexico, these firearms are trafficked to Mexico.  And/or I begin to suspect that the person is dealing without a license, meaning they're selling the firearms on site.

Q.  So now, once you have these suspicions, kind of how do you begin your investigation into Mr. Delgado?

A.  In this specific investigation with Mr. Delgado, we had a cooperating defendant which had communication with Delgado. The cellphone communication noted the transaction of money for firearms, which included a .50 caliber rifle with the possibility of purchasing said firearms from either a gun show or from two different Federal Firearms Licensees.

This information was also -- the communication on the cellphone -- there's a third person which this person appeared

to be related to.  Very consistent with trafficking.  And so that was our initial step here to -- to have more -- aside from the felon in possession of a firearm, we had an additional lead that this was a possible trafficking of firearms.

Q.   Okay.  Now I guess during your investigation, you learn Mr. Delgado's cellphone number?

A.   Correct.

Q.   Now, are cellphone numbers an important part of your investigation?

A.   They are.

Q.   And why are they important?

A.   Because with a cellphone number, it connects to various subjects that this person is in communication with.

In this specific case, like with his phone number, odds are through the process of deconfliction, we were able to see that Delgado was in communication with the target that FBI was looking into.

Q.   Okay.  Let's talk about that.

You said this term "deconfliction."  What is deconfliction?

A.   Deconfliction is used for both officer safety and to gather criminal intelligence.

In this case, it was gathering criminal intelligence. So agencies, law enforcement agencies, will deconflict a subject by their name, date of birth, or moniker, phone

numbers.

So this information is entered into -- entered into a database where we're able to see if somebody -- some other agency is either investigating this person or has any kind of ties with the people that you're investigating.  So you -- so that you don't have a conflict of interest in that same person and we're not both -- both agencies investigating the same person.  We're able to deconflict and start working together to target that individual and, ultimately, prosecute.

Q.  I guess in the early part of 2023, were you contacted by the FBI during this deconfliction process?

A.  I was.

Q.  Were they specifically targeting Pablo Delgado?

A.  They weren't.

Q.  Who were they targeting?

A.  They were targeting Brian Muñoz Alexis -- Brian Alexis Muñoz-Castro.

Q.  Now during your investigation, as it's continued up until the current date, do you know who Mr. Muñoz-Castro is?

A.  Up until -- no.  We have no idea who Muñoz-Castro is until we meet with FBI.

Q.  No, but now, since that you've continued this investigation, today, do you know who that person is?

A.  I do.

Q.  And does the FBI have Mr. Castro's -- or Mr. Muñoz's

cellphone?

A.   Yes.  So in March of 2023, FBI seized the cellphone from known -- or from a suspected drugs firearms trafficker and stash house operator by the name of Muñoz-Castro.

In that cellphone, communications were observed with Pablo Delgado.  And in the communication -- based on that information, several photos and videos of Delgado are exchanged between -- and firearms -- are exchanged between Delgado and Muñoz-Castro.

Q.   Now at this point in time when you had the deconfliction meeting, do you have Mr. Delgado's cellphone or just Mr. Muñoz's cellphone?

A.   At this point we only have Mr. Muñoz's cellphone.

Q.   Okay.  Now, you had mentioned that you can see conversations in Mr. Muñoz's cellphone?

A.   Correct.

Q.   What kind of idea -- from that cellphone what are you starting to see?

A.   We're starting to see another person which the information appears to be related to.  So photographs and videos that Delgado would send Brian Muñoz.  Brian Muñoz would turn around and forward those photos and videos to additional subjects.

Q.   Okay.  I guess there's probably a conversation on February 13th of, I think -- I believe 2023 -- between Mr. Muñoz and Mr. Delgado?

A.   Correct.

Q.   And is that kind of like a general tenor, is they're talking about weapons and there's, like, a third person involved in this transaction?

A.   Yes, sir.

Q.   Now that third person, have you identified who that third person might be?

A.   This is Maria del Rosario Navarro-Sanchez, also known as Chayo or Fernanda.

Q.   Okay.  I would like to show you some exhibits that have not yet been admitted into evidence.

Government's Exhibit 12A.  Do you recognize Government's Exhibit 12A?

A.   I do.

Q.   Government's Exhibit 12B.  Do you recognize Government's Exhibit 12B?

A.   I do.

Q.   Government's Exhibit 12C.  Do you recognize Government's Exhibit 12C?

A.   I do.

Q.   Do you recognize Government's Exhibit 12D?

A.   I do.

Q.   And do you recognize the video of Government's Exhibit 12E?

A.   I do.

Q.   Where do exhibits -- Government's Exhibits 12A through E

come from?

A.   From Brian Muñoz-Castro's cellphone.

MR. MYERS:   Your Honor, I'd offer Government's Exhibits 12A through E into evidence.

MR. GUTIERREZ:   Your Honor, we would object to the multiplicity of 12A through 12D of the same picture of the same object.

And we do not object to the video in 12E.

THE COURT:   Your objection is overruled.

MR. GUTIERREZ:   Thank you, Your Honor.

THE COURT:   Government's Exhibits 12A through 12E are hereby admitted.

MR. MYERS:   May I publish to the jury, Your Honor?

THE COURT:   You may publish.

BY MR. MYERS:

Q.   What are we looking at in Government's Exhibit 12A?

A.   That's going to be an AR-style rifle with a -- what appears to be a grenade launcher.

Q.   Now in addition to being a special agent, are you also familiar with the Spanish language?

A.   I am.

Q.   And how are you familiar with the Spanish language?

A.   That was my first language.

Q.   And in addition to being a native Spanish speaker, do you use Spanish as an ATF agent?

A.   I do.

Q.   And how do you use Spanish in your career as an ATF special agent?

A.   I use it to be able to understand.  And so -- either text messages, phone calls, voice notes.  And then during communication with a Spanish speaker I'm able to fluently have a conversation.

Q.   Now, are you also familiar with slang in the Spanish language?

A.   I am.

Q.   And does that help you as an ATF special agent?

A.   It does.

Q.   How so?

A.   I'm able to understand the terms, the slang terms or code words that are being used, depending on the context of the conversations.

Q.   Now, you said in Government's Exhibit 12A there was a grenade launcher.  I guess where is that grenade launcher?

A.   The grenade launcher is going to be the bottom portion -- well, in this case, the top portion of the rifles.  So since the rifle is kind of facing upside down, it would be the top portion of what you can see here displayed.

Q.   Between the barrel and the trigger?

A.   Yes.

Q.   All right.  Now I guess in Spanish slang or code words, how

is that -- how is that often referred to as?

A.   The grenade launcher is *lanza papas*.

Q.   In English what would that be, literally?

A.   The literal translation would be a potato launcher.

Q.   But code word, what is it actually?

A.   Code word, it's a grenade launcher.

Q.   Grenade launcher.

      Government's Exhibit 12B, it's a similar photograph?

A.   Yes, sir.

Q.   Government's Exhibit 12C, is this a different view?

A.   It's just now facing the other way, yes.

Q.   And Government's Exhibit 12D?

A.   Yes.

Q.   And if we look at the Government's video, Government's
Exhibit 12E.

      (Video played.)

BY MR. MYERS:

Q.   Okay.  Now if we look at the beginning here on Government's
Exhibit 12E -- and we're stopped at the very beginning of the
video, the first second mark.

      Do you notice any imprints or stamp on the alleged
firearm?

A.   I do, sir.  It's the caliber.  You have caliber
information.  You have make, importer, and the serial number.

Q.   Okay.  Now, was this weapon ever seized by ATF?

A.   It was not.

Q.   Now, do you suspect that it is a -- it is an actual firearm and not a toy?

A.   I do.

Q.   And why would you suspect that's an actual firearm?

A.   Based on the information observed in this video, we were able to conduct a trace to see if -- who the original purchaser was.  Which we got some information, meaning that this firearm was legally sold at one point.

Q.   At one point?

A.   Uh-huh.

Q.   Okay.  And what do you use to get that information?

A.   For that information you need the make, model, importer, serial number, and caliber.

Q.   And that's the information we see here on Government's Exhibit 12E?

A.   Yes, sir.

Q.   All right.  Now, you'll notice that the -- this weapon does not look like a regular AR-15.  It's decorated?

A.   Correct.

Q.   I guess kind of for the record, how is it decorated?

A.   It's gold plated with various designs throughout the firearm.

          MR. GUTIERREZ:  Your Honor, I'm going to object to the speculation if it is gold plated or not.  It might be colored

gold, but it's not -- we don't know if this is gold plated.

THE COURT:  I'll sustain the objection.

BY MR. MYERS:

Q.  Have you seen weapons like this before?

A.  I have.  Not very often, but I have.

Q.  And most often times, what color is -- what are these weapons associated with?

A.  They're associated with cartels.

Q.  And how so, or why?

A.  These types of weapons are -- just because of the bling and the flashiness of the firearms, those weapons are used in, like, cartel-type videos, narco video.

MR. GUTIERREZ:  Your Honor, I'm going to object to speculative again.  This could be a collector's weapon as well.  And she's basically, with her opinion, saying it has to do with just cartels.

THE COURT:  Overruled.

BY MR. MYERS:

Q.  Now that you've seen this video, or these photographs in Mr. Muñoz's phone, and he is communicating -- or he's sending those videos to whom?

A.  To Pablo Delgado.

Q.  To Mr. Delgado.

What are the next steps in your investigation?

A.  So at this point we decided to arrest Pablo Delgado.  ATF

got an arrest warrant for Pablo Delgado, and Pablo Delgado was arrested on April 25 of 2023.

Q.   So he's currently charged with a federal crime?

A.   Yes.

Q.   All right.  Now in your experience, do you have any familiarity with how drug -- or firearms trafficking organizations work?

A.   I do.

Q.   And how did you gain this knowledge?

A.   For firearms and drug trafficking, that was once I became an agent with ATF.  Working here on the border, you see there's certain firearms that are sought after by cartel members.  And it just -- it just depends on the type of firearm that -- and so not necessarily in my cases, but what I've learned from more senior experienced agents, as to the type of investigations that they've done, the types of firearms that are involved with cartel and drug trafficking organizations.

Q.   Now when you're investigating individuals like Mr. Muñoz and Mr. Delgado, do you kind of need to understand what roles they play within the organization?

A.   Eventually, yeah.

Q.   Okay.  And is that an important part of your investigation?

A.   It is.

Q.   And why is that important?

A.   Because we're able to start piecing together kind of like a

bigger -- a bigger picture of what's going on as to who's --
who's doing what role in the organization.

Q.   Now, you've kind of gotten us to the point of the
investigation where Mr. Delgado is under arrest.  Mr. Muñoz,
they have been separately investigated by the FBI.

     Were you there for his detain, or do you know -- were
you part of that part of the investigation?

A.   I was not part of the investigations.

Q.   Okay.  But you have that -- those pieces of evidence?

A.   I do.

Q.   Okay.  So now that you have, for example from Mr. Muñoz's
cellphone and Mr. Delgado's cellphone, are you able to put a
better piece of this investigation together?

A.   We are.

Q.   And what are you suspecting at this point?

A.   I'm suspecting -- at this point, it appears that Brian
Muñoz is the stash house operator.  And Delgado was what we
suspected to be a straw purchaser.  And he's also involved in
the trafficking of firearms.

     And then those are two roles that we start to
identify.

Q.   I would like to show you an exhibit that has not yet been
admitted into evidence.

     Do you recognize the person in Government's
Exhibit 1D?

A.  I do.

Q.  Is that a fair and accurate depiction of that person?

A.  It is.

        MR. MYERS:  Your Honor, I'd offer Government's Exhibit 1C into evidence.

        MR. GUTIERREZ:  No objections.

        THE COURT:  Government's Exhibit 1C, was it?

        MR. MYERS:  Yes, Your Honor.

        THE COURT:  It's hereby admitted.

        MR. MYERS:  Yes, sir.  May I publish to the jury?

        THE COURT:  You may.

BY MR. MYERS:

Q.  All right.  Who is that?  Who is pictured in Government's Exhibit 1C?

A.  This is going to be Brian Muñoz-Castro.

Q.  Okay.  So you've told us that Mr. Delgado was trying to obtain a large number of weapons, and that you would label Mr. Muñoz as the stash house.

        So what does that stash house operator mean?  What is that?

A.  A stash house operator, meaning at his residence or the place that he controls, firearms and/or drugs are being stashed and secured until a point where those firearms are then to be transported -- firearms or drugs to be transported out of his house.  And then at that point, then he kind of releases them.

But in the meantime, he oversees care and control of whatever he has.

Q. At this time in the investigation -- so we're talking about late spring, April, May of 2023 -- do you know how Mr. Muñoz-Castro gets weapons from his stash house?

Is it here in El Paso?

A. Here in El Paso.

Q. A stash house here in El Paso to Mexico?

A. No.

Q. Okay. Now from the cellphones, do you think -- where do you think these weapons are headed?

A. Based on my experience they were headed to Mexico.

Q. Okay. And at the behest of that person you identified earlier as Chayo?

A. Yes.

Q. Okay. Now I guess in this organization, with your and FBI's investigation, have you taken up two important legs of the firearms trafficking?

A. We have.

Q. And what legs were those?

A. That's the stash house operator, which would be Brian in this case. And then also the person who is acquiring the firearms to bring to him, or one of the subjects involved in doing that, is Delgado. So those two people are now contacted by federal agencies.

Q.   Did this disrupt the criminal organization?

A.   Somewhat.

Q.   Okay.  You say "somewhat."  Does it stop their activities?

A.   No, sir.

Q.   Okay.  Now when we talked about, you know, those ideas of compartmentalization, are there people in an organization that are kind of easily replaceable?

A.   There are.

Q.   And what -- typically, what type of roles do they possess -- or do they perform?

A.   It's usually going to be the lowest part of the organization.  So it would be like scouts or couriers, from Point A to Point B.

Q.   Okay.  Now you had said that you had somewhat disrupted this organization, this organization's criminal activity.  Did you and FBI kind of come up with a plan to maybe exploit that?

A.   We did.

Q.   What was the plan that you came up with?

A.   At that point, once Pablo Delgado and Brian Muñoz were cut off from the organization, we decided to introduce an undercover, which was the undercover that was here previous to me.

Q.   Okay.  And who was that -- who was Special Agent Benavides introduced to?

A.   He was introduced to Maria del Rosario Navarro-Sanchez.

Q.   Now, Special Agent Benavides referred to her as Fernanda.

A.   Correct.

Q.   What other names do you know her by?

A.   Know her as Chayo and as Fernanda.

Q.   So the person that Brian Muñoz-Castro is allegedly communicating with, who do you suspect that is?

A.   Brian communicates with Chayo, which appears to be the same person, Chayo and Fernanda, which is Maria del Rosario Navarro-Sanchez.

Q.   Now, we heard Special Agent Benavides testify about the undercover operation.  Is that the plan that you guys had to kind of exploit?

A.   Yes, sir.

Q.   Okay.  Now, were you a part of that operation on August 21st, 2023?

A.   I was.

Q.   And what was your role in that?

A.   As the case agent I was receiving information, relaying it over to either the react team on the outside of the -- that would be, like, the team that was on the outskirts, to make an arrest -- effect the arrest.

     Also to the surveillance units that were assisting, and vice versa.  Whatever information they had, we were trying to relay that information via text messages to the undercovers.

Q.   Now once the arrests are effectuated, who are the two

people that ended up going to be arrested?

A.   It's going to be defendant Rene Hernandez Cordero and Jesús Gerardo Ramos.

Q.   Okay.  Now, did you -- were you able to collect any evidence from those two individuals?

A.   We did.

Q.   And what physical pieces of evidence did you collect?

A.   I collected the one cellphone -- or a total of three cellphones -- and 66- -- or $63,000.

Q.   Okay.  The cellphones.  You said a total of three.  Where did the cellphones come from?

A.   One cellphone was Rene Hernandez Cordero's cellphone.  And then two were for Mr. Ramos.

Q.   Okay.  Would you explain to the jury what a search warrant is?

A.   Yeah.  A search warrant, a legal document with the judge's approval, authorizing law enforcement to search either a person, place, or thing, depending on what it is that you're searching for.

Q.   Okay.  I would like to show you some exhibits that have not yet been admitted into evidence.

        Do you recognize Government's Exhibit 2G?

A.   I do.

Q.   And do you recognize Government's Exhibit 2H?

A.   I do.

Q.   And are these the search warrants that you were referencing just previously?

A.   Yes, sir.

MR. MYERS:   Your Honor, I'd offer Government's Exhibits 2G and 2H into evidence.

MR. GUTIERREZ:   No objections.

THE COURT:   Government's Exhibits 2G and 2H will be admitted.

MR. MYERS:   And, Your Honor, I ask permission to publish to the jury.

THE COURT:   You may publish.

BY MR. MYERS:

Q.   Here we're looking at Government's Exhibit 2G -- or excuse me, 2H.

What is Government's Exhibit 2H?

A.   This is a search warrant for the cellphone belonging to Jesús Gerardo Ramos.

Q.   And we see Government's Exhibit 2G.   What is this?

A.   This is a search warrant for the cellphone that Rene Hernandez Cordero had.

Q.   Okay.   Now with these warrants, what are you legally able to do?

A.   You're able to search anything within the phone -- text messages, call log or call information, photos.   Whatever is identified in the search warrant.

Q.   Okay.   This would be evidence that you're looking for?

A.   Yes, sir.

Q.   Okay.   Now, let's talk about Mr. Ramos's phones.   I know we just saw a search warrant for one, but were there search warrants for both phones?

A.   Yes, sir.

Q.   And what did you see in those phones?

A.   In one of the phones not much information was seen.

In the second phone there's communication that appears to be the phone that he uses more -- more frequently.   There's some communication with various subjects through WhatsApp.

Specifically, there's some messages, recent messages, which had the address to the undercover location where the arrests took place.

Q.   Were there -- was there much what you would consider incriminating evidence on Mr. Ramos's cellphone?

A.   There was some.

Q.   Some?

A.   Uh-huh.

Q.   Now when you look at Mr. Ramos's phone, were you able to legally search Mr. Ramos's phone -- I mean, Mr. Hernandez's phone.   Excuse me.

A.   Yes.

Q.   Okay.   And inside Mr. Hernandez's phone, do you start to gain more information about kind of the drug trafficking

organization?

A.  I do.

Q.  Of the firearms.  Excuse me.

And now that you kind of have Mr. Ramos's cellphone, Mr. Hernandez's, Mr. Muñoz's, Mr. Delgado's cellphone, are you able to put more pieces of the puzzle together?

A.  We are.  I am.

Q.  Okay.  And what are you able to see, generally?

A.  So we start seeing the communication.  In this case it started to kind of make sense as to who was communicating with who.

Once we had both cellphones, we additionally had information from Brian Muñoz and Delgado.  We start seeing Chayo or Maria Navarro-Sanchez, communicating with Mr. Hernandez Cordero, Hernandez Cordero communicating with an additional subject by the contact name of Ramos Rural.

Q.  Now, who do you suspect Ramos Rural is?

A.  We suspect this to be the brother of Jesús Gerardo Ramos.

Q.  Okay.  I'd like to show you some exhibits that have not yet been admitted.

Do you recognize Government's Exhibit 2A?

A.  I do.

Q.  Is this a fair and accurate depiction of Mr. Hernandez's cellphone?

A.  Yes, it is.

MR. MYERS:  Your Honor, I offer Government's Exhibit 2A into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 2A will be admitted.

MR. MYERS:  Your Honor, the Government had previously filed Government's exhibit -- or notice of an intent to file business records for Government's Exhibits 2B and 2C, 2D, 2E, and 2F.  We would offer those into evidence now.

MR. GUTIERREZ:  No objections, Your Honor.

THE COURT:  Government's Exhibits 2B, 2C, 2D, 2E, and 2F are hereby admitted.

BY MR. MYERS:

Q.  Special Agent Zayas, I would like to show you Government's Exhibit 2I.

Is this from an examination report from Mr. Ramos's cellphone?

A.  Yes.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 2I into evidence.

MR. GUTIERREZ:  No objections, Your Honor.

THE COURT:  Government's Exhibit 2I will be admitted.

BY MR. MYERS:

Q.  I'd like to show you Government's Exhibit 2J.

Special Agent Zayas, is this another photograph of Mr. Hernandez's cellphone?

A.   It is, sir.

MR. MYERS:   Your Honor, I'd offer Government's Exhibit 2J into evidence.

MR. GUTIERREZ:   No objections, Your Honor.

THE COURT:   Government's Exhibit 2J will be admitted.

MR. MYERS:   All right.

Your Honor, may I publish those exhibits to the jury?

THE COURT:   You may.

BY MR. MYERS:

Q.   Okay.   Let's start off with Government's Exhibit 2A.

What is the jury looking at in Government's Exhibit 2A?

A.   This is going to be Hernandez Cordero's cellphone, when you search for the name Brian, in that specific spelling.

Q.   Now, who do you think that this Brian is?

A.   We suspected this person to be -- this contact name to be Brian Muñoz-Castro.

Q.   Now back in March, when FBI had a phone number for Mr. Muñoz-Castro, what were the last four digits of that phone number?

A.   They were 2332 or 2132 -- 2132.

Q.   So this first contact up on Government's Exhibit 2A, that is your -- Mr. Muñoz's cellphone number?

A.   Yes, sir.

Q.   And it is in Mr. Hernandez's phone?

A.   Yes, sir.

Q.   Okay.

If we look at Government's Exhibit 2J.

What is Government's Exhibit 2J?

A.   This is the -- in Mr. Hernandez Cordero's cellphone -- a photograph of when you search the name Hardy.

Q.   And why were you searching the name Hardy in Mr. Hernandez's cellphone?

A.   We were searching the name Hardy because it matched -- so there's different variations, as you can see, different variations of the contact name Señora Hardy.

Based on the phone number that we had for Fernanda or Chayo, Maria del Rosario Navarro-Sanchez, that phone number that was communicating with our ATF undercover agent matches the phone number that is saved in Hernandez Cordero's cellphone as Señora Ed Hardy 22, ending in 2319.

Q.   So here, I'll highlight that section, Señora Hardy 22.

That's the number that Mr. Benavides was communicating with?

A.   Yes, sir.

Q.   Okay.  Now, do you know what a pen register device is?

A.   I do.

Q.   What is a pen register device?

A.   That's to receive incoming and outgoing calls.  It gives you the content -- the phone, without content.  It just gives

you the phone number of incoming and outgoing calls.

Q. And the FBI, were they up on any pen trap trace devices related to Chayo?

A. They were.

Q. Have they identified numbers for Chayo?

A. They have.

Q. And were those contacts, those numbers, also in Mr. Hernandez's phone?

A. Correct.

Q. And how were they saved in Mr. Hernandez's phone?

A. One of them is going to be Señora Ed Hardy 22 and the second is Señora Ed Hardy 21, which ends in --

Q. 2- -- sorry.

A. Señora Ed Hardy 21 ending in 2457.

Q. Okay. So multiple numbers related to Fernanda or Chayo are saved as how in Mr. Hernandez's phone?

A. Different variations of Señora Hardy, Señora Ed Hardy, sometimes just Señora Hardy. And then there's a number after.

Q. Okay. Now -- now that you have these cellphones, you had said you got a better understanding of how this organization was working.

     We're going to walk the jury through some of these conversations.

A. Okay.

Q. How -- can you kind of give a preview to the jury of how

it's going to work?  What are we going to see?

A.   Okay.  So we expect to see -- after we've reviewed this, what you guys will expect to see is, it's going to be Maria del Rosario Navarro-Sanchez reaches out to Hernandez Cordero, and will request something from him.

In this example, let's say five firearms to be picked up.

Hernandez Cordero will then forward that info- -- will then forward -- and then aside from the request from Chayo, or Mario del Rosario Navarro-Sanchez, you'll also see a contact name by the name of -- with different variations of Brian, which is the previous image we observed.  So she'll forward that information to Rene Hernandez Cordero.

He then will forward that information to a different subject by the content name in his phone of Ramos Rural.

Then Ramos Rural advises that, Okay.  We'll start working on this, arranging for pickup or whatever it is that the request is.

From that point, then we'll see communication between the stash house operator, Brian Alexis Muñoz-Castro, and Jesús Gerardo Ramos.

We suspect that Ramos Rural is the brother of Jesús Gerardo Ramos.  And so we're assuming that that's -- that communication is then relayed to him.

We see communication between the stash house and

Ramos.

And then after that communication, you see Ramos crossing the United States back into the Republic of Mexico.

Once he crosses back into Mexico, you see Ramos Rural update Rene Hernandez Cordero saying, Hey, your items have arrived, whatever it is that he requested.

Then he will then turn around and forward that information and update Maria del Rosario Navarro-Sanchez.

Q.   So let's take one step back.

So in this, like, line of cellphones that you have, you have Mr.- -- do you have Mr. Ramos Rural's cellphone?

A.   At this point, once we have the Hernandez Cordero, we have the cellphone for Ramos Rural.

Q.   Oh, no.  I'm saying, Do you have physical custody of that phone?

A.   Yes.

Q.   Of Ramos Rural?

A.   No, I'm sorry.  No, we don't.

Q.   Okay.  So you're kind of missing a piece of the puzzle?

A.   Yes.

Q.   Okay.  Now Jesús Ramos's cellphone, does it have incriminating context with Ramos Rural?

A.   Yes.

Q.   Okay.  Now, how is the cellphone listed in Mr. Jesús Ramos's cellphone for Ramos Rural?

A.   The cellphone number is saved in Jesús Gerardo Ramos's phone as Alfredo.

Q.   I'd like to show you an exhibit that's not yet been admitted.

Let me take it back.

MR. MYERS:  I would like to publish to the jury, Your Honor, an exhibit that has been admitted.  Government's Exhibit 2A.

BY MR. MYERS:

Q.   All right.  So here, we're looking at Mr. Hernandez's cellphone.  And you had talked about several different conversations that we're going to preview, correct?

A.   Correct.

Q.   Which date are we going to start off with?

A.   We'll start with September 11th.

Q.   All right.  If we zoom in here on September 11th, what is the highlighted section in Government's Exhibit 2A?

A.   The highlighted section is the Mexican phone number ending in 3362.  This number is saved in his -- Hernandez Cordero's cellphone as Hardy, Señora Hardy 19, I believe.

Q.   If we look at Government's Exhibit 2J, we see that Señora Hardy 19, 3362?

A.   Yes, sir.

Q.   Okay.  So this is the beginning of the chain?

A.   I believe so.

Q.   And then after it's sent to -- well, let's go look at the Government's exhibits on those.  And they have not yet been admitted.

I would like to show you Government's Exhibit 9A.

What is photographed in Government's Exhibit 9A?

A.   This is a photograph of Hernandez Cordero's cellphone, and a WhatsApp communication with the contact name of Ramos Rural.

Q.   And these are conversations starting on September 11th?

A.   Yes, sir.

MR. GUTIERREZ:  Your Honor, I'm going to object.  This is pre-Indictment dates.

MR. MYERS:  Your Honor, the Indictment goes back to August 1st, 2022, so this would be within the Indictment.

THE COURT:  The objection is overruled.

BY MR. MYERS:

Q.   And if we look at Government's Exhibit 9D, is this a translation --

A.   Yes.

Q.   -- of Government's Exhibit 9A?

What is Government's Exhibit 9E?

A.   This is a cellphone -- cellphone of Rene Hernandez Cordero in communication with that Mexican phone number ending in 3362, which is saved in his contact as Señora Ed Hardy 19.

Q.   And Government's Exhibit 9F.

What is this?

A.   That's the translated information on that communication for September 11th.

Q.   And Government's Exhibit 9B.

What is Government's Exhibit 9B?

A.   This is a call log for the phone number that Brian Muñoz-Castro had.

And the highlighted in yellow is going to be the phone number when he's communicating with Jesús Gerardo Ramos.

Q.   And what is Government's Exhibit 9C?

A.   This is going to be information on Mr. Ramos exiting -- entering and exiting the United States.

MR. MYERS:  Your Honor, I'd offer Government's Exhibits 9A, B, C, and D into evidence -- E and F, excuse me.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibits 9A, 9B, 9C, and 9D are hereby admitted.

Did you make reference to 9- --

MR. MYERS:  9E and F, Your Honor.  Yes.

THE COURT:  And Government's Exhibits 9E and 9F will be admitted.

MR. MYERS:  Permission to publish to the jury, Your Honor?

THE COURT:  You may.

BY MR. MYERS:

Q.   Let's start off with Government's Exhibit 9E.

Okay. Whose cellphone did you photograph in this picture here?

A. This picture is a photograph of Rene Hernandez Cordero's cellphone. And that's a WhatsApp communication between him and the Mexican phone number ending in 3362, suspected to be Chayo, or Maria del Rosario Navarro-Sanchez.

Q. Also known as Señora Ed Hardy?

A. Señora Hardy.

Q. Okay. So how does the conversation begin on September 11th?

A. Okay. The conversation begins with --

MR. GUTIERREZ: Your Honor, I'm going object. I believe the testimony I heard was this is a snapshot of the defendant Rene Hernandez Cordero. I believe this is a Ramos Rural communication.

MR. MYERS: That's Government's Exhibit 9A. This is 9E.

MR. GUTIERREZ: I apologize.

THE COURT: Overruled.

BY MR. MYERS:

Q. Okay. So looking at Government's Exhibit 9E, the photograph for Mr. Hernandez's cellphone.

How is Chayo, or Señora Hardy, how is she starting off the text message?

A. She starts off with the date September 11th, '22. She

says, *Oiga, son 15 largos.*

Asking, Hey, it's going to be 15 long ones.

Q.  15 long.  Okay.

We heard Special Agent Benavides testify about code words.

Do you also have familiarity or experience with code words?

A.  I do.

Q.  What is your experience?

A.  Just growing up speaking both languages.  I've -- and being around, like, the southwest border.  I've learned to understand certain terms that they use for various things including money, drugs, and firearms in this case.

Q.  Okay.  As a special agent, have you also had experience with these code words?

A.  I have.

Q.  And what is your experience there?

A.  My experience has been -- so in this case we have *largos.* They're referring to -- it's -- the trans- -- the literal translation would be long.  But it's referring to, like, the long ones, meaning like any kind of rifle, so because it's longer than, like, a pistol or a handgun.

Q.  Okay.  And what is Mr. Hernandez Cordero's cellphone response?

A.  So he says, *Ok.  Paseme el número.*

Meaning, Okay.  Send me the number.  Forward me the number.

Q.  Okay.  And this number, Brayan 1 Nuebo.  What are the cellphone -- what are the last four cellphone [sic] of that cellphone number, Brayan's number?

A.  It's going to be 1820, I believe.

Q.  1820.  Okay.

So if we -- now, we look at Government's Exhibit 9A.

What is Government's Exhibit 9A?

A.  This is going to be communication between Rene Hernandez Cordero and a contact name by the name of Ramos Rural.

Q.  Okay.  We started off with a conversation on September 11th.  How does this conversation start off?

A.  It starts off with a forwarded message by the note on the -- the WhatsApp note here saying 15 long.

And then a forwarded contact, also from Brayan 1 Nuebo.

Q.  And what's the next message from Mr. Hernandez Cordero?

A.  It says, *Para q los traiga.*

So that you can bring them.

Q.  And how does Ramos Rural respond?

A.  He responds by saying, *Ok.  Mañana hacemos el trámite.*

Meaning, Okay.  We'll start working on it tomorrow.

Q.  And how does Mr. Hernandez's phone respond?

A.  He says, Okay.

Q.   And then the next day, is that September 12th?

A.   Yes, September 12th.

Q.   And if we look at Page 2, what -- excuse me -- Page 2 of Government's Exhibit 2A [sic] -- what phone number was passed?

A.   The phone number for contacting Brayan 1 Nuebo, ending in 1820.

Q.   Now, the conversation continues on September 12th?

A.   Yes.

Q.   And how does Mr. Hernandez -- what does he text?

A.   So he starts off by saying -- so "Q" in Spanish, when you just put the "Q," that means -- that's short for "que."  So you would say, *q rollo fueron* --

Q.   And the "X" means -- it's like "*por*."  It's code for *por*.  So to understand this, he's asking *q rollo ya fueron x esos con el vecino?*

Which translates to, Hey, what up?  Did you guys go pick those things up from the neighbor?

Q.   All right.  And I guess we can go look over at the translated section of Government's Exhibit 9D.

Right here is where you're talking about?

A.   Yes, sir.

Q.   To go pick up those from the neighbor?

A.   Uh-huh.

Q.   How does Ramos Rural respond?

A.   He responded with *Dejeme pregunto prose si me pidieron el*

*dato temprano.*

Let me ask, because he asked for the info earlier.

Q.   And looking at Page 2 on Government's Exhibit 9D of the translation, how does Mr. Hernandez -- what does he text?

A.   He texted, Okay.  Tell him to call the guy and set it up.

And then Ramos Rural responded with, Okay.

And Hernandez Cordero then says, Okay.

At 1426 hours, then Ramos Rural says, They already talked and worked it out.  They're going to see each other later.

And then Hernandez Cordero responds with, Okay.

Q.   All right.  So now, what -- your hypothesis, or your suspicion, was is that Ramos Rural was going to contact Brayan Nuebo 1, Muñoz-Castro.

Do you have evidence of that contact?

A.   That Ramos Rural contacted --

Q.   I mean that Jesús Ramos, excuse me, contacted Brayan Nuebo 1?

A.   Yes, sir.

Q.   What is your evidence of that?

A.   The call logs between Brayan and Gerardo Ramos-Ramos, Jesús Gerardo Ramos.

Q.   If we look at Government's Exhibit 9B.

What are we looking at in Government's Exhibit 9B?

A.   This is a call log for the phone number that Brian Muñoz

was using.  And the highlighted in yellow is going to be communication with the phone number ending in 5521 which is going to be Jesús Gerardo Ramos's phone.

Q.  So now, we look here on the left-hand side of Government's Exhibit 9B.

Do we see a date?

A.  We do.

Q.  And now, do we see a time?

A.  We do.

Q.  And what's the time listed on Government's Exhibit 9B for this first phone call?

A.  That's going to be 1920 with 19 seconds.

Q.  And where do those records come from?

A.  These records came from FBI.

Q.  Meaning the phone company.  They came from AT&T?

A.  I believe so.

Q.  Okay.  Now when these phone records come from AT&T, this 1920 time, is that in El Paso time or is that in a different time zone?

A.  No, it's a different time zone.  That's going to be the UTC time, or universal time.  And to get the local time, you would subtract -- from that time stamp you would subtract six hours.

Q.  Okay.  So in El Paso time, instead of 1920 hours, this would be 1320 hours?

A.  Yes, sir.

Q.   Okay.  If we go back and look at Government's Exhibit 9D, they already talked.  They worked it out.  They're going to see each other later.

        Do you know the time?

A.   That's 1426 hours.

Q.   And that would be after the first phone call we looked at, correct?

A.   Yes, sir.

Q.   Let's go back to Government's Exhibit 9B, the cellphone records for Mr.- -- Mr. Muñoz-Castro.

        So we see a lot of -- an incoming call, and the -- and highlighted here ending in 5521?

A.   Correct.

Q.   Whose phone number is that?

A.   That's the phone number for Jesús Gerardo Ramos.

Q.   And how do you know that's the phone number for Jesús Gerardo Ramos?

A.   That's the phone number that he had when Ramos was arrested.

Q.   Okay.  Now, let's go back to the conversations with Mr. Ramos Rural, the translated version.

        Okay.  On September 13th, the following day, what is the text message from Mr. Ramos Rural to Mr. Hernandez?

A.   It starts with, Good morning, sir.  10 pieces arrived.  The others will be brought to me today.

Q.   And what else does he ask?

A.   Should I head your way or wait until later when I have everything?

Q.   And how does Mr.- -- and Mr. Hernandez responds?

A.   He responded with stating, Once everything is there.

Q.   Okay.  So earlier, we went from 15 long to now 10 pieces?

A.   Correct.

Q.   In this context, what are long and what are pieces really a reference to?

A.   Firearms.  In this -- I would assume more specifically rifles.

Q.   Because of the nature of long?

A.   Because of the initial message of long, yeah.

Q.   Okay.  Now, were you or someone else in your agency able to find crossings of Jesús Ramos?

A.   Yes.

Q.   Border crossings?

A.   Yes.

Q.   And what did you see on September 13th -- 12th and 13th, that kind of correlates with these text messages?

A.   Jesús Gerardo Ramos is traveling back into the United States after the pickup of the firearms.  So a portion of it arrived.  According to this message, a portion of the items have arrived to Ramos Rural.

          And then -- so you see Jesús Gerardo Ramos crossing

back and forth between these same days, consistent with the dates noted here.

Q.   Okay.   If we look at Government's Exhibit 2C, what time does Mr. Ramos -- Jesús Ramos -- enter the United States?

A.   He enters on September 12th at 1237 hours.

Q.   And if you zoom in on Government's Exhibit 9C, we see a photograph here?

A.   We do.

Q.   Do you recognize that vehicle?

A.   I do.

Q.   How do you recognize that vehicle?

A.   That was the vehicle that Jesús Gerardo Ramos was in on August 21st of 2023, when he was arrested.

Q.   Now that night, that evening of September 12th, is there an exit entry -- or exit from the United States?

A.   There is, at 1928 hours.

Q.   On which day?

A.   On September 12th.

Q.   Okay.   So now we have what they would say, 10 pieces have arrived, and Mr. Hernandez Cordero has instructed them to wait for the rest?

A.   Correct.

Q.   Okay.   If we go to Government's Exhibit 9F, this is the translation with the two, Mr. Hernandez and Señora Ed Hardy?

A.   Yes.

Q.   Okay.   Now here on this September 12th, 2022, we'll note that it says, Sends a voice note.

Were you able to listen to these voice notes?

A.   We weren't.

Q.   And why are you not able to listen to the voice notes?

A.   Some of the voice notes weren't able to properly download. Since the phone was placed on airplane mode, there's no access to the Internet at that point on the cellphone; therefore, through WhatsApp, some of the messages weren't able to download.

And when you hit to try and, like, listen to what those voice notes specifically said, a lot of them weren't -- we weren't able to listen to them.

Q.   Once you seize Mr. Hernandez's cellphone, why do you place it in airplane mode?

A.   That's to prevent the phone from being compromised or being wiped.

Q.   Okay.   Now if we look on the conversation of September 12th, is Mr. Hernandez giving updates to Fernanda, or Señora Hardy?

A.   He is.

Q.   And what messages is he forwarding?

A.   He forwarded the message that said they spoke and scheduled something.   They will see each later.

Q.   Where did that message come from?

A.   That's the message that Ramos Rural had previously sent Rene Hernandez Cordero.

Q.   And then at the same time, does Mr. Hernandez send another message to -- to Fernanda or Chayo or Señora Hardy?

A.   He does.

Q.   What does he send?

A.   He says, When are you sending paper?  Have to pay.

Q.   Okay.  Paper.  Now, I guess we've heard this earlier in a conversation between Mr.- -- Special Agent Benavides and Fernanda, when she said, I don't have papers to cross.

     In that context what was -- what was she talking about?

A.   She's talking about, like, a visa to enter the United States.

Q.   Is that the same context of this paper here?

A.   No, sir.

Q.   What's paper in reference to here?

A.   Based on this context, paper is reference to money.

Q.   All right.  If we jump to September 13th, do you recall the conversation where Ramos Rural told him, Hey, we only have 10?

A.   Yes.

Q.   Does he -- does Hernandez Cordero give an update to Fernanda?

A.   He does.

Q.   And what is that update?

A.   He says they brought 10.  Let them bring the others.

Q.   All right.  And then how does Fernanda respond?

A.   Fernanda says, Okay.

Q.   And how does Mr. Hernandez respond?

A.   He advises, Hey, your guy isn't answering to turn over what's missing.  Since noon, bunch of BS.

Q.   And now how does Señora Hardy -- or Fernanda, how does she respond?

A.   So there's three messages.  First she sends a voice note. Then she says, *Estoy hablando con el.*

        Meaning, I'm speaking with him.

Q.   And how does Mr. Hernandez respond?

A.   Parts and charges were missing.  And this way we won't be going for that.

Q.   And how -- what update does -- does Señora Hardy, or Fernanda, then give to Mr. Hernandez?

A.   She says, They just turned it over right now.

Q.   Okay.  Now, when you're -- in your suspicion of your, Hey, your guy isn't answering.

        And her response is, I'm speaking with him.

        Who do you think that is a reference to?

A.   I suspect that this is reference to she's speaking with Brian Muñoz-Castro.

Q.   And what are you basing that suspicion on?

A.   It's based on -- well, she notes that the items are being

picked up from Brian Muñoz-Castro, since she forwarded the initial contact card for Brian, and then also some call logs.

Q.  All right.  We note the number 3362.

If we look on Government's Exhibit 9B, do you see phone contacts with phone number 3362?

A.  I do.  It's going to be the portion highlighted in pink.

Q.  Pink.  Okay.

But now when she was referencing that conversation, she's saying -- she's giving this update on September 13th, not the 12th, correct?

A.  Correct.

Q.  And do you see any of those 3362 phone numbers that happen on the 13th?

I'm going to go through all of them.

There are none?

A.  No.

Q.  Okay.  Now those phone numbers that were related to Señora Hardy, the ZIP code -- or not ZIP code -- the area code.

What is the area code related to?

A.  The area code -- so the Mexican phone number is going to be 52, meaning it's a call -- or it's a phone number in Mexico.

The first two to three numbers are depending on the state or region in Mexico.

33 is consistent with the area of Jalisco, in Guadalajara.

Q.  Okay.  Now if we look on here on Government's Exhibit 9B, we see a couple of -- excuse me -- 33 phone calls.

Do you see the highlighted section?

A.  Correct.

Q.  Now here on the exhibit, it says they happened on September 14th, kind of at midnight or 1:00 in the morning. But that's UTC time?

A.  Correct.

Q.  What time would this be in El Paso time?

A.  For example, that time stamp, that 9/14/2022, would have been on September 13, 2022, with the time stamp of 0058.

That in local time, El Paso time, would have been 1858.

Q.  And now this area code, do you see the 52 and the 33?

A.  I do.

Q.  And where would this phone call likely be originating from?

A.  It's coming from somewhere in the area, region of Jalisco.

Q.  And what do you suspect then?

A.  I suspect that's just a different number that was used to contact Brian.

THE COURT:  Mr. Myers, we need to take our morning break at this time.

MR. MYERS:  Yes, Your Honor.

THE COURT:  We'll be in recess for the next 15 minutes.

(Recess taken 10:29 to 10:46 a.m.)

THE COURT:  You may be seated.

And you may continue, Mr. Myers.

MR. MYERS:  Thank you.

BY MR. MYERS:

Q.  All right.  Special Agent Zayas, when we left off, we were looking at this conversation.

How many smuggling trips were taken between the 11th and 13th in this conspiracy?

MR. GUTIERREZ:  Objection, Your Honor.  Speculative.

THE COURT:  I'll sustain the objection.

BY MR. MYERS:

Q.  From the text messages on September 11th to 13th, what did you suspect?

A.  We suspected that, as we mentioned before, that Ramos was picking up items from -- based on communication and toll records -- Ramos was picking up items from Brian Muñoz and then traveling south into the Republic of Mexico.

He traveled south within that time frame twice.

Q.  And the first time around they were supposed to be, what was the original order for?

A.  The original order was the 15 long.

Q.  15 long.  And then when the first part of the delivery happened, how many pieces were delivered?

A.  10 pieces were delivered.

Q.   Now the text messages between Hernandez Cordero and Señora Hardy, or Chayo or Fernanda, did they have conversations about Brian?

A.   They did.  That's when Señora Hardy said that -- or Brian -- or Hernandez Cordero asked -- advised her that his -- his -- or her people weren't answering.

And Chayo responds with, I already spoke to them.

Q.   And did she also indicate -- if we look at Government's Exhibit 9F, what's the highlighted section she indicates?

A.   She says, They just turned it over right now.

Q.   Now do you have evidence, or is there evidence that Jesús Ramos was in contact with Brian a second time on September 13th?

A.   Yes.

Q.   And what is that evidence?

A.   The call logs for Brian Muñoz.

Q.   And if we look at Government's Exhibit 9B, those call logs, do you see a second set of contacts between phone number 5521?

A.   Yes.

Q.   And whose number is 5521?

A.   It's going to be Jesús Gerardo Ramos's phone number.

Q.   And September 13th at what time?

A.   September 13th at 2337.  From that time stamp you would subtract the six hours.  So it would be at 1737 hours.

Q.   Now within these time frames and these phone calls and text

messages, are there crossings for Mr. Ramos that correlate with this?

A.   There are.

Q.   And if we look at Government's Exhibit 9C, is there a second set of crossings on September 13th?

A.   Yes, sir.  On September 13th at approximately 1214 hours, Jesús Gerardo is entering the United States.

Q.   And is -- when is Mr. Ramos exiting the United States?

A.   On September 13th, at approximately 1848 hours, Ramos's vehicle and Ramos is seen departing the United States into the Republic of Mexico.

Q.   If we look at Page 2 of Government's Exhibit 9C, what is this photograph we're looking at?

A.   This is a photograph of Jesús Gerardo Ramos's vehicle exiting through the BOTA Port of Entry on September 13th at 1848 hours.

Q.   And what's on the third page?  What are these photographs of?

A.   Those are additional photographs of him traveling, Gerardo Ramos, traveling.

Q.   In the photograph, picture, the one at the top, can you see the license plate?

A.   It's Paul Boy Paul 2584.

Q.   And do you recognize that license plate?

A.   I do.

Q.   Where do you recognize it from?

A.   From August 21st, 2023, when Gerardo Ramos was arrested.

Q.   Now, this exit time of 1848 hours.  If we look on Government's Exhibit 9F, which is the conversation between Señora Ed Hardy or Chayo or Fernanda and Hernandez, at what time does she tell Mr. Hernandez, They just turned it over right now?

A.   At 1745.

Q.   Okay.  So Mr. Ramos is exiting after this context?

A.   Yes.

Q.   All right.  Now that phone number ending in 1820, we have referred to it as Brian's cellphone number.  What makes you think that it's Brian's cellphone number?

A.   That phone number was in communication with the phone number that we had for Pablo Delgado, previous contact, ending in 3539.  Based on shared contacts, that the phone numbers that Brian has he shares several contacts with -- which include Pablo Delgado's phone number as well.

        MR. MYERS:  I would like to publish to the jury Government's Exhibit 2F, which has already been admitted in evidence.

        THE COURT:  You may publish.

BY MR. MYERS:

Q.   And do you recognize Government's Exhibit 2F, Special Agent Zayas?

A.   Yes.

Q.   And what are they the phone records for?

A.   These are the phone records for the phone number ending in 1820.

Q.   These are the full phone records?

A.   Yes.

Q.   All right.  And if we look on Page 2 of Government's Exhibit 2F, do you see the subscriber name?

A.   Yes.  It's Fernando Estrada.

Q.   Not Brian Alexis Muñoz-Castro?

A.   Correct.

Q.   Is that common in your line of experience?

A.   Yes.

Q.   And why is it common to see a different subscriber than the actual user of the phone?

A.   Just to conceal their identity.  So they'll use different people's -- either a fake name or somebody else's name to -- for transactions, different types of transactions, to include subscriber information for, like, getting a new phone number.

Q.   Now when Fernanda or Señora Hardy forwarded this phone number to Mr. Hernandez, how was it labeled as?

A.   It was labeled as Brayan 1 Nuebo.

Q.   Okay.  And Mr. Muñoz-Castro's full name?

A.   It's Brian Alexis Muñoz-Castro.

Q.   Okay.  Now, you also said that there were common contacts

within these cellphone records.

A.   Yes, sir.

Q.   What does Mr.- -- you mentioned Mr. Delgado?

A.   Delgado.

Q.   What are the last four digits of his phone number?

A.   3539.

Q.   So if we look -- or we search Government's Exhibit 2F for 3539, what are we going to find?

A.   It's communication between Delgado and Brian.

Q.   Okay.  So because there's this contact, or this shared contact, what do you begin to suspect about phone number 1820?

A.   We begin to suspect that it's the same Brian Alexis Muñoz-Castro.

Q.   All right.  If we go back to publish Government's Exhibit 2A, which has previously been admitted.

        Now, we went through September 11th and 13th.  Could these -- all this timing between Mr. Ramos crossing and these phone calls, could that have been a coincidence?

A.   It could have been a coincidence.

Q.   Do you think it's a coincidence?

A.   I don't.

Q.   Why not?

A.   Because you see that pattern repeated over and over again.

Q.   Okay.  When is the next conversation that was seen as a pattern that was repeated?

A.   September 25th.

Q.   And why are you picking out September 25th?

A.   Because on this date, once you search for Brian and Hernandez Cordero's cellphone, you will see communication where that contact card is sent between -- twice that day.  So like on September 11th, it was sent between the phone number ending in 3362.  And then it was then forwarded to Ramos Rural, where you'll see the same -- the same pattern on September 25th.

Q.   All right.

        MR. MYERS:  Your Honor, I would like to show the witness some exhibits that have not yet been admitted into evidence.

BY MR. MYERS:

Q.   Do you recognize Government's Exhibit 2A [sic]?

A.   Do.

Q.   And what is Government's Exhibit 2A [sic]?

A.   That's Hernandez Cordero's cellphone in communication with the contact name Ramos Rural.

Q.   Government's Exhibit 10B.

        Do you recognize Government's Exhibit 10B?

A.   I do.

Q.   And how do you recognize Government's Exhibit 10B?

A.   Those are the crossings for Jesús Gerardo Ramos.

        MR. GUTIERREZ:  Your Honor, for the record, I would like to clarify.  I believe the Prosecution had said 2A, and I

think he meant 10.

MR. MYERS: 10A, yes.

MR. GUTIERREZ: And 10B, just for the record.

THE COURT: What was it?

MR. MYERS: 10A and 10B.

BY MR. MYERS:

Q. Do you recognize Government's Exhibit 10C?

A. I do.

Q. And what is Government's Exhibit 10C?

A. That's a call log call records for Brian Muñoz-Castro.

Q. Do you recognize Government's Exhibit 10D?

A. I do.

Q. And what is Government's Exhibit 10D?

A. That's the -- it's going to be a translation of the conversation on September 25th between Ramos Rural and Hernandez Cordero.

Q. Do you recognize Government's Exhibit 10F?

A. I do.

Q. And what do you see in Government's Exhibit 10F?

A. That's a photo of the cellphone belonging to Hernandez Cordero. And it's a WhatsApp communication between him and the Mexican phone number ending in 3362.

Q. And then what is the next Government's Exhibit 10F?

A. It's going to be the communication. Now, it's a translated communication.

MR. MYERS:  Your Honor, I would offer Government's Exhibits 10A, B, C, D, E, and F into evidence.

MR. GUTIERREZ:  No objection, Your Honor.

THE COURT:  Government's Exhibits 10A, B, C, D, E, and F will be admitted.

MR. MYERS:  And permission to publish to the jury, Your Honor?

THE COURT:  You may publish.

BY MR. MYERS:

Q.  All right.  What is the jury looking at in Government's Exhibit 10F?

A.  That's a photograph of the cellphone belonging to Hernandez Cordero.  And it's a WhatsApp communication between him and a Mexican phone number ending in 3362 for Señora Hardy.

Q.  Okay.  And how do you know that is Mr. Hernandez's cellphone?

A.  Because I took photos of the communication.

Q.  Who seized the cellphone from Mr. Hernandez?

A.  We seized the cellphone from Mr. Hernandez on the day that he was arrested, on August 21st.

Q.  Okay.  Now the first part of this message, I guess Señora Hardy or Fernanda, did she forward a message or forward contact information?

A.  She does.  She sends the contact name for -- a contact card for Brayan 1 Nuebo on September 25th.

Q.   And how does Mr. Hernandez respond?

A.   He responds, *Q cosas son.*

Meaning, What items -- What items are there?

And then Señora Hardy responds with *5 largos y 2 cajas.*

Five long and two boxes.

Q.   Let's go switch over to Government's Exhibit 10F.

This is the translation of that conversation?

A.   Yes.

Q.   Okay.  So she says five large and two boxes?

A.   Yes.

Q.   How does Mr. Hernandez respond?

A.   He responds asking, Two boxes of what?

And then Chayo responds with, *De chibo de 500.*

Or of goat, 500 throws.  So like a *"millar"* in two.

Q.   All right.  Let's break this down a little bit.  Okay?

So five long, you've already told us you suspect that's going to be a what?

A.   It's going to be a rifle.

Q.   Now, two boxes.  What do you think two boxes is going to be a reference to?

A.   It's going to be boxes of ammunition.

Q.   Okay.  Now, is there anything in this conversation that's going to confirm this suspicion?

A.   Yes.

Q.   What is that?

A.   Later on she says, Of goat, 500 throws.  Throws are --
it's -- tiros is what she says, throws.  But that's a code word
used, or slang term, used for ammunition.

Q.   Okay.  So when he asks two boxes of what, she says, Of the
goat, 500.  So it's not going to be boxes of goats, is it?

A.   No.

Q.   All right.  You know, you heard Special Agent Benavides's
testimony about chibo and cuernos, goats and horns?

A.   Correct.

Q.   Is that also your experience as an ATF agent?

A.   It is.

Q.   What are those generally in reference to?

A.   Chibo is going to be code for the AK-47-style rifle.

Q.   Okay.  So if you read this in code, it would look like two
boxes of 500 rounds?

A.   Correct.

Q.   Okay.  Now tiros, just like a literal translation, that
would mean what, again?  I'm sorry?

A.   Throws.

Q.   Throws.  In your training and experience, has tiros been
used as a code or slang word for something?

A.   It has.

Q.   And what is that?

A.   That's ammunition, just because it's coming out of the

firearm.

Q. Okay. So like a *tiro* would be one bullet?

A. Correct.

Q. Okay. And now we have, like, a -- so like *millar* in quotation marks.

Have you had experience with that term *millar*?

A. Yes. *Millar* means a box of ammunition. A box of ammunition that has a thousand rounds.

Q. Okay. And how does Hernandez Cordero respond to that, to that message?

A. Cordero- -- Hernandez Cordero says, Okay.

Q. And then what does Señora Hardy or Fernanda, what did she say?

A. Then she says, One *millar* at 9. They'll see you at the SMart.

Q. Okay. And how did Mr. Hernandez respond to that?

A. He says, What's up? Are they there already? What's up? Lies.

Q. Okay. So now that Fernanda has placed an order with Mr. Hernandez, what's the next step that we're going to see?

A. We'll see this information forwarded or relayed to Ramos Rural.

Q. If we look at Government's Exhibit 10A, do we see exactly that?

A. We do.

Q.  And what is Government's Exhibit 10A, for the record?

A.  That's a cellphone of Hernandez Cordero.  It's a communication between him and the contact name Ramos Rural.

Q.  Now, do you see the same information that we saw in that conversation with Fernanda or Chayo?

A.  Yes.  So the forwarded message of Brayan 1 Nuebo is again forwarded from Hernandez Cordero to Ramos Rural.

And additionally, *5 largos y 2 cajas.*

It's a forwarded message on WhatsApp.

Q.  If we look on Page 2, what is the contact number that was forwarded?

A.  It was forwarded to 1820.

Q.  Same number as last time?

A.  Brayan 1 Nuebo.  Correct.

Q.  And after Mr. Hernandez says the five large and two boxes, how does Mr. Rural respond?

A.  He responds, *Ok.  Deje lo acomodo.*

Meaning, like, arrange.

Q.  Okay.  And we'll look at Government's Exhibit 10D, which is a translation of that phone call.

A.  Yes.

Q.  Okay.  After Mr. Ramos Rural says, Okay.  Let me make the arrangements, what does -- how does Mr. Hernandez respond?

A.  He says, Okay.  The boxes are of the dogs that have 500 throws each one.

Q. Okay. So now we went from 200 boxes of the goat, to now -- or excuse me -- two boxes of the goat, now two boxes of the dogs.

MR. MYERS: In your training and experience has *"perro"* been used as a code word or slang word for a firearm?

A. Yes.

Q. Is there any particular firearm that's attached to that word?

A. It's usually a rifle.

Q. A rifle.

And here, he's -- even though the message is saying that the boxes are of the dogs that have 500 throws, what is your suspicion?

A. It's going to be -- the boxes are going to be of ammunition, 500 in each box of ammunition to -- for an AK-47-style rifle.

Q. Okay. And where are you getting that, that it's for an AK-47-style rifle? How are you putting that together?

A. When Chayo initially advised that it would be of goat or of *chibo*. And that's the term used for AK-47-style rifle -- or AK-47.

Q. All right. So step one, we saw Fernanda order the weapon.

Step two, we saw arrangements made between Mr. Hernandez and Mr. Ramos Rural.

What's the next step that we're potentially going to

see?

A.   We'll see communication between Jesús Gerardo Ramos and Brian Alexis Muñoz-Castro.

Q.   And in fact, is that what you see in this context?

A.   We do.

Q.   And if we go to Government's Exhibit 10C.

    We look on September 26th?

A.   September 26th, time stamp 2345.

Q.   In El Paso time, what is that really going to be?

A.   El Paso time that's going to be 1745 hours.

Q.   On what day?

A.   On September 26th.

Q.   And one would be the day before -- oh, it would be September 26th.  Excuse me.

    And what contact number is on September 26th at that time?

A.   It's contacting a phone number ending in 5521.  That number is Jesús Gerardo Ramos's phone.

Q.   And also, do you see contacts between Jesús Ramos and that 1820 number throughout the day on the 26th?

A.   I'm sorry?

Q.   Do you see, on Government's Exhibit 2F, more contacts between Jesús Ramos's phone number and 1820?

A.   Yes, sir.

Q.   Now here, they're labeled as September 27th in the early

morning hours.  Correct?

A.   Correct.

Q.   But in El Paso time, what was the date and time that's going to be associated with this?

A.   So El Paso time, from the time stamp there you subtract six.  So instead of September 27th of '22, it would be September 26th at 1810, 1809, 1809.

Q.   Okay.  So these will all kind of be all on the 26th here in El Paso?

A.   Yes, sir.

Q.   Okay.  Now, is there going to be any other evidence to corroborate that it's Mr. Ramos coming and going from the United States?

A.   Yes.  Crossing history for Mr. Ramos will show that.

Q.   If we look at Government's Exhibit 10B, when does Mr. Ramos enter the United States?

A.   He enters on September 26th at 1742 hours.  And then his vehicle is exiting on September 26th at approximately 1953 hours.

Q.   And how do you know that that's his vehicle?

A.   It's the plates.  It would be the same plate matching the vehicle that Jesús Gerardo Ramos was arrested in during the reversal.

Q.   And here in Government's Exhibit 10B, do you see a picture of anybody in the driver's seat that you recognize?

A.   I do.   I see Gerardo Ramos driving.

Q.   Now if we go back to Government's Exhibit 10D, are there more conversations on -- following up on September 26th?

A.   Yes.   On September 26th, Hernandez reaches out to Ramos Rural and says, Good morning.   How's that going with your partner making arrangements?   You know how they cause problems.

     And then Ramos Rural responds, Your products have arrived, sir.

Q.   Okay.   We've taken note of time.   What time did Ramos Rural say, Your products have arrived, sir?

A.   On 2130 hours.

Q.   On what day?

A.   On September 26th.

Q.   And what day did Mr. Ramos leave the United States?

A.   On September 26th at 1953 hours.

Q.   Relatively close in time?

A.   Yes, sir.

Q.   How -- what does Mr. Hernandez respond to, Your products have arrived?

A.   He responds by saying, Okay.   Cool.   What was it, by the way?

     Ramos Rural says, Six and two little boxes.   I'll call you in the morning.

Q.   And how does Mr. Hernandez respond?

A.   He responds by saying, Okay.

And then Ramos advises, I'll call you -- oh, I'm sorry.

I'll call you in the morning.

And then Hernandez, again, says, Okay.  Cool.

Q.   Now on September 27th, the following day, what is the conversation?  How does Mr. Ramos Rural start the conversation?

A.   He says, What's up, sir?

And Hernandez says, Hey, hold up, because I just got busy.

Q.   And how does Mr. Hernandez respond?

A.   He responds stating, Okay.

Q.   And what does Mr.- -- or that was Mr. Rural.  Excuse me.

How does Mr. Hernandez respond to Mr. Rural?

A.   Hernandez responds by saying, Bring that to me at 5.

And then Ramos Rural states, Okay.

Q.   Now if we look at September 26th within that same time frame, this is a conversation between Señora Hardy and Mr. Hernandez?

Let me scroll to the top.

A.   Yes.

Q.   Okay.  If we start off on Page 2 of September 26th -- now, let me walk through it.

So at the very beginning of the conversation, what was the order for?

A.   This order was for the two boxes and --

Q.   Is it two boxes?  And if we look at -- and five, correct?

A.   Five long and two boxes, yes.

Q.   Now Mr. Rural, when they finally -- when the products have arrived and Mr. Hernandez asks what they were, what did it turn out to be?

A.   Turned out to be six and 2 boxes.

Q.   Okay.  Does Mr. Hernandez forward that information back to Fernanda?

A.   Yes.  He updates her on September 26th and states, No, they brought all R.  I have six.  I'll give them to you for 2300.

Q.   Okay.  So now, let's go back.

They brought all R, or letter R, in Spanish, correct?

A.   Correct.

Q.   Is that a slang or code term that you have become familiar with?

A.   I have.

Q.   And in your training and experience, when someone in this context refers to something that's just R.  What are you interpreting that as?

A.   I interpret it as an AR-15-style rifle.

Q.   And why do you say AR-15?

A.   That's the -- instead of -- in Spanish, instead of saying R15, they refer to it as "r" or "r" as in the English translation.

Q.   Now, Mr. Hernandez says he'll give them to you for 2300.

A.   Correct.

Q.   Okay.  And how does Ms. Fernanda respond?

A.   She responds saying, Those aren't mine.  They won't get those from me.

Q.   And what does Mr. Hernandez say?

A.   He says, But you can sell them.  Hook me up.  Your dirty ones arrived.

Q.   Okay.  So when he says Your dirty ones arrived, what do you suspect that's in reference to?

A.   That's a reference to the items that Fernanda had, or Señora Ed Hardy had asked Hernandez to acquire.

Q.   And how does she respond?

A.   She responds, I have 10 here.

Q.   And what else does she say?

A.   And they want to give me 30 for each one.  They're crazy.

Q.   And then how does this conversation end?

A.   The number for Señora Hardy says, He just saw them.

        Hernandez responds with, Uh-huh.  Okay.

        Then there's a voice note.  And Hernandez Cordero ends this conversation with, Send me the money.

Q.   If we go back to Government's Exhibit 2A, does this pattern play out again?

A.   It does.

Q.   And when is the next date -- or when is the next -- or when is another time that we'll see this pattern play out?

A.   We'll see it October 17th, I believe.

Q.   All right.  And where are you getting the date of October 17th from?

A.   Again, that same pattern is observed on the date of October 17th, where the phone number ending in 3362, that Mexican phone number, forwards Brian's contact card to Hernandez Cordero.  And then Hernandez Cordero will forward that information to Ramos Rural.

MR. MYERS:  Your Honor, I would like to show the witness some exhibits that have not yet been admitted into evidence.

BY MR. MYERS:

Q.   I'll show you what's been Government's Exhibit as Government's Exhibit 11A.

Do you recognize Government's Exhibit 11A?

A.   Yes.

Q.   And what is Government's Exhibit 11A?

A.   That's Rene Hernandez Cordero's cellphone communication between him and the contact name of Ramos Rural.

Q.   Do you recognize Government's Exhibit 11B?

A.   Yes.  That's going to be call log for Brian Alexis Muñoz-Castro.

Q.   If we look at Government's Exhibit 11C, do you recognize Government's Exhibit 11C?

A.   Yes.  That's going to be the crossing history for Jesús

Gerardo Ramos.

Q.   And Government's Exhibit 11D?

A.   That's going to be -- yes.  That's the translation from the communication between Hernandez and Ramos Rural.

Q.   And Government's Exhibit 11E.

     Do you recognize this one?

A.   Yes.  That's communication between the cellphone belonging to Rene Hernandez Cordero and that Mexican number ending in 3362.

Q.   And we see Government's Exhibit 11F.

A.   Yes.  That's the translation for the conversation of the phone number ending in 3362.

Q.   Okay.  So on September 17th, if we --

     MR. MYERS:  Oh.  Your Honor, I'd move to offer into evidence Government's Exhibits 11A, B, C, D, E, and F.

     THE COURT:  Government's exhibit -- no objection?

     MR. GUTIERREZ:  No objections, Your Honor.

     THE COURT:  Government's Exhibits 11A, B, C, D, E, and F will be admitted.

     MR. MYERS:  Permission to publish to the jury?

     THE COURT:  You may publish.

BY MR. MYERS:

Q.   We'll start off with Government's Exhibit 2A.

     MR. GUTIERREZ:  11.

     MR. MYERS:  No.  We're starting with 2A.  Sorry.

MR. GUTIERREZ:  Sorry.

BY MR. MYERS:

Q.  Here on the 17th, this is the beginning of that text message string, or the chain of evidence?

A.  Yes.

Q.  Okay.  So Brian's number has been forwarded.

What's the next step that we're likely to see?

A.  We'll see forwarded contact for Brian, and then a request of some sort from Chayo.

And then from there, you'll see that same request forwarded to Ramos Rural along with the Brayan 1 Nuebo contact card.

Q.  If we look at Government's Exhibit 1A -- or excuse me, 11A -- do you see a conver- -- whose conversation is this on Government's Exhibit 11A?

A.  This is going to be a conversation, WhatsApp conversation, between Ramos Rural and Rene Hernandez Cordero.

Q.  And we can go over to the translation, which is Government's Exhibit 11D, of this conversation.

How does this conversation start?

A.  It starts with Hernandez asking Ramos Rural, Hey, what's up?  When is your partner going?

Q.  And how does Mr. Ramos Rural respond?

A.  He responds with, You know what?  He got stuck on the highway.  But in the morning we'll handle that.

Q. And then what happens next?

A. Hernandez responds with, Okay. I'll pass you the number.

Q. And how does Mr. Ramos Rural respond?

A. He responds by saying, Send me the number in the morning and we'll figure it out. Or if you want -- if you want one of it right now, you know.

Q. And what information does Mr. Hernandez send?

A. It says for them to go and they can arrange.

Q. Yeah. But what phone number is sent?

A. Oh. He sends the phone number for Brayan 1 Nuebo.

Q. Okay. And then after -- about the same time he sends that, how does Mr.- -- what message does Mr. Hernandez also send?

A. So he sends the contact name for Brayan 1 Nuebo, and then says for them to go and they can arrange.

Q. And how does Mr. Ramos Rural respond?

A. He responds by stating, You send it. I'll let you know.

Q. Okay. Now, these are conversations that occur on October 17th?

A. Correct.

Q. Okay. So what is the next step? Now that the number has been passed, what's the next step you expect to see?

A. Based on the call log of Brian, you should see communication between Brian and the phone number ending in 5521 for Ramos.

Q. And the following day, on October 18th, do you see those

contacts?

A.   I do.

Q.   And now down here, which contacts are highlighted in yellow?

A.   So the contact highlighted yellow is going to be communication between Brian and Ramos.  And the contact highlighted in pink is going to be communication with the number ending in 3362 and Brian.

Q.   Okay.  Now again, we see conversations beginning on October 18th?

A.   Yes.

Q.   But what time is listed?

A.   The time is listed in UTC time.  So for October 18th, the first one, it shows the time stamp of 2236 hours.

Q.   In El Paso time that's going to be?

A.   Six hours less.  So it would be 1636.

Q.   And these conversations, if we look on Page 2 of Government's Exhibit 11B, how long do these contacts generally continue?

A.   Up to October.  A time stamp shows October 19, 2022.  But in reality, it's based on the difference of time, the six hours that you subtract, it would be October 18th at approximately 1839 hours.

Q.   And then after this contact between Brian Muñoz-Castro and Hernandez, with Mr. Jesús Ramos, with phone number 5521, what

are you going to see?

A.   We'll see Ramos crossing back into the Republic of Mexico.

Q.   And if we look at Government's Exhibit 11C, what time and what day -- what time does Mr. Ramos enter the United States?

A.   This was Jesus Gerardo Ramos enters on October 18th at approximately 1629 hours.

Q.   And what time does he leave?

A.   Ramos is leaving the United States on October 18th at approximately 2137 hours.

Q.   And do you recognize the truck that's pictured in all three of these photographs?

A.   I do, sir.

Q.   And whose truck is that?

A.   That's the truck Jesús Gerardo Ramos was driving.

Q.   And if we look on that first page on the left on the entry, do you recognize anybody photographed there?

A.   I do.  I recognize Jesús Gerardo Ramos in the driver's seat.

Q.   If we go back to the conversation, and we go to October 18th between Ramos Rural and Mr. Hernandez, walk us through this conversation, please.

How did Mr. Hernandez -- what does he do?

A.   Mr. Hernandez reaches out to Ramos Rural and asked, Hey, call this guy so you can make arrangements, because they're giving me a hard time now.

Ramos Rural responds, We are working on it, at 10:15.

Hernandez responds with, Okay.

Then Ramos Rural says, They sent me photos of some females.  You interested?

Hernandez responds, Let me see them.

Q.   Now, let's take a break and go back to the real -- the untranslated version here on Government's Exhibit 11A.

Okay.  So after he says, Let me see them, then we see a forwarded message that begins with, like, *HK 15 tiros*.

Do you see those right there?

A.   I do.

Q.   Okay.  Could you dictate it out for the record, please?

A.   Yeah.  So it's a forwarded message from Ramos Rural to Hernandez.  And it reads, *HK 15 tiro*s 9mm, two *cargadores*

Q.   And the next forwarded message?

A.   The next forwarded message says, Glock 9mm, 15 *tiros*, and 3 *cargadores*.

Q.   Okay.  So this one, they were referred to as Photographs of some females?

A.   Yes.

Q.   Are photographs of females forwarded?

A.   No.

Q.   Okay.  This HK, are you familiar with that -- those initials?

A.   Yes.  That's the manufacturer of the firearm.

Q.   HK is a manufacturer?

A.   Yes.

Q.   All right.  15 *tiros*.  *Tiros*, again in Spanish, means throws.  But in this context, what does it mean?

A.   It would mean ammunition.

Q.   9mm.  Are you familiar with that?

A.   Yes.  That's the caliber.

Q.   And which caliber is that?

A.   That would be 9 millimeter caliber.

Q.   *All right.  Cargadores*.  In English, what's the literal translation?

A.   Literal translation is chargers.

Q.   But in slang, in the context of firearms, what can that mean?

A.   In the context of firearms, that means two magazines, like just a magazine for the firearm.

Q.   Sort of like filling up, where they're charging the firearm?

A.   Yes.

Q.   The next forwarded message starts with Glock.  Are you familiar with the name Glock?

A.   Yes.  Again, it's a manufacturer.

Q.   And the 9mm?

A.   9 millimeter.  It's going to be the caliber.

Q.   And now when you talk about -- going back to chargers,

because that's the next two lines, 15 *tiros*, 3 chargers.

Going back to the magazines.  Magazines are what, for the record?

A.  Magazines are what you insert into a firearm to -- so that the firearm can load from -- from the magazine.  That's part of the firearm.

Q.  Okay.  A magazine holds what?

A.  Ammunition.

Q.  Ammunition?

A.  Uh-huh.

Q.  And how much ammunition can you fit on the magazine?  I guess it depends on the firearm and the weapon.

But for just a general handgun, how many bullets could a magazine hold?

A.  It varies.  There's smaller type firearms which you can have up to, like, maybe six rounds.

There's the 10-round magazine.  There's 15-round, 17.  It just depends.

Q.  It depends.  Okay.

Here we see, at the bottom of Government's exhibit -- on Page 5 of Government's Exhibit 11A, 15 throws, 3 chargers.

What do you think that's an explanation of?

A.  So 15 throws is going to be the capacity of -- so it's going to be -- this is based on the context of the information. It's going to be 3 magazines.  And each magazine, 15 *tiros*

would be the capacity, so 15-round ammunition, or 15-round

capacity for each magazine.

Q.   Now if we look on the next page, Government's Exhibit 11A,

there are some photographs that are sent.

          Can you see those?

A.   Yes.

Q.   Now, the photographs are blurry.  Why are they blurry?

A.   Because the phone was on airplane mode, and we didn't

have -- we didn't have Internet connected to that phone at the

time, so we weren't able to properly download those photos.  So

it just appears as a blurry photo.

Q.   Even though they're blurry, can you kind of make out what's

in there?

A.   I can.

Q.   And does it appear to show in those photographs?

A.   It appears to be firearms, specifically handguns here, or

pistols.

Q.   Would it match the description of what was previously

discussed in those conversations?

A.   It does.  It matches the description of also the magazines.

And one has the one -- you assume it's inserted, because it has

the other one there.  And then the other one that had -- the

Glock had three magazines.

          It shows the pistol with what I would assume would be

one magazine already inserted, plus the two additional, making

a total of three.

Q.   If we'd go back to the translation on Government's Exhibit 11D.

After the photographs are sent, what does Mr. Hernandez ask?

A.   He asked, How much?

Q.   And how does Mr. Ramos Rural respond?

A.   Ramos Rural said, 1300 each.

And then Hernandez responds with, It's expensive. There's no profit.  1100, and yes.

Q.   And what does Mr. Hernandez -- or what Mr. Rural respond to that?

A.   Ramos Rural responds, Yes, but they put them at that price. Let me see, and I'll let you know right now.

Q.   And what does Mr. Hernandez say to that?

A.   He says, Okay.

And then followed by a message stating, I'm going to leave tomorrow.  Bring me the material.

And then Ramos Rural says, Okay.

Q.   The following day, on October 19th, what does Mr. Ramos text to Mr. Hernandez?

A.   He texted, I have your tool, sir.

Q.   All right. *Herramienta* -- I can't say it.

What's the Spanish?

A.   *Herramienta.*

Q.  All right.  Thank you.  All right.

And in English, that means tool?

A.  Yeah.  Tool or tools.

Q.  And in your training and experience, have you come across that Spanish word used for something else?

A.  Yes.

Q.  What is that?

A.  It's code for firearms or for just -- you know, it's code for whatever it is that they're referring to.

Q.  Okay.  Now once Mr. Ramos Rural says, I have your tools, sir, how does Mr. Hernandez respond?

A.  He responds and states, Okay.  What was it?

Q.  And what else does he tell Mr. Ramos Rural?

A.  And those two, they didn't want to give them cheaper?

Q.  Now in the question that responds to, What was it?  Does Mr. Ramos Rural give an answer?

A.  Which one?  I'm sorry.

Q.  When he says, Okay.  What was it?

Mr. Hernandez texts, Okay.  What was it?

Does Mr. Hernandez -- does Mr. Rural respond to that?

A.  He does.  He responds by saying, 15 mutts, or dogs.

Q.  Now in your training and experience, have you come across this term *chuchos*?

A.  Yes.  That's -- specifically more here in this region. *Chuchos* is a term that's used to refer to, like, dogs or mutts.

Q.  Mutts.  But in this context, what's it a reference to?

A.  This would be in reference to 15 firearms, possible rifles.

Q.  Okay.  And how does Mr. Hernandez respond?

A.  He says, Okay.  Good.

Q.  And what else does Mr. Rural inform Mr. Hernandez?

A.  He goes back -- it appears that he goes back to the conversation on the two firearms, the two pistols that he was trying to sell and says, And those two, they didn't want to give them cheaper?

Well, they will lower a little bit, 1250.

Q.  And what does Mr. Hernandez say?

A.  Mr. Hernandez says, Let me tell them.

Q.  And then what does -- what's the conversation that Mr. Rural has?

A.  He responded by stating, All right.  Didn't say anything, sir.

Q.  And what does Mr. Hernandez say?

A.  Mr. Hernandez says, 1200 for those?

Q.  And how does this conversation end?

A.  And Ramos Rural responds, All right.

And then Hernandez says, Okay.

And Ramos Rural says, Say what time.

Q.  And the next part of the conversation?

A.  Hernandez says, Well, 5:30 sounds good.

Ramos Rural responds by stating, You said it.

And then Hernandez responds with, Okay.

Q.   Now that we have seen evidence that something might have come back to the United States, and this conversation between Mr. Ramos Rural and Mr. Hernandez, what's kind of the final step that we should see?

A.   This information, once he -- once Ramos Rural provides the update to Hernandez Cordero, Hernandez Cordero should turn around and update Señora Ed Hardy, or Chayo.

Q.   Okay.  And if we look at Government's Exhibit 11E.

What is the conversation between himself and Señora Hardy, or Fernanda?

A.   This conversation says -- October 19th, Hernandez says, *Ya estan sus mugres aquí q son 15.*

Your dirty ones are here.  It's going to be 15.

Then he follows *Le mando foto de 2 cortas haber si las quiere.*

I'll send you a photograph of the two short ones.  Let me know if you're interested.

Q.   Okay.  And do you recognize the photographs that are -- that are sent?

A.   I do.

Q.   And what are the photographs that are sent?

A.   That looks like the photograph that was sent between Ramos Rural to Hernandez Cordero depicting the Glock with the three magazines that was described.

Q.  And what does Hernandez send along with that photograph?

A.  Hernandez sends information and says, *Son esa glock 9mm y una hk.*

It's going to be this Glock 9 millimeter and one HK.

Q.  Okay.  Same explanation that we sent -- that was sent from Mr. Ramos Rural?

A.  Correct.

Q.  Okay.  Now, going back to October 19th.

At the top of this conversation we see a term now "*mugres*," dirty, or stuff is used.  And then, They are 15.

A.  Correct.

Q.  And we also say -- he's going to send a photo of two shorts?

A.  Yes.

Q.  Two *cortas*.  This term *cortas* is one we've seen before during the presentation of this evidence?

A.  I'm not sure about this evidence -- oh, yes.  Yes.

Q.  Okay.  And how was shorts used?

A.  Shorts used for -- so it's not -- it's depicting the size of the firearm.  So instead of -- like a long one would be referring to, like, a rifle, because those are usually longer. *Corta* would be short.  That means it's like the shorter firearm.  So like a pistol or handgun similar to what you see in the photo.

Q.  If we go back to Government's Exhibit 2A.

Is there a final date, I guess we see at the top of Government's Exhibit 2A, where Brian's contact information is shared?

A.   We do.  It's March 26th of '23.

Q.   But now this time, instead of 1820, it's the phone number ending in 2132?

A.   Correct.

Q.   And just to refresh everyone's memory, do you know, or are you familiar with this 2132 number?

A.   Yes.  That's the phone number that Brian Muñoz-Castro had during the time that his cellphone was seized by FBI.

Q.   Okay.  I want to show you a conver- -- something that's not been admitted in evidence.

Government's Exhibit 12G.

Do you remember a photograph of this phone?

A.   Can you zoom in?  I believe that's Brian Muñoz's phone.

Q.   And do you see the number at the top?

A.   Yes, it is.  It's going to be in communication with the Mexican number ending in 2457.

Q.   And Government's Exhibit 12H.

Do you recognize -- and this is a translation of that conversation?

A.   Yes.

MR. MYERS:  Your Honor, I'd offer Government's Exhibits 12G and 12H into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibits 12G and 12H will be admitted.

MR. MYERS:  Permission to publish to the jury?

THE COURT:  You may publish.

BY MR. MYERS:

Q.   If we look at here at Government's Exhibit 12G, you said this is a photograph of whose phone number?

A.   This is Brian Alexis Muñoz-Castro's phone.

Q.   This is the one that the FBI actually seized?

A.   Yes.

Q.   All right.  Now this number 2457 at the top, do you recognize that phone number?

A.   Yes.  That's the -- that phone number is saved in Hernandez Cordero's cellphone as a contact name for Señora Ed Hardy I believe it's 21.

Q.   Señora Hardy 21?

A.   Yes.

Q.   And here, if we look at the -- well, we'll look at the translation, Government's Exhibit 12H.

What are they talking about in Government's Exhibit 12H?

A.   They're stating -- okay.

They're talking about *el dorado.*  So that's going to be a reference to the images and the videos that we saw of that

AR-15, the gold plated -- or gold colored plated with the --

what appeared to be a grenade launcher.

Q. Okay. And what -- what are the conversations about?

A. Okay. So do you want me to read them?

Q. Just please read them, yes.

A. Okay. Can you scroll up a little bit? I can't see the

beginning part.

Q. Okay. Oh, sorry. I went the wrong way.

A. All right. It states, Okay. Yes, it's wrapped good.

El Dorado, together with what he has down and what he -- and

what does he have? Hey, I don't have any cold there with you

is good, right? Let it be whole.

Q. All right. Now we're introducing a new term, I guess,

cold.

And if we look at the actual Exhibit 12G, that's what

she literally says, I don't have any cold?

A. Correct.

Q. Have you come across that term "*frio*" before?

A. I have.

Q. And in your training and experience, what's *frio* in

reference to?

A. *Frio* is reference to -- it's a code -- one of the many

codes words used for -- referring to methamphetamine.

Q. Now in addition to this evidence that we've seen, have you

seen any evidence in the cellphones that this is related to

cartel activity?

A.   Yes.

Q.   Okay.  I'd like to show you an exhibit that's not yet been admitted into evidence.

Government's Exhibit 13C.

And what is Government's Exhibit 13C?

A.   It's communication between Hernandez Cordero and Señora Ed Hardy 22.

Q.   Okay.  And these are photographs of Mr. Hernandez's phone?

A.   Yes.

Q.   And Government's Exhibit 13G?

A.   That's the translated communication between the number for Señora Ed Hardy 22 and Hernandez.

MR. MYERS:  Your Honor, I would offer Government's Exhibits 13C and 13G into evidence.

MR. GUTIERREZ:  No objection, Your Honor.

THE COURT:  Government's Exhibits 13C and 13G will be admitted.

MR. MYERS:  May I have permission to publish to the jury, Your Honor?

THE COURT:  You may publish.

BY MR. MYERS:

Q.   If we look at the second page of Government's Exhibit 13G, will you kind of describe for the jury what we're looking at here -- or 13C, excuse me.

A.   13C is going to be the photo of Rene Hernandez Cordero's cellphone with the contact information for Señora Ed Hardy. It's a WhatsApp contact name here.  That phone number -- Mexican phone number ending in 2319.

Q.   And do you recognize that number 2319?

A.   I do.

Q.   And where do you recognize that phone number from?

A.   That same number that was being used by ATF undercover to contact Chayo.  It's also in communication with Rene Hernandez Cordero.

Q.   Okay.  And this is a conversation, I guess that we're going to begin on July 6th; is that correct?

A.   Yes.

Q.   And if we switch over to the translated version, how does the conversation begin on July 6th?

A.   July 6th.  The conversation begins with, Good morning. Hey, are you interested in a 50 bolt action, by Hernandez to Señora Ed Hardy.

Q.   How does Señora Hardy, or Fernanda, respond to that information?

A.   She responds by saying, No, not in bolt action.  They don't work, those mothers.

Q.   And what does Mr. Hernandez respond?

A.   He responds by stating, What do you mean they don't work? The Michoacanos used them and -- and kicked the ass of the

people you are with.

Q.   And what else does he say?

A.   He says, Hey, and do you get rims of the chain?

Q.   Okay.  And there's also a photograph that's sent?

A.   Correct.

Q.   Okay.  And if we go back and look at the actual photograph that was sent between the two, and if we look on Page 5 of Government's Exhibit 13C, what do you see in this page?

A.   On this page I see two rifles.  One appears to be a .50 caliber rifle, by the size of it.  The other appears to be some sort of AR-15-type rifle.

Q.   Anything interesting about the -- the .50 caliber?

A.   The size of it.  And then also, it's -- it appears that it's not fully assembled at this point.

Q.   Okay.  Now when there's .50 caliber, are there different kinds of .50 caliber between, like, bolt action or magazine fed?

A.   Yes.

Q.   Okay.  What are -- could you explain to the jury, what are the differences?

A.   There's going to be differences of -- a bolt action means -- so this one, it's not -- you're not able to just pull the trigger and have the round exit the firearm.  You have to manually expel the projectile by pulling back on the bolt. That's why it's called bolt action, because you expel the

projectile, bring it back up to be able to load.  It's one round at a time, so it takes some time.

Q.  Okay.  Now if we go back to Government's Exhibit 15G, Fernanda, or Señora Hardy 22, she's not interested in this bolt action, correct?

A.  Correct.

Q.  Okay.  But now Mr. Hernandez responds, and he is mentioning the Michoacanos -- excuse the pronunciation -- correct?

A.  Correct.

Q.  All right.  So Señora Hardy 22, from all that you know, where is she working or based out of?

A.  Based on my knowledge, Señora Hardy is -- would be Maria del Rosario Navarro-Sanchez.  She's based out of Guadalajara and works in the area of Guadalajara, Jalisco.

Q.  What cartel is associated with that state?

A.  Cartel Jalisco Nueva Generación.

Q.  Now do you know much about cartel and cartel violence in Mexico, learned from your investigations?

A.  I have.

Q.  What have you learned?

A.  They're always fighting each other to -- for strategic routes, to be able to push illegal narcotics into the U.S.

       And they also -- they also fight for territory.  So depending on who's overseeing certain territories, certain cartels will come and try to take over and control that area.

Q.   So do the weapons help control the drug trade?

A.   Yes.

Q.   And how so?

A.   The higher the caliber, the more powerful the caliber, obviously, the stronger you are as a -- as an organization, or as a cartel.  And that's a huge reason why these drug trafficking organizations seek these -- the .50 caliber and those high-end types of military-type rifles.

Q.   Now, what's a neighboring state to Jalisco?

A.   There are several.  There's Nayarit.  There's -- *Michoacán* is one of them.  But it's -- it's got several around it. Colima, I believe, is also one.

Q.   Now, is there a cartel or a rival cartel to CJNG?

A.   As far as I know, there is.  And one of them -- well, several.  But in that vicinity, the *Familia Michoacana* would be a cartel that would be in close proximity to Jalisco.

Q.   So then here, when Mr. Hernandez texts, The Michoacanos use them and kicked the ass of the people you are with --

A.   Yes.

Q.   -- he's telling that to Señora Hardy?

A.   Correct.

Q.   In reference to cartel violence?

A.   Yes.

Q.   How does she respond?

A.   She responds, It took me forever to sell the last one you

sold me.  And then she asks, Is it Ares, the one you are talking about?

Q.  Ares, what is that?

A.  Ares is a manufacturer of a -- in this case, it's going to be referring to that AR-15 rifle.

Q.  And how does Mr. Hernandez respond?

A.  Responds, Yes.

Q.  And what does Ms. Hernandez [sic] ask after that?

A.  Navarro-Sanchez then responds with, Send me a photo of it alone, to let them know.  Send me the price of the Ares.

And then Mr. Hernandez responds with, Once the -- let me know.

And then she answered, Okay.

Q.  All right.  Now, are these the entirety of the conversations in Mr. Hernandez's phone?

A.  No.

Q.  Okay.  And if we look back up on Government's Exhibit 13C -- or excuse me -- yes, 13C -- we see that contact card.

Do you see photographs that have been sent back and forth between him and Señora Ed Hardy?

A.  I do.

Q.  Would you kind of describe those photographs?

A.  So the first one, you see there is -- it looks like a pistol.

The second photo shows what appears to be several pistols with the magazine to the side of the pistol.

Then there's another photo similar to that, that you were just pointing to, the pistols at the top.  You have two rifles at the bottom.

And then it appears to be the barrel and part of the trigger of another pistol in the fourth photo.

Q.   Okay.  I would like to show you some exhibits that have not yet been admitted into evidence.  I'll show you Government's Exhibit 15A.

Do you recognize this exhibit?

A.   I do.

Q.   15B.  Is that a translation of that exhibit?

A.   It is.

Q.   Government's Exhibit 15C.

Do you recognize this conversation?

A.   I do.

Q.   Is that a photograph of Mr. Hernandez's cellphone?

A.   Yes.  It's a communication between Mr. Hernandez's cellphone and a contact name of Ramos Rural.

Q.   And have you -- do you recognize the translation of that?

A.   I do.

Q.   And Government's Exhibit 15S -- or 15F -- E, excuse me. 15E.

Do you recognize Government's Exhibit 15E?

A.   Yes.   That's the cellphone of Hernandez Cordero.

Q.   And what is Government's Exhibit 15F?

A.   That's a translation between Hernandez Cordero and Señora Ed Hardy 22.

Q.   Do you recognize Government's Exhibit 15G?

A.   I do.

Q.   Is that another photograph of Mr. Hernandez's cellphone?

A.   Yes.   It's a photograph of Mr. Hernandez's cell communication with the contact name of Manny Gel.

Q.   And 15I.   Do you recognize that one?

A.   Yes.   It's Mr. Hernandez's phone with communication with Señora Ed Hardy 21.

Q.   Okay.

        MR. MYERS:   Your Honor, I'd offer Government's Exhibits 15A, B, C, D, E, F, and G.   Not I, but all the way up to G, into evidence.

        MR. GUTIERREZ:   No objections to A through G.

        THE COURT:   Government's Exhibit 15A through 15H are hereby admitted.   And 15J is hereby admitted.

        MR. MYERS:   May I have a moment with co-counsel, Your Honor?

        THE COURT:   You may.

    (Mr. Myers conferring with co-counsel.)

        MR. GUTIERREZ:   Your Honor, just for clarification, it was 15A, 15B, C, D, E, F, and G.

THE COURT:  All of them except 15I.

MR. GUTIERREZ:  Thank you, Your Honor.

(Mr. Myers conferring with Ms. Holderfield.)

MR. MYERS:  Your Honor, at this time we'll pass the witness.

THE COURT:  Go ahead, Mr. Gutierrez.

MR. GUTIERREZ:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.  All right.  You testified that you have multiple training. How much years of training have you had in, specifically, trafficking?

A.  Specifically trafficking, after I graduated the academy, just whatever I learned there, and then I was here.  So most of our investigations here is trafficking.  So I would say close to two years.

Q.  And you started off with Pablo Delgado?

A.  Yes, sir.

Q.  And apparently he was a felon with a firearm, and the investigation started with him, correct?

A.  Correct.

Q.  And part of what you were looking into was the straw purchase of firearms that he was doing, correct?

A.  Correct.

Q.  And you mentioned a straw purchaser is a person who goes to

the store or sends somebody else to go to a store to buy a gun for somebody that cannot have a gun, correct?

A.   Correct.

Q.   All right.  What's the distinction between a private person having a weapon and selling it to another person?

A.   That would be -- without the form, without filling out the ATF 4473, that would be a private sale.

Q.   Okay.  So a private sale of a firearm, a person does not have to fill out the ATF Form 4473?

A.   That's correct.

Q.   So would that be outside the scope of a straw purchaser?

A.   I guess, depending on the -- yeah.  If it's just a regular transaction, a private sale.

Q.   Okay.  And then you went on that during the investigation, you found that Delgado, Pablo Delgado, was actually working under the direction of a Brian Muñoz-Castro; is that correct?

A.   He was working with Muñoz-Castro.

Q.   Now, you got Pablo Delgado's phone records.  You got his information.  You got everything for Pablo Delgado, correct?

A.   Yes, sir.

Q.   Okay.  And there was no link at all with the defendant Rene Hernandez Cordero; is that correct?

A.   That's correct.

Q.   Okay.  You also got Brian Muñoz-Castro's phone, correct?

A.   Correct.

Q.   And you were able to go through all the phone numbers that he had, correct?

A.   Most of them, yeah.

Q.   And you did not see a telephone call that was made between Rene Hernandez Cordero and Brian Castro; is that correct?

A.   Correct.  Not to my knowledge.  That's correct.

Q.   Okay.  In fact, there was not even a text between the defendant Rene Hernandez Cordero and Brian Muñoz-Castro?

A.   Correct.  Not that I'm aware of.

Q.   Okay.  So basically, whatever Pablo Delgado was doing with Brian Muñoz-Castro, it's outside the realm of what Mr. Rene Hernandez Cordero is being charged here today, correct?

A.   No.

Q.   The transactions that were happening between Pablo Delgado and Brian Castro, there was no communication involving Rene Hernandez Cordero, correct?

A.   Yes, sir.  Correct.

Q.   Okay.  And during the investigation of Pablo Delgado and Brian Muñoz, at those -- at that time, when they got arrested, the defendant Rene Hernandez Cordero was not a target; is that correct?

A.   Correct.

        MR. GUTIERREZ:  Your Honor, may I publish Exhibit 12A, that has already been admitted through the Government?

        THE COURT:  Yes, you may.

I'll tell you what.  Why don't we do that after lunch.

MR. GUTIERREZ:  Thank you, Your Honor.

THE COURT:  I'm informed that lunch is here for the jurors.

Members of the jury, we will provide lunch for you.  I understand it's here already.

I do want to caution you that if you do leave the jury room during lunch -- which you're free to do -- please abide by all the instructions that I gave you.  Don't converse with anyone, if possible.

We'll be in recess until 1:15 in the afternoon.

(Recess taken 12:00 to 1:13 p.m.)

THE COURT:  Mr. Gutierrez, you may continue.

MR. GUTIERREZ:  Yes, Your Honor.  Thank you.

BY MR. GUTIERREZ:

Q.  Agent, do you see --

MR. GUTIERREZ:  If I may publish 12A, that's already been admitted.  I believe the Court gave me permission before we took a lunch break.

THE COURT:  You may.

MR. GUTIERREZ:  Thank you, Your Honor.

BY MR. GUTIERREZ:

Q.  This exhibit of this weapon was actually something that Brian Muñoz-Castro had purchased or furnished, and was communicating with Fernanda, or whatever that other person was,

correct?

A.   Correct.

Q.   And during those contacts, there was nothing that included the contact or information or text or anything of my defendant, the defendant Rene Hernandez Cordero, correct?

A.   Between Brian and Chayo?

Q.   No.   Between anyone in connection with this weapon with the defendant Rene Hernandez Cordero.

A.   Correct.   Not that specific weapon.

Q.   Right.   Pablo Delgado was arrested April 25th, 2023, correct?

A.   Correct.

Q.   And you -- they had an opportunity to debrief with him, correct?

A.   Correct.

Q.   And during that debriefing, he had never mentioned the name of defendant Rene Hernandez Cordero; is that correct?

A.   Yes, sir.

Q.   It's correct that he did not mention his name?

A.   That's correct, yes, sir.   He did not mention him.

Q.   Okay.   And during this time, Brian Muñoz-Castro was communicating directly with Fernanda, Chuya [sic], whatever her name was, right?

A.   Correct.

Q.   Okay.   And Fernanda was also communicating directly with

Brian, correct?  Brian Castro?

A.   Yes, sir.

Q.   So they had this communication among themselves already going, correct?

A.   Correct.

Q.   Okay.  Exhibit 2F is the T-Mobile that has the name Fernando Estrada, right?

A.   Yes.

Q.   And you're assuming that it's connected with Brian Muñoz-Castro, correct?

A.   I don't remember the phone number for it, but I believe so. It's one of the phone numbers that Brian had.

Q.   Okay.  And 2B, C, D, these are all business records, or phone records, correct?  T-Mobile phone records?

A.   Yes.

Q.   Okay.  And out of all those phone records, the phone number of the defendant Rene Hernandez Cordero is not listed in any of those numbers correct?

A.   Correct.  Not to my knowledge.

         THE COURT:  Speak into the microphone, please, Mr. Gutierrez.

         MR. GUTIERREZ:  Yes, sir.

         Your Honor, I request to publish 2J, that has already been admitted, to the jurors.

         THE COURT:  Yes, you may.

MR. GUTIERREZ:  Thank you, Your Honor.

BY MR. GUTIERREZ:

Q.  All right.  You see all these phone numbers, correct?

A.  I do.

Q.  And have you had an opportunity to go through each single phone number and identify who the other party is?

A.  No, sir.  Not each and every single one.

Q.  And you heard the testimony yesterday asking if, during this investigation, if you were able to get Mexico's cooperation, their authorities, to cooperate with you.

        Do you remember that testimony?

A.  Yes.

Q.  And he said, Well, I wasn't the case agent.

        Did you have any means of communicating with the Mexican authorities for their cooperation?

A.  No, not on this specifically.  No, not on this specific information for -- for information on the phone numbers.

Q.  Okay.  All right.

        Were you able to get their -- the authorities of Mexico to assist you in locating the numbers that are located with Fernanda or Hardy or Chuyo [sic]?  Were you able to go through the Mexican authorities to assist you with that?

A.  Not that I'm aware of.  Not through Mexican authorities.

Q.  Okay.  So all the numbers that are coming from Mexico, you have no proof of actually who they are or who they belong to,

correct?

A.   Not 100 percent proof, no.

Q.   I'm sorry?

A.   Not 100 percent proof, no.

Q.   Okay.  That is an avenue that you could have pursued, right?  That you get the Mexican authorities to help you communicate with the Mexican telephone companies in order to get you this information, correct?

A.   Correct.

Q.   And that was not done here?

A.   No.

Q.   You also heard the Agent Benavides testify of -- a person in Mexico can get a license in order to sell or purchase firearms.

     Do you recall that testimony?

A.   I believe so.

Q.   Okay.  And you also heard that there's a possibility that the defendant Rene Hernandez Cordero could have a license in order to perform that in Mexico, correct?

A.   Correct.  There's a possibility.

Q.   And during this entire investigation, I'm sure you've looked into the crossings, the entering and crossings into the United States by the defendant Rene Hernandez Cordero, correct?

A.   Correct.

Q.   And there was no crossings besides the August 21st, 2023,

event; is that correct?

A.   Crossings into the United States?

Q.   Yes.

A.   No.  He had other crossings.

Q.   But do you remember the dates?

A.   Not off the top of my head, no.  I would have to refresh my memory.

Q.   Okay.  And was it within the year or within more than a year?

A.   I know he wasn't crossing for about -- close to 10 years. And then in 2022, sometime in 2022, he started crossing again.

Q.   Okay.  But not as frequent as everybody else crosses; is that correct?

A.   I mean, not every day.  As far as I remember, it wasn't every day.

Q.   Okay.  You were able to compare those crossings to the timeline of all these events that have happened in this case, correct?

A.   Correct.

Q.   And none of those coordinate with the defendant Rene Hernandez Cordero crossing to the U.S. during any of these events?

A.   Not that I recall.

Q.   So that's a yes?  Correct?

A.   I don't recall him crossing within those dates, yes.

Q.   Okay.  All right.

So it would presume that during those times, he was still in Mexico when he's texting whoever he wants to in Mexico; is that correct?

A.   Yes, sir.

Q.   And if he has this license in Mexico and he's talking about guns and arms and all that, that would be legal in Mexico, correct?

A.   I'm not very familiar with the laws of Mexico.

Q.   Very good.  But there is that possibility that in Mexico, having a license, he can talk about guns and arms, right?

A.   There's a possibility, yes, sir.

Q.   Okay.  And you understand the concept of the mere association is not enough for a conspiracy?

A.   I do.

Q.   And it goes further than that.  It's not just -- let me read this entire section, and you just tell me if you understand it.

"The mere presence at the scene of an event, even with knowledge that a crime is being committed, or that mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of an existence of a conspiracy."

You understand that, right?

A.   I do.

Q.   Okay.  Okay.

Then you went through a barrage of dates: September 11th, September 12th, September 13th.  And I believe it was October -- September 26th, September 27th.

These are all dates where there was communication of the possibility of purchases of firearms and such, correct?

A possibility.  We don't -- we definitely don't know exactly what they're talking about?

A.   Yeah.  I don't know about the purchase; but the acquisition of firearms.

Q.   Okay.

A.   Uh-huh.

Q.   These conversations with my client in Mexico is allowed, correct?

A.   He's free to communicate through his phone, yeah.

Q.   During those dates the defendant Rene Hernandez Cordero is in Mexico, correct?

A.   Correct.

Q.   You showed pictures of Ramos crossing over and exiting back to Mexico several times, correct?

A.   Yes, sir.

Q.   But there's no evidence, no proof, of exactly what he was doing coming and going, correct?

A.   Correct.

Q.   There's no pictures of any weapons in the vehicle when he drives by?

A.   No.

Q.   There's no pictures of anything of what he could be doing, correct?

A.   Correct.

Q.   Just the fact that he entered and exited during those times is what you're showing?

A.   That's correct.

Q.   There was no arrest made during that time, correct?

A.   No, not at that point.

Q.   There was no arrest of when he entered or crossing at those times?

A.   No.

Q.   So you don't know 100 percent what was happening -- what was coming or going, if anything, from the U.S. to Mexico; is that correct?

A.   Based on the communications we assumed, but we don't know 100 percent.

Q.   Right.  You assume.  That's the word?

A.   Correct.

Q.   Another word for assume is guess?

A.   You're not guessing at that point, when you see the communication.

Q.   Even the communication, you still don't know for sure

because you don't know what's actually happening?

A.   Correct.  Not for sure.  Not 100 percent sure.

Q.   Certain parts of weapons can be crossed over to Mexico that are legal, correct?

A.   Certain parts of weapons, correct.

Q.   Exhibit 9B, there's a phone call that starts with 323.  And you testified that it's the Jalisco area of Mexico, correct?

A.   Correct.

Q.   But you don't know, 100 percent sure, who that person was, correct?

A.   Not 100 percent sure, correct.

Q.   Another thing is that you mentioned a certain cartel.  And you don't have any proof that whoever this person is, Fernanda or Chayo or whatever her name is, is associated with this cartel, correct?  You have no physical proof?

A.   We have interviews.  We have testimony that, I would say, that this person belongs to the Cartel Jalisco Nueva Generación.

Q.   Have you verified it?  I'm sure you have opportunities to verify it through the Mexican authorities.

A.   Not through Mexican authorities.  But it was information that was received from the DEA office in Guadalajara, Jalisco.

MR. GUTIERREZ:  Pass the witness, Your Honor.

REDIRECT EXAMINATION

BY MR. MYERS:

Q.   All right.   Special Agent Zayas, you testified that there was no direct phone call from Brian Muñoz-Castro to Hernandez Cordero.

     Do you recall that part of the testimony?

A.   I do.

Q.   Are you surprised by that?

A.   No.

Q.   Why are you not surprised?

A.   That's a way that they -- these organizations keep certain people out of it, so that if one person gets compromised, the entire organization can continue to work.

Q.   Now, I think Mr. Gutierrez asked you a question about the stuff that Pablo Delgado and Brian Muñoz-Castro were doing were separate and apart from Hernandez Cordero.

     And you answered no.   Or you said that's part of the same thing.

     Do you recall that testimony?

A.   I do.

Q.   Why is it part of the same thing?

A.   Because they're both -- or everyone involved mentioned in my testimony so far is part of the organization.   They all have a role to play, even if they didn't communicate directly with one another.

Q.   Now if they don't communicate directly from one another, is there a link from Pablo Delgado and Muñoz-Castro to Hernandez Cordero?

A.   There is.

Q.   What is that link?

A.   That's -- well, Chayo or Ramos, through Ramos Rural, through Hernandez Cordero back to Chayo.

Q.   So those kinds of conversations you and I went through earlier.  Is that that link?

A.   Yes, sir.

Q.   I would like to show you that's not yet been admitted.

     Do you recognize Government's Exhibit 12I?

A.   It's not showing up on my screen.

     THE CLERK:  It's not showing?

     THE WITNESS:  No.

     THE CLERK:  Just a second, please.

BY MR. MYERS:

Q.   Can you see it now?

A.   Yes.

Q.   If we scroll through Government's Exhibit 12I, do you recognize Government's Exhibit 12I?

A.   I do.

Q.   Is this a conversation between Mr. Hernandez's phone and Señora Hardy 21?

A.   Yes, sir.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 12I into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 12I will be admitted.

MR. MYERS:  Okay.  I'd also -- permission to publish to the jury, Your Honor?

THE COURT:  Yes, you may publish it.

MR. MYERS:  And I'd also like to publish what's already been admitted as Government's Exhibit 2A.

THE COURT:  I'm sorry.  What is it, 2A?

MR. MYERS:  2A.

THE COURT:  Yes, you may.

MR. MYERS:  I'd also like permission to publish to the jury Government's Exhibit 12G.

THE COURT:  You may.

BY MR. MYERS:

Q.  We'll start off with Government's Exhibit 2A.  We can go through this.

So again, on March 26th, what is -- Brian's contact card is exchanged again, correct?

A.  Correct.  It's been between Rene Hernandez Cordero, which is the cellphone on the photo, and Señora Ed Hardy 21.  And then it's changed again between Hernandez Cordero and Ramos Rural.

Q.  Okay.  And the date on this exchange?

A.   It's showing March 26, '23.

Q.   And this 2132, that's a known number for Mr. Muñoz?

A.   Yes, sir.

Q.   Okay.  If we switch over to Government's Exhibit 12I -- or excuse me.  Yeah, 12I -- with Señora Hardy 21 and Mr. Hernandez Cordero?

A.   Correct.

Q.   Okay.  Do we see that call card exchanged?

A.   We do.

Q.   All right.  And this is on Page 5 of Government's Exhibit 12I?

A.   Yes, sir.

Q.   And then we see what number is exchanged?

A.   It's the contact card for the contact name of Brian with the last four of 2132.

Q.   Now, if we do down to the next day -- well, now let's switch over to 12G.  We've already looked at this one, and you've kind of testified about *el dorado.*

     Do you remember this one, the gold one?

A.   Yes, sir.

Q.   What day were these text messages?  Were these also on the 26th or 27th, or you don't remember?

A.   I don't remember.  I don't recall.

Q.   Okay.  Now going back -- if we highlight the section here on March 27th, does Mr. Hernandez send a message to

Señora Hardy 21, or Chayo?

A.  Yes, sir.

Q.  And what is -- in English, what does that message say?

A.  Can you make it a little bigger, please?

Q.  Oh, yes.

A.  So Rene Hernandez's message here says, Hey, you owe money because they gave him the golden one.  And that one has a *lanza papas*, which is the grenade launcher.  It's going to be a thousand for that one and 450 of the other -- "*rin*" is code for another AR-style rifle.

Q.  Okay.  Let's go back to some of the code words we discussed in your previous testimony.

*Lanza papas*.  What is that in English, literally?

A.  In English, it's -- *papas* would be potato, and *lanza* is launching.  So it's potato launcher.

Q.  Okay.  But in code, what is that a reference to?

A.  It's a grenade launcher.

Q.  Now when we looked at that gold weapon from Mr. Muñoz-Castro's cellphone, those conversations he had with Pablo Delgado, was there a grenade launcher on there?

A.  There was.  One appears to be a grenade launcher, correct.

Q.  So there's a conversation with Mr. Hernandez about this *lanza papa*, about this grenade launcher?

A.  There is.

Q.  Okay.  On the next page, does Mr. Hernandez mention

*el dorado* again?

A.   He does.

Q.   What does he say this time?

A.   The golden one you sent we'll be charging 1500.  I'm charging 1,000.  There's three items with the grenade launcher.  Also, I have to charge -- don't, like, stop abusing.  Pretty much stop abusing stuff, like take advantage.

Q.   Okay.  Can you explain that?

A.   So based on the context of this conversation, it appeared that the information relayed to Mr. Hernandez Cordero didn't include that one of the rifles would have a -- what he refers to as a *lanza papas*, a grenade launcher.

     He's explaining to her that there's an additional fee because the grenade launcher itself would be considered another firearm.

Q.   Now when you're smuggling firearms, I guess there's prices to certain things?

A.   Yes.

Q.   And are grenade launchers more expensive to cross?

A.   I would believe so.

Q.   Would it surprise you, in your investigation, if Mr. Muñoz-Castro had never met the defendant Mr. Hernandez Cordero?

A.   It wouldn't.

Q.   Why wouldn't it surprise you?

A.   Muñoz-Castro had his own assignment.  And unless, for whatever reason Rene Hernandez Cordero had to go and meet him directly, then other than that they wouldn't ever interact.

Q.   Okay.  Now, you were also talking about conversations -- we went through those conversations pretty at length about what you thought might have been weapons transferred, correct?

A.   Correct.

Q.   Okay.  And I think Mr. Hernandez [sic] asked you if you had -- there's no evidence about what was transferred versus do you 100 percent know.

     Do you remember those questions?

A.   Yes.  I remember those questions, sir.

Q.   Okay.  So do you 100 percent know what was smuggled, or if anything was smuggled, during those conversations we went through?

A.   I don't know 100 percent; however, that -- I've been a part of an interview where that specific firearm, the gold-color plated one, is mentioned.

Q.   Okay.  So you're not there.  But there are other people involved in it that could come testify to help fill in the gaps?

A.   Yes, sir.

Q.   So now this evidence that we discussed, does that mean that this evidence is completely useless because you don't know what exactly was going on?

A.   No, sir.

Q.   What does it mean, then?

A.   It means that -- it just goes to show a pattern of events that appear to be constantly happening between the subjects that we discussed.

Q.   There was also questions about the licenses and whether Mr. Hernandez had a license to possess firearms in Mexico.

     Were you aware of this license?

A.   I'm not aware that he's licensed.  I knew that there's some information on his cellphone which mentions that he could possibly be, but I don't have any confirmation on it.

Q.   Okay.  Why don't you have any confirmation on him?

A.   We didn't reach out to Mexican authorities for confirmation on that information, because we weren't -- we don't want to compromise the Mexican side of the investigation.

Q.   Now also, I guess when -- these conversations you're talking about, does the acronym -- I think it's SEDENA?

A.   Correct.

Q.   Okay.  What is SEDENA?

A.   SEDENA is the -- I believe it's, like, a military group that oversees the enforcement -- or the acquisition of firearms in Mexico.  I'm not 100 percent sure on exactly what they do.

Q.   Did you see some of this SEDENA information on Mr. Hernandez's phone?

A.   I did.

Q.   Now, SEDENA is an organization in Mexico.  You could have double-checked with them.  Why didn't you?

A.   We didn't, based on the information we observed on the phone.  It appeared that some of the -- some of the contacts that Mr. Hernandez was in contact with, they were creating these -- what appeared to be credentials.  They didn't seem legitimate.

     So based on that information, we didn't reach out directly to the agency to ask and inquire, to not compromise the Mexican side of the investigation.

Q.   And also, does, I guess SEDENA, have a reputation amongst law enforcement here in El Paso or in the United States?

A.   Yes.

Q.   And what that reputation?

A.   That they're corrupt.

Q.   Okay.  So if you did double-check, what's the fear then?

A.   That information would be leaked.  And information would be, you know, provided to whoever it is that needed to know this information, that we're inquiring about said subject.

Q.   Okay.  And now when you say "the Mexican investigation," you're talking about the United States investigation of activities in Mexico, or are you talking about a separate Mexican investigation?

A.   No.  I'm talking about the United States -- part of the investigation for the United States, but in Mexico.

Q.   Okay.   Now this license, does that -- you know, we briefly talked about a license, that you need a license to export firearms from the United States?

A.   You do.

Q.   This type of license that was referenced during the cross-examination, is that a license to export firearms from the United States?

A.   No, sir.

Q.   Okay.   And the kind of firearms that are on these licenses, are they the same type of firearms that are discussed in these conversations?

A.   Not that I'm aware of, no.

Q.   Okay.   What's the difference?

A.   These are going to be more discussed -- in the conversations are AR-15s, AK-47s.   Those are more -- .50 calibers, those are more military-type firearms.

Q.   I think Special Agent Benavides called them weapons of war.

A.   Yes, sir.

Q.   And the kind of firearms that you might see on that license, what kind of firearms would those be?

        MR. GUTIERREZ:   Your Honor, I'm going to object. She's speculating of laws that are applied in Mexico.

        THE COURT:   I'll sustain the objection.

        MR. MYERS:   Your Honor, I pass the witness.

RECROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.   There's other agencies in Mexico, correct, that you could have followed up with?

A.   Yes, sir.

Q.   Okay.  And the SENDENILLA [sic], you said they were corrupted?

A.   SEDENA.

Q.   And you have proof of their corruption or...

A.   No.  That's just information that's been over, like, social media and open source stuff.

Q.   There's corruption everywhere.  You would agree with me, right?

A.   I believe so.

Q.   Even in the U.S. there's corruption?

A.   Possibly.

Q.   Okay.  So that alone would not be a reason not to reach out to the Mexican authorities if you wanted to get information about these licenses, correct?

A.   Correct.  That wasn't the reason.  We didn't want to compromise anything.

Q.   In fact, the state of Mexico is quite large, correct?

A.   The state of Mexico?  It's smaller, compared to other states.

Q.   Okay.  You could have gone to the tip of Mexico, Cancun

area, whatever, to get this information if you were worried about compromise?

They have organizations of the Mexican authorities to assist the U.S., correct?

A.  I could have, but there's reasons why we didn't.

Q.  The fact is, you did not verify if Mr. Rene Hernandez Cordero has a license, correct?

A.  Yes, sir.  That's correct.

Q.  And the burden is on the Government to prove his guilt, correct?

A.  Correct.

Q.  And if he's in Mexico and he has a license, then in Mexico he's a broker and he can talk about guns and trade guns and buy guns and do whatever he wants with the guns, correct?

MR. MYERS:  Objection.  Calls for speculation.

THE COURT:  Speculation, and it's already spoken about.

MR. GUTIERREZ:  Pass the witness.

THE COURT:  Anything else for this witness?

MR. MYERS:  No, Your Honor.

THE COURT:  You may take your seat, ma'am.

Call your next witness.

MR. MYERS:  The Government calls Special Agent Michael Janowski to the stand.

May I proceed, Your Honor?

THE COURT:  You may proceed.

MR. MYERS:  Thank you.

MICHAEL JANOWSKI, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MYERS:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  Would you please state your full name for the record?

A.  Michael Janowski.

Q.  Mr. Janowski, where do you work?

A.  I'm a special agent with the Federal Bureau of Investigation.

Q.  Commonly known as the FBI?

A.  Yes, sir.

Q.  And how long have you been a special agent with the FBI?

A.  About six years.

Q.  How does one become a special agent with the FBI?

A.  You go through the application process.  And then when hired, you go to the FBI academy in Quantico, Virginia, which is a six-month training program.

Q.  And what do you learn at this training program?

A.  You learn everything about how to be a case agent, how to collect evidence, how to properly record the evidence you've collected.  You learn interviews.  You learn legal statutes and other stuff about the federal rules that are applied here in

the U.S.

Q.   And as a special agent, have you been a case agent before on a larger investigation?

A.   I have.

Q.   And what are the responsibilities of a case agent?

A.   It's to manage all aspects of the case.  You manage the surveillance teams that are out there.  You manage the relationships with other agencies, in this case ATF and DEA. And you kind of serve as the admin person to keep it all organized.

Q.   Now, are you involved in the case of the United States of America versus Rene Hernandez Cordero?

A.   I am.

Q.   And how are you involved in this?  How did you start to become involved in this investigation?

A.   I am the case agent on the FBI side.

Q.   Okay.  Back in December of '22 or January of '23, were you investigating a Pablo Delgado or a Rene Hernandez Cordero?

A.   In January of 2023?

Q.   Correct.

A.   No.

Q.   Who were you investigating?

A.   I was investigating a cartel operating out of Jalisco.

Q.   And any particular person?

A.   At that point it was just different -- like Chayo.  Chayo

would come up a few months later.

Q.   Okay.  Have you, since that time, been able to identify who Chayo is?

A.   Yes.

Q.   Who is Chayo?

A.   Maria del Rosario Navarro-Sanchez.

MR. MYERS:  Your Honor, I would like to show the witness an exhibit that has not been admitted into evidence, Government's Exhibit 1D.

Do you recognize Government's Exhibit 1D?

A.   Yes, I do.

Q.   And who do you believe is photographed in Government's Exhibit 1 ID?

A.   That is Chayo.

Q.   Okay.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 1D into evidence.

MR. GUTIERREZ:  Your Honor, we would object.  That lacks foundation or personal knowledge of who took this picture, or if he took the picture.

THE COURT:  Overruled.  Government's Exhibit 1D may be admitted.

MR. MYERS:  May I publish 1D to the jury, Your Honor?

THE COURT:  You may publish.

BY MR. MYERS:

Q.  Now as part of your investigation into this person by the name of Chayo, back in January of '23 how did you begin this investigation?

A.  We had a confidential source that this individual Chayo was trying to acquire firearms to take into Mexico and was bringing drugs into the U.S.

Q.  Now when you're running an investigation, what kind of things can you do in order to, like, substantiate information that you had received?

A.  We find as many ways as possible to corroborate the information.  So we don't just take source reporting at its word.

         In this particular case we used a series of WhatsApp pen register trap and traces.  We did surveillance.  We conducted drug buys in order to corroborate what was being told.

Q.  Okay.  Let's walk through some of that.

         What is a pen trap and trace, or pen register?

A.  Pen register trap and trace is a technique in which -- in this case, it was WhatsApp.  So we had a Court order that allowed us to see WhatsApp transactions.  It doesn't give you the content of those messages.  It simply says Person A sent a text message to Person B at this date and this time.

Q.  Okay.  And you don't know who's on the other side of those

phone numbers?

A.   No, sir.

Q.   Okay.  So back when you're beginning this investigation, do you have a couple of phone numbers suspected that you have linked to Chayo?

A.   I do.

Q.   What were those phone numbers?

A.   The main one ended in 2457.

Q.   2457.  Okay.

I'd like to show you what has already been admitted as Government's Exhibit 2J.

MR. MYERS:  May I publish that to the jury, Your Honor?

THE COURT:  You may.

BY MR. MYERS:

Q.   All right.  If we look on Page 3 of Government's Exhibit 2J -- do you recognize Government's Exhibit 2J?

A.   Yes, sir.

Q.   Whose phone is photographed here?

A.   Señora Ed Hardy 21.  That number that ends in 2457 is the same number that I had for Chayo.

Q.   Now, this is a number that's in Mr. Hernandez's phone, correct?

A.   Correct.  This is a photo of Mr. Hernandez's phone.

Q.   But back in January of '21 -- or excuse me -- January

of '23, were you yet aware of Mr. Hernandez or this nickname, Señora Ed Hardy?

A.   No, I was not.

Q.   Okay.  So are you able to introduce your own confidential source into -- with Chayo?

A.   I was.

Q.   And what were you -- what were you able to exploit or accomplish at that point in time?

A.   At that time she was looking for narcotics purchasers in the U.S., particularly for meth.

Q.   And how did you exploit that information?

A.   We conducted an operation in which we introduced, through a series of confidential sources, a narcotics buyer that was working on our behalf to purchase meth from Chayo.

Q.   And when was the date of this purchase?

A.   March 30th, 2023.

Q.   Okay.  Now, are you familiar with the term "buy/walk"?

A.   Yes, sir.

Q.   What does that mean, buy/walk?

A.   Buy/walk is a technique.  In this case we call it a buy/walk operation.  And what it means is we set up an operation where we're using confidential sources to talk to drug traffickers in Mexico to agree to buy drugs.

When they deliver us the drugs we give them cash, and we let the subjects walk away; hence, buy/walk.  We don't

arrest anyone there.

The purpose of that is it allows us to collect evidence and keep everything fresh, because once people get arrested you lose a lot of intel.

Q.  And why do you lose a lot of intel once you start making arrests?

A.  Once you start making arrests, subjects in Mexico that we are not able to arrest in that moment will immediately know that law enforcement has contacted their couriers and other workers here in the United States.  And then that main subject, in this case Chayo, would drop her phone, get a new phone number, and we would lose everything.  We would have a hard time figuring out what her new number is.  So we let everything walk in order to make it seem like it's just an ordinary drug deal that she does regularly.

Q.  Now, you've heard this term "compartmentalization" before?

A.  Yes, sir.

Q.  And have you seen that, or experienced that with your own investigations?

A.  Yes, sir.

Q.  Does delaying an arrest, this buy-walk, does that help you overcome compartmentalization?

A.  A little bit, yes, sir.

Q.  How does it do that?

A.  If we arrest -- for example, if we arrest the courier that

day, the only person we're going to know about is the courier and Chayo.  Because -- because of the compartmentalization, I'm not going to find out any more information.  The buck stops right there.

By letting them walk, I now know that this courier exists.  And now I can start doing investigative activity about the courier, who I just learned about that very day.  And now I can start using their phone number to see, Who is the courier talking to?

And now I can figure out, Are there other subjects involved?

But if I arrest them that day, I lose all of that because of compartmentalization.

Q.   Okay.  So now you have a drug deal set up for what day?

A.   March 30th, 2023.

Q.   And where is this drug deal supposed to take place?

A.   Here in El Paso.

Q.   Is that within the Western District of Texas?

A.   It is.

Q.   Okay.  So what's going to happen?  What's the plan that's supposed to happen on March 30th?

A.   The plan is that -- in this case, Chayo is talking to one of our confidential sources coordinating for her driver, who we do not know, to meet up with our driver, who she does not know.  So there's compartmentalization on both sides.

She -- she is giving instructions to her driver, and we are giving instructions to our driver, who is just another confidential source.  And then through the source and Chayo they work out, Hey, this is a good parking lot.  We'll have your driver meet my driver to conduct the exchange.

Or the drivers, the couriers, will never talk to each other.  That's part of the compartmentalization.

Q.  I'd like to show you some exhibits that have not yet been admitted.

Do you recognize Government's Exhibit 3B?

A.  Yes, sir.

Q.  Is Government's Exhibit 3B an aerial map of where the drug buy took place?

A.  Yes, sir.

MR. MYERS:  Your Honor, I offer Government's Exhibit 3B into evidence.

MR. GUTIERREZ:  No objections, Your Honor.

THE COURT:  Government's Exhibit 3B will be admitted.

BY MR. MYERS:

Q.  I'd like to show you what's been marked as Government's Exhibit 3C.

Do you recognize 3C?

A.  Yes, sir.

Q.  Is this the money for the drugs you're about to buy?

A.  Yes, sir.

MR. MYERS:  Your Honor, I'd offer Government's

Exhibit 3C into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 3C will be admitted.

BY MR. MYERS:

Q.  If we look at Government's Exhibit 3D, is this a view of

the money outside the bag?

A.  Yes, sir.

MR. MYERS:  Your Honor, I'd offer Government's

Exhibit 3D into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 3D will be admitted.

BY MR. MYERS:

Q.  And I'd like to show you Government's Exhibit 3E.

Is this a picture of the bag that the money was in?

A.  Yes, sir.

MR. MYERS:  Your Honor, I'd offer Government's

Exhibit 3E into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 3E will be admitted.

MR. MYERS:  Permission to publish to the jury,

Your Honor?

THE COURT:  You may publish.

BY MR. MYERS:

Q.  So here, what's the jury looking at in Government's

Exhibit 3B?

A.  On March 30th, 2023 -- this is an aerial map.  It's the I-10 and McRae area over there by the Sprouts.

        This was the general location of where Chayo agreed to send her driver to meet with our driver to conduct the drug exchange.

Q.  Now, who picked this -- this location?

A.  Kind of mutually agreed upon, based on where -- it kind of goes back and forth.  You know, you choose east side or west side.  Chayo chose -- it would be better to happen on the east side.  So we mutually kind of agree on this location.

Q.  Okay.  Now, are there other agents besides yourself working on -- at this area?

A.  There are.

Q.  Okay.  So when the drug deal happens, where are you?

A.  I'm about a mile to the east, off of the ramp, and I'm with the confidential source that is going to serve as our driver --

Q.  And where are the other agents?

        Now as the case agent, who's in charge, I guess, of this investigative operation?

A.  I'm in charge.

Q.  Okay.  And where do you have other agents placed during this time?

A.  There are other agents on surveillance all around this area on the map, in order to be able to observe and collect

photographic evidence of the actual operation.

Q.  Why are you with the source a mile away?

A.  It's easier for me to be a mile away.  One, I don't want the source to be compromised before the operation.  I don't want the -- I don't know who Chayo's driver is, so I don't want Chayo's driver to accidentally drive by and see our source, you know, with me, just moments before the operation.

I'm also a mile away so that I can monitor the pen register trap and trace that was active at this point in time.

And it's just easier for, I guess, command and control of the whole thing if you're not in the middle of it.

Q.  Now while you're doing this, too, are you checking the confidential source for anything?

A.  I am.  I searched the confidential source's person and vehicle, just because I want to know for certain that the source didn't bring extra cash or drugs with them that would tarnish the operation that we're trying to do.  We have to keep everything sterile.

Q.  Now, you mentioned that during this time you're keeping track -- or you're monitoring the pen trap trace device.

A.  Yes, sir.

Q.  Can you kind of explain to the jury how you're doing that?

A.  Yes, sir.  So it's basically an Excel sheet.  So the ones I've done are the pen register trap and trace that I explained earlier.

This one was on Chayo's phone number 2457, which was Ed Hardy -- or Señora Ed Hardy 21.  And as it's happening, it's going in realtime.  I'm able to see the call logs on WhatsApp for Chayo.  So I see who Chayo is in communication with in the minutes leading up to the drug deal.  And I'm using that information to try and -- try to figure out who might be the driver, to help assist the surveillance team, give them pre-warning of the type of cars or people that they may need to watch out for.

Q.  Okay.  Now this drug deal that's been set up.  What exactly is going to be exchanged?

A.  The agreement was 5 pounds of meth for $1200 per pound.  So $6,000 cash was going to be given from us to Chayo's driver, and Chayo's driver was going to give us 5 pounds of meth.

Q.  Now pounds, in terms of kilograms, was --

A.  2.5 kilograms.

Q.  So a little less than half?

A.  Yes, sir.

Q.  Okay.  Now if we look at Government's Exhibits 3C and 3D, what does this money represent?

A.  This is the $6,000 that I gave to the source to purchase the drugs.

Q.  And 3E.  You put it in a Jimmy John's bag?

A.  I put it in a Jimmy John's bag.  It's a bright white bag. It makes it a little bit easier for the surveillance team to

identify what they're watching.  It's just easier on the eye than a small, like, bundle of cash.

Q.  Okay.  Now, are you monitoring what's happening in any way?

A.  We have an audio -- audio recording device that the source is wearing.  So we're able to monitor live, through that recording device.  And then it also records for evidence purposes later.

Q.  Okay.  Now do you ever make it out to the scene, and do you watch the trans- -- do you watch the drug deal go down?

A.  I do not.

Q.  Okay.  But do you later learn who the driver -- or who delivered to your confidential source?

A.  I do.

Q.  Who was it?  Who delivered it?

A.  It was Brian Alexis Muñoz-Castro.

Q.  Okay.  Now did you learn Mr. Muñoz-Castro's phone number, I guess, during this part of the operation?

A.  I learned it the following day.

Q.  The following day.  Okay.

Now after the drug deal has been done, what is supposed to happen next?

A.  After the drug deal was supposed to go down, the source was going to come right back to me with the drugs, and then I was going to take possession of it.

Meanwhile, our surveillance teams were going to follow

the courier that was working for Chayo, in this case Muñoz-Castro, and they were going to follow Castro as long as he was going around, to try to gather more info.  Where does he live?  Does he have stash houses, et cetera.

Q.  Okay.  Now, how do you know -- is there anybody keeping an eye -- or is there anybody in charge of watching the source as this person travels from Point A to Point B?

A.  Yeah.  The source is under observation at all times during the operation.

Q.  And why is that?

A.  Again, just to keep things sterile.  We just want to make sure they don't go into a back alley unwatched and grab the drugs.  So it's just a way to keep everything sterile.

Q.  I want to show you some exhibits that have not yet been admitted into evidence.

        Government's Exhibit 3F.

        Do you recognize Government's Exhibit 3F?

A.  Yes, I do.

Q.  Is that a fair and accurate representation of what you saw on March 30th, 2023?

A.  It is, sir.

        MR. MYERS:  Your Honor, I'd offer Government's Exhibit 3F into evidence.

        MR. GUTIERREZ:  No objections, Your Honor.

        THE COURT:  What's the number?

MR. MYERS:  3F.

THE COURT:  Government's Exhibit 3F will be admitted.

BY MR. MYERS:

Q.  Special Agent Janowski, do you recognize Government's Exhibit 3G?

A.  Yes, I do.

Q.  Is this a fair and accurate representation of what was received on March 30th, 2023?

A.  It is.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 3G into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 3G will be admitted.

BY MR. MYERS:

Q.  And Government's Exhibit 3H.

Is this after you examined the -- the bag, or the contents that were delivered on March 30th, 2023?

A.  Yes, sir.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 3H into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 3H will be admitted.

MR. MYERS:  Permission to publish to the jury, Your Honor?

THE COURT:  You may.

BY MR. MYERS:

Q.   All right.   We're looking at Government's Exhibit 3F.

Will you please explain to the jury what we're looking at?

A.   This is a black trash bag containing five bundles of what was presumed meth at that time, but later confirmed.   And this is what the courier, Muñoz-Castro, gave to our source on March 30 during that buy/walk operation.

Q.   And then Government's Exhibit 3H, what are we looking at?

A.   This is the five bundles, when I took them out of the trash bag inside of our evidence room.

Q.   And Government's Exhibit 3G?

A.   Just the five bundles on the scale, to show that they weighed approximately two and a half kilograms.

Q.   And were these -- these items eventually tested?

A.   They were field-tested that day positive for meth, and then later confirmed by the DEA lab in Dallas, to be that.

Q.   All right.   Now that you have received this methamphetamine, and you're -- are you following Muñoz-Castro or is someone else doing that?

A.   Someone else is doing that.

Q.   Okay.   At the end of the day, what did you end up learning?

A.   At the end of the day, I ended up learning that Muñoz-Castro, right after the deal, went to an address here in El Paso, picked up a woman who was later identified as his

significant other, and then traveled to another residence in El Paso, which was 605 Barcelona.

Q. Okay. Now from the pen register, were you able to glean any information?

A. On the pen register we saw several numbers that were very frequently in contact with Chayo at the time of this deal. One of them we were able to identify that day as being a phone number belonging to Saul Velasco Quezada.

And then there was another number that we were not able to identify that day. Later, I learned that it was Brian Muñoz-Castro. But on March 30, I did not know that.

Q. Okay. So now let's talk a little bit about Saul Quezada.

Why are you interested in his phone number when it's communicating with Chayo on March 30th, 2023?

A. On March 30th, when Chayo is telling our source, Hey, the drugs were about to be crossed, I quickly look at the pen register, and I see that Chayo is in frequent contact with this number that belongs to Saul. So I have a suspicion that Saul might be the one trying to cross the drugs at the bridge.

And I'm just trying to compare Saul's border crossing data with this pen register, to see if any of that lines up. So that way I can possibly tell my surveillance team, Hey, maybe be on the lookout for Saul in this vehicle. He might be the courier.

Again, you're just doing the best work you can to try

to -- try to make sense of data.  Sometimes it works, sometimes it doesn't.  In this case, Saul was not the one that showed up that day.

Q.  Okay.  But now you have his number.  So what are you going to do with that information?

A.  So I have his number, and I still have a suspicion that he might be working for the organization, even though his role that day was not to deliver the drugs.

So I set up a surveillance team to immediately start following Saul when he's in the United States, just to confirm if he is, in fact, involved in criminal activity.

Q.  Was there an operation where you were able to effectuate that surveillance?

A.  Yes.  Very next -- the very next day, March 31st, 2023.

Q.  What happened on March 31st, 2023?

A.  Saul entered the United States from Mexico through one of the ports of entry, and we conducted surveillance on him.

MR. MYERS:  Your Honor, I would like to show the witness an exhibit that has not yet been admitted into evidence.

THE COURT:  You may.

BY MR. MYERS:

Q.  Do you recognize Government's Exhibit 1G?

A.  I do.

Q.  Is this a fair and accurate picture of Mr. Quezada?

A.   It is.

          MR. MYERS:   Your Honor, I'd offer Government's
Exhibit 1G into evidence.

          THE COURT:   Government's Exhibit --

          MR. GUTIERREZ:   No objection, Your Honor.

          THE COURT:   -- 1G will be admitted.

BY MR. MYERS:

Q.   So did you testify that you had placed an alert on
Mr. Quezada?

A.   Sorry.  Yeah.  I placed an alert on Mr. Quezada, which aids
our surveillance team.

Q.   Okay.  What is an alert?

A.   An alert is -- I basically have Customs and Border
Protection place an alert -- or it's called an alert.  So
basically, when Saul enters the U.S. they notify me that, Hey,
this vehicle of interest to you, this person of interest just
entered the United States.

          MR. MYERS:   And, Your Honor, permission to publish 1G
to the jury.

          THE COURT:   You may.

BY MR. MYERS:

Q.   Who is photographed in Government's Exhibit 1G?

A.   Saul Quezada Orozco.

Q.   Now, did Mr. Quezada cross into the United States on
March 31st, 2023?

A.   He did.

Q.   And were you alerted to that?

A.   I was.

Q.   How did you respond?

A.   We set up a surveillance team to follow him from the port of entry to wherever he was going in El Paso.

Q.   Now, were you able -- you personally -- able to spot Mr. Quezada?

A.   Yes.

Q.   Okay.  And where did you see Mr. Quezada?

A.   The very first place he went was a gun store in El Paso.  I believe it was off Montana.

Q.   Okay.  And so what are you doing on March 31st, then, to continue this investigation?

A.   We were now just, again, following him covert.  We don't want to alert anybody, to the reasons we talked about before. If you alert that law enforcement is on, you're going to lose a lot of intel because of the compartmentalization.  So we were just quietly following, trying to see what he's up to.

        Obviously, if he engages in any act of violence, we'll immediately interact for safety issues.  But otherwise, we're just going to stay quiet and covert.

Q.   How many gun stores did Mr. Quezada visit?

A.   That day, two.

Q.   Did Mr. Quezada meet with anybody you recognized?

A.   He did.

Q.   Who did he met with?

A.   He met with Brian Alexis Muñoz-Castro.

Q.   Now at the time, when you see Mr. Quezada meeting with Mr. Muñoz, have you fully identified Mr. Muñoz?

A.   No.  So I did not know his name.  I just knew that that is the same man that delivered the drugs before, in the same vehicle that was used in the drug deal just 24 hours previous.

Q.   All right.  So now that you have seen this meeting, what happens next?

A.   So we saw -- Saul had gone to one gun store and he walked out empty-handed.  But then he went to a second gun store, where he came out with boxes.

So when he met with Muñoz-Castro in this parking lot in El Paso, I saw those boxes from the gun store go from Saul into Muñoz-Castro's car, and then the two vehicles departed in separate directions.  So our surveillance teams split to follow both vehicles.

Q.   Now, what did you personally do?

A.   I personally was on the team that followed Brian Muñoz-Castro.

Q.   All right.  What happened next?

A.   We followed Brian Muñoz-Castro, and he went to the house that we saw him go to after the drug deal the day before, the first house.

And as soon as he parked outside of that house I approached him because, again, at that point I felt like there was a public safety issue dealing with possibly rifle parts. So we made an approach at Brian.

Q.   Not going into what Brian said, but what happened next?

A.   He gave me consent to search his vehicle.  He was cooperative.

And during the search of the vehicle we discovered there was boxes from the gun store.  One was a box for a 16-inch upper receiver of a rifle.  And the other box was for a buttstock of a rifle, but the boxes were empty.  The parts were not in them.

Q.   All right.  Were there drugs in Mr. Muñoz-Castro's vehicle?

A.   It looked like personal use marijuana that he was up front about.  But nothing -- no meth or anything like that.

MR. MYERS:  Your Honor, I'd like to show the witness exhibits that have not yet been admitted into evidence.

BY MR. MYERS:

Q.   I'm showing you what's been marked as Government's Exhibit 4P.

Do you recognize this photograph?

A.   Yes, I do.

Q.   Is that a fair and accurate depiction of Mr. Muñoz's car?

A.   Yes.

MR. MYERS:  Your Honor, I'd offer 4P into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4P will be admitted.

BY MR. MYERS:

Q.  I would like to show you Government's Exhibit 4Q.

Is this a fair and accurate depiction of some of the contents of Mr. Muñoz's car?

A.  It is.

MR. MYERS:  Your Honor, I'd offer 4Q into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4Q will be admitted.

BY MR. MYERS:

Q.  I would like show you Government's Exhibit 4R.

Do you recognize Government's Exhibit 4R?

A.  Yes, I do.

Q.  Is that a fair and accurate representation of Mr. Muñoz-Castro's -- the backseat of his car?

A.  It is.

MR. MYERS:  Your Honor, I'd offer 4R into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4R will be admitted.

BY MR. MYERS:

Q.  I would like show you Government's Exhibit 4S.

Do you recognize Government's Exhibit 4S?

A.  Yes, I do.

Q.  Is it a close-up of an item in Mr. Muñoz's car?

A.   It is.

Q.   Fair and accurate representation?

A.   Yes.

            MR. MYERS:  Your Honor, I'd offer 4S into evidence.

            MR. GUTIERREZ:  No objections.

            THE COURT:  Government's Exhibit 4S will be admitted.

BY MR. MYERS:

Q.   Do you recognize Government's Exhibit 4T?

A.   Yes, I do.

Q.   Fair and accurate representation of a photograph taken from a Barcelona address?

A.   Yes.

            MR. MYERS:  Your Honor, I'd offer 4T into evidence.

            MR. GUTIERREZ:  No objection.

            THE COURT:  Government's Exhibit 4T will be admitted.

BY MR. MYERS:

Q.   Government's Exhibit 4U, same question.

        Is this a fair and accurate representation of items taken from the Barcelona residence?

A.   It is.

            MR. MYERS:  Your Honor, I'd offer 4U into evidence.

            MR. GUTIERREZ:  No objections.

            THE COURT:  Government's Exhibit 4U will be admitted.

BY MR. MYERS:

Q.   Government's Exhibit 4V.

Is this a fair and accurate representation of items taken from that Barcelona address?

A.  It is.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 4V into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4V will be admitted.

BY MR. MYERS:

Q.  Government's Exhibit 4W.

Do you recognize Government's Exhibit 4W?

A.  Yes, I do.

Q.  Fair and accurate representation of what was photographed on March 31st, 2023?

A.  Yes.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 4W into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4W will be admitted.

BY MR. MYERS:

Q.  Government's Exhibit 4X.

Is it another fair and accurate representation of the search inside the Barcelona address?

A.  It is.

MR. MYERS:  Your Honor, I'd offer 4X into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4X will be admitted.

BY MR. MYERS:

Q.  Government's Exhibit 4Y.

A fair and accurate representation of the search of the Barcelona address?

A.  Yes.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 4Y into evidence.

THE COURT:  4Y will be admitted.

BY MR. MYERS:

Q.  Government's Exhibit 4Z.

Fair and accurate representation of an item seized -- or box seized from that residence?

A.  Yes.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 4Z into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4Z will be admitted.

BY MR. MYERS:

Q.  Government's Exhibit 4A.

Another -- another item that was photographed from that residence?

A.  Yes.

Q.  4AA.  Excuse me.

A.  Yes.

          MR. MYERS:  Your Honor, I'd offer Government's
Exhibit 4AA into evidence.

          MR. GUTIERREZ:  No objections.

          THE COURT:  Government's Exhibit 4AA will be admitted.

BY MR. MYERS:

Q.  Special Agent Janowski, do you recognize Government's
Exhibit 4AB?

A.  Yes.

Q.  Fair and accurate representation?

A.  Yes.

          MR. MYERS:  Your Honor, I'd offer Government's
Exhibit 4AB into evidence.

          MR. GUTIERREZ:  No objections.

          THE COURT:  Government's Exhibit 4AB will be admitted.

BY MR. MYERS:

Q.  Do you recognize Government's Exhibit 4AC?

A.  Yes, I do.

Q.  Fair and accurate representation?

A.  Yes.

          MR. MYERS:  Your Honor, I'd offer Government's
Exhibit 4AC into evidence.

          MR. GUTIERREZ:  No objections.

          THE COURT:  Government's Exhibit 4AC will be admitted.

BY MR. MYERS:

Q.  Government's Exhibit 4AD.

Do you recognize 4AD?

A.   Yes, I do.

Q.   Fair and accurate representation?

A.   Yes.

        MR. MYERS:  Your Honor, I'd offer Government's Exhibit 4AD into evidence.

        MR. GUTIERREZ:  No objections, Your Honor.

        THE COURT:  Government's Exhibit 4AD will be admitted.

BY MR. MYERS:

Q.   Government's Exhibit 4AE.

        Do you recognize this?

A.   Yes, I do.

Q.   Fair and accurate representation?

A.   Yes.

        MR. MYERS:  Your Honor, I'd offer Government's Exhibit 4AE into evidence.

        MR. GUTIERREZ:  No objections, Your Honor.

        THE COURT:  Government's Exhibit 4AE will be admitted.

BY MR. MYERS:

Q.   Special Agent Janowski, do you recognize Government's Exhibit 4AF?

A.   Yes, I do.

Q.   Fair and accurate representation?

A.   Yes.

        MR. MYERS:  Your Honor, I'd offer Government's

Exhibit 4AF into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 4AF will be admitted.

BY MR. MYERS:

Q.  Do you recognize Government's Exhibit 4AG?

A.  Yes.

Q.  Fair and accurate representation?

A.  Yes.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 4AG into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4AG will be admitted.

BY MR. MYERS:

Q.  Do you recognize Government's Exhibit 4AH?

A.  Yes.

Q.  Fair and accurate representation?

A.  Yes.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 4AH into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4AH will be admitted.

BY MR. MYERS:

Q.  Do you recognize Government's Exhibit 4AI?

A.  Yes.

Q.  Fair and accurate representation?

A.   Yes.

          MR. MYERS:   Your Honor, I'd offer Government's Exhibit 4AI into evidence.

          MR. GUTIERREZ:   No objections.

          THE COURT:   Government's Exhibit 4AI will be admitted.

BY MR. MYERS:

Q.   And finally, Government's Exhibit 4AJ.

          Do you recognize Government's Exhibit 4AJ?

A.   Yes.

Q.   Fair and accurate representation?

A.   Yes.

          MR. MYERS:   Your Honor, I'd offer Government's Exhibit 4AJ into evidence.

          MR. GUTIERREZ:   No objections.

          THE COURT:   Government's Exhibit 4AJ will be admitted.

          MR. MYERS:   Permission to publish to the jury?

          THE COURT:   You may publish.

          MR. MYERS:   Thank you.

BY MR. MYERS:

Q.   All right.   Now, starting with Government's Exhibit 4P.

          What is the jury looking at?

          THE COURT:   Mr. Myers --

          MR. MYERS:   Yes.

          THE COURT:   -- we need to take a recess.

          MR. MYERS:   Yes, Your Honor.

THE COURT:  It's going to be a short one, perhaps 10 minutes.

We'll be in recess for the next 10 minutes.

(Recess taken 2:24 to 2:47 p.m.)

THE COURT:  You may continue, Mr. Myers.

MR. MYERS:  Thank you, Your Honor.

Your Honor, I don't remember if I asked, but permission to publish 4P through 4AJ to the jury?

THE COURT:  Yeah, I did.  You've got permission to publish.

MR. MYERS:  Thank you, Your Honor.

BY MR. MYERS:

Q.  Special Agent Janowski, on the screen should be Government's Exhibit 4P.

What -- what are we looking at here?

A.  This photo was taken March 31st, 2023.  This is the Starbucks at Fox Plaza.  If you see the brown sedan in the drive-thru window of Starbucks, that is Brian Muñoz-Castro's vehicle.  It's a brown Kia Forte.

Q.  Is this before or after Mr. Muñoz has met with Mr. Quezada?

A.  This is after.  So at this point, Mr. Quezada is in the vehicle with Mr. Castro.

Q.  Okay.  And why do you take photographs of this?

A.  Evidentiary purposes.

Q.  Now, after -- after this at Starbucks, now you're saying

Mr. Quezada and Mr. Muñoz are in the same car?

A.   Correct.

Q.   Okay.  So what's going to happen next in the sequence of events?

A.   Right on the other side of this Starbucks is the large parking lot at Fox Plaza.  That's were Mr. Quezada's vehicle was left.

     As soon as this photo was taken, right after this, the brown Kia drives around the building and will go right back to Mr. Quezada's car, and -- where Mr. Quezada will get out of this brown vehicle and back into his own vehicle.

Q.   Now, you had told the jury this is where you would follow Mr. Muñoz-Castro and eventually stop him after that?

A.   After -- after they get back into their separate vehicles they go separate ways.  This is not where we approach Mr. Castro.

Q.   Okay.  But eventually, you do?

A.   Shortly after this, yes.

Q.   Okay.  And you're able to search Mr. Muñoz's car?

A.   Correct.

Q.   How were you able to do that?

A.   He gave us written consent to search.

Q.   If we look at Government's Exhibit 4Q, what are we looking at in Government's Exhibit 4Q?

A.   It's personal use marijuana that Mr. Castro told us was in

the car.

Q.   Government's Exhibit 4R.

What is the jury looking at in Government's Exhibit 4R?

A.   These are the boxes that I saw Mr. Quezada get from the second gun store that he went to.  The large brown triangle one is for a 16-inch upper rifle receiver.

And that blue box is for a rifle buttstock.  But the boxes were empty.

Q.   Government's Exhibit 4S.

Again, Mr. Muñoz's car?

A.   Yep, backseat of the car.

Q.   And what are we looking at in Government's 4S?

A.   That's the box for the rifle buttstock.

Q.   Now, Government's Exhibit 4T.

We're going to start looking at a bunch of photographs from inside the house; is that correct?

A.   That's correct.

Q.   Tell us a little bit about this address before we start going through these photographs.

What address is this?

A.   So this is 605 Barcelona.  We approached Mr. Castro outside of a house on Paraguay.

Q.   And how did you find out -- or who -- let me ask you this.

Who led you to the address on Barcelona?

A.    Mr. Castro told us about this house, told us what was inside the house, the illegal items that were inside the house. And he took us to this house and unlocked the door and walked us through it.

Q.    Now, what gave you -- what gave you the authority to search this house?

A.    Written consent.

Q.    Okay.  And so these photographs that we're about to look at, what are these photographs documenting?

A.    These are photos that I took from inside 605 Barcelona of some of the items that are found there.

Q.    Okay.  Government's Exhibit 4T.

      Can you kind of describe for the jury what -- what are these items that we're looking at?

A.    So this is a variety of rifle parts.  They're firearm parts.

      You'll see a rifle buttstock.

      You see a magazine for one that looks like a 30-round magazine for a rifle.

      Down in the lower right you see several boxes of ammunition for 7.62x39, which is the ammunition commonly associated with AK-47s.

      You see some rifle scopes in the upper right.

      And again, just miscellaneous parts, parts and ammo.

Q.    And Government's Exhibit 4U.

What is the jury looking at in Government's Exhibit 4U?

A. That is three bundles of presumed meth. It field-tested positive for meth that day and was later confirmed as meth by the DEA lab.

Q. Government's Exhibit 4V.

What is the jury looking at in Government's Exhibit 4V?

A. Those are blue M30 pills believed to be Fentanyl, and confirmed by the DEA lab later on to be Fentanyl.

Q. Are there any code words or any other particular names that are used for these pills?

A. A lot of times it's just M30s or blues.

Q. Government's Exhibit 4W?

A. Just another photo of the same -- those drugs that we were talking about.

Q. What's the jury looking at in Government's Exhibit 4X?

A. Just another photo of one of the bundles of meth that was found in that room.

Q. And where was this bundle found?

A. It was found in a bedroom, along with all the rifle and gun parts and ammo.

That was particularly found in a closet of that bedroom.

Q. Okay. Is this -- the picture, is this how it was found, or

did someone place in it there?

A.  No, that's now it was found.

Q.  Government's Exhibit 4Y.

What is the jury looking at?

A.  Those are four boxes for -- I believe those are all rifles. We found a lot of empty boxes that firearms were shipped in or originally came in, but every box that was found was empty.

Same with that black Glock case on the floor.  In front of the boxes -- again, it's just a typical box that normally contains in that case, a Glock pistol, but the box was empty.

Q.  Government's Exhibit 4Z.

What is this?  What is the jury looking at?

A.  This is a label on one of those boxes.  In this case it is a rifle 7.62x39 which, again, is the caliber typically associated with AK-47s.

Q.  Government's Exhibit 4AA.

What is the jury looking at?

A.  Another empty rifle box, same caliber, that AK-47-type rifle with a military stock with pistol grip.

Q.  Government's Exhibit 4AB.

What is the jury looking at?

A.  Another label on one of the empty boxes.  Once again, 7.62x39 was the caliber of the rifle.

Q.  Government's Exhibit 4AC?

A.  Once more, another empty box with the label that said it's for a 7.62x39 rifle.

Q.  The photographs we just looked at, were these photographs of all the same box or different boxes?

A.  Different boxes.

Q.  Government's Exhibit 4AD.

What's important about this photograph?

A.  There was a roll of Saran wrap on the, like, dresser.  It was odd to -- odd to see that you see -- plastic wrap in your house.  It's usually in a kitchen, and it's normally not a roll like that.  That's very common of wrapping -- the meth bundles that we found was wrapped in a plastic wrap, so that's why I took that photo.

Q.  Government's Exhibit 4AE.

A.  Just more empty boxes for firearms.

Q.  And how many boxes are we looking at?

A.  I don't know the exact number.  It was a lot.

Q.  Oh, no.  But in this exhibit.

A.  Oh.  In this exhibit there's two.

Q.  Government's Exhibit 4AF?

A.  That looks like it's Baggies, possibly vacuum-sealed bags. Again, I took that picture because it's -- in my training and experience, it's common for drug trafficking to have those type of materials.

Q.  What is -- in your training and experience, what would a

drug trafficking organization use this kind of material for?

A.   Bags like that, a lot of times you'll see those M30 pills in.  Or a lot of times they'll use vacuum-sealed bags just to make the bundles of narcotics as small as possible, to make them easier to conceal.

Q.   Government's Exhibit 4AG.

     What is the jury looking at?

A.   Another empty box for a Glock pistol.

Q.   Was that the empty box you were referring to earlier in your testimony?

A.   Yes.

Q.   Government's Exhibit 4AH.

     What's this a photograph of?

A.   That's just a label on a box that has the serial number. And in this particular case, there was a -- Glock 45 was the type of firearm that belonged to that box at one point.

Q.   From that label, how can you tell it's a Glock 45?

A.   On the blue you see where it says G45?  That's just the -- the make of it.

Q.   Government's Exhibit 4AI.

     Do you recognize this?

A.   I do.  I found the Jimmy John's bag.  This photo, again, was taken on March 31st, 2023, one day after the March 30th buy/walk operation in which I had used this Jimmy John's bag during that operation.

Q.  And Government's Exhibit 4AJ.

What's inside that Jimmy John's bag?

A.  It was approximately $6,480 U.S. currency.

Q.  Now, do you recognize where that money came from?

A.  $6,000, I would imagine, came from myself the day before during the buy/walk operation.

Q.  And why do you think it came from yourself?

A.  Just the way the rubber bands and the way that I packaged it, it looked relatively untouched during those 24 hours.

Q.  It's in the same Jimmy John's bag?

A.  Yeah, and it's in the same bag.

Q.  I'd like to show you some more exhibits that have not yet been admitted into evidence.

Do you recognize Government's Exhibit 4AK?

A.  I do.

Q.  Is this an evidence submission photograph?

A.  It is.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 4AK into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4AQ will be admitted.

MR. MYERS:  It was AK, Your Honor.

THE COURT:  You may.

MR. MYERS:  Thank you.

BY MR. MYERS:

Q.  What are we looking at in Government's Exhibit 4AK?

          THE COURT:  4AQ, right?

          MR. MYERS:  No, AK.

          THE COURT REPORTER:  4AK.

          THE COURT:  4AK?

          I'm sorry.

          Government's Exhibit 4AK will be admitted.

BY MR. MYERS:

Q.  Do you recognize Government's Exhibit 4AL?

A.  Yes, I do.

Q.  Is this a fair and accurate representation of those pills on the scale?

A.  It is.

          MR. MYERS:  Your Honor, I'd offer 4AL into evidence.

          MR. GUTIERREZ:  No objection.

          THE COURT:  Government's Exhibit 4AL will be admitted.

BY MR. MYERS:

Q.  Government's Exhibit 4AM.

          Is this a picture of the meth that was seized?

A.  Yes, it is.

          MR. MYERS:  Your Honor, I offer 4AM into evidence.

          MR. GUTIERREZ:  No objection, Your Honor.

          THE COURT:  Government's Exhibit 4AM will be admitted.

BY MR. MYERS:

Q.  Government's Exhibit 4AN.

Is that a fair and accurate -- is this an evidence submission photograph of the ammunition that was seized?

A.  It is.

MR. MYERS:  Your Honor I'd offer Government's Exhibit 4AN into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4AN will be admitted.

BY MR. MYERS:

Q.  And do you recognize Government's Exhibit 4AO?

A.  Yes, I do.

Q.  Is that a ledger that was seized from the Barcelona address?

A.  It was provided to us by Castro at the Paraguay address -- at the Paraguay.

Q.  Okay.  Is that -- is this set of photographs a fair and accurate depiction of that alleged ledger?

A.  It is.

MR. MYERS:  Your Honor, I'd offer 4AO into evidence.

MR. GUTIERREZ:  No objections, Your Honor.

THE COURT:  Government's Exhibit 4AO will be admitted.

MR. MYERS:  Permission to publish those exhibits to the jury, Your Honor?

THE COURT:  You may publish.

BY MR. MYERS:

Q.   What is the jury looking at in Government's Exhibit 4AK?

A.   This is the photo I took from our evidence room.  These were the narcotics seized from the Barcelona house on March 31st.  The three bundles of meth on the left, and then the bags of M30 Fentanyl pills.

Q.   These were all the drugs that were seized that day?

A.   Correct.

Q.   What is the jury looking at in Government's Exhibit 4AL?

A.   So that's -- the approximate weight of the Fentanyl pills. It was .33 kilograms.

Q.   300 grams?

A.   Roughly, yes, sir.

Q.   Government's Exhibit 4AM?

A.   The weight -- total weight -- approximate total weight of the three bundles of meth, 2.5 kilograms.

Q.   And Government's Exhibit 4AN.

        What's pictured here?

A.   It's just a picture of -- I took the ammo out of the boxes to show that the boxes were, in fact, full with ammo, and that the ammo in those boxes did correlate to the labels on the boxes.

        You also have the extended pistol mag, along with several other pistol magazines, rifle buttstock, and rifle magazines, and some other firearm accessories.

Q.  Now switching topics, let's talk about ledgers.

Can you kind of explain to the jury what a ledger is?

A.  A ledger is typically used by a stash house operator.  In this case it was a firearms and drugs stash house operator.  And it was his way of keeping track of every transaction he was involved in, whether it was a drug transaction or firearm transaction.

And he was keeping these ledgers the same way an accountant would.  So that way, when his boss comes asking if money is missing, he has protection because he kept track of every transaction.

Q.  Now, who provided this ledger to you?

A.  Brian Castro gave us this.

Q.  And when you receive ledgers like this -- have you looked through this particular ledger?

A.  I have.

Q.  Are you able to understand it, or does someone -- did someone need to explain it to you?

A.  You can understand it to an extent.  But most of the time you need the actual person that wrote it to explain it to you.

Q.  If we look on Page 3 of Government's Exhibit AO -- excuse me -- what is the jury looking at?

A.  Again, just looking at a series of transactions.  On the left side, for example, you've got one that says 250, so I would imagine that was $250 for some transaction the week of

the 12th of March.

But other than that, I have very limited knowledge of what it actually means unless I sit down with Castro.

Q.   Page 4.  Do we see more of the same thing?

A.   Yeah.  More of same with plus and minus signs on the left.

Q.   Page 5?

A.   Yeah.  Page 5 starts to make a little bit more sense because you see, like, R15 or AK.  So it's easy -- easier to understand that, okay, they're probably talking about firearms.

And I also see, at the bottom, *Saul pago.*  So now I start to see like, okay, maybe this is Saul Orozco Quezada.

So it starts to make a little more sense.

Q.   Page 6?

A.   More of the same.

Q.   And Page 7?

A.   Yeah.  And again, we start to see some of the code words that we've talked about, *largos* and *cortas.*

So it makes a little bit more sense, but no, like, full clarity yet.

Q.   Okay.  Here too, also, *cuerno* on the right-hand side?

A.   Yeah.  Almost every code word we've talked about, there's a lot of them on this page.

Q.   Okay.  Now after March 31st, 2023, do you know, does your target, this Chayo, does she become aware of FBI involvement?

A.   Yes.  She knows on March 31st.  March 31st, Chayo becomes

aware that law enforcement approached Castro.

Q.   How did she become aware?

A.   Another associate called Chayo to let her know that Castro had been compromised.

Q.   And how do you know that?

A.   Because when I was with -- or when other agents were with Castro, he received a call from Chayo asking if everything was okay.

And then Castro told us what had happened, that someone else had told Chayo that he was compromised.

Q.   What did you do in response?

A.   Later on that night, myself and other agents called Chayo directly.

Q.   What did you tell Chayo, or what did you and the other agents tell Chayo?

A.   We introduced ourselves to Chayo as agents of the FBI and, you know, told her that, yes, what she had heard is true, and we were trying to gain her cooperation.

Q.   Now, do you have hopes that maybe Mr. Muñoz-Castro will cooperate with you on March 31st, 2023?

A.   Yeah.  That was the goal.

Q.   But now -- do you run into a problem, now that Chayo knows he's been approached by federal agents?

A.   Yeah.  He -- he agreed to cooperate.  He was willing.  But again, because of the compartmentalization of -- these

organizations are smart.  So the way they're compartmentalized, as soon as they find out that Castro has been compromised, even though he's willing to cooperate, we can't do anything with it.

Q.  Did you try anything -- in this phone call with Chayo, did you try anything to clean up or kind of point away from your investigation?

A.  We tried to.  We tried to allude to the fact -- when talking to Chayo, we tried to allude to the fact that, Hey, we were following this Saul guy.  We could see that he was doing suspicious stuff, like going to multiple gun stores.  So we used things like that to try to clean it up.

Q.  Okay.  Was that successful?

A.  It was not successful.

Q.  Okay.  So now on March 31st, from the physical evidence, from the toll records, what -- kind of generally, what have you learned?

A.  Generally what I've learned is that Chayo is a relatively high-level cartel member in Guadalajara, Jalisco, and that Castro is sent specifically to El Paso on behalf of Chayo to operate this stash location to deal in firearms and narcotics trafficking, and that Saul is a courier working for the organization.

And then we also find out Pablo Delgado, being another member of the organization.

Q.  Okay.  Now, let's -- I guess let's break this up.

So we'll start off with Pablo Delgado, because we've heard that before.

What are some of the other things that you seize from Mr. Muñoz-Castro besides all the evidence we went through?

A.   We seize a cellphone -- two cellphones from Mr. Castro.

Q.   Okay.  Both of those cellphones, were they forensically examined?

A.   They both were.  Only one had any value to it.

Q.   Okay.  What do you mean by value?

A.   Evidentiary value.  It was his work phone.  The other one was a personal phone that I examined and then returned to him.

Q.   Okay.  And even though it was a personal phone, did you, I guess, document what was in that and preserve it some way?

A.   Yes, I did.

Q.   What did you end up doing with that physical phone?

A.   The physical phone I returned to him.  So he -- you know, he's got a life to live.  So I returned it to him so that he could use it for work purposes and family.

But we still have a forensic extraction from the phone preserved.

Q.   Now, why isn't Mr. Muñoz arrested?

A.   Again, he was cooperating at that point.  And we still had hopes that we'd be able to clean it up enough to continue the investigation.

Q.   Now the other phone, the work phone, what happens with that

phone?

A.   We also forensic -- did a forensic extraction on that phone.  And then I had maintained that phone in evidence because, again, it had a lot of evidentiary value to it.

Q.   Now, you heard Special Agent Zayas testify about deconfliction?

A.   Yes, sir.

Q.   That's a process that you -- that took place after you had seized this phone?

A.   Correct.

Q.   Would you walk the jury through that, please?

A.   When we went through the phone with Mr. Castro, he told us about a contact in the phone that was saved as PB, Papa Bravo.  And he told us it was Pablo Delgado.

And when we went through that phone, we saw what we had talked about previously, significant firearms trafficking chats.  And so I took that phone number, Delgado's, which ended in 3539, plugged it into the database, and that's where I was alerted to Special Agent Zayas and the ATF investigation into Pablo Delgado.

Q.   And what happened next?

A.   Called Special Agent Zayas.  And we sat down and we did a synchronization, or deconfliction meeting, to figure out how we could help each other with our investigations and not get in each other's way.

In this case we decided to work jointly and go forward.

Q.  Now, let's talk about the first part of working together.

Who do you and Special Agents Zayas begin to focus on?

A.  Primarily, Pablo Delgado.

Q.  And how do you so?

A.  ATF got an arrest warrant for Pablo Delgado for felon in possession.  And FBI got a search warrant -- anticipatory search warrant for his residence.

Q.  What's an anticipatory search warrant?

A.  An anticipatory search warrant is a search warrant signed by a judge.  But the anticipatory -- well, the search warrant part of it allows us to legally search, in this case, a residence.

The anticipatory part means that certain things have to happen in order for that search warrant to take legal effect.

Q.  Did those things happen?

A.  They did.

Q.  And were you able to search Mr. Delgado's residence?

A.  We did.

Q.  When you say "we," were you part of that search?

A.  I was part of that search, yes.

MR. MYERS:  Your Honor, I'd like to show the witness some exhibits that have not been admitted.

BY MR. MYERS:

Q.  Have you and I previously reviewed the photographs all linked in Government's Exhibit 16C?

A.  We have.

Q.  Did those fairly -- there's 31 pages of photographs.

But do all those photographs fairly and accurately depict the search of Mr. Delgado's residence?

A.  They do.

MR. MYERS:  Your Honor, I offer 16C into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  16C, was it?

MR. MYERS:  16C, Your Honor.

THE COURT:  Government's Exhibit 16C will be admitted.

MR. MYERS:  Permission to publish to the jury, Your Honor?

THE COURT:  You may.

BY MR. MYERS:

Q.  All right.  What did you find when you searched Mr. Delgado's residence?

A.  We found miscellaneous ammunition and firearm parts.

And we also found a piece of paper, it was like a handmade receipt regarding a firearm transaction that Mr. Delgado was part of.

Q.  So if we start scrolling through, and we look on Page 14 of Government's Exhibit 16C, this is the search of Mr. Delgado's

residence?

A.   Yes.

Q.   And what is the jury looking at on this photograph on the top of Page 14?

A.   This is, like, 80 percent of the lower -- part of a -- what could be made into a rifle.  It just has to be milled down a little bit more, and then it's the lower receiver of a rifle.

Q.   Is it yet classified as a firearm?

A.   Not yet.

Q.   Is that why it's 80 percent as opposed to 100 percent?

A.   Correct.

Q.   Do you find evidence of ammunitions at the house?

A.   Yeah, miscellaneous ammunition.

Q.   And we see here the ammunition starting to be pictured on the bottom photograph on Page 19?

A.   Yes, sir.

Q.   And this continues through the following few pages of Government's Exhibit 16C?

A.   Yes, sir.

Q.   Okay.  Now that you have -- Pablo Delgado is under arrest, Muñoz-Castro is not under arrest, but you've got evidence from him.  Are you starting to get a better picture of the organization?

A.   We are.

Q.   All right.  Now, let's go back to this pen trap trace

register.

You had one on Chayo's phone, who now you assume is also Señora Hardy, but I think it was 21 or 22?

A.   Yes, sir.

Q.   Okay.  You had a pen trap trace register on that leading up to, like, a March 30th deal.

March 31st comes along, FBI gets involved.  What happens with that pen registry?

A.   So we had a pen register on Chayo's phone that ended in 2457, otherwise known as Señora Ed Hardy 21.  That data began collection on the afternoon of March 30th, just in time for the buy/walk operation.

Fast-forward to the afternoon of March 31st, when Chayo becomes aware that the FBI approached Castro.  She drops that number, so she no longer uses 2457.  That's part of the harm of the compartmentalization of these organizations that we talked about.  She immediately drops the number.  So now the pen register for 2457 is effectively useless, and we only collected 24 hours worth of data.

Q.   Okay.  Now, what do you mean by that term "drops"?

A.   She switched phone numbers, because she now knows if Castro was compromised.  Castro had access to the 2457 phone number.  That phone number could possibly be compromised, meaning law enforcement knows that Chayo uses that number.  So she drops it or stops using it altogether, to protect herself.

Q.  Now, do you find evidence -- I think you had -- you referred to the term, at one point maybe, a "V card."

Do you know what I'm talking about?

A.  Yes, sir.

Q.  Does that help you kind of figure out Chayo's new phone numbers?

A.  Yes.  Right before Chayo dropped this phone number, I'm watching a pen register.  And like I said, it doesn't give you the content, but it will tell you outgoing call or incoming text message.

There's another code in there that says V card.  And what that means is that a contact card was sent.

And what I noticed was right before Chayo stopped using the 2457 number, she was sending a series of V cards to a new number that ended in 2319.

I believe what she was doing was, 2319 was her new number, and she was saving her contacts.  But the mistake she made was that she WhatsApp messaged all of her contacts to the new phone, which allowed me to figure out her new phone number.

Q.  Now, do you recognize that number ending -- the new number ending in 2319?

A.  I do.

Q.  How do you recognize that number?

A.  Later on I found it in Cordero's phone as Señora Ed Hardy 22, I believe.

Q.   Is that the same number Special Agent Benavides used to contact Cha- --

A.   It is --

Q.   To contact Fernanda?

A.   It is.

Q.   Okay.  So were you ever up on a pen register for this 2319 number?

A.   We did.  We went up on pen register, I believe like early April, on that phone number.

Q.   Were there any technical difficulties with that pen register?

A.   There were.  It appears it wasn't collecting data.  So at first -- I think we went up on it on April 5th, and we didn't start collecting data until May 31st.

So during that time I believe that I was wrong.  She didn't -- that wasn't actually a good phone number.  So I just figured that 2319 number did not have a WhatsApp account that was active; hence, why I wasn't collecting data.

Then all of a sudden, between May 31st and I think June 4th, we collected a bunch of data, and then it stopped collecting again.

So in the moment, I didn't know there was a technical difficulty.  After the fact, looking back, it was probably a data collection issue on the technical side.

Q.   Now with the little bit of data that you were able to

collect, did you see anything useful?

A.   Yeah.   There were several hot callers, or frequent callers, one of them being Cordero.

Q.   Now, you heard the -- about the August undercover operation and that Mr. Hernandez Cordero was kind of listed as a possible suspect.

A.   Yes, sir.

Q.   How does he get listed as a possible suspect?

A.   One of the hot callers during that short window of data collection that we had on the pen register was a number that ended in 7252.

It called -- it was in contact with Chayo 42 times during that short three- to four-day window that the pen register was actually working.

When we looked at that number, that was the number that Mr. Cordero had used on his permanent residence card.  So we had a pretty good idea that that was, in fact, the number he was using.

Q.   And now, were you able to confirm that information once Mr. Hernandez is arrested?

A.   Once he was arrested and we seized his phone, we, in fact, saw that 7252, the number he put on his legal permanent residence card, was, in fact, the number that was -- he was still in possession of at the time of his arrest.

Q.   Now, you heard -- now, were you part of the -- the

undercover operation on August 21st, 2023?

A.   I was part of it.  I wasn't physically out there.

Q.   Okay.  You were on family leave at the time?

A.   Yes, sir.

Q.   Okay.  Now when you come back from family leave, are you able to catch up on the investigation?

A.   Yes, sir.

Q.   What are some of the things that you do?

A.   I get search warrants for all digital devices that were seized on August 21st, and then conduct forensic extractions of those devices.

Q.   In addition to forensic extractions, do you do a physical review?

A.   Yeah.  We do a -- we did a digital forensic extraction, but we always do a manual review as well, just 'cuz I don't have faith in technology.  And so I would like to manually search everything, so that way we avoid technical issues.

Q.   And are those many of the photographs that we have seen to date?

A.   Yes, sir.

Q.   Okay.

        MR. MYERS:  Your Honor, I would like to show the witness some exhibits that have already been admitted.

        THE COURT:  You may.

BY MR. MYERS:

Q.  I'd like to show Government's Exhibit 15F -- 15E and 15F.

Do you recognize this photograph?

A.  Yes, sir.

Q.  And what is it a photograph of?

A.  Can you scroll up just a little bit?

Okay.  This a -- this is Cordero's phone, a photo of Cordero's phone.  And this is WhatsApp messages between him and Señora Ed Hardy 22, which I believe is the 2319 phone number.

MR. MYERS:  Your Honor, permission to publish to the jury?

THE COURT:  You may.

BY MR. MYERS:

Q.  And also, 15F is the translation that goes along with that?

A.  Yes, sir.

Q.  Now we start down here with the conversation, and we can walk through just the English versions.

And what does Mr. Hernandez ask of Chayo on April 26th, 2023?

A.  He says, Good afternoon.  Hey, do you have a client for 2C-B or pink cocaine?

When he actually types it out, he doesn't use the numeral.  He types it out as T-U-S-I-B-I and *coca rosa.*

Q.  What is pink cocaine or 2C-B?

A.  So the way he writes it out, tusibi is a common street way

of saying it.  Another common way is to actually write it out, the number 2C-B.  And what that is is a synthetic narcotic. It's similar to cocaine.

Q.  And how does she respond?

A.  Where?

Q.  And what does she say next?

A.  They're inside.  Hey, do me a solid and search this person.

Q.  And going on to the next page, this Señora Hardy 22, I think we're at -- where does she request Mr. Hernandez to search?

A.  In the pages of El Paso.

To which Mr. Hernandez responds, Which?

Chayo says, Brayan Alexi Muños-Castros.

Q.  Let's stop right there.

The name is spelled different.  But do you recognize that name?

A.  I recognize it, yes, sir.

Q.  Who is that name in reference to?

A.  Brian Alexis Muñoz-Castro.  She just spells Brian differently.

Q.  And what does Mr. Hernandez respond?

A.  He asked for the date of birth.

Q.  And what does she say in response?

A.  Born December 7th, 2002.

Q.  Now, do you know Mr. Muñoz's true date of birth?

A.   I do.   That is his true date of birth.

Q.   Okay.   And what does he say to her?

A.   He says, I'll search there.

Q.   Now, do they switch topics back to the pink cocaine?

A.   They do.

Q.   And what are they talking about?

A.   Chayo says, Where do you have clients?

     To which Mr. Cordero responds, That if you have any, there's some here.

     Chayo says, That's why.  Do you want the clients in the USA?

     Cordero responds, Well, let's see what's in it.

     Chayo responds, Let's see.  We usually get white, but let me tell them.

     Cordero responds, Well, it seems to be becoming fashionable.

Q.   Let me stop you right there.  Let's go back.

     Let's see.  We usually get white, but let me tell them.

     Are you familiar with code words for drugs?

A.   Yes, sir.

Q.   How are you so familiar with code words for drugs?

A.   I've spent my entire time with the bureau working on the organized crime drug enforcement task force.

Q.   And during that time on the drug enforcement task force,

what kind of investigations have you participated in?

A.   Drug trafficking, firearms trafficking, bulk cash smuggling.

Q.   Now, same kind of thing with firearms.

Are drugs talked about in code?

A.   Yes, sir.

Q.   And why are drugs talked about in code?

A.   Again, they think that it will protect them from judicial prosecution if they speak in code, as opposed to just talking outright about drugs.

Q.   Now, have you seen conversations in -- where they referred to a specific kind of narcotic as whites?

A.   Yes.

Q.   And what kind of specific narcotic are they generally talking about?

A.   So in this context, they're talking about white cocaine versus this new fashionable pink cocaine, that's kind of become hot on the party scene and more fashionable, I guess.

MR. MYERS:   Your Honor, I'd like -- oops.   Before we go to that.

BY MR. MYERS:

Q.   Let me talk first about a person named Manuel González. Are you familiar with that name?

A.   Yes, sir.

Q.   How are you familiar with that name?

A.   He came up during this investigation as one of the contacts that we identified from Cordero's phone, and then I eventually interviewed.

Q.   Now, how is it listed in Mr. Cordero's phone?

A.   Meny Gel.

MR. MYERS:  Your Honor, I would like to publish to the jury Government's exhibit -- and I believe they've already been admitted -- 15H and 15I.  Or excuse me.  15G and 15H.

THE COURT:  You may publish.

BY MR. MYERS:

Q.   Now, Government's Exhibit 15G.

What are we looking at?

A.   This is a photo of Cordero's phone with a WhatsApp conversation between him and Meny Gel, or Manuel González.

Q.   Now, do you see the date on this conversation?

A.   Yes.  April 27th, 2023.

Q.   And this is kind of immediately after the conversation we just went through with the Señora Hardy phone number?

A.   Correct.

Q.   Okay.  And before we go to the translation, do you recognize the name?

A.   I do.  The name Mr. Cordero sends in the text.

Q.   Okay.  If we look at the translation for 15H.

Is that -- that translation on the beginning of April 27th, how did Mr. Hernandez start the conversation?

A.  He says, Good afternoon.

Q.  How does Meny Gel respond?

A.  Good afternoon.

        Mr. Cordero then asked, Hey, can you check and see if a person was detained in El Paso?

        To which Meny Gel responds, You can see it in the portal in the city or at the bridge.  You need a name and date of birth.

Q.  What name and date of birth does Mr. Hernandez provide?

A.  Brayan Alexis Muñoz-Castro, December 7th, 2002.

Q.  Now this time, has he cleaned up the spelling of the name?

A.  A little bit.  He used the same spelling of Brian that Chayo did, but he added the S to Alexis and took off the S at the end of Castro to make it the correct name.

Q.  Now, how does Mr. Meny Gel respond?

A.  Let me see.

Q.  And what happens next?

A.  Mr. Cordero responded, Okay.

        Meny Gel responded, Not in the prison.

        Mr. Cordero said, This is federal.

        And Meny Gel said, Ah, everything is there.  Much less here than in immigration camp.

Q.  If we go into the next page.

A.  Mr. Cordero says, Well, it looks like they were stopped, went to house and got pills.

Q.  Now when we look at that *pastillas*, are you familiar with that term in reference to the drug trade?

A.  Yeah.  It's just a frequent, frequent code word.  A way of referencing pills, M30 pills, the common Fentanyl pills that we see.

Q.  Same kind of Fentanyl pills that you seized from Mr. Muñoz's house?

A.  Yes, sir.

Q.  Okay.  What does Mr. Hernandez say next?

A.  He says, There's another jail.

     To which Meny Gel responds, No.  But let me see, because maybe with the name they put it wrong.

Q.  And how does -- what does -- does Mr. Hernandez give a new spelling?

A.  Yeah.  He offers a new spelling of, Maybe use S at the end of Muñoz instead of a Z, and maybe add an S at the end of Castro's.

     And then he said, Let's see like that.  They don't know how to write it.  Who sent it?

Q.  And who sent it to him?

A.  Chayo, or Señora Ed Hardy 22.

Q.  How does Mr. Meny Gel respond?

A.  He said, That's what I searched and called, and nothing. When did this happen?

Q.  All right.  Now, let's stop.

Janowski - Direct by Mr. Myers

You have already interdicted or seized evidence from Mr. Muñoz at this date, correct?

A. Correct.

Q. Approximately a month earlier?

A. Yes, sir.

Q. If he's not under arrest, does his name go in any public system that can be searched?

A. It would not.

Q. Now if he had been placed under arrest, would his name pop up?

A. It would be.

Q. Where would his name pop up?

A. Open source. Like on Google, you can find jail records pretty easily.

Q. Okay. Now after Mr. Meny Gel asks, When did this happen? What happens next?

A. Mr. Cordero said, Hey, that the FBI got him, has to be in the jail.

Meny Gel responds, It has to be there. They don't have him in the system. Did they follow him from the store or the line?

Mr. Cordero responds, No. It looks like they had him and followed him for two days.

Meny Gel responds, To sell or buy, or more of the other of the three letters has him.

Mr. Cordero says, Well, he went to a store and bought bullets, was stopped and went to the house and found methamphetamine and M30 pills.  And he had Mexican plates on the car.

Q.  Now, let's stop right there.

Does that kind of corroborate the information that you know about March 31st?

A.  It does.

Q.  How so?

A.  He's basically saying exactly what happened.  So Mr. Cordero knew exactly what happened on March 31st.

Q.  Okay.  How does Mr. Meny Gel respond?

A.  Maybe they were rats.  It was Mexican.

Q.  And what does Mr. Hernandez say?

A.  Yes, it's Mexican.  I think his phone was taken only, and they were calling the numbers that he had.

Q.  Now, did you end up using numbers that were in Mr. Muñoz's phone?

A.  We obviously had the number we called Chayo, and was one of the numbers that was in Mr. Castro's phone.

Q.  But you knew that number beforehand?

A.  Yes.

Q.  Okay.  But -- and you, prior to -- like you previously testified, did you make a phone call?

A.  We did that night.

Q.  Okay.  How does Mr. Meny Gel respond?

A.  He says, Then they have a tail for something or someone.

Mr. Cordero responds, That's what I'm saying for drugs, and they are singing like birds and then they get information.

Q.  Okay.

MR. MYERS:  May I have a moment with co-counsel, Your Honor?

THE COURT:  You may.

(Mr. Myers confers with Ms. Holderfield.

MR. MYERS:  I pass the witness.

THE COURT:  Before you start, Mr. Gutierrez --

MR. GUTIERREZ:  Yes, Your Honor.

THE COURT:  -- we're not going to be able to go the whole afternoon without at least one break.

MR. GUTIERREZ:  Thank you, Your Honor.

THE COURT:  So we'll take another short break, 10 minutes.  Well, let's make it 15.  15 minutes.

We'll be in recess for the next 15 minutes.

(Recess taken 3:18 to 3:34 p.m.)

THE COURT:  Mr. Gutierrez, you may proceed.

MR. GUTIERREZ:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.  Agent, you testified six years' experience?

A.   Yes, sir.

Q.   Agent, did you have any communication with the Mexican authorities?

          THE COURT:   Speak into the microphone.

          MR. GUTIERREZ:   I'm sorry.

BY MR. GUTIERREZ:

Q.   Agent, did you have any communication with the Mexican authorities to assist you in any type of information?

A.   With authorities of the Government of Mexico, no.

Q.   But they're available to you, correct?

A.   They are.

Q.   You did what was called a walk/buy; is that correct?

A.   Yes, sir.

Q.   Where you gave money, and it was given to -- later found out -- to Brian Muñoz-Castro?

A.   Yes, sir.

Q.   And he gave you drugs, correct?

A.   Correct.

Q.   And then eventually -- well, that day was March 30th, or March 31st?

A.   That was March 30th, 2023.

Q.   March 30th, 2023.  On that day you still did not have any information of the defendant Rene Hernandez Cordero; is that correct?

A.   That's correct.

Q.   That day he was not even a target of the FBI?

A.   Not a target of my investigation.  I don't know if he was targeted by any other.  But just me, no, sir.

Q.   Just you.  Okay.

And on that day, that's where the meth was the transaction for the 6,000 that Brian gave you.  And you purchased 6,000 -- let me reverse that.

You gave him money, the 6,000, and he gave you meth?

A.   Yes, sir.

Q.   Okay.  And then you were alerted of a Saul Orozco Quezada, correct?

A.   Correct.

Q.   And you obtained his phone?

A.   Yes, sir.  On March 31st, 2023.

Q.   And you went through his entire phone?

A.   We got the search warrant for his phone, and we were unable to crack.  And we gave it to our CART team, or cellular analysis team, that specializes in conducting searches of cellphones.

But they were not able to defeat the passcode to actually effect the search warrant for that phone.

Q.   Did you debrief with him?

A.   He was interviewed back on March 31st.  I was not part of that interview.

Q.   Do you have information of that interview?

A.   Other agents do.  I don't recall.  I'd have to see the report to refresh.

Q.   And then you approached Brian Muñoz, correct?

A.   Yes, sir, on March 31st.

Q.   And then you went to his home and he gave you consent, correct?

A.   Yes, sir.

Q.   And all of Exhibits P - -- I'm sorry -- all of Exhibits 4 are of Brian Muñoz's home in Barcelona?

A.   Yes.

Q.   Here in El Paso, Texas?

A.   Yes, sir.

Q.   Okay.  And that's where you found meth and Fentanyl, correct?

A.   Correct.

        MR. GUTIERREZ:  Your Honor, may I publish Exhibit 4U, that has already been admitted?

        THE COURT:  4U?

        MR. GUTIERREZ:  Yes, Your Honor.

        THE COURT:  You may.

BY MR. GUTIERREZ:

Q.   All right.  This was found at Brian Muñoz's home, correct?

A.   Sir, I'm not able to see it, sir.

Q.   Oh, I'm sorry.

A.   All right.  Now, I can.

Yes, sir.

Q. Okay.

MR. GUTIERREZ: Your Honor, I would like to publish 4V as well, which has already been admitted.

THE COURT: You may.

MR. GUTIERREZ: Thank you.

BY MR. GUTIERREZ:

Q. Again, this is the pills that were found in Brian Muñoz-Castro's home?

A. That's correct.

Q. March 31st, 2023?

A. Correct.

Q. And until that day, you did not even know of defendant Rene Hernandez Cordero?

A. Correct. On March 31st, 2023, I did not know about Mr. Cordero.

MR. GUTIERREZ: Your Honor, may I publish 4AO? It's already been admitted.

THE COURT: You may.

BY MR. GUTIERREZ:

Q. Agent, this is the front cover of the ledger, correct?

A. Correct.

Q. And this was given to you by whom?

A. Brian Muñoz-Castro.

Q. Okay. And you've had an opportunity to go through the

entire ledger, correct?

A.   Correct.

Q.   And in that ledger there was nothing that identified the defendant Rene Hernandez Cordero, correct?

A.   Correct.

Q.   Agent, what was the relationship between Pablo Delgado and Brian Castro-Muñoz or Brian Muñoz-Castro?

A.   The professional relationship that I discovered was that Pablo was a -- provided firearms to Castro on behalf of Chayo. The familial relationship was that Pablo was a cousin of Brian's significant other.

Q.   Right.  So Brian's girlfriend was a cousin of Pablo Delgado?

A.   Correct.

Q.   And Pablo Delgado is how he met Brian, through the cousin?

A.   I -- I believe so.

        MR. GUTIERREZ:  Your Honor, I would like to publish 15F, which has already been admitted.

        THE COURT:  You may.

BY MR. GUTIERREZ:

Q.   This is the conversation that you were talking about earlier, about the defendant Rene Hernandez Cordero talking about 2C-B, or pink cocaine, correct?

        Do you recall that?

A.   Yes, sir.

Q.  But there was nothing ever conspired through that.  It was just a conversation, correct?

A.  Correct.

Q.  And just talking about drugs is not a crime, correct?

A.  Correct.

Q.  So you're not inferring, because he was talking about drugs, that this had to do with anything illegal?

A.  Certain conversations, they were -- I think there's a difference between talking about drugs and having a conspiratorial-type conversation of trying to acquire drugs.

Q.  Not illegal?

A.  To just talk about drugs?  No, not illegal.

Q.  This right here, what we're showing the jury, is not illegal, correct?

        MR. MYERS:  Objection, calls for a legal conclusion.

        THE COURT:  Sustained.

BY MR. GUTIERREZ:

Q.  Okay.  And I want to see if you're familiar with this.

        "The mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that a certain person may be -- may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy."

        Do you understand that?

A.  Yes, sir.

Q.  The conversation of Meny Gel about looking for Castro.

Do you recall that?

A.  Yes, sir.

Q.  It's not illegal for anybody to look for another person; is that correct?

A.  Not illegal.  It's alarming.

Q.  Still not illegal, correct?

A.  Not illegal.

Q.  I mean anybody can look for another person if they're detained or whatever the case may be?

A.  Yes, sir.

Q.  The conversation itself is not illegal?

A.  Not illegal.

Q.  The action of looking for somebody is not illegal?

A.  So long as you don't mean that person harm, correct, it is not illegal to look for that person.

Q.  So the conversation that the defendant Rene Hernandez Cordero, in looking for this person, was not illegal?

MR. MYERS:  Objection.  Calls for a legal conclusion.

THE COURT:  Overruled.

MR. GUTIERREZ:  You can answer.

A.  Correct.  The conversation is not illegal.

MR. GUTIERREZ:  Your Honor, I pass the witness.

REDIRECT EXAMINATION

BY MR. MYERS:

Q.  On April 27th, 2023, were you aware of Rene Hernandez Cordero?

A.  On April 27th, 2023?  Not at that time.

Q.  Was Rene Hernandez Cordero aware of you?

A.  He was aware of my organization.  I don't know if he was aware of my name, but he was definitely aware that I, as the FBI in El Paso, was on to his organization.

Q.  And how do you know that?

A.  Through the conversations where he's talking about, They must have a tail.  He specifically wrote out FBI.  He specifically walked through the events that I was a part of on March 31st, 2023.

So he certainly knew that I, as a FBI, was on his organization.

Q.  Even though at that point in time you had not discovered his name yet?

A.  Correct.

Q.  Now, you went through a whole series of questions about, Is it illegal to have a particular conversation, or isn't it?

Do you recall those questions?

A.  Yes, sir.

Q.  Okay.  Now are these conversations, nonetheless, evidence that are important to your case?

A.   Yes, sir.

Q.   What is it evidence of?

A.   It's evidence of the larger pattern that we've seen.  We have drug evidence, we have firearm evidence.  And so it just goes to the greater -- all of the evidence that pieces together this conspiracy.  I don't need to have seized pink cocaine to have evidence of a conspiracy.

Q.   Okay.  Now when you're coordinating a response for the FBI, how, exactly, are you coordinating, for example, this buy/walk?  What do you have to do?

A.   There's a lot of things.  We have to deconflict the area, to make sure that the people that we are talking to, Chayo and the others, are not other undercover law enforcement officers, things of that nature.

     We talked to --

Q.   Do you have to talk to people?

A.   Yes, sir.

Q.   Okay.  So is your coordination -- is your communication key to getting the job done?

A.   Yes, sir.

Q.   Is that the same thing in a drug organization?

A.   Exact same.

Q.   How is it the same?

A.   In this particular -- the same way that I talk to my surveillance team, the same way I talk to the interview teams,

is the same way that Mr. Cordero was talking to these others, by trying to figure out their problem with, in this case, Brian Muñoz-Castro.

He was trying to solve his problem in the exact same way that I try to solve problems within my team and my organization.

Q.  Now, you -- it's certainly not illegal to look up anything. But you said it was alarming.

Why is it alarming?

A.  It's alarming, just because in my training and experience, these -- I mean, he used the term "rats" in the text.  It's usually a very negative connotation.  In my training and experience, when someone is called a rat by cartels, it could be a very dangerous situation.

So when I see that they were actively looking for Muñoz-Castro, because they knew the FBI was involved, it was alarming to me because I felt that they could mean harm to him. This is a violent organization that's referring to this young man as a rat.

Q.  Now, it doesn't necessarily mean violence.  There are also other things that could happen, correct?

A.  Correct.

Q.  What other things?

A.  They could have sat down with him and interviewed him to try to figure out what he learned from his interaction with the

FBI.

They could try to feel him out to see if he truly has been compromised, or if he fed the FBI a bunch of lies.

Q.   Does this help the drug conspiracy in any way?

A.   Certainly.

Q.   How would it help the drug conspiracy?

A.   It shows me the level to which Mr. Cordero was at.  The fact that he was so compartmentalized to where the lower guys didn't know who he was, and the fact that he's one of these problem solvers that is talking with Chayo, trying to solve the problem.  Usually, you have --

MR. GUTIERREZ:  Your Honor, I'm going to object to speculative.

THE COURT:  Sustained.

BY MR. MYERS:

Q.   Okay.  I'd like to show you an exhibit that has not yet been admitted into evidence.

Government's Exhibit 3A.

Do you recognize Government's Exhibit 3A?

A.   Sorry, I can't see it.

MR. MYERS:  He can't see the --

THE CLERK:  Give me a second, please.

A.   Yes, I recognize 3A.

BY MR. MYERS:

Q.   And what is Government's Exhibit 3A?

A.   This is a DEA form that I filled out, to submit the drugs that were seized on March 31st, to the DEA lab in Dallas, just to get confirmation that the field test results are accurate.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 3A into evidence.

MR. GUTIERREZ:  No objection, Your Honor.

THE COURT:  Government's Exhibit 3A will be admitted.

MR. MYERS:  Permission to publish to the jury?

THE COURT:  You may publish.

BY MR. MYERS:

Q.   How are the exhibits labeled, by what number?

A.   They're labeled -- if you see Box Number 13, Exhibit Number, they're labeled 1B1, 1B2, and 1B3.  That's just how the FBI labels evidence.

1B1 and 1B2 -- 1B1 is actually the 5 bundles of meth that were seized on March 30th, 2023.

1B2 is the three bundles of meth seized from 605 Barcelona on March 31.

And 1B3 is the bag of Fentanyl pills seized from 605 Barcelona on March 31st.

MR. MYERS:  Your Honor, I pass the witness.

MR. GUTIERREZ:  Your Honor, can we keep that up?  That has been published.

THE COURT:  I'm sorry?

MR. GUTIERREZ:  The exhibit.  May we keep it published

still?

THE COURT:  You may.

                    RECROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.  Okay.  This is March 31st, 2023, correct?

A.  Yes, sir.

Q.  And again, you testified that you had no knowledge yet of defendant Rene Hernandez Cordero?

A.  That is correct.

Q.  So these drugs, you had nothing linked to him this day?

A.  Not on this day.

        MR. GUTIERREZ:  Rest -- I'll pass the witness.

        MR. MYERS:  No further questions, Your Honor.

        THE COURT:  Very well.  You may take your seat, sir.

        Call your next witness.

        MS. HOLDERFIELD:  Your Honor, the Government calls HSI Special Agent Charles Bachhuber to the stand.

        He also has not been sworn in yet, Your Honor.

        THE COURT:  Right.

    (Witness duly sworn.)

        THE WITNESS:  I do.

        THE CLERK:  You may lower your hand.

        Please have a seat.

        THE COURT:  You may proceed.

CHARLES BACHHUBER, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. HOLDERFIELD:

Q.  Good afternoon, sir.

Will you please state and spell your name for the record?

A.  My name is Charles Bachhuber.  The last name is spelled B-A-C-H-H-U-B-E-R.

Q.  Where do you work?

A.  I'm employed as a special agent with Homeland Security Investigations.

Q.  How long have you held that position of special agent?

A.  For approximately 13 years.

Q.  Did you have to go through training to become a special agent?

A.  I did.

Q.  What did that training entail?

A.  The training entailed attending the criminal investigator training program at the Federal Law Enforcement Training Center.

It also -- there was an add-on for the Immigration Customs Enforcement special agent training.  And that was our basic training.

Q.  And where was the -- where was the training?

A.  At the Federal Law Enforcement Training Center.

Q.   And how long was it?

A.   Approximately six months.

Q.   As part of -- as part of being a special agent, are you assigned to a particular group within the agency?

A.   Yes.  I'm currently assigned to the global trade investigations group.

Q.   What is that group?

A.   That group is comprised of a couple of elements, the first being counter-proliferation investigations, which is investigations involving the export of technology and weapons from the United States.

The other portion of the group involves Customs fraud, intellectual property rights investigations, which deals -- generally, more with importing of goods into the United States.

Q.   How long have you been part of the global trade group?

A.   For approximately nine years.

Q.   Do you have specialized training for this group?

A.   Yes.  When I first started with the group, we did -- there was a week long counter-proliferation investigations training seminar.  Also, the Federal Law Enforcement Training Center provided a basic background into investigative -- or export investigations and agencies that were generally involved in those investigations.

Q.   Do you take a -- do you take, like, an exam at the end of this specialized training?

Bachhuber  - Direct by Ms. Holderfield

A.   I don't believe we did in that case.  I believe it was just a -- just a generalized -- you know, basically a certificate for participation.

Q.   So you have a certificate?

A.   Yes.

Q.   Okay.  As part of that training, were you taught on export regulations and licensing requirements?

A.   Yes, we were.

Q.   What is your experience with export regulation and licensing requirements?

A.   The bulk of my experience with the export regulations and licensing, just based on -- on -- my work in the group deals with the Commerce Control List primarily, now.  And in the past, the United States Munitions List as well.

Q.   Is your experience primarily in firearms and ammunition?

A.   Yes, it is.

Q.   Do you work with the Department of Commerce?

A.   Yes, I do.

Q.   As well as the Bureau of Industry and Security?

A.   Yes.

Q.   How do you stay updated with the latest developments in export control laws and regulations?

A.   There's -- there is periodic training.  Additionally, our headquarters frequently pushes out information as -- as the rules and regulations change, just to keep us up-to-date.

Additionally, as we're conducting investigations, I frequently review -- especially the Code of Federal Regulations, the online -- their online website, to keep up-to-date.

Q.   Do you consult these resources daily within your job duties?

A.   Generally.  At least several times a week.

Q.   Have you published or authored any articles?

A.   No, I have not.

Q.   Have you lectured or provided training in this particular area?

A.   I've not lectured.  With regards to training, more informal training, with -- the last couple of years we've added a lot of members to the group.

But again, just basic day-to-day getting them up to speed with the regulations.

Q.   What's your -- what's your education?

A.   I have a bachelor's degree in mechanical engineering.

Q.   Does your background, your education, does that help in your position?

A.   I feel it does, yes.

Q.   How so?

A.   Oh, in -- I worked as a design engineer for approximately 12 years prior to accepting this position.  In that job I did a lot of review and application specifications, that sort of

thing.  Again, a lot of research in specifications and applying them.

Q.  Have you ever received any awards or acknowledgments for your work in this field?

A.  Nothing formal, no.

Q.  Have you testified before as an expert?

A.  No, I have not.

Q.  Have you testified before?

A.  Yes.

Q.  How many times would you say?

A.  I'd estimate at least 50 times.

Q.  How many licensing determinations have you done within the course of your career?

A.  I'd estimate -- I mean specific of the Commerce Control List, I've submitted in excess of 300 license determinations and license history requests.

Q.  Is that a combination of licensing determinations and licensing history?

A.  Yes.  It's a combination of the two.

Q.  Are you regularly consulted on firearms and export compliance?

A.  By other law enforcement, yes.

Q.  So you assist other law enforcement agencies on export licensing of firearms and ammunition?

A.  Yes.

Q.  So you would say -- in other words, you're basically the go-to person that agencies call for assistance?

A.  I would think so, yes.

MS. HOLDERFIELD:  Your Honor, at this time the Government moves to tender this witness, HSI Special Agent Charles Bachhuber, as an expert in the field of export licensing and compliance of firearms and ammunition.

MR. GUTIERREZ:  No objection.

THE COURT:  You may.

BY MS. HOLDERFIELD:

Q.  Okay.  I'm referring to what's been marked as Government's Exhibit 70.

Do you recognize this?

A.  Yes, I do.  This is --

Q.  Let me stop you right there.

Is it a fair and accurate description of the Commerce Control List?

A.  Yes, it is.

MS. HOLDERFIELD:  Your Honor, at this time the Government moves to admit and publish Government's Exhibit 70.

MR. GUTIERREZ:  No objections, Your Honor.

THE COURT:  Government's Exhibit 70, is it?

MS. HOLDERFIELD:  Yes, Your Honor.

THE COURT:  It will be admitted.

BY MS. HOLDERFIELD:

Q.  So this -- this document here, this is part of the Commerce Control List.  Yes?

A.  Yes.

Q.  It's -- I'm going to scroll down a little bit more.

Would you say it's a very technical document?

A.  Yes.

Q.  And the document right here, this is just a snippet of the Commerce Control List?

A.  Yes, that's correct.

Q.  Okay.  So to put it in -- to put it in the simplest terms to explain to the jury, what is the Commerce Control List?

A.  The Commerce Control List --

THE CLERK:  It's not published.

MS. HOLDERFIELD:  Oh.

Permission to publish, Your Honor?

THE COURT:  You may.

BY MS. HOLDERFIELD:

Q.  Okay.  What is -- what's the Commerce Control List?

A.  Okay.  The Commerce Control List is a list of what are considered dual-use commodities; commodities that can have either a military or a civilian application.

The items contained on the list are -- are items and commodities that the Government has specifically chose to control with regards to export from the United States.

Bachhuber  - Direct by Ms. Holderfield

Q.  Who maintains the Commerce Control List?

A.  The U.S. Department of Commerce, ultimately.

Q.  Does "control" simply mean regulated?

A.  Yes.

Q.  Okay.  Are firearms listed under the Commerce Control List?

A.  They are.

Q.  How are firearms clarified under the Commerce Control List?

A.  They're classified as non-automatic and semiautomatic firearms, is what -- which includes pistols, carbines, revolvers, that sort of thing.

Basically, I describe it as the firearms that you would commonly encounter at a gun shop or sporting goods store.

Q.  What criteria are considered when determining the classification of firearms under the Commerce Control List?

A.  It's -- for firearms, it's broken into two categories.  The first one being calibers, up to and including .50 caliber.  And then the second designation for firearms, which is above .50 caliber to .72 caliber.

Q.  How does the classification of firearms under the Commerce Control List impact their exportation from the United States?

A.  Well, their classification -- well, their classification, again relative to non-automatic and semiautomatic arms, they're controlled for several reasons.

The first being national security, and the second one being firearms convention, and the third one being regional

stability.

These are basically just -- just different -- different categories of control that apply relative to this case, for the exportation of firearms from the United States to Mexico.

Q.  Are licenses required to export firearms and ammunition to Mexico?

A.  To permanently export firearms and ammunition to Mexico, a license is required.

Q.  Are there any exceptions for firearms to Mexico?

A.  There's -- there's an exception for temporary export.  A U.S. citizen or a lawful permanent resident can temporarily export up to three firearms and a thousand rounds of ammunition.

There's multiple conditions that need to be met.  But ultimately, the firearm and any unused ammunition must be returned to the United States.  The firearms and ammunition can't be permanently exported under the exception.

Q.  Are you familiar with the licensing determinations made in this case?

A.  I am.

Q.  Were you asked to make several licensing determinations periodically during this investigation?

A.  Yes.

Q.  I'm referring to Government's Exhibit 7D.

Do you recognize this?

A.  I do.

Q.  Is it a fair and accurate licensing determination issued by the Bureau of Industry and Security?

A.  It is.

Q.  I'm also referring to Government's Exhibit 7E.

Do you recognize this?

A.  I do.

Q.  Is this another fair and accurate licensing determination from the Bureau of Industry and Security?

A.  It is.

Q.  I'm referring to Government's Exhibit 7G.

Do you recognize this?

A.  Yes, I do.

Q.  Is this a fair and accurate licensing determination from the Bureau of Industry and Security?

A.  It is.

Q.  And also referring to Government's Exhibit 7H.

Do you recognize this?

A.  I do.

Q.  Is this a fair and accurate licensing determination issued by the Bureau of Industry and Security?

A.  Yes.

Q.  I'm also referring to Government's Exhibit 7J.

Do you recognize this?

A.   Yes.

Q.   Is this a fair and accurate licensing determination from the Bureau of Industry and Security?

A.   It is.

MS. HOLDERFIELD:  Your Honor, at this time the Government moves to admit Government's Exhibits 7D, 7E, 7G, 7H, 7I, and 7J.

MR. GUTIERREZ:  Your Honor, I didn't hear the foundation laid for 7I.  I apologize if it did happen.

But I don't object to 7D, 7E, 7H, and 7J.

MS. HOLDERFIELD:  I apologize, Your Honor.  I can refer to 7I as well.

THE COURT:  Go ahead.

BY MS. HOLDERFIELD:

Q.   Do you recognize this?

A.   I do.

Q.   Is this a fair and accurate licensing determination from the Bureau of Industry and Security?

A.   It is.

MS. HOLDERFIELD:  Your Honor, at this time the Government moves to admit 7I as well.

MR. GUTIERREZ:  No objection.

MS. HOLDERFIELD:  Your Honor, permission to publish these exhibits?

THE COURT:  Wait.  I haven't admitted them yet.

MS. HOLDERFIELD:  Oh, I apologize.

THE COURT:  You're moving for 7F?

MS. HOLDERFIELD:  No, sir.  We're not offering 7F at this time.

THE COURT:  Government's Exhibits 7D, 7E, 7G, 7H -- and is there another one?

MS. HOLDERFIELD:  Yes, Your Honor.  There's 7J.

THE COURT:  7I, 7J --

MS. HOLDERFIELD:  Yes, Your Honor.

THE COURT:  -- will all be admitted.

BY MS. HOLDERFIELD:

Q.  Agent Bachhuber, were you asked to make a determination on March 31st of 2023?

A.  Yes.

Q.  What firearms information did you review to make your licensing determination?

A.  On that date I reviewed -- I received a description based on a sales receipt reflecting the sale of a Luth-AR, complete AR-15 upper receiver assembly, as well as an AR-15 stock.

Q.  Do you have any other information about these firearm parts from that day?

A.  Yes.  From that day, the -- the parts in question are encountered by CBP officers at a port of entry here in El Paso.

I was also -- and additional information to that, too, as -- again, as I mentioned, the sales receipt.  I was also

privy to that afterward.

Q.   Do you know where the firearm -- where the firearm parts came from?  Who they came from?

A.   Yes.

Q.   Who was that?

A.   It was Saul Quezada-Orozco.

Q.   Okay.  And when you received the information about this upper receiver -- I'm also referring to Government's Exhibit 7E, that's been published.

7D, 7E.

BY MS. HOLDERFIELD:

Q.   Okay.  So you reviewed Government's -- you reviewed an upper receiver assembly?

A.   Correct.

Q.   And an AR-15 stock.  Those were the two parts that you reviewed on March 31st?

A.   Correct.

Q.   When you reviewed these parts, did you make a determination regarding their licensing?

A.   I did.

Q.   What information did you put together about the firearm parts?

A.   With regards to the firearm parts, with regards to the upper receiver assembly, after reviewing the specifications and the Commerce Control List, it appeared to be classified as a

0A501.c, is the way we would classify it.  The stock was 0A501.y.1.

Q.  Go ahead, if you have more information.

A.  No, I have no more information.

Q.  Okay.  All right.

Did these two parts, the upper receiver and the AR-15 stock, did they require a license to be exported to Mexico?

A.  No, they did not.

Q.  Okay.  I'm referring to what's been admitted as Government's Exhibit 7G.

And you were also asked to periodically review other firearms throughout this investigation?

A.  That's correct.

Q.  Can you tell the jury the firearm in this licensing determination?

A.  The firearm in this determination is a Walther PPQ-M2 9mm pistol.

Q.  Is that -- what kind of firearm is that?

A.  That's a semiautomatic.

Q.  Okay.  And based on the information you received about this semiautomatic 9mm pistol, did it require a license to be exported to Mexico?

A.  Yes.  For permanent exportation, yes.

Q.  And referring to what's been admitted as Government's Exhibit 7H, did you review the firearm in this -- in this

licensing determination?

A.  I did.

Q.  What firearm is that?

A.  This is a BERSA.  The model number is TPR9.  It's also a 9mm semiautomatic pistol.

Q.  Does this firearm require an export -- a license to export to Mexico?

A.  Yes, for permanent exportation.

Q.  And referring to what's been admitted as Government's Exhibit 7J.

Did you review the firearms for this licensing determination?

A.  I did.

Q.  Can you tell the jury what firearms are for this determination?

A.  For this -- for this determination, there's several.  The Zastava M70AB2.  It's an AK-47-type firearm.

There was an RPG Arms M70AB2, again an AK-47-type firearm.

The Poly Technologies manufacturer, it's an AKS-762.  Again, an AK-47-type firearm.

The last AK-47-type firearm was a Magua Industries AKMS, also 7.62x39, similar to the other AK-9s.

And the final was a Barrett, M82A1, which is a semiautomatic .50 caliber rifle.

Q.   Now, do you know where these firearms -- the information you received about them?

A.   Yes.  I received the list of firearms from the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

Q.   Did you know anything about these firearms when you received that Information?

A.   I was -- I was aware that they were involved in an operation that -- excuse me.

     They were involved in an undercover operation and -- but -- and that -- I believe I was also provided with Mr. Hernandez and Mr. Ramos's -- or excuse me -- yeah, Ramos's names.

Q.   Okay.  But you had no other further details?

A.   No.

Q.   Okay.  Are these firearms -- do three firearms require a license to export them to Mexico?

A.   Yes.

Q.   And referring to what's been admitted into evidence as Government's Exhibit 7I, did you also review the firearm in this licensing determination?

A.   Yes.

Q.   What is it?

A.   It is a Charter Arms Model Undercover.  It's a .38 Special Revolver.

Q.   What kind of firearm is that?

A.   It's a pistol, a revolver.

Q.   Does this firearm require a license to export to Mexico?

A.   Yes.

Q.   Okay.  So after reviewing all the firearms in this case, or that you were asked to investigate, are these firearms listed under the Commerce Control List?

A.   Yes, they are.

Q.   Is there any exception that would allow someone without an export license to smuggle or permanently export firearms from the United States to Mexico?

A.   No.

Q.   In your opinion, based on your expertise, because these firearms are listed under the Commerce Control List, do the firearms reviewed require a license to export them?

A.   Yes, they do.

Q.   I'm now referring to Government's Exhibit 7K.

        Do you recognize this?

A.   I do.

Q.   Is this a fair and accurate licensing history request from the Bureau of Industry and Security?

A.   It is.

Q.   I'm also referring to Government's Exhibit 7L.

        Do you recognize this?

A.   Yes, I do.

Q.   Is this -- is this a fair and accurate description of a

licensing history request?

A.   Yes, it is.

        MS. HOLDERFIELD:  Your Honor, the Government moves to admit into evidence Government's Exhibit 7K and 7L.

        MR. GUTIERREZ:  No objection.

        MS. HOLDERFIELD:  Your Honor, may --

        THE COURT:  7K and 7L will be admitted.

        You may publish.

        MS. HOLDERFIELD:  I'm sorry, Your Honor.

        Permission to publish to the jury?

        THE COURT:  Yes, you may publish.

BY MS. HOLDERFIELD:

Q.   Okay.  Agent Bachhuber, can you explain to the jury what this document is?

A.   This document is provided by the Bureau of Industry and Security to HSI.  It basically states that they queried their records going back to October of 2012, and in this case were not able to find any license history for the individual named Pablo Delgado.

Q.   Okay.  Did you -- did you conduct an initial inquiry on several people associated in this case?

A.   I conducted initial queries on two individuals in this case.

Q.   Okay.  Do you remember who?

A.   Mr. Hernandez and Mr. Ramos.

Q.   Okay.  Do you remember conducting a licensing history check on Pablo Delgado?

A.   Yes.  Not a preliminary.  Just -- just a request that I submitted to the Bureau of Industry and Security.

Q.   So is there a difference between a preliminary inquiry and a full inquiry?

A.   The -- the preliminary -- when I refer to a preliminary inquiry, it is I'll query databases here in El Paso, query law enforcement databases to look and see if there's any -- if I can find any evidence of license history for an individual, or if they've been a party to other shipment -- other exports that require a license.

Q.   Did you run a -- so just to go back.

Did you run an inquiry on Pablo Delgado?

A.   Not -- no, I did not.  Not in his case, no.

Q.   Okay.  Did you -- you ran a licensing history check on Rene Hernandez Cordero?

A.   Correct.

Q.   Did you run a licensing history check on Jesús Gerardo-Ramos?

A.   I did.

Q.   Did you run a licensing history check on Maria del Rosario Navarro-Sanchez?

A.   Not -- not queries that I conducted myself.  I just submitted the request to the Bureau of Industry and Security

for those two -- for Navarro-Sanchez and for Mr. Muñoz.

Q.  When you sent those -- if you don't conduct a preliminary query on your own, you submit them to the Bureau of Industry and Security, do they conduct their own checks on certain people?

A.  Yes, they do.

Q.  Do they return anything back to you?

A.  Yes.  The documents that we're reviewing now are the documents that they provide to us.

Q.  So it confirms, then, that they don't have a licensing history -- or a license to export?

A.  That's correct.

Q.  Okay.  Did you conduct a licensing history on Saul Quezada?

A.  I did not conduct an initial local query.  No, that's correct.  I did not -- I did not conduct an initial query on Mr. Quezada.

Q.  Did you conduct any query on Mr. Quezada?

A.  Again, just the submission to the Bureau of Industry and Security.

Q.  And -- go ahead.

A.  Oh, okay.  And this was the document -- the document on display is what they provided back.

Q.  All right.  So when you received this document back, did Saul Quezada, whose name has been blacked out, did he have a license to export to Mexico?

A.   No, he did not.

Q.   Okay.  So in your -- in your opinion, based on your expertise as an export licensing expert, did any of these people mentioned have a license or authority to export firearms from the United States to Mexico?

A.   No, they did not.

MS. HOLDERFIELD:  Pass the witness Your Honor.

THE COURT:  You may proceed, Mr. Gutierrez.

MR. GUTIERREZ:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.   Do I call you agent, or what do you prefer to be called?

A.   That's fine, sir.  Thank you.

Q.   Okay.  Agent, were you -- did you physically see all these weapons that you did these inquiries on?

A.   I did not.

Q.   Okay.  So you would not know if these weapons were actually a hundred percent completed?

A.   No, I couldn't say that for certainty.  No.

Q.   If they were missing a firing pin you would not know?

A.   No, sir.

Q.   You basically just did a search of this type of weapon, if you need a license or not?

A.   That's correct.

Q.   Okay.  Now, it's my understanding that you can also request

permission to export through the State Department; is that correct?

A.   With regard to certain firearms, those being fully automatic -- and again, once we get more into the military side of the house, some of the larger calibers, basically firearms that will be common in the military, would be regulated by the State Department.

Q.   Right.  So that's the possibility, that you can actually request the type of license or permission through the state of -- State Department?

A.   Yes, relative to the firearms that they will receive.

Q.   Okay.  And when you did these searches, were you able to conduct one through the State Department as well?

A.   I did not in this case, no.

         MR. GUTIERREZ:  Pass the witness, Your Honor.

         MS. HOLDERFIELD:  No further questions, Your Honor.

         THE COURT:  You may be excused, sir.

         THE WITNESS:  Thank you.

         THE COURT:  Call your next witness.

         MS. HOLDERFIELD:  Your Honor, at this time the Government calls Casey Thompson to the stand.

    (Witness duly sworn.)

         THE WITNESS:  I do.

         THE CLERK:  You may lower your hand.

         Please have a seat.

CASEY THOMPSON, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. HOLDERFIELD:

Q.   Good afternoon, sir.

       Would you please state and spell your name for the record?

A.   Casey Thompson.  C-A-S-E-Y, T-H-O-M-P-S-O-N.

Q.   What do you do for a living?

A.   I'm a special agent with the Drug Enforcement Administration.

Q.   How long have you been doing that?

A.   I've been employed with the DEA since March of 2022.

Q.   And what is your -- what's your current assignment?

A.   I am a special agent involved in the OCDETF Strike Force.

Q.   What is OCDETF Strike Force?

A.   It's the Organized Crime and Drug Enforcement Task Force, which involves different agencies to combat narcotics trafficking here in El Paso.

Q.   Did you receive specialized training to become a DEA agent?

A.   I did.

Q.   What is that training?

A.   17 weeks at the DEA academy in Quantico, Virginia.

Q.   How long have you been in law enforcement?

A.   Just since March of 2022.

Q.   Did you do anything before becoming a DEA agent?

A.   Yes, ma'am.  I was in the military.

Q.   What branch?

A.   The United States Marine Corps.

Q.   And how long were you in the Marine Corps?

A.   I did four years active.

Q.   Okay.  Do you remember March 30th of 2023?

A.   I do.

Q.   Were you on duty?

A.   Yes, ma'am.

Q.   What was your assignment that day?

A.   I was tasked to help the FBI to conduct a buy/walk operation.

Q.   And to remind the jury, what is a buy/walk?

A.   A buy/walk is where law enforcement utilizes a confidential source or an undercover agent to conduct a controlled buy of drugs from a target of their investigation, at which point no arrest is made, in order to further the investigation.

Q.   Did you know -- did you know anything about the buy/walk? Did you have any information about it?

A.   Just the location and the -- very few things of it, of the deal.

Q.   Okay.  At the time, did you know who you -- who were -- who you were surveilling?

A.   No, ma'am.

Q.   Did you later learn who that target was?

A.   Yes, ma'am.

Q.   And who was that?

A.   Brian Muñoz.

Q.   Okay.  For the buy/walk, where were you told to go?

A.   We were going to go to the parking lot in the Gold's parking lot, on the corner of McRae and Woodbridge [sic], I believe.

Q.   Is that on the east side of El Paso?

A.   Yes, ma'am.

Q.   I'm referring to what's already been admitted as Government's Exhibit 3B.

        MS. HOLDERFIELD:  Permission to publish, Your Honor?

        THE COURT:  You may publish.

BY MS. HOLDERFIELD:

Q.   Okay.  So you were off on the Gateway, McRae, and Wedgewood?

A.   Yes, ma'am.

Q.   Does this map accurately depict that?

A.   Yes, it does.

Q.   Okay.  Where did you park?  Where were you?  Where were you stationed on this map?

A.   I was at the south end, where the Walgreens there is, to the right.  The concrete kind of like changes colors there, and I was parked on the darker side, to the south side there.

Q.   This area, more or less (indicating)?

A.  Yes, ma'am.  That's correct.

Q.  Now, is this -- this is in El Paso, Texas?

A.  Yes.

Q.  In the Western District of Texas?

A.  Yes, ma'am, it is.

Q.  Okay.  I'm referring to what's been marked and admitted -- no, sorry.

    I'm referring to Government's Exhibit 3L.

    Do you recognize this?

A.  Yes, ma'am, I do.  I took that photo.

Q.  Okay.  Is this a fair and accurate photo of what you saw that day?

A.  Yes, ma'am.

Q.  I'm referring to Government's Exhibit 3M.

    Do you recognize this?

A.  Yes, ma'am.  I also took that photo.

Q.  Is this a fair and accurate picture of what -- that you took that day?

A.  Yes, ma'am, it is.

Q.  Okay.  I'm referring to Government's Exhibit 3N.  Do you recognize this?

A.  Yes, ma'am, I do.

Q.  Okay.  Is this a fair and accurate photograph of what you took that day?

A.  Yes, ma'am.

Q.   I'm referring to Government's Exhibit 3O.

Do you recognize this?

A.   Yes, ma'am.   I also took that photo.

Q.   Okay.   And do you -- I'm referring to Government's Exhibit 3J.

Do you recognize this as well?

A.   Yes, ma'am, I do.

Q.   Okay.   Did you take this photo?

A.   Yes.

Q.   Okay.

MS. HOLDERFIELD:   Your Honor, the Government moves to admit Government's Exhibits 3L, 3M, 3N, 3O, and 3J.

MR. GUTIERREZ:   No objections, Your Honor.

THE COURT:   Government's Exhibits 3L, 3M, 3N, 3O, and 3J will be admitted.

MS. HOLDERFIELD:   Your Honor, permission to publish these exhibits?

THE COURT:   You may publish.

BY MS. HOLDERFIELD:

Q.   Okay.   I'm referring to Government's Exhibit 3J.

Can you tell us the jury what this photograph is?

A.   That is the vehicle the confidential source was driving that day.

Q.   Which one?

A.   The black sedan in front of that Toyota.

Q.   This one right here (indicating)?

A.   Yes, ma'am.

Q.   Okay.  Can you tell the jury what's happening in this photo?

A.   Yes, ma'am.  That is Brian Muñoz approaching the driver's side door of the black sedan and talking to the confidential source.

Q.   What about 3M?

A.   That is Brian Muñoz leaving the vehicle with the Jimmy John's bag, which we knew before the operation that was going to contain the money for the exchange.

Q.   Okay.  And Government's Exhibit 3N?

A.   So this photo is actually directly after the first photo, where he's meeting with the confidential source.

He met with them.  The confidential source gave him that Jimmy John's bag, which you can see there in his right arm, and then he entered the backseat of that vehicle.

Q.   You said he got into the backseat?

A.   Yes, ma'am.

Q.   Okay.  Referring to Government's Exhibit 3O.

Now, what is this picture of?

A.   So that is the very first photo I took of Brian Muñoz entering on scene, in my view of the vehicle.  He's carrying that black trash bag, and that's when he approached that driver's side door.

Q.  Did you know what was in the trash bag?

A.  Not at the time, no.

Q.  Did you later learn what was in it?

A.  Yes.

Q.  Did Brian Muñoz-Castro get into his car?

A.  In whose car?

Q.  Get into his car.  After this -- after you saw -- after you see him take the bag, do you see him go into his car?

A.  Into the source's car?

Q.  No, into his own car.

A.  After he leaves the source's --

Q.  Yes.

A.  Yes.

Q.  Okay.  Did you follow them after that?

A.  I was part of the surveillance that followed him, yes.

Q.  Where did you go?

A.  I believe -- I know he arrived at the address on Paraguay.

Q.  Okay.  Did you -- did anything happen at the Paraguay house -- Paraguay address -- on that day?

A.  I believe he entered the residence.  But I was not directly where I could see him enter in that residence.

Q.  Were you involved in any other portion of this investigation?

A.  No, ma'am.

        MS. HOLDERFIELD:  Pass the witness, Your Honor.

THE COURT:  Mr. Gutierrez?

MR. GUTIERREZ:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.  Sir, on March 30th, 2023, when this all event happened, did you have any knowledge of the defendant Rene Hernandez Cordero that day?

A.  No, sir.

MR. GUTIERREZ:  Pass the witness, Your Honor.

THE COURT:  Very well.

You may be excused, sir.

It's kind of late to call another witness, so we're going to get out a little bit early.

Ladies and gentlemen of the jury, I want you to remember all the instructions I gave you.  And please, please abide by all of them.

And be here promptly at 9:00.  We intend to get started promptly at 9:00 tomorrow.

We'll be in recess until 9:00 tomorrow morning.

(Outside the presence of the jury; open court.)

THE COURT:  Counsel, I'm -- I've got docket call scheduled for 10:30 tomorrow morning.

Now, I'm going to keep it.  It's not very long.  So right up close to that, I'm going to take a recess.  You can leave everything where you have it.  We'll make sure nobody

touches anything.  But I'll take a recess to have the docket call at 10:30.

And where is the stipulation that was corrected, Anna? Do you have it?

LAW CLERK:  Where is it?  It's in the binder.  I can pull it up for you.

THE COURT:  Okay.  The one in the Government's binder is not the one that's corrected.

LAW CLERK:  They made the corrections -- yeah, with the dates.

THE COURT:  Okay.

LAW CLERK:  Yes, it's right here.  And all three initialed.

THE COURT:  It's marked as 7N, I think.  So when you get ready, I'll go ahead and give it to you and you can read it.

MR. GUTIERREZ:  I didn't understand you, Judge.  I'm sorry?

THE COURT:  I'm sorry?

MR. GUTIERREZ:  I did not understand what you just said.

THE COURT:  I didn't have the stipulation that you all corrected --

MR. GUTIERREZ:  Yes.

THE COURT:  -- in the Government's witness exhibit

book, so I wanted to be sure we had it so it can be read.

MR. GUTIERREZ:  Yes, sir.

THE COURT:  Okay.  So we'll be in recess until 9:00 tomorrow morning.

MR. GUTIERREZ:  Thank you, Your Honor.

(Proceedings continued in Volume 4).

I N D E X

GOVERNMENT'S EVIDENCE

WITNESSES:

GUS BENAVIDES:

  Cross-Examination (Continued)by Mr. Gutierrez ..............2
  Redirect Examination by Mr. Myers ..........................8


MARTHA ZAYAS:

  Direct Examination by Mr. Myers  .........................11
  Cross-Examination by Mr. Gutierrez .......................108
  Redirect Examination by Mr. Myers .......................121
  Recross-Examination by Mr. Gutierrez .....................131


MICHAEL JANOWSKI:

  Direct Examination by Mr. Myers  .........................133
  Cross-Examination by Mr. Gutierrez .......................199
  Redirect Examination by Mr. Myers .......................207
  Recross-Examination by Mr. Gutierrez .....................212


CHARLES BACHHUBER:

  Direct Examination by Ms. Holderfield ....................213
  Cross-Examination by Mr. Gutierrez .......................233


CASEY THOMPSON:

  Direct Examination by Ms. Holderfield ....................235
  Cross-Examination by Mr. Gutierrez .......................242


Jury Excused for the day ...................................242

GOVERNMENT'S EXHIBITS

| NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| 1B | Photograph of Pablo Delgado | 14 |
| 1C | Photograph of Brian Alexis Muñoz-Castro | 31 |
| 1D | Photograph of Rosario Navarro-Sanchez aka Chayo | 135 |
| 1G | Photograph of S.Q. | 152 |
| 2A | Muñoz in Hernandez Phone | 39 |
| 2B | Subscriber Information of #3376 | 39 |
| 2C | Call Records for Phone #3376 | 39 |
| 2D | Subscriber Information for Phone #9927 | 39 |
| 2E | Call Records for Phone #9927 | 39 |
| 2F | Records for Phone #1820 | 39 |
| 2G | Executed Search Warrant Device 1 | 36 |
| 2H | Executed Search Warrant Device | 36 |
| 2I | Device 2 Properties (Ramos) | 39 |
| 2J | SRA Hardy Contacts in Hernandez Phone | 40 |
| 3A | Chain of Custody 1B1, 1B2, and 1B3 | 211 |
| 3B | Map of Drug Buy | 141 |
| 3C | Photograph of Money in Bag | 142 |
| 3D | Photograph of Money Provided by FBI | 142 |
| 3E | Photograph of Outside of Bag | 142 |
| 3F | Photograph of Black Trash Bag | 148 |
| 3G | Photograph of Bundles on a Scale | 148 |
| 3H | Photograph of Bundles Removed from Trash Bag | 148 |

GOVERNMENT'S EXHIBITS

| NO. | DESCRIPTION | ADMITTED |
|-----|-------------|----------|
| 3J | CHS Vehicle | 239 |
| 3L | Photograph of Muñoz-Castro at door of CHS vehicle | 239 |
| 3M | Photograph of Muñoz-Castro Leaving CHS vehicle | 239 |
| 3N | Photograph of Muñoz-Castro  with Bag | 239 |
| 3O | Photograph of Muñoz-Castro with Trash Bag | 239 |
| 4P | Photograph of Muñoz-Castro Vehicle | 156 |
| 4Q | Photograph of Marijuana in Muñoz-Castro's Vehicle | 156 |
| 4R | Photograph of Gun Boxes in Muñoz-Castro's Vehicle | 156 |
| 4S | Photograph of Gun Box in Muñoz-Castro's Vehicle | 157 |
| 4T | Photograph of Barcelona Address Search 1 | 157 |
| 4U | Photograph of Barcelona Address Search 2 | 157 |
| 4V | Photograph of Barcelona Address Search 3 | 158 |
| 4W | Photograph of Barcelona Address Search 4 | 158 |
| 4X | Photograph of Barcelona Address Search 5 | 159 |
| 4Y | Photograph of Barcelona Address Search 6 | 159 |
| 4Z | Photograph of Barcelona Address Search 7 | 159 |

GOVERNMENT'S EXHIBITS

| NO. | DESCRIPTION | ADMITTED |
|-----|-------------|----------|
| 4AA | Photograph of Barcelona Address Search 8 | 160 |
| 4AB | Photograph of Barcelona Address Search 9 | 160 |
| 4AC | Photograph of Barcelona Address Search 10 | 160 |
| 4AD | Photograph of Barcelona Address Search 11 | 161 |
| 4AE | Photograph of Barcelona Address Search 12 | 161 |
| 4AF | Photograph of Barcelona Address Search 13 | 162 |
| 4AG | Photograph of Barcelona Address Search 14 | 162 |
| 4AH | Photograph of Barcelona Address Search 15 | 162 |
| 4AI | Photograph of Barcelona Address Search 16 | 163 |
| 4AJ | Photograph of Barcelona Address Search 17 | 163 |
| 4AK | Photograph Evidence Submission 1 | 173 |
| 4AL | Photograph Evidence Submission 2 | 173 |
| 4AM | Photograph Evidence Submission 3 | 173 |
| 4AN | Photograph Evidence Submission 4 | 174 |
| 4AO | Ledger | 174 |
| 7D | E107736 License Determination | 224 |
| 7E | E107737 License Determination | 224 |
| 7G | E1078124 License Determination | 224 |

| | GOVERNMENT'S EXHIBITS | |
|---|---|---|
| NO. | DESCRIPTION | ADMITTED |
| 7H | E1078131 License Determination | 224 |
| 7I | E1078193 License Determination | 224 |
| 7J | E1078668 License Determination | 224 |
| 7K | Non-Existence Record Search | 230 |
| 7L | Non-Existence Record Search S.Q. | 230 |
| 7O | Commerce Control List Excerpt | 218 |
| 9A | Hernandez and Rural Ramos Conversation | 47 |
| 9B | Pages from Phone #1820 Call Logs | 47 |
| 9C | Jesús Ramos Crossing History | 47 |
| 9D | Translation of 9A | 47 |
| 9E | Hernandez and #3362 Conversation | 47 |
| 9F | Translation of 9E | 47 |
| 10A | Hernandez and Rural Ramos Conversation | 70 |
| 10B | Pages from Phone #1820 Call Logs | 70 |
| 10C | Jesús Ramos Crossing History | 70 |
| 10D | Translation of 10A | 70 |
| 10E | Hernandez and #3362 Conversation | 70 |
| 10F | Translation of 10E | 70 |
| 11A | Hernandez and Rural Ramos Conversation | 83 |
| 11B | Pages from Phone #1820 Call Logs | 83 |
| 11C | Jesús Ramos Crossing History | 83 |
| 11D | Translation of 11A | 83 |
| 11E | Hernandez and #3362 Conversation | 83 |

GOVERNMENT'S EXHIBITS

| NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| 11F | Translation of 11E | 83 |
| 12A | Photograph El Dorado 1 | 24 |
| 12B | Photograph El Dorado 2 | 24 |
| 12C | Photograph El Dorado 3 | 24 |
| 12D | Photograph El Dorado 4 | 24 |
| 12E | Video El Dorado | 24 |
| 12G | Muñoz-Castro Messages with #2457 | 98 |
| 12H | Translation of 12G | 98 |
| 12I | Hernandez Messages with 2457 | 123 |
| 13C | Hernandez and Señora Hardy 22 Conversation | 100 |
| 13G | Translation of 13C | 100 |
| 15A | Hernandez and Señora  Hardy 22 April 20 | 107 |
| 15B | Translation of 15A | 107 |
| 15C | Hernandez and Rural Ramos April 20 | 107 |
| 15D | Translation of 15C | 107 |
| 15E | Hernandez and Señora Hardy 22 April 26 to Muñoz | 107 |
| 15F | Translation of 15E | 107 |
| 15G | Hernandez conversations with Meny Gel | 107 |
| 15H | Translation of 15G | 107 |
| 15J | Translation of 15I | 107 |
| 16C | Photographs from Search of Delgado Residence | 183 |

DEFENDANT'S EXHIBITS

| NO. | DESCRIPTION | ADMITTED |
|-----|-------------|----------|
| 1 | Videotape | 3 |