UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

UNITED STATES OF AMERICA       )   No. EP-23-CR-1842-DB
                               )
vs.                            )   El Paso, Texas
                               )
RENE HERNANDEZ CORDERO (3)     )   May 3, 2024

VOLUME 4 OF 6 VOLUMES

JURY TRIAL

BEFORE THE HONORABLE DAVID BRIONES

UNITED STATES DISTRICT JUDGE, and a jury.

A P P E A R A N C E S:

FOR THE GOVERNMENT:    MR. KYLE MYERS &
                       MS. SHANNON HOLDERFIELD
                       Assistant United States Attorneys
                       700 E. San Antonio, Suite 200
                       El Paso, Texas  79901


FOR THE DEFENDANT:     MR. RAY GUTIERREZ
                       Attorney at Law
                       11623 James Grant Drive
                       El Paso, Texas  79936




    Proceedings reported by stenotype.  Transcript produced by
computer-aided transcription.

(Esperanza Gallegos and Barbara Espinosa sworn to interpret Spanish into English.)

(Defendant present; open court.)

THE COURT:  Welcome back, members of the jury.  I hope you complied with all the instructions that I gave you earlier.

Are you ready to proceed, Mr. Myers?

MR. MYERS:  Yes, Your Honor.

THE COURT:  Call your next witness.

MS. HOLDERFIELD:  Your Honor, the Government calls Joshua Worthy to the stand.

(Witness duly sworn.)

THE WITNESS:  I do.

THE CLERK:  You may lower your hand.

Please have a seat.

JOSHUA WORTHY, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. HOLDERFIELD:

Q.  Good morning.

Will you please state your name for the record and spell your last name?

A.  Joshua Worthy.  Last name, W-O-R-T-H-Y.

Q.  What do you do for a living?

A.  I'm a special agent with the FBI.

Q.  How long have you been a special agent?

A.  Five years and a couple of months.

Q. What's your current assignment?

A. A special agent on the Organized Crime Drug Enforcement Task Force.

Q. Did you receive training to become a special agent?

A. I did.

Q. Can you explain to the jury what your training entailed?

A. It's approximately 21 to 22 weeks in Quantico, Virginia, where we go over investigations, evidence collection, defensive tactics, close quarters combatives, and other investigative, like, techniques.

Q. Are you part of a special team within the FBI?

A. I am.

Q. What is that?

A. I'm on a Special Weapons and Tactics Team located here in El Paso, so the SWAT team.

Q. What training do you receive to become part of the SWAT team?

A. Outside of training on a regular basis, we go to a three-week -- a little extension of investigative detainments, arrests, search warrants, arrest warrants, being able to use specialized weapons to take -- to take subjects that are barricaded.

Q. How long have you been in law enforcement?

A. Since 2011.

Q. So 13 years?

A.   Yes, ma'am.

Q.   And what did you do before becoming an FBI special agent?

A.   I worked for the Central Intelligence Agency.

Q.   Do you remember March 30th of 2023?

A.   I do.

Q.   Okay.  Were you on duty that day?

A.   I was.

Q.   What was your assignment?

A.   I was assigned surveillance.

Q.   Surveillance for what?

A.   Surveillance for a controlled purchase or buy/walk operation.

Q.   Would you tell the jury what a buy/walk is?

A.   A buy/walk is when we control the finances and we purchase narcotics to enhance our investigations.

Q.   And what was your specific duty and assignment for that buy/walk?

A.   I was a takeaway vehicle on surveillance.  A takeaway vehicle would be a vehicle that's not actually looking at the operation.  But if someone was to give out a description of a vehicle, I try to observe that vehicle as it leaves the area.

Q.   What did you know about the buy/walk that day?

A.   The case agent briefs us all on our specific roles.  Our role at this point was -- or my role, excuse me, at this point -- was to observe any vehicles coming in the area that

matched the description that's given out on surveillance.

Q.   Did you know who you -- who you were surveilling that day?

A.   I did not.

Q.   Did you later learn who -- what the target was of that buy/walk?

A.   Afterwards, yes.

Q.   And who was that?

A.   It was a gentleman named Brian.

Q.   And for this buy/walk, where were you told to go?

A.    I was told to go to the east side of El Paso by Gold's Gym. I believe the street is -- I couldn't tell you the street name right now, ma'am.

Q.   Okay.  I'm referring to what's been marked as Government's Exhibit 4D.

        Can you see it?

A.   Oh, yes.  Now, I can.

Q.   Do you recognize it?

A.   Yes.

Q.   Is this a fair and accurate map of where you were on March 30th, 2023?

A.   It is.

        MS. HOLDERFIELD:  Your Honor, the Government moves to admit Government's Exhibit 4D into evidence.

        MR. GUTIERREZ:  No objections.

        THE COURT:  4D, was it?

MS. HOLDERFIELD:  Yes, Your Honor.

THE COURT:  Government's Exhibit 4D will be admitted.

MS. HOLDERFIELD:  And, Your Honor, permission to publish?

THE COURT:  You may publish.

BY MS. HOLDERFIELD:

Q.  Okay.  So on this map, where were you specifically told to go?

A.  I was told to get the south side takeaway, which would be south of the target location, Dutch Bros and Brake Masters, in between that area.

Q.  And this is off of McRae and Wedgewood?

A.  That is correct.

Q.  Okay.  And you said you were located down near the Dutch Bros coffee and Brake Masters?

A.  Correct.

Q.  Is this more or less the area?

A.  Yes.

Q.  Okay.  And this is in El Paso, Texas?

A.  It is.

Q.  In the Western District of Texas?

A.  Yes.

Q.  All right.  So when you -- when you arrived to park for the buy/walk, had surveillance already started?

A.  Yes.

Q.   Okay.  Were you alone or were you with someone else during this surveillance?

A.   I was alone in my vehicle.

Q.   And can you tell the jury what you -- what you saw?  Like where -- where is your direction, line of sight?

A.   So my line of sight is kind of working towards the north, looking towards Free Tax Assistance and Gold's Gym.

Q.   Okay.  So you're directly -- you directly see this area right here (indicating)?

A.   Yes, ma'am.

Q.   And as you're sitting there waiting for this buy/walk, what do you -- what happens?

A.   On surveillance we have communication radios that go between each other's cars.  Certain surveillance units are calling out descriptions of vehicles.

        One vehicle in particular did something irregular from what the regular normal driving person would do.  And we kind of keyed on that vehicle and kind of observed that vehicle also.

Q.   What kind of -- what kind of vehicle was this?

A.   It was a brown sedan.

Q.   Okay.  And what was the -- what was the brown sedan doing?

A.   The brown sedan entered Wedgewood and -- where the Walgreens is located.  It circled the Walgreens, as if it was going through, like, the drive-thru or looking for someone.

You kind of look, drive around slowly.

It made a complete circle around and then pulled into the east side location, or east side part of the parking lot where the Black Fridays is, and made its way towards Gold's Gym.

Q.   So the brown sedan is parked right here (indicating)?

A.   Yes.

Q.   Okay.  Did you see the confidential human source?  Did that person drive up to meet the brown sedan?

A.   No, ma'am.

Q.   Okay.  Okay.

Did you see at all what the confidential human source was driving?  Could you see from your angle?

A.   From my angle, no.  I can only tell you what was said on the radio.  Because as the -- the friendly, or the confidential source enters the parking lot, on the radio everyone says --

MR. GUTIERREZ:  Objection, Your Honor.  Hearsay.

THE COURT:  I'm sorry.  Talk into the microphone.

MR. GUTIERREZ:  Objection, Your Honor.  Hearsay.

BY MS. HOLDERFIELD:

Q.   Did you learn about the --

THE COURT:  Let me rule on the objection.

MS. HOLDERFIELD:  I'm sorry, Your Honor.

THE COURT:  I'll sustain the objection.

BY MS. HOLDERFIELD:

Q. Did you -- did you learn about the confidential human source?

A. I did.

Q. Did you see where -- did you see the driver of the brown sedan get out of the vehicle?

A. I did.

Q. And what did you see the driver do?

A. I saw the driver exit the vehicle and start walking towards -- like walking in a parking lot. Not towards the business, but walking in the parking lot.

Q. Okay. What else did you see?

A. At that point my view is obstructed, and I wasn't able to see any interaction. I just saw the subject -- or excuse me -- the individual exit the vehicle, walk -- make contact with another person, and then my view was obstructed.

Q. Did you see the driver of the vehicle, Brian Muñoz-Castro? Was he holding anything in his hands?

A. No, ma'am.

Q. Okay. Did you see any -- did you see a bag get exchanged for another bag?

A. No, ma'am. I was just told by the case agent -- or at the briefing, the case agent showed us a Jimmy John's bag that was going to be in play for the operation.

Q. Okay. Once that -- you don't see -- you just see them

meet?

A.   Yes.

Q.   Okay.  You don't see an exchange?

A.   Correct.

Q.   What happens after that?

A.   Brian goes back to his vehicle and proceeds to exit the location.

Q.   Did you follow Brian Muñoz-Castro?

A.   I did.

Q.   Okay.  Where did you go?

A.   So we started back off on Wedgewood and south on McRae and pretended -- or proceeded to go eastbound onto Gateway Boulevard and getting onto I-10.

Q.   I'm referring to what's been marked as Government's Exhibit 4F.

         Do you recognize this?

A.   I do.

Q.   Is this a fair and accurate representation of the map of the general area that you were in?

A.   Yes.

         MS. HOLDERFIELD:  Your Honor, the Government, at this time, moves to admit Government's Exhibit 4F.

         MR. GUTIERREZ:  No objections.

         THE COURT:  Government's Exhibit 4F will be admitted.

         MS. HOLDERFIELD:  Your Honor, permission to publish

this exhibit?

THE COURT:  You may.

BY MS. HOLDERFIELD:

Q.  Okay.  So you follow Brian Muñoz-Castro and you catch up on I-10?

A.  Correct.

Q.  Okay.  And where else on I-10?

A.  So on I-10 we exit at the Trowbridge exit, down there by where the WestStar Bank is located and I-10, correct.

Q.  So right here (indicating)?

A.  Yes.  And then at this point, there's a line of surveillance units.  I couldn't tell you a number, but anywhere between three to five other additional surveillance units are with us.

We observe the vehicle take a left on Yandell and then another left on Paraguay Court.

Q.  Okay.  So the surveillance team ends up here (indicating)?

A.  Correct.

Q.  Okay.  Where did you park?

A.  So I -- because there was a lot of units, we don't try to flood the area with a lot of undercover or plain vehicles.

I proceeded to go Yandell and Paraguay Court on the second entrance, so the one to the west.  And I parked in the apex of the curve.

Q.  Did you see anything when you parked around the Paraguay

Street?

A.   I just saw the brown vehicle that we had been following.

Q.   Okay.  Did anything else happen on March 30th, 2023?

A.   Not that I was involved in.  No, ma'am.

Q.   Okay.  Do you remember March 31st of 2023?

A.   I do.

Q.   And were you on duty?

A.   I was.

Q.   And what was your assignment for that day?

A.   The case agent reached out to us and said that there was a vehicle that he potentially identified and wanted us --

MR. GUTIERREZ:  Objection, Your Honor.  Hearsay.

THE COURT:  Overruled.

BY MS. HOLDERFIELD:

Q.   You can continue.

A.   He wanted us to go to the port of entry for surveillance.

Q.   And what did you know about that surveillance?

A.   That we were looking for a blue vehicle.

Q.   Did you know anything else about the blue vehicle?

A.   Just the blue vehicle that was -- he gave us a description of a plate and then a description of the vehicle.  I just know it was blue at the time.  And we were supposed to locate it at the port of entry.

Q.   Okay.  And what did you do?

A.   So while -- we were approximately out for about 20 minutes

or so, and I was unable to locate it.  The case agent then got on the radio, since we were all out, and told us to make our way towards Paraguay Court to see if we observed the vehicle over there.

Q.  Okay.  The same address from the previous day?

A.  Correct.

Q.  Okay.  And did you go to the Paraguay address?

A.  I did.

Q.  Did you see anything happening at the Paraguay address?

A.  No, ma'am.  Not at the Paraguay address.

Q.  Okay.  And then what happened?

A.  I was on the phone with Special Agent Michael Janowski and Special Agent Patrick Doolin, and said, I'm going to stay in the area and just try to see if I locate it.

Q.  You said that?

A.  Yes.

Q.  Okay.  And then -- so -- so agents are looking for the blue vehicle?

A.  Correct.

Q.  They couldn't find it at this time?

A.  Correct.

Q.  Okay.  And what were you -- what were you thinking at that point?

A.  At that point, while on the phone with Janowski and Doolin, I was like, You know what, guys?  This person sat in line to

get into the country for however many long minutes.  They're probably hungry.

And so I drove down Montana towards the east, made my way -- a couple of fast-food restaurants, made a U-turn, and ended up at the Trowbridge and Montana intersection.

Q.   And that's right over here (indicating)?

A.   Yes.

Q.   And then what happened?

A.   While on the phone with Janowski and Doolin, I looked to my left and there was a Baskin-Robbins.  And I continued to look at the Whataburger entrance, and I observed the vehicle.

And I told Janowski and Doolin, Holy shit, guys.  I got him.

Q.   Okay.  And so you found him?

A.   Yes.

Q.   The blue vehicle?

A.   Yes.

Q.   Okay.  And then what did you do?

A.   I made an abrupt U-turn and then proceeded to follow the blue vehicle on Montana, and waited for surveillance units to catch up.

Q.   Okay.  Did you -- once he exited the Whataburger, did you follow him?

A.   Yes.

Q.   Okay.  Where did you follow him to?

A.   We went east on Montana to Hawkins -- all the way down to approximately Hawkins Boulevard.

Q.   Okay.  I'm referring to what's been marked as Government's Exhibit 4A.

       Do you recognize this?

A.   I do.

Q.   Is this a fair and accurate map of the location where you followed the blue car?

A.   Correct.

       MS. HOLDERFIELD:  Your Honor, at this time the Government moves to admit Government's Exhibit 4A into evidence.

       MR. GUTIERREZ:  No objections, Your Honor.

       THE COURT:  Government's Exhibit 4A will be admitted.

       MS. HOLDERFIELD:  And permission to publish, Your Honor?

       THE COURT:  You may publish.

BY MS. HOLDERFIELD:

Q.   Okay.  Do you follow -- so you follow this blue car.

       Did this blue car stop?

A.   It did.

Q.   Where did -- where did the blue car stop?

A.   We took a southbound turn on Hawkins Boulevard, and the vehicle turned into the El Paso Gun Exchange parking lot.

Q.   And that's right here (indicating)?

A.  Correct.

Q.  And where did you go?  Where did you park?

A.  I parked at the UC- -- USCIS El Paso Federal office parking lot across the street.

Q.  And that's right here on the map.  This one right here (indicating)?

A.  Correct.

Q.  So you can see directly across the street, then?

A.  Yes.

Q.  Okay.  You have a good line of sight?

A.  Yes.

Q.  Okay.

MS. HOLDERFIELD:  Your Honor, I'm referring to Government's Exhibit 4I.  It has not been admitted into evidence.

BY MS. HOLDERFIELD:

Q.  Do you recognize this?

A.  Yes.

Q.  Is this a -- is this a fair and accurate photograph of across from your line of sight?

A.  Yes.

Q.  Did you take this photo?

A.  I did.

Q.  Okay.

MS. HOLDERFIELD:  Your Honor, at this time the

Government moves to admit Government's Exhibit 4I into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 4I will be admitted.

And you may publish, if you wish.

MS. HOLDERFIELD:  Yes, Your Honor.  Permission to publish?

THE COURT:  Yes.

BY MS. HOLDERFIELD:

Q.  Can you see it?

A.  Yes.

Q.  Okay.  Is this your direct line of sight?

A.  It is.

Q.  Okay.  And this is right across from -- you're parked at the USCIS building?

A.  Yes.

Q.  Okay.  All right.  So you're parked across.

What do you -- what do you see from your view?  What do you see about the driver of the vehicle?

A.  That it's just a single occupant, male, sitting in the vehicle.

Q.  Okay.  Does he get out of the -- does he get out of the car?

A.  He does.

Q.  Okay.  Where does he go?

A.   He walks into the El Paso Gun Exchange.

Q.   And is anything else happening outside?

A.   Nothing.  Other surveillance units are finally catching up. When I was behind him, I was behind him for, like, a long time. So I needed other units to catch up and kind of do the takeaway situation that we were doing on the previous day.

Q.   Okay.  Did you see the driver leave the store?

A.   I did.

Q.   Did he have anything in his hands?

A.   He did not.

Q.   Okay.  Does he get back into the car?

A.   He does.

Q.   And where does he go next?

A.   He proceeds southbound on Hawkins Boulevard.  He leaves the parking lot of El Paso Gun Exchange, proceeds southbound on Hawkins Boulevard towards the Gateway.

        MS. HOLDERFIELD:  Your Honor, I'm referring to Government's Exhibit 4B.

        It has not been admitted into evidence.

BY MS. HOLDERFIELD:

Q.   Do you recognize this?

A.   I do.

Q.   Is it a fair and accurate map of the area that you were in?

A.   It is.

        MS. HOLDERFIELD:  Your Honor, the Government moves to

admit Government's Exhibit 4B into evidence.

MR. GUTIERREZ:  No objection, Your Honor.

THE COURT:  Government's Exhibit 4B will be admitted.

MS. HOLDERFIELD:  Permission to publish?

THE COURT:  You may publish.

BY MS. HOLDERFIELD:

Q.  Okay.  So you follow -- you still follow the blue car.
Where did you see the blue car go?

A.  The blue car goes and turns -- we go the Gateway.  He does,
like, the turnaround under the bridge and then turns into Gun
Central.

Q.  And that's this right here (indicating)?

A.  Correct.

Q.  Okay.  And where are you?  And where are you located?

A.  So I drive past Gun Central, I see a blue car.  Special
Agent Patrick Doolin turns into the parking lot where Gun
Central is located.  And he has what we call the eye, which is
the direct line of sight of the blue vehicle.

I then reposition my vehicle to Jimenez Drive, or
Spectrum Technologies, for, like, a westbound takeaway.

Q.  All right.  And Spectrum is down here on the map
(indicating)?

A.  Correct.

Q.  Can you see anything -- once you park at Spectrum
Technologies, can you see anything at Gun Central?

A.   I cannot.

Q.   Okay.  But you're listening over the radio of what's happening?

A.   I am.

Q.   Okay.  What do you know about the driver of the blue vehicle, what was occurring at Gun Central?

A.   When I passed Gun Central, the driver of the blue vehicle was getting out of the vehicle.

After I passed, Special Agent Doolin had, I guess command and control, or can speak freely on the radio.  And he notified me that the driver was going inside of Gun Central. And then I just repositioned my vehicle.

Q.   Okay.  And where did you reposition to?

A.   I repositioned to Spectrum Technologies.

Q.   Okay.  Did see -- did you know --

        MS. HOLDERFIELD:  One moment, Your Honor.

BY MS. HOLDERFIELD:

Q.   Did you learn that the driver left Gun Central and got into his car?

A.   Yes.

Q.   Okay.  Did he go anywhere else after that?

A.   He did.

Q.   Where did he go?

A.   He pulled into the Hyatt parking lot to, like, the -- yeah. Like, over there, the PNC Bank/Hyatt parking lot.  A little bit

to the east.  Like in that parking lot (indicating).  Yes, ma'am.  And he sat for several minutes.

Q.  Okay.  Could you see him?

A.  Yes.

Q.  Okay.  What was he doing?

A.  He was on his phone (indicating).  The driver was just on his phone (indicating).  He never exited the vehicle.  He was just on his phone the whole time.

Q.  Okay.  All right.

Did he ever -- did he move again?

A.  He did.

Q.  Okay.  Where did he -- where did he drive to?

A.  We got back on the Gateway, did the turnaround at the next intersection, and we proceeded back westbound on the Gateway towards Fox Plaza.

Q.  I'm referring to Government's Exhibit 4C, that has not been admitted into evidence.

Do you recognize this?

A.  I do.

Q.  Is this a fair and accurate map of the area that you were in?

A.  It is.

MS. HOLDERFIELD:  Your Honor, the Government moves to admit Government's Exhibit 4C.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 4C will be admitted.

MS. HOLDERFIELD:  And permission to publish, Your Honor?

THE COURT:  You may publish.

BY MS. HOLDERFIELD:

Q.  So you continued to follow the blue car?

A.  Correct.

Q.  Where does the blue car go?

A.  The blue car pulls into the east side of the parking lot close to I guess, like, the gray dot.  I'm trying to read what the words are.

Yes, ma'am, right there (indicating), and parks.

Q.  All right.  Does the driver do anything?

A.  The driver exits the vehicle.

Q.  And where does the driver go?

A.  He gets into the brown sedan from the previous day.

Q.  Did you see that brown sedan pull up next to the blue --

A.  Yeah.  After the blue car was there, the brown sedan pulls up.  The driver of the blue vehicle gets out and gets into the brown sedan.

Q.  And that's the same brown sedan from the day before, on March 30th?

A.  Correct.

Q.  Is the driver Brian Muñoz-Castro?

A.  I did not observe if it was him or not.

Q.   All right.  So you see -- you see the driver of the blue car get out of the -- get out?

A.   Yes.

Q.   Where did he go?

A.   He gets in the brown sedan.  I position my vehicle to where the Starbucks is located.

Q.   So you're parked over here, then (indicating)?

A.   Yes.  I was too close, because I had been on what we call the eye.  I observed the vehicle for so long that I didn't want to be made or be, like, noticed that I was following the vehicle.

     And so I moved my car and let other surveillance units take, like, primary.  So I moved as a -- once again, a takeaway off the eye and put myself where Starbucks is located.

Q.   All right.  What did you see about the brown sedan?

A.   The brown sedan then leaves the parking location and drives to the Starbucks and gets in line.

Q.   Do you see a purchase at all?

A.   Yes.

Q.   Okay.  And after they go through the drive-thru, then what happened?

A.   After they go through the drive-thru, the brown vehicle then pulls back up to the blue vehicle.  The driver of the blue vehicle gets back into his -- they get -- the blue -- the driver of the blue vehicle gets back into the blue vehicle, and

the vehicles depart several minutes later.

Q.  Okay.  And then what happens?

A.  They go different directions.  So the case agent gave us a directive of who was going to follow what.

       The brown vehicle proceeds northbound on East Paisano, and the blue vehicle was following behind it.

       At the highway, the blue vehicle takes a left and gets back on the Gateway, and the brown vehicle continues to go towards Yandell and the Paraguay location.

Q.  Okay.  And where did you go?

A.  So I was tasked to go with the brown vehicle to the Paraguay location.

Q.  Okay.  So you follow him to the Paraguay house?

A.  Yes.

Q.  Okay.

       MS. HOLDERFIELD:  Your Honor, I'm referring to what's already been admitted and published as Government's Exhibit 4F.

BY MS. HOLDERFIELD:

Q.  Okay.  So we're back -- we're back at the Paraguay address?

A.  Correct.

Q.  Okay.  What's happening at the Paraguay address?

A.  At the Paraguay address, multiple units are on surveillance.  There's probably three to four additional units that are with me.  I am not directly behind the vehicle.

       Special Agent Uriel Acosta and Special Agent Chris

Acevedo observe the brown vehicle park in front of the location that he last -- that the brown vehicle was at yesterday, and the driver got out of the vehicle.

Q.   Okay.  Did you get out of your vehicle?

A.   Several minutes later.

Q.   Okay.  What -- what were you observing?

A.   I was observing the two agents I listed before, Acosta and Acevedo, have a conversation with the driver.

Q.   Okay.  Did you ever -- did you get out of the vehicle?

A.   I did.

Q.   Okay.  And what did you do?

A.   I walked, as scene security.  You don't want someone to, like, walk up on, like, agents when they're making interaction.

So I just kind of walked up, and kind of like a little standoff distance, approximately from, like, me to you or me to this lady as well, just to observe.

Q.   Okay.  And did the owner -- the owner of the -- no.

And then after -- after agents were talking to what we learn is Brian at the Paraguay house, what happens after that?

A.   I was on the phone with Special Agent Janowski and Patrick Doolin, again.  And Patrick was sent to another residence, and I was sent to go back him up at that residence.

Q.   Okay.  Did you drive to that residence?

A.   I did.

Q.   And where was that residence?

A.   It was south of I-10 close to Fox Plaza.  And he was sitting -- sitting there.

        MS. HOLDERFIELD:  Your Honor, I'm referring to what's been admitted and published as Government's Exhibit 4C.

        One moment, Your Honor.

BY MS. HOLDERFIELD:

Q.   All right.  So you get to the Barcelona house.  Did Brian Muñoz-Castro consent to a search of his house?

A.   He did.

Q.   And were you present for that?

A.   I was.

Q.   What did you see inside the house?

A.   Inside the house agents collected -- it was a collection team.  Agents collected ammunition.  There was a -- gun boxes.  There was a Jimmy John's bag that was used for a previous deal yesterday, and there was some narcotics as well.

Q.   Okay.  After the search concluded and they find narcotics in the house, where did you go?

A.   Again, a lot of phone calls that day.  I called Janowski and asked him where he needed me.

        He said that they -- the blue vehicle was stopped, attempting a southbound exit of the country in a port of entry.

        So I proceeded to go back up the TFO, or Task Force Officer Mark Cervantes, at the port of entry.

Q.   Okay.  And were you instructed to do anything?

A.   I was just going to check with -- check in with him to see if he needed assistance in anything.

Q.   All right.  And did you assist in anything?

A.   I just stood by while they were removing things from the vehicle.

Q.   Okay.  Did you do anything else that day, on March 31st?

A.   That day, I did not.

Q.   Okay.  Did you have any other involvement in this case?

A.   I did.

Q.   Okay.  What else were you involved in?

A.   There was a buy/bust operation that took place -- or not a buy/bust.  It was an operation that took place on the east side of El Paso, where the ATF was leading, like, a takedown.

Q.   Do you remember when that was?

A.   August.

Q.   Okay.  And what was your assignment for that August ATF gun buy?

A.   Surveillance.

Q.   Okay.  And on the day of the gun buy, where were you located?

A.   I was located on the side of the street close -- I was across the street from a storage facility.

        MS. HOLDERFIELD:  Your Honor, I'm referring to what's been previously admitted and published, Government's Exhibit 5B.

And permission to publish again?

THE COURT:  You may publish it, yeah.

MS. HOLDERFIELD:  Thank you, Your Honor.

BY MS. HOLDERFIELD:

Q.  On this map, is this -- is this the area that you -- you surveilled in August of 2023 for the ATF gun buy?

A.  It is.

Q.  Okay.  Where were you?  Where were you located?

A.  I was located at the -- there's that long stretch of driveway at the bottom of the map to the east, where Dyer is. And there's a -- keep going -- keep going on the -- across the street.  I was there.

Q.  This is where you were located (indicated)?

A.  Yes.

Q.  Okay.  Could you see directly at a Circle K from your view?

A.  I could.

Q.  Okay.  What did you observe?

A.  During the briefing, they showed us who the undercover agent was going to be.  I just observed his vehicle, his truck, and him in -- like in the parking lot of the Circle K.

Q.  Did you see anything else at the Circle K?

A.  There was a white truck that had pulled up, but I couldn't see any conversation or anybody getting out of the vehicle.

Q.  Okay.  And did you see -- did you ever see those cars leave the Circle K?

A.   I did.

Q.   And where did you see them go to?

A.   They proceeded southbound on Dryer Street towards my location.

Q.   All right.  And did you see where they stopped?

A.   They stopped at a U-Haul storage facility -- or not U-Haul -- like a storage facility.

Q.   All right.  And is that still in your line of sight?

A.   It is.

Q.   And can you tell me on the map where the storage facility was?

A.   It's going to be this gray stretch of road.  Yes.

Q.   Down here (indicating)?

A.   Yes.

Q.   All right.  So you can see -- you can see this storage facility, a good sight to that?

A.   I could.

Q.   Okay.  And then -- and then what did you see?

A.   Through the operation, there was going to be some signals of the gate opening.  The vehicles were entering, and then the gate was to be closed, and that's what happened.

Q.   Did you see anything else?

A.   There was another truck that had showed up and pulled kind of into the -- the open space right in front of the storage facility.

Q.  All right.  And then anything else that happened?

A.  Approximately, like many maybe five -- three to five minutes later, there was an explosion that kind of happened in the back of the storage facility.  You kind of see dust kind of rise in the air (indicating).

And we knew that there was a takedown occurring in the -- in the parking lot -- or excuse me -- in the storage facility.

Q.  Okay.  Did you see, like, inside the storage facility?  Could you see from your view?

A.  I could not see inside, no, ma'am.

Q.  Okay.  But you knew that an arrest had happened?

A.  Yes.

Q.  Okay.  Did you know who was arrested?

A.  I did not.

Q.  Okay.

        MS. HOLDERFIELD:  No further questions, Your Honor.

        THE COURT:  You may proceed.

        MR. GUTIERREZ:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.  Agent, you testified that you have five years with the FBI?

A.  Yes.

Q.  How many years do you have with this organization criminal task force?

A.   Five.

Q.   Okay.  So you went straight into that part of the FBI?

A.   Yes, sir.

Q.   Now, you stated you witnessed the buy/walk on March 30th.

A.   I did.

Q.   And would you be able to recognize the person you saw on the buy/walk?

A.   During it or afterwards?

Q.   While it was happening.  Do you rec--- can you recognize -- can you see who that person is?

A.   No.

Q.   Did you later find out that that was Brian Muñoz-Castro?

A.   I did.

Q.   Okay.  And he was the driver of the brown sedan; is that correct?

A.   Correct.

Q.   And then there was another vehicle, a blue -- you just mentioned a blue vehicle, correct?

A.   Yes, sir.

Q.   And that blue vehicle, were you later to find out that that was Pablo Delgado?

A.   That was Saul, correct?

Q.   Oh.  Was it Saul?

         Were you able to see him?

A.   I did not see him, no.

Q.   So you would be able to recognize a picture of him?

A.   If I was shown a picture, yes.

Q.   Okay.  And you do recall who -- what his full name was?

A.   I do not.

Q.   Okay. So on March 30th, Brian Muñoz-Castro does a sale of narcotics; is that correct?

A.   I believe so, yes.

Q.   And then on March 31st, 2023, you follow him to a Paraguay address, correct?

A.   Correct.

Q.   That's when you witnessed that they confronted him, the other agents, to talk to him about his involvement, correct?

A.   Correct.

Q.   Were you able to listen in to what the conversation was?

A.   I was not.

Q.   Okay.  You seem to be a person that -- you were just an assistant into different types of organizations, correct, different types of events?

A.   Yes.

Q.   So you're not here today to testify that whatever happened in March is tied in to whatever happened on August 21st, 2023, correct?

A.   Can you repeat the question, sir?

Q.   Sure.  You're not here today to testify that whatever happened on March 30th and 31st has anything to do, or to tie

in, to August 21st, 2023, correct?

A. I'm not sure if they are or not. I don't know, sir.

Q. Okay. You were just a body to assist in the operations of following these people, correct?

A. Correct.

Q. Going back to August 21st, 2023.

Did you witness a vehicle leave Circle K by himself?

A. There was two vehicles that were leaving Circle K. There was the undercover vehicle, and then there was another white vehicle that was behind it.

Q. Okay. Before that, did you witness one of the vehicles leave the Circle K by himself and go down Dyer?

A. I wasn't paying attention to that, sir.

Q. You were positioned there the entire time. You were stationed there watching Circle K and watching the shed location?

A. No, sir. So because the street is very secluded, not a lot of traffic, you can't sit for long -- long periods of time.

I believe it started to rain, and so we were kind of moving around -- not rain, excuse me -- but like drizzle, if you will. And we were moving our vehicles around because, like, businesses were still open, and we didn't sit in people's parking lots for a long period of time.

Q. Okay. So you were not at that one parked location where you can see the Circle K and you can see the storage unit all

the time during this entire event?

A.   There was probably, like, a three-minute gap of me leaving and coming right back to the same spot.

Q.   Okay.  So there's possibilities that vehicles could have left the Circle K and you would not have witnessed it?

A.   There is a possibility, sir.

Q.   And you're saying it was raining or drizzling that day?

A.   Later on.  Not at that moment, but later on.  Because we try and have our windows down, and I remember that you couldn't have your window down for, like, a hot second.

MR. GUTIERREZ:  Pass the witness, Your Honor.  Thank you.

THE COURT:  Any redirect?

MS. HOLDERFIELD:  No further questions, Your Honor.

THE COURT:  You may be excused.

THE WITNESS:  Thank you, sir.

THE COURT:  Call your next witness.

MS. HOLDERFIELD:  Your Honor, the Government calls Ramon Guzman to the stand.

(Witness duly sworn.)

THE WITNESS:  Yes, ma'am.

THE CLERK:  You may lower your hand.

Please have a seat.

RAMON GUZMAN, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. HOLDERFIELD:

Q.  Good morning, sir.

Will you please state your name and spell it for the record?

A.  Good morning.  My name is Ramon Eduardo Guzman.

Q.  Will you spell your last name?

A.  G-U-Z-M-A N.

Q.  And where do you work?

A.  I work for Customs and Border Protection.

Q.  How long have you been with Customs and Border Protection?

A.  A little over 12 years.

Q.  What are your duties and responsibilities as a Customs and Border Protection officer?

A.  I'm currently assigned to the A-TCET Team here in El Paso.

Q.  What is the A-TCET Team?

A.  A-TCET team is a -- stands for the Anti-Terrorism Contraband Enforcement Team.  It's the tactical team for the port of El Paso.

Q.  What are your duties and responsibilities being part of the A-TCET team?

A.  I'm the team focused primarily on contraband interdiction coming north into the country.  And then firearms, currency, going out of the country.

Q.   Did you receive training to become a Customs and Border Protection officer?

A.   Yeah.  We did a training in Detroit, the A-TCET land border training.

Q.   But before that, did you -- did you attend a training academy to become a CBPO?

A.   Yes, ma'am.

Q.   And what does that training entail?

A.   When did the training get done?

Q.   What did that training consist of?

A.   Well, for a CBP officer, it's all training on the laws of the CBP and -- I don't know.  It's a long training in FLETC.

Q.   And how long is training?

A.   When I went to the academy it was a little over four months.  Currently, it's six months.

Q.   All right.  Now with this A-TCET team, can you describe a little bit more about the training that goes into it?

A.   Yes, ma'am.  So the training consists of a lot of outbound interdiction, a lot of outbound declarations, how to process the outbound environment.  As well as we do have a lot of active shooter scenario trainings, a lot of hands-on training in tactical environments, in Detroit.

Q.   Do you have to take a test at the end of the A-TCET training?

A.   No.  It's a pass/fail course.  If they deem that you're not

operating to their standards, they'll just send you back home.

Q.  But you passed the test?

A.  Yes, ma'am.

Q.  Do you have any previous -- other previous law enforcement experience?

A.  No, ma'am.

Q.  Have you held any other positions within CBP?

A.  No, ma'am.

Q.  Okay.  Do you remember March 31st, 2023?

A.  Yes, ma'am.

Q.  And were you on duty that day?

A.  Yes, ma'am.

Q.  What port of entry were you working at?

A.  Our team is mobile, so we don't work out of, necessarily, a port of entry.  We just bounce around between the Bridge of the Americas and the Paso del Norte bridge.

Q.  So you're -- you're set at the -- you're set a -- the br- -- at certain ports of entry different amounts of time throughout the day?

A.  Yes, ma'am.

Q.  Okay.  Were you at the Bridge of the Americas that day?

A.  Yes, ma'am.

Q.  Do you remember what time?

A.  We were working outbound around 7:00 that evening.

Q.  7:00 p.m.?

A.   Yes, ma'am.

Q.   Were you alone or were you with other Customs and Border Protection officers?

A.   I was with a portion of my team.

Q.   Okay.  And how big is that team?

A.   Currently, we're staffed at 12.  So we divide six and six.

Q.   All right.  And do you remember a man by the name of Saul Quezada?

A.   Yes, ma'am.

Q.   And how do you remember him?

A.   I stopped his -- the vehicle he was driving, and I found gun parts in his vehicle.

Q.   Why did you stop him at first?

A.   It was just a random inspection.  And I couldn't tell you why.  It was just -- I liked the car, and I just stopped the car to inspect it.

Q.   So this -- this is just random -- a random choice?

A.   Yes, ma'am.

Q.   Are -- random choices with your group, is that normal?

A.   Yes.

Q.   Did you speak to Mr. Quezada?

A.   I did.

Q.   Did you speak to Mr. Quezada in English or in Spanish?

A.   I don't recall.

Q.   Do you remember what Mr. Quezada drove?

A.   Yes, ma'am.

Q.   But you did -- you did speak to Mr. Quezada?

A.   Yeah.

Q.   Okay.  Did you ask Mr. Quezada where he was going?

A.   I did.

Q.   Was he going to Juárez?

A.   Yes, ma'am.

Q.   Did Mr. Quezada declare anything?

A.   Nothing.

Q.   What did you tell him about making a declaration?

A.   So I asked him if he was carrying -- customarily, we ask if they have over $10,000.

     He said he did not.

     I advised him it wasn't illegal to have money going south.  You've just got to declare it before you exit the country.

Q.   Is this standard, to ask about making a declaration?

A.   Yes.

Q.   Okay.  And that's part of your training, when you become a Customs and Border Protection officer?

A.   Yes, ma'am.

Q.   As well as the A-TCET Team?

A.   Correct.

Q.   Did you ask him about money?

A.   Yes.

Q.   What did you notice about Mr. Quezada's demeanor?

A.   He was very nervous during our interaction.  And he was very -- his hands were shaking as well.

Q.   And because of this nervousness and shakiness that you're seeing, what does that signal to you?

A.   It -- usually when I see those -- those tendencies, I like to inspect the vehicle more, so we just do a more thorough inspection of the vehicle.

Q.   All right.  What did you tell Mr. Quezada to do?

A.   I asked him to step out of the vehicle so that I could inspect his vehicle.

Q.   Did he comply?

A.   Yes, ma'am.

Q.   Did you conduct a pat-down?

A.   Yes.  On everybody outbound, if we remove them from the vehicle we do an immediate pat-down.

Q.   Did you find anything on -- with the pat-down?

A.   No, ma'am.

Q.   All right.  Then what happened?

A.   So after that, I drove his vehicle from the outbound environment to the secondary inspection area, to not impede the flow of traffic going into Mexico.  And then we inspected his vehicle in that area.

Q.   Can you describe this inspection?

A.   Yes.  So once we stopped the vehicle in the secondary

inspection area, I asked our canine -- we have a currency and firearm detector dog.  I asked him to sweep the vehicle, because that's what we look for outbound, currency and firearms.

So he swept the vehicle, and he alerted me that there was a -- his dog was showing interest in the trunk of the area [sic].  He was alerting to the area.

So at that point we did an inspection of his vehicle.

Q.  All right.  The canine hit on the trunk?

A.  Yes, ma'am.

Q.  Did you find anything in the trunk when you started your search?

A.  No, ma'am.

Q.  Okay.  Did you search other parts of the car?

A.  Yes, ma'am.  After that we did a complete inspection of the vehicle.

Q.  Okay.  And with that search, what did you and your other officers discover?

A.  So after doing the search of the vehicle in the engine, in what's considered the cowl of the vehicle, I discovered gun parts.

MS. HOLDERFIELD:  Your Honor, I'm referring to what has not been admitted into evidence, Government's Exhibit 4K.

BY MS. HOLDERFIELD:

Q.  Do you recognize this?

A.   Yes, ma'am.

Q.   Do you recognize this?

A.   Yes, ma'am.

Q.   Is this a fair and accurate photograph of what you saw that day?

A.   Yes, ma'am.

Q.   Okay.

      MS. HOLDERFIELD:   Your Honor, I'm referring to Government's Exhibit 4L.

BY MS. HOLDERFIELD:

Q.   Do you recognize this?

A.   Yes, ma'am.

Q.   Is this a fair and accurate photograph of what you saw during the inspection of Mr. Quezada's car?

A.   Yes.

Q.   And referring to Government's Exhibit 4M, do you recognize this?

A.   Yes, ma'am.

Q.   Is this a fair and accurate photograph?

A.   Yes.

Q.   I'm referring to Government's Exhibit 4N.

      Do you recognize -- do you recognize this?

A.   Yeah.

Q.   Is this a fair and accurate photograph of what you saw?

A.   Yes, ma'am.

Q.   And referring to Government's Exhibit 4O.

Do you recognize this?

A.   Yes, ma'am.

Q.   Is this a fair and accurate photograph of what you saw?

A.   Yes, ma'am.

MS. HOLDERFIELD:   Your Honor, at this time the Government moves to admit Government's Exhibits 4K, 4L, 4M, 4N, and 4O.

MR. GUTIERREZ:   No objections, Your Honor.

THE COURT:   Government's Exhibit 4K, 4L, 4M, 4N, 4O are hereby admitted.

MS. HOLDERFIELD:   And, Your Honor, permission to publish?

THE COURT:   You may publish.

BY MS. HOLDERFIELD:

Q.   All right.  Can you explain to the jury what is happening in this photograph?

A.   Yes, ma'am.  So on the top you can see I'm holding up the plastic trimming on the engine cowl.  And you can see plastic bags inside of it.

Q.   What's an engine cowl?

A.   So that engine cowl is that portion between the hood and windshield that houses the wiper motors and the air vent flow for the vehicle's cabin.

Q.   All right.  So you -- you see things wrapped in plastic in

that?

A.   Yes, ma'am.

Q.   Okay.  Can you tell me what's happening in this photograph?

A.   So here, that's the forward view of the engine cowl.  And you can see, from left to right, the plastic of -- the plastic bags inside of the engine cowl that shouldn't be there.

Q.   Is this just a better view of the parts?

A.   Yes, ma'am.

Q.   What about this photograph?

A.   It's the same.  It's just a different angle to try to see how deep the engine cowl is.

Q.   What's happening in this photograph?

A.   So here you can see both plastic bags that were removed from the engine cowl, just to see how many were in the -- in the gap.

Q.   And how many were in -- how many were in the gap?

A.   There were two bags in there.

Q.   Two bags.

     Do you know what -- what they were?

A.   Yes, ma'am.

Q.   And what were they?

A.   So the smaller one is the buttstock.  And then the longer one, or bigger one, is the upper receiver.

Q.   Okay.  And what is this photograph of?

A.   So this is the photograph of the upper receiver out of the

bag, and the buttstock.  It's taken in our -- what we consider our seizure room, where we do all the seizures of the narcotics and stuff.

Q.  Okay.  So after you find these gun parts, do Customs and Border Protection officers detain Saul Quezada?

A.  Yes, ma'am.  He was taken into one of the holding cells for a better pat-down and then for detention.

Q.  Okay.  Do you know if Mr. Quezada was released from Customs and Border Protection officers?

A.  Yes, ma'am.  We released him.

Q.  Okay.

          MS. HOLDERFIELD:  May I have a moment, Your Honor?

          THE COURT:  You may.

     (Ms. Holderfield and Mr. Myers confer.)

          MS. HOLDERFIELD:  No further questions, Your Honor.

          THE COURT:  Mr. Gutierrez?

          MR. GUTIERREZ:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.  Sir, can you describe the vehicle?

A.  The -- for the vehicle, this one?

Q.  Yeah.

A.  It was a 2008 Ford Fiesta.

Q.  Ford Fiesta.  What color?

A.  Blue.

Q.  Blue four-door or two-door, sedan?

A.  It was a four-door hatchback.

Q.  Do you know Saul Quezada's full name?  Is it -- is there other names that he had?

A.  Saul Norberto Quezada-Orozco.

Q.  And were both these parts illegal to cross into Mexico?

A.  The gun parts aren't illegal themselves to cross into Mexico.

Q.  So these two items were not illegal?

A.  No.

        MR. GUTIERREZ:  Pass the witness, Your Honor.

        Thank you.

        THE COURT:  No further redirect?

        MS. HOLDERFIELD:  No further questions, Your Honor.

        THE COURT:  Very well.

        You're free to leave.

        THE WITNESS:  Thank you.

        THE COURT:  Call your next witness.

        MR. MYERS:  Your Honor, the Government calls Brian Muñoz-Castro to the stand.

     (Witness brought in; open court.)

        THE COURT:  Right here.

        MR. MYERS:  He is a Spanish speaker, Your Honor.

        THE COURT:  Officer, we've got to swear him in right here.

(Witness duly sworn.)

THE WITNESS:  I swear.

THE CLERK:  You may lower your hand.

MR. MYERS:  May I proceed, Your Honor?

THE COURT:  You may proceed.

BRIAN MUÑOZ-CASTRO, GOVERNMENT'S WITNESS, SWORN

TESTIFIED THROUGH THE INTERPRETERS ESPINOZA & GALLEGOS

DIRECT EXAMINATION

BY MR. MYERS:

Q.  Good morning, sir.

A.  Good morning.

Q.  Will you please introduce yourself to the jury?

A.  I am Brian Alexis Muñoz-Castro.

Q.  Mr. Muñoz, how old are you?

A.  21 years old.

Q.  Are you involved -- or were you involved in a trafficking of firearms and drugs?

A.  Yes.

Q.  How long -- or let me ask you this.

Where are you from?

A.  From Jalisco; Guadalajara, Jalisco.

Q.  Are you a United States citizen or citizen of Mexico?

A.  Mexico.

Q.  Where did you start out becoming involved with the drug trade?

A.   In Jalisco.

Q.   How old were you?

A.   14.

Q.   And at 14 years old, how does someone get involved in the drug trade?

A.   Because of circumstances of life.

Q.   And what did you start working, when you first entered the drug trade?

A.   Well, I started with a radio.  They gave me some points, some positions, to manage them.

Q.   How does using a radio help out with drug trafficking?

A.   It's to be an eyesight, to become a hawk.

Q.   A lookout?

A.   Yes.

Q.   What are you looking out for?

A.   Soldiers, Government.

Q.   Are you looking out for other cartel members?

A.   Well, you don't see that in Jalisco.  There are people that jump around from one side, or one band to the other.

Q.   So in Jalisco, who's really in control of the drug trade there?

A.   El Mencho.

Q.   And what cartel is he a part of?

A.   Cartel Jalisco Nueva Generación.

Q.   And so why, as a lookout, do you need to warn people about

soldiers or about the Government?

A. Because nobody -- not everybody has been bribed.

Q. What are you worried that the soldiers will do?

A. Interdiction of points, points of trade.

Q. Okay. What are points of trade?

A. Where drugs are sold.

Q. Are these also referred to as offices?

A. Yes.

Q. What happens at these offices?

A. Usually it's where the drugs are sold, or where the people in charge are located. That's where drugs are put in Baggies. And then from there, they're moved to the different points of sale.

Q. So this is about selling drugs within the state of Jalisco?

A. Yes.

Q. Are drugs moved -- did your organization move drugs from Jalisco to the United States?

A. Yes.

Q. Were -- now these offices, did you ever get a chance to work in these offices while you were living in Jalisco?

A. Yes.

Q. What happened? What kind of work did you do in the offices?

A. Well, it would depend. The people that were picked up would be taken there or drugs will be put in Baggies.

Q.   When you were in Jalisco working in the offices, did you ever see firearms?

A.   Yes.

Q.   In what context did you see firearms?

Let me rephrase.

Did you see people carrying firearms?

A.   Oh, yes.

Q.   Did you see firearms stored at offices?

A.   Yes.

Q.   Can you describe for the jury, like, the type of firearms you saw stored at the offices?

A.   Glocks, 9mm, 5.7, AK-47 rifles.  Just the regulars.

Q.   Now in Spanish, I heard you say *cuerno de chibo*.

What is that?

A.   It's an AK-47.

Q.   That's another word that's -- or set of words that's used for AK-47?

A.   *Cuerno de chibo*?

Q.   Yes.  Is that another word for AK-47?

A.   Yes.

Q.   Now when you were working in Guadalajara, or Jalisco, had you ever met a person named Chayo?

A.   Yes.

Q.   Who is Chayo?

A.   She's a lady.  Not an older lady, but older.

Q.  Is she involved with CJNG?

A.  Yes.

Q.  Based on your experience, how was she involved with CJNG?

A.  We would sell the weapons to 03, Mencho's brother.

Q.  Who is "we"?

A.  Chayo, her children.

MR. MYERS:  Your Honor, I would like to show the witness an exhibit that has already been admitted into evidence.  Government's Exhibit 1D.

THE COURT:  You may.

BY MR. MYERS:

Q.  Do you recognize Government's Exhibit 1D?

A.  Yes.

MR. MYERS:  And may I also publish to the jury, Your Honor?

THE COURT:  You may.

BY MR. MYERS:

Q.  Who's pictured in Government's Exhibit 1D?

A.  Chayo.

Q.  Does Chayo have any other names that you know about?

A.  Fernanda.

Q.  Do you know her real name?

A.  Maria del Rosario Sanchez-Navarro, I think.

Q.  Was Chayo a part of you getting introduced into the drug trade?

A.   Yes.

Q.   How did she introduce you into the drug trade?

A.   Well, she saw that I was good with my -- on my books.  And so she offered me -- she asked me if I wanted to work.

Q.   How did you -- what did you do with that offer?

A.   Well, I took it.

Q.   And is that how you started out as the -- a lookout?

A.   No.  When I came over here.

Q.   Okay.  So when did you meet Chayo?

A.   I met her -- well, first, I met her children.  And then when I earned their trust, they introduced me to their mom.

Q.   All right.  How did you respond -- or how did you call Chayo after a while?

A.   Mom.

Q.   Now when you were working at the offices in Jalisco, did you see firearms being used?

A.   Yes.

Q.   How did members of the cartel use firearms?

A.   Well, when they're going to go pick up -- pick somebody up.  Or the usual, when you're doing their accounting, their numbers.

Q.   But how were they using firearms?

A.   Well, to threaten people.  Or for what they're for, to kill.

Q.   Would CJNG be able to track their drugs without firearms?

A.   Well, I wouldn't know how to respond to that question.   But a weapon is a fundamental part.

Q.   Why do you say it's a fundamental part?

A.   Because that's how they inflict fear on people, so that they pay.   Otherwise, a lot of people won't want to pay up.

Q.   Down near Jalisco, is the CJNG at war with any other cartels?

A.   Yes.

Q.   What are the other rival cartels near Jalisco?

A.   MZs.

Q.   Who else?   Or what other organizations?

A.   The Afterthoughts of Marro, or the *Familia Michoacana*, *Michoacán* family.

Q.   The Family Michoacana, what state are they from?

A.   *Michoacán*.

Q.   Is that a neighboring state, next to the state of Jalisco?

A.   Yes.

Q.   Now, how long did you work in the drug trade in Jalisco?

A.   Up until I was 17 years old.

Q.   What happened when you were 17 years old?

A.   I was offered to come over here.

Q.   Who gave you that offer?

A.   Chayo.

Q.   Did she explain to you what the offer was?

A.   She explained to me once I was already here.

Q.   Okay.  So before you left, did you have any idea what you would be doing in the United States?

A.   Well, not really.  I was -- I could imagine.

Q.   And what did you think?

A.   Well, I decided to take it, to accept it.

Q.   No.  But what did you think the offer was going to be?

A.   Well, honestly, many things went through my head or went through my mind.

Q.   How did you get to the United States?

A.   Well, I jumped the border.

Q.   You came to the United States illegally?

A.   Yes.

Q.   Do you remember about what year you got to the United States?

A.   Well, I got here three years ago.  You can make your math.

Q.   And when you got here, were you instructed -- or given directions of where to go?

A.   Yes.  They went to pick me up.

Q.   Who picked you up?

A.   Alfredo.

Q.   And what happened once you -- is Alfredo someone you met here in the United States?

A.   I knew him from Jalisco.

Q.   But is this -- he's picking you up after you entered the United States?

A.   Yes.

Q.   Okay.  And once Alfredo picks you up, what happens next?

A.   Well, nothing.  We went through and he told me what I had to do, and I was left in charge.

Q.   Okay.  What instructions were you given by Alfredo?

A.   Well, nothing.  To be careful.  Just to be careful and to do my job right.

Q.   Did you meet anybody else that would help explain the job to you?

A.   No.

Q.   When you got to the United States, what job did you have to do?

A.   To transfer the kilos to pounds, to prepare them well.  To prepare them well and to cure them, and to pick up our weaponry.

Q.   Let's break that down.

     What kind of drugs were you dealing with?

A.   Crystal, coke.

Q.   And crystal, is that a reference to methamphetamines?

A.   Yes.

Q.   Now, you said you would break the -- the drugs down from kilograms to pounds.

     What does that mean?

A.   Well, just literally the way you -- the way it sounds.  In Mexico you work with kilos; here you work with pounds.

Q. You would repackage drugs?

A. Yes.

Q. Where did you do this repackaging?

A. In my apartment.

Q. Here in the United States?

A. Yes.

Q. Here in El Paso?

A. Yes.

Q. How did the drugs get to you?

A. They would cross them for me, from Juárez to here.

Q. Were you involved in crossing the drugs from Juárez to the United States?

A. Well, me, practically not. I would only pick it up when it was already on this side.

Q. Who was one of the couriers that you would pick it up from?

A. Saul or different people. It would vary.

MR. MYERS: Your Honor, I'd like to publish a picture that's already been admitted. Government's Exhibit 1G.

THE COURT: You may.

BY MR. MYERS:

Q. Who -- do you know, or do you recognize the person in Government's Exhibit 1G?

A. Yes.

Q. Who is this?

A. Saul.

Q.   When did you first meet Saul?

A.   In Jalisco.

Q.   Was Saul also involved in the drug trade in Jalisco?

A.   Not in Jalisco, Jalisco.  But that's when I learned that he worked for Chayo.

Q.   How did you learn that?

A.   Because they sent me to pick him up at the airport.

Q.   And what happened once you picked him up from the airport?

A.   He stayed at my apartment for a week.

Q.   Did you learn from Saul what he did for the organization?

A.   Not right at that moment.  But with time, I started learning many things.

Q.   What did you learn about Saul's role within the organization?

A.   That he's the one that crossed things over here, into the United States, on behalf of Chayo.

Q.   Now, when you're here in the United States, how were you receiving directions?

A.   Well, the usual.  Go pick up, go deliver.

Q.   Yeah.  But how do you know?  Or how are you informed where to be and when to be?

A.   Through WhatsApp.  I'd be sending -- they would send me the addresses through WhatsApp.

Q.   Who was sending you the addresses?

A.   Chayo.

Q.   This Chayo, was she personally handling the drugs, to your knowledge?

A.   Can you please repeat that question?

Q.   Was she the one that was in actual possession of the drugs, or was that somebody else's responsibility?

A.   Well, she only had them in Jalisco.  So by the time they got to El Paso, they became my responsibility.

Q.   Okay.  She's coordinating?

A.   Yes.

Q.   So when Saul delivers narcotics to you, how much drugs are we talking about each time?  What would he bring?

A.   It would depend.  With Saul it would be 10 kilos, 8 kilos.

But with other people, it was different.  It would be 20 to 25 packages.

Q.   And when you say "packages," you're talking about methamphetamine and cocaine?

A.   Yes.

Q.   And a package, when it comes from Mexico, is that a pound or was that a kilogram?

A.   One kilo.

Q.   When you're speaking with Chayo over WhatsApp, is there any particular reason you're using WhatsApp?

A.   No.

Q.   Do you often change cellphone numbers?

A.   Yes.

Q.   What about Chayo?

A.   Also.

Q.   Why would you change cellphone numbers?

A.   For safety, security reasons.

Q.   How does that make you -- your job more secure?

A.   Well, you usually switch every month or every two months. So numbers get burnt, and you just get another one.

Q.   What do you mean?  What that term mean, "burn"?

A.   Well, yes.  I don't know how to explain that.  They get burned.  They -- it's like other people see them, and we're told that name is burned, you have to get rid of it.

Q.   That law enforcement might know about the number?

A.   Yes.

Q.   When you got phones, when you walked into AT&T or T-Mobile to buy a phone, or open a phone line, did you use your real name?

A.   No.

Q.   Why didn't you use your real name?

A.   Well, because -- well, no.  I mean, how am I going to give out my name?  I know that everything comes out there, so I'm never going to use my real name.

Q.   Who are you trying to hide your name from?

A.   Well, someone was talking too much who might be around there.  It's better to be careful.

Q.   Are you trying to hide your name from law enforcement?

A.   Also.

Q.   Who is Pablo Delgado?

A.   He's somebody that would sell me weapons.

Q.   And how many weapons would Mr. Delgado sell you?

A.   Well, I don't have an amount, but he did sell me several.

Q.   In a given week, how many times might he sell you weapons? Or how many weapons might he sell you, excuse me.

A.   Well, there weren't really that many.  If he received a gun one day, he would offer it to me.  And if I had money I would buy it from him.  Or maybe two, three a week.

Q.   What -- why were you buying guns from Mr. Delgado?

A.   In order to send them to Guadalajara.

Q.   Under whose direction were you sending the weapons to Guadalajara?

A.   Chayo's.

Q.   Were there other people that would deliver weapons to your house here in El Paso, besides Mr. Delgado?

A.   Yes.

Q.   What kind of weapons would those people deliver?

A.   Well, all sorts: short, long, monster.  Pretty much every type.

Q.   Okay.  So --

THE COURT:  Mr. Myers?

MR. MYERS:  Yes, sir.

THE COURT:  We need to take our break right now.

Muñoz-Castro - Direct by Mr. Myers

MR. MYERS:  Yes, sir.

THE COURT:  Members of the jury, not only is it time for your break, but it's also -- I have some other matters I have to take care of other than this trial.  So it may be a longer recess than usual.

Let's say for now, 20 minutes.  But it might be a little longer than that.

So we'll be in recess until we can come back.

(Recess taken 10:25 a.m.)

THE COURT:  Thank you, everyone, for your patience.

And you may continue, Mr. Myers.

MR. MYERS:  Thank you, Your Honor.

BY MR. MYERS:

Q.  Mr. Muñoz, before we left for break you gave an answer in which you had said some people would bring long and shorts.

Do you remember that answer?

A.  Yes.

Q.  All right.  What did you mean when you used the term "short"?

A.  Glocks, short handguns, 9s.

Q.  So short is a term for firearms?

A.  Yes.

Q.  You used the term "long."  What did you mean when you were talking about longs?

A.  High-caliber weapons, *cuernos*.

Muñoz-Castro - Direct by Mr. Myers

Q.  So long is another code word for a different kind of firearm?

A.  Yes.

Q.  Now as part of your responsibilities here, are you running a stash house here in El Paso?

A.  Of a thing or of a house?

Q.  A place where drugs and firearms are at.

A.  Oh, yes.

Q.  And what happens at this -- at this place with drugs and firearms?

A.  I manage them there before they go.

Q.  Where are the drugs going?

A.  The drugs?  The drugs go up.

Q.  Into the United States?

A.  Yes.

Q.  Where do the firearms go?

A.  To Juárez.

Q.  And what's their ultimate destination?

A.  Jalisco.

Q.  Now you had mentioned earlier, before our break, that you paid Pablo Delgado money for firearms.

        Where did you get that money to pay for these firearms?

A.  From Chayo.

Q.  How would Chayo get you money?

Muñoz-Castro - Direct by Mr. Myers

A.   Well, when things go up, usually money would come down, or weapons.

Q.   And so Pablo is not the only person bringing the weapons?

A.   No.

Q.   Who -- for the weapons that Pablo didn't bring, who was arranging for those weapons to get to your office here in El Paso?

A.   Chayo.

Q.   Do you know how she was doing that?

A.   Honestly, no.  Not -- she already had her network.

Q.   Now, how did the guns get from your house to Juárez?

A.   They would send them to be delivered to me.

Q.   Okay.  Let's use some names.

     Who are you talking about "they would send"?

A.   Chayo.

Q.   And do you know the people that she would send?

A.   Well, yes.

Q.   And who are the people that come to mind?

A.   Ramos and Saul.

Q.   These people that you're dealing with, Quezada and Pablo, do you know a lot about them?

A.   Can you please repeat the question?

Q.   The people who are -- other people who are bringing guns to you or picking up drugs, do you know a lot about those people?

A.   Well, only of those that I knew.  I usually don't know

Muñoz-Castro - Direct by Mr. Myers

them.

Q.   Is that on purpose?

A.   Well, yes.

Q.   Why?

A.   Also for their own security.

Q.   And your security as well?

A.   Yes.

Q.   Now as part of your responsibilities did you keep a ledger, or did you take notes of your criminal activity?

A.   Yes.

MR. MYERS:   Your Honor, I'd like to publish to the jury Government's Exhibit 4O -- 4AO, which has already been admitted into evidence.

THE COURT:   You may.

BY MR. MYERS:

Q.   Do you recognize Government's Exhibit 4AO?

A.   Yes.

Q.   And what is Government's Exhibit 4AO?

A.   It was -- it was my notebook.

Q.   And why -- why did you have this notebook?

A.   Because I had to manage everything.   It was my responsibility.

Q.   And when you say "manage everything" what specifically are you talking about?

A.   Well, to keep a management of everything in case anything

Muñoz-Castro - Direct by Mr. Myers

happens.

Q.   Are you talking about drugs and firearms?

A.   Yes.

Q.   If we look on Page 3 of Government's Exhibit 4AO, do you see here where it says Monday, 7 of March?

A.   Yes.

Q.   This would be like the year before you were arrested -- or before you were caught by the FBI?

A.   Yes, before.

Q.   Okay.  Let's talk the jury through this ledger.

So what's this first line that's highlighted here?

A.   759 positive for my mom.

Q.   Okay.  And who, I guess, is your mom that you're referencing in this -- this line here?

A.   Chayo.

Q.   And now when it says "a *favor*," do you remember what specifically this was for?

A.   To her favor.  So her money.

Q.   So she's owed $759?

A.   Yes.

Q.   Okay.  Would you read the next line below that?

A.   250 delivered extras, along with the 10,000.

Q.   All right.  What does this mean?

A.   Just how it sounds.  That I delivered 250 extras, aside from the $10,000 that I had already turned in.

Muñoz-Castro - Direct by Mr. Myers

Q.   Okay.   Now in this next highlighted section we see, generally, four or five lines of $250 subtracted each week. What is this in reference to?

A.   That was my money.

Q.   And what was that money going towards, per these notes?

A.   So everything that's negative is for my favor.

Q.   Okay.   So when it says 250 the week of March 26th, why are you getting 250?

A.   Because that is what I have to receive per week.

Q.   Is that your salary, for lack of a better term?

A.   Yes.

Q.   Now here, it also says 850 for rent on April 2nd, and that you pay yourself?

A.   Yes.

Q.   This is money that went towards rent of what?

A.   For the property.   For the apartment.

Q.   Is this where you were storing drugs and firearms?

A.   Yes.

Q.   The line before that is a negative 200 for four pieces, the 16th of April.

     What is this line talking about?

A.   That I picked up four pieces.

Q.   What are the pieces?

A.   Kilos.

Q.   Now when you write kilos in this manner, do you know what

Muñoz-Castro - Direct by Mr. Myers

particular drug it's in reference to?

A.   Crystal.

Q.   That would be methamphetamine?

A.   Yes.

Q.   And the 200, is that how much the methamphetamine costs, or that's what you earned for doing this job?

A.   Yes, what I take for my part.

Q.   Here on April 26th, four more pieces.

What is this entry about?

A.   Of the same, crystal.

Q.   Now, why did you write the term pieces and not methamphetamine?

A.   Well, because that's how we call it, some of us, pieces or packages.

Q.   Are there other words you use to refer to methamphetamine?

A.   Crystal.

Q.   How about ice or cold?

A.   The Americans are the ones that usually use those terms.

Q.   All right.  Have you heard those terms used to refer to methamphetamine before?

A.   Yes.

Q.   If we look on Page 4 again, we see three pieces on June 10th.

Would this be another set of narcotics?

A.   Yes.

Muñoz-Castro - Direct by Mr. Myers

Q.   And, "pieces."  Is this going to be pounds or kilograms of methamphetamine?

A.   They're kilos.

Q.   Now here, we see smaller charges for plastic and aluminum.

What -- what are these?

A.   It's a material that's utilized to cure it.

Q.   Okay.  Utilized to cure what, specifically?

A.   The drugs.

Q.   Okay.  When you were apprehended by the FBI on March 31st the following year, do you remember pieces of plastic being around your apartment on Barcelona?

A.   Yes.

Q.   Is that the same kind of material you're talking about here in your ledger?

A.   Yes.

Q.   Now here on July 6, still looking at Page 4, we see a different notation for a "fine piece" for the 16th of July.

What is a fine piece?

A.   Coke.

Q.   Cocaine?

A.   Yes.

Q.   And why would you make this notation entry on your ledger?

A.   Because it's something -- because it's something I received, so I have to write everything down.

Q.   Ultimately, who were you responsible to?

Muñoz-Castro - Direct by Mr. Myers

A.   To Chayo.

Q.   If we look on Page 5 of Government's Exhibit 4AO, here in this notation of plus 21,000, what did you receive?  What is that?

A.   $21,000.

Q.   And can you tell from this notation who you received it from?

A.   From Nano.

Q.   Do you know Nano's real name?

A.   No.

Q.   Now below that, we have three more lines.  Would you read those lines to the jury, please?

A.   1,850 purchase of an AK; 850 purchase of an MP; and 1300 for purchase of an R15.

Q.   Okay.  Now, what is -- here when you say AK on that first line, what is that -- what is that in reference to?

A.   Of a *cuerno de chibo* AK-47.

Q.   The next line it says a "short MP."

     What is that a reference to?

A.   Of a short handgun.

Q.   And then that you bought, or someone bought, an R15.

     What is that in reference to?

A.   Of a long one, of an R15.

Q.   Now, could you legally purchase these weapons in the United States?

Muñoz-Castro - Direct by Mr. Myers

A.   Yes.

Q.   Did you purchase these weapons in the United States?

A.   Yes, but not legally.

Q.   How did you receive these weapons?

A.   I would buy them from Pablo.

Q.   Now two lines down from there, we see another entry about $8,000.

      Would you please read that entry to the jury?

A.   8,000 delivered, old man, gray truck.

Q.   All right.  What was delivered to the old man in the gray truck?

A.   Come again?

Q.   What was delivered to the old man in the gray truck?

A.   $8,000.

Q.   Okay.  Who is the old man in the gray truck?

A.   Ramos.

Q.   I'd like to show you what's already been entered into evidence.

      MR. MYERS:  Your Honor, permission to publish to the jury Government's Exhibit 1F?

      THE COURT:  You may publish.

BY MR. MYERS:

Q.   Do you recognize this man?

A.   Yes.

Q.   Who is this?

Muñoz-Castro - Direct by Mr. Myers

A.   Ramos.

Q.   And how do you know Mr. Ramos?

A.   Because I would give him weapons so that he would take them out to Juárez.

Q.   How did you end up meeting Mr. Ramos?

A.   Through Chayo.

Q.   And how many times do you think you might have delivered weapons to Mr. Ramos over the course of the years?

A.   Honestly, I wouldn't have a number, but there were several.

Q.   And when you're delivering weapons to Mr. Ramos, what kind of weapons are we talking about?

A.   AK-47, short, long, 50s, also Minimis.

Q.   Every time that Mr. Ramos came by, was he only there to pick up weapons?

A.   Yes.

Q.   And why do you refer to him in your notebook as the old man in gray truck?

A.   Because that's how I knew him.

Q.   What did he drive?

A.   A gray F150.

Q.   And when you delivered weapons to him, is it you're just giving him one or two weapons?  Is it multiple weapons?  What -- what are you giving to him?

A.   I would give him several.

Q.   What is several?

Muñoz-Castro - Direct by Mr. Myers

A.   Maybe 10 long, a monster, a backpack with short ones.   It would depend.

Q.   When you say "monster," what kind of firearm is that?

A.   A 50, a Minimi, very high caliber.

Q.   Would -- all of those weapons, would those all be -- would all those weapons come from Pablo Delgado?

A.   No.

Q.   Okay.   So these are all weapons from various different people?

A.   Yes.

Q.   Now here at the bottom of Government's Exhibit 4AO, we see two more entries.

Could you read those to the jury, please?

A.   750 payment Saul.   250 payment Saul.

Q.   What is this entry -- what does this entry into your ledger mean?

A.   That I paid money to Saul.

Q.   Mr. Quezada, that picture we saw earlier, that's that Saul?

A.   No.

Q.   Let me show you Government's Exhibit 1G.

Is this the Saul that you're referencing in your ledger?

A.   Yes.

Q.   Would you read to the jury the line that I've highlighted on Page 6 of your ledger, AO, the $2300 line?

Muñoz-Castro - Direct by Mr. Myers

A.   $2,300 purchase of box of peanuts on September the 17th, with the extra 100.

Q.   All right.  What does that mean?

A.   Bullets.

Q.   Peanuts is a -- a box of peanuts is a reference to boxes of ammunition?

A.   Yes.

Q.   Now here on Page 7 of your ledger, the top that's highlighted here, 4th of August, would this be August of 2022?

A.   Yes.

Q.   And what is notated on Page 7?

A.   All the weapons that I would receive, and drugs.

Q.   Okay.  So let's -- which ones are references to the weapons?

A.   All except for the last one.

Q.   Okay.  What words are you using to reference weapons on this page?

A.   Long ones and short ones.

Q.   And then what word are you using to reference drugs?

A.   Two packages, fine ones, ugly ones, depending on what it is.

Q.   All right.  Here, the highlighted section on Page 7, two different words of *paquete*, or packages, what kind of drugs is this a reference to?

A.   Those were weapons.  Sometimes they arrived in packages.

Muñoz-Castro - Direct by Mr. Myers

And so that in order not to open those, we would ship them like that.

Q.   Okay.  We also have another word over here, *"millar."*  What is that?

A.   It's one million -- one thousand bullets.

Q.   Here we see the term of five chargers?  Or what's a charger?

A.   It's the charger for the weapon, where you put in the ammunition, the magazine.

Q.   I'd like show you what's already been admitted into evidence.

MR. MYERS:  And if I may publish to the jury, Your Honor, Government's Exhibit --

THE COURT:  You may publish.

MR. MYERS:  Thank you.

BY MR. MYERS:

Q.   -- 12E.

(Video played.)

BY MR. MYERS:

Q.   Do you recognize the video of Government's Exhibit 12E?

A.   Yes.

Q.   How do you recognize that video?

A.   Because I recorded it.

Q.   How did you come -- that -- that weapon that's pictured in there, how did you come into possession of that weapon?

Muñoz-Castro - Direct by Mr. Myers

A.   It was sent from Jalisco to here.

Q.   Who sent it?

A.   Chayo.

Q.   Do you know why she gave it to you?

A.   Because she -- because ordinarily, it would be given to somebody that owed money, but that person didn't pay.

Q.   So in payment of a debt?

A.   Yes -- no.  Money was owed to Chayo, and Chayo was not paid, so she didn't deliver it.

Q.   Do you remember when you got the weapon?

A.   Honestly, no.

Q.   What ended up happening with the weapon?

A.   I ended up returning it to Juárez.

Q.   Before you returned it to Juárez, did you try to sell it to somebody?

A.   Yes.

Q.   Who did you try to sell it to?

A.   To Pablo.

Q.   But was Mr. Delgado able to come up with the money, or he wasn't willing to buy it?

A.   Well, no.  He couldn't get it.

Q.   What couldn't he get?

A.   The money.

Q.   Now, you said this weapon made it back to Mexico?

A.   Yes.

Muñoz-Castro - Direct by Mr. Myers

Q.   Who did you give it to?

A.   To Ramos.

Q.   I'd like to show you what's already been admitted into evidence.

MR. MYERS:   May I publish Government's Exhibit 12G, Your Honor?

THE COURT:   You may.

BY MR. MYERS:

Q.   Do you recognize this phone pictured in Government's Exhibit 12G?

A.   Yes.

Q.   Whose phone is that?

A.   Mine.

Q.   And who were you communicating with?

A.   With Chayo.

Q.   And what is Chayo asking you to do in this string of text messages?

A.   Did you wrap el dorado well?

Q.   Okay.   When the term "el dorado" is used, what do you understand that to be?

A.   The R that is covered.

Q.   The -- what do you mean, "the R"?

THE INTERPRETER:   Plated.   Correction by the interpreter.

The R that is plated.

Muñoz-Castro - Direct by Mr. Myers

BY MR. MYERS:

Q.   When you're talking about the R that is plated, are you talking about the video -- the weapon in the video we saw?

A.   Yes.

Q.   Do you remember who you gave that weapon to?

         MR. GUTIERREZ:  Objection.  Asked and answered.

         THE COURT:  Overruled.

A.   Yes.

BY MR. MYERS:

Q.   I'd like to show you another exhibit.

         MR. MYERS:  And I don't know that it's been admitted. This one has not been admitted.

BY MR. MYERS:

Q.   I would like to show you Government's Exhibit 12L.

         Do you recognize the phone that is pictured in Government's Exhibit 12L?

A.   Yes.

Q.   Whose phone is that?

A.   Mine.

         MR. MYERS:  Your Honor, I'd offer into evidence Government's Exhibits 12L.

         MR. GUTIERREZ:  No objection.

         THE COURT:  12L, was it?

         MR. MYERS:  Yes, Your Honor.

         THE COURT:  It is hereby admitted.

Muñoz-Castro - Direct by Mr. Myers

MR. MYERS:  May I publish to the jury?

THE COURT:  You may publish.

BY MR. MYERS:

Q.  Now here on the first page of Government's Exhibit 12L, do you see a number that's highlighted?

A.  Yes.

Q.  And if we look on Page 2, what are the last four digits of the number that we're focusing on?

A.  5521.

Q.  And what times or what days were called for -- did you call this number?

A.  Yes.

Q.  What days?

A.  March 26th at 6:50.

Q.  And what time did you receive a phone call from this number?

A.  At 7, I think.

Q.  And why are you calling this particular number?

A.  To deliver.

Q.  To deliver what?

A.  El dorado.

Q.  Now in addition to delivering el dorado, did you deliver anything else?

A.  No.

Q.  Now, you were apprehended by the FBI on March 30th, 2023?

Muñoz-Castro - Direct by Mr. Myers

A.   Yes.

Q.   The delivery of el dorado.  Did that happen close to when you were approached by the FBI?

A.   Yes.

Q.   Just a couple of days before?

A.   Yes.

Q.   Now when the FBI entered your house on March 31st, 2023 -- oh, actually, let's take a step back.

Do you remember delivering drugs on March 30th, 2023?

A.   Yes.

Q.   What did you end up delivering?

A.   Crystal.

Q.   And did you know the person that you were delivering the crystal to?

A.   No.

Q.   Did you find that transaction suspicious?

A.   Yes.

Q.   And why did you find that transaction suspicious?

A.   Because it would change -- they would change me from one place to another.

Q.   What else did you find suspicious about it?

A.   The behavior of the person and the vehicle that the person was driving.

Q.   Was also the amount that you were delivering unusual?

A.   Yes.

Muñoz-Castro - Direct by Mr. Myers

Q.  How was it different from your normal experience?

A.  Because it was the minimum, and he was too covered from his face.

Q.  Normally, what kind of amounts were you delivering?

A.  About 20 kilos, more or less.

Q.  Now the next day, on March 31st, why are you meeting with Saul?

A.  To pay him.

Q.  And what are you paying him for?

A.  What he crossed for me.

Q.  Do you remember what he crossed for you?

A.  Crystal.

Q.  And now, did Saul give you anything?

A.  Right at that moment he gave me some empty boxes.

Q.  And why did he give you empty boxes?

A.  Because I was going to do him a favor of putting them in the trash.

Q.  Do you know why Saul wouldn't keep -- why he had the empty boxes?

A.  Well, not at that moment.  I figured that he had everything stashed, or hidden in the vehicle.

Q.  Why would you need to hide firearms in a vehicle?

A.  In order to get them out to Juárez.

Q.  Is it illegal to smuggle firearms into Mexico?

A.  Yes.

Muñoz-Castro - Direct by Mr. Myers

Q.   I guess at this point in time, we can tell that you're wearing a jail outfit.

Are you currently in jail?

A.   Yes.

Q.   What kind of crimes were you charged with?

A.   Drugs and weapons.

Q.   The trafficking and smuggling of each?

A.   Yes.

Q.   Have you pleaded guilty to some of those charges?

A.   Yeah, I did.

Q.   To both gun and drug trafficking?

A.   Yes.

Q.   Now as part of pleading guilty, you've been cooperating with the federal government?

A.   Yes.

Q.   And why are you cooperating with the Government?

A.   Because I want to be with my daughter.

Q.   How is cooperating with the Government going to help you be with your daughter?

A.   By reducing my sentence.

Q.   In order to get a recommendation from the Government, what did you have to do in exchange?

A.   Tell the truth.

Q.   And what happens if you get caught lying?

A.   Everything is over.

Muñoz-Castro - Direct by Mr. Myers

Q.   What does that mean?

A.   Well, yes, everything.  Everything that I have cooperated with, it will just go to trash.

Q.   If you lie, you won't get a recommendation?

A.   No.

Q.   Now when you're apprehended by the FBI on March 31st, 2023, what's inside the Barcelona address?

A.   Drugs.

Q.   What kind of drugs?

A.   Crystal.

Q.   And what else?

A.   Fentanyl and ammunition.

Q.   That Fentanyl, are those the pills?

A.   Yes.

Q.   Where did those come from?

A.   From Jalisco.

Q.   Were these part of the drugs that Chayo trafficked?

A.   Yes.

Q.   The same.  How about the methamphetamine?  Where did the methamphetamine come from?

A.   The same, Jalisco.

Q.   And were these drugs that also Chayo was trafficking -- Chayo and -- Chayo and you were trafficking?

A.   Yes.

Q.   There were also empty boxes in your house?

Muñoz-Castro - Direct by Mr. Myers

A.   Yes.

Q.   What had been in those boxes?

A.   Weapons.

Q.   What kind of weapons?

A.   R15s, AK-47s.

Q.   What happened to those weapons?

A.   I had sent them over to Juárez.

Q.   And how did you get them to Juárez?

A.   Because I sent them with Ramos and Saul.

Q.   I'd like to show you what's already been admitted as
Government's Exhibit 9E.

      MR. MYERS:   May I publish to the jury, Your Honor?

      THE COURT:   You may publish.

BY MR. MYERS:

Q.   Can you see the exhibit on your screen?

A.   Yes.

Q.   In this text message, is it -- at the beginning it says 15
large, and someone asked for a number to be passed.  And then
you see the contact card?

A.   Yes.

Q.   In this context what is 15 large?

A.   5 guns -- 15 long ones of a high caliber.

Q.   And if phone records indicated that someone had contacted
you on September 11th, or about that day, to pick up 15 large,
what would you have delivered?

Muñoz-Castro - Direct by Mr. Myers

A.   I delivered that, 15 long ones.

Q.   That's 15 firearms?

A.   Yes.

          MR. MYERS:   I would like to show you what's been admitted as Government's Exhibit 10E.

          THE COURT:   You may.

          MR. MYERS:   Thank you.

BY MR. MYERS:

Q.   What's the date at the top?

A.   September 25th.

Q.   And below the contact card do you see the five long and two boxes?

A.   Yes.  Well, five long ones and two boxes of bullets.

Q.   And down here, the other highlighted section, *de chibo de 500?*

A.   Yes.

Q.   If someone had contacted you about September 25th, 2022, what do you think you would have delivered?

A.   Well, what it says right there, five long ones and two boxes.

Q.   Five firearms?

A.   Yes.

Q.   And two boxes.  Two boxes of what?

A.   Of bullets.

Q.   If we look at Government's exhibit --

Muñoz-Castro - Direct by Mr. Myers

MR. MYERS:  May I publish to the jury Government's Exhibit 11E?

THE COURT:  You may.

BY MR. MYERS:

Q.  11A, excuse me.

Do you see the highlighted term there?  15 --

MR. GUTIERREZ:  I'm sorry, Your Honor.  Are we looking at -- I think he asked for 11E to be published, and we're showing 11A.

THE COURT:  I can't hear you.

MR. GUTIERREZ:  I believe that he had requested to publish 11E, and we're being shown 11A.  I just wanted to get that correction.

THE COURT:  Well, which one is it, Mr. Myers?

MR. MYERS:  It's 11A.

THE COURT:  They've all been admitted.

MR. MYERS:  It has been admitted.  11A, Your Honor.

BY MR. MYERS:

Q.  Do you see the term on your screen of 15 dogs, or mutts?

A.  Yes.

Q.  Have you ever heard that term, "chuchos," in reference to firearms?

A.  Well, honestly, no.

Q.  Were you in the business of delivering dogs?

A.  No.

Muñoz-Castro - Direct by Mr. Myers

MR. MYERS:  Permission to publish Government's Exhibit 12I to the jury, Your Honor?

THE COURT:  You may.

BY MR. MYERS:

Q.  After the contact card on Page 7 of Government's Exhibit 12I, do you see the date there?

A.  Yes.

Q.  What date is highlighted for the jury?

A.  March 27th.

Q.  This is the day after you delivered el dorado to Mr. Ramos?

A.  I think so.  I'm not very certain or aware of the dates, to be honest.

Q.  Do you remember that photograph?  We looked at your phone from those phone calls from March 26th?

A.  Oh, yes.

Q.  So this would be the following day.

A.  Okay.

Q.  The highlighted section here, can you please read that for the jury?

A.  Hey, you owe because you received el dorado.  And that one has a potato launcher.  It's 1,000 for that one and 450 for the other one.  You owe.

Q.  Now, that -- that weapon that we've been discussing, the el dorado in the video, did that have a grenade launcher attached to it?

Muñoz-Castro - Direct by Mr. Myers

A.   Yes.

Q.   And have you ever heard of the term "*lanza papas*"?

A.   Yes.

Q.   What does that mean, or what's that a reference to?

A.   A grenade launcher.

Q.   After you were apprehended by the FBI on March 31st, 2023, did Chayo know that you had been caught by the FBI?

A.   Yes.

Q.   How did she know?

A.   Because my woman called my mom, and my mom is Chayo.

Q.   After that date, were you still trafficking drugs and firearms for Chayo?

A.   No.

Q.   Why not?

A.   Well, because -- no, not anymore.  I couldn't do it.  The trust wasn't going to be there.

Q.   Now, do you know Mr. Hernandez Cordero?

A.   Mr. Hernandez Cordero?  No.

Q.   Had you ever delivered weapons to him?

A.   Hernandez Cordero, no.  I don't know people by their names so specifically.

          MR. MYERS:  May I have a moment with co-counsel, Your Honor?

          THE COURT:  You may.

       (Mr. Myers and Ms. Holderfield confer.)

Muñoz-Castro - Direct by Mr. Myers

         MR. MYERS:  Your Honor, I would like to show the
witness a few exhibits that have not been admitted.

BY MR. MYERS:

Q.  Mr. Muñoz, do you recognize Government's Exhibit 4AP?

A.  Yes.

Q.  And do you recognize Government's Exhibit 4AQ?

A.  Yes.

Q.  Do you recognize Government's Exhibit 4AR?

A.  Yes.

Q.  Are these the consent forms you signed on March 31st, 2023?

A.  Yes.

         MR. MYERS:  Your Honor, I offer Government's
Exhibits 4AP, AQ, and AR into evidence.

         MR. GUTIERREZ:  No objections.

         THE COURT:  4AP and 4AQ?  Are those the only ones?

         MR. MYERS:  And 4AR.

         THE COURT:  Government's Exhibits 4AP, 4AQ, and 4AR
are hereby admitted.

         MR. MYERS:  And permission to publish to the jury,
Your Honor?

         THE COURT:  You may.

BY MR. MYERS:

Q.  Mr. Muñoz, what are we looking at in Government's
Exhibit 4AR?

A.  About the vehicle that I was driving.

Muñoz-Castro - Direct by Mr. Myers

Q.   And if we look at Government's Exhibit 4AQ, what is this giving permission to the FBI to search?

A.   A notepad.

Q.   The green notepad you and I went through in front of the jury?

A.   Yes.

Q.   And what are we looking at on Government's Exhibit 4AP? What is -- what -- why did you sign this document?  Do you remember?

A.   Yes.

Q.   Why did you sign it?

A.   It was for my rights.

        MR. MYERS:  I'd also like to show you what's already been admitted, Your Honor, as Government's Exhibit 15A.

        May I publish to the jury?

        THE COURT:  You may.

BY MR. MYERS:

Q.   This is not your phone, correct?

A.   No.

Q.   Here, where you see the term *son frio*," how would you understand that?

A.   Crystal.

Q.   And on the second page of Government's Exhibit 15A, where it talks about 22 packets, how would you interpret that?

A.   Well, packages of crystal.

MR. MYERS:  I'd also like to publish to the jury Government's Exhibit 15C, which has already been admitted.

THE COURT:  You may.

BY MR. MYERS:

Q.  Here, in the highlighted section on Page 3 of Government's Exhibit 15C, do you see ice -- or no -- cold and a little small emoji?

A.  Yes.

Q.  How would you interpret that?

A.  Crystal.

Q.  And below that 11kg, how much crystal would you think that's in reference to?

A.  11 kilos.

Q.  And this is not a photograph of your phone either, correct?

A.  Yes.

Q.  All right.

MR. MYERS:  Your Honor, I pass the witness.

THE COURT:  Mr. Gutierrez, you only have a few minutes before I'm going to break up for lunch, but let's get whatever we can in.

MR. GUTIERREZ:  Yes, sir.

THE COURT:  Go ahead.

MR. GUTIERREZ:  Thank you.

CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.   Okay, Mr. Castro.

You started your career in this when you were 14 years old, correct?

A.   Yes.

Q.   And you said "circumstances of life."

What do you mean by that?

A.   Well, yes.  I did it out of necessity, in a few words.

Q.   What were your necessities?  Because you needed to pay for stuff or you couldn't live?  Can you explain?

A.   Well, basically, it's a matter of a young rebellious kid that leaves his -- leaves his home out of problems.  And I had to get ahead and survive on my own.

Q.   Okay.  So you started as a -- basically, as a lookout; is that correct?

A.   Yes.

Q.   And then you moved up the chain and became a person that was in the office; is that correct?

A.   Yes.

Q.   Okay.  And you explained the of- -- can you explain again what you meant -- the office meant?

A.   Well, the office, you can call it a point for the drugs, or a place where the people are packaging the drugs.

Q.   Okay.  You also testified that people would be taken there.

Do you recall that?

A.   Yes.

Q.   What did you mean, "people would be taken there," to the office?

A.   People that were changing sides.  All sorts of people, in a few words.

Q.   So these people were taken there to be threatened; is that correct?

A.   Yes.

Q.   All right.  And you witnessed this?

A.   Yes.

Q.   And what do you see when they threatened them?  What was going on?

A.   You know, interrogations, Where did you get this?  Where did you get that?

Q.   Okay.  And they're being tortured while they're being asked these questions, I would imagine.

     Is that true?

A.   Yes.

Q.   And you also stated that people would be killed; is that correct?

A.   Yes.

Q.   Had you witnessed people being killed there?

A.   Well, no.  But I did know, practically.

Q.   You never killed anyone, correct?

A.   Yes.

Q.   How old were you when they moved you into the office?

A.   About 15, going on to 16, more or less.

THE COURT:   Let me -- we need to break up for lunch.

MR. GUTIERREZ:   Yes, Your Honor.   Thank you.

THE COURT:   I am informed that your lunch is here, members of the jury.   So we'll be in recess until 1:15 in the afternoon.

You do not -- like I said before, you don't have to stay in the jury room.   But if you do go out, please -- please comply with all the instructions that I gave you.

We'll be in recess until 1:15.

(Recess taken 11:59 to 1:13 p.m.)

THE COURT:   You may continue, Mr. Gutierrez.

MR. GUTIERREZ:   Thank you, Your Honor.

BY MR. GUTIERREZ:

Q.   Can you hear me?

A.   Yes.

Q.   We left off people with that were taken into the office.

Do you recall that?

A.   Yes.

Q.   These people that were taken to the office were all sorts of people, correct?

A.   Yes.

Q.   People that didn't follow orders, I would imagine; is that

correct?

A.  Yes.

Q.  So even people that were told to do something and didn't do it, they were brought into the office.

        Is that a fair statement?

A.  Well, actually, that's the way they work.  Usually you're not there just for nothing, you know.

Q.  Would family members be taken into the office and threatened?

A.  No.

Q.  Would they go talk to family members of people that they were upset about?

A.  I did not become aware of that, actually.

Q.  What you're doing here today, testifying, do they frown upon that?

A.  I don't think they would.  That would make sense, wouldn't it?

Q.  You're saying that they would not be upset that you're testifying against them?

A.  I wouldn't be upset, but they would.

Q.  Okay.  You had a really close relationship with this person named Chayo.  You used to call her mom, right?

A.  Yes.

Q.  I mean, she practically took you off the street and raised you.

Is that fair?

A. Well, yes. But nothing is free.

Q. Okay. When you moved to the United States, you were 17 years old, correct?

A. Yes.

Q. This was orders by Chayo, correct?

A. Yes.

Q. And basically, you didn't have any right to say no. You were ordered to do it, right?

A. I did. Honestly, I did have the right to say no.

Q. And wouldn't you not be following her order?

A. Yes.

Q. Okay. But you felt that this was a way to move up in position; is that correct?

A. Yes.

Q. So you crossed the border when you were 17 years old, and you said you jumped the border.

Can you tell us how you came to the United States?

A. Through the Cristo Rey Mountain, through the desert.

Q. And when they talked to you about -- when you were asked about the T-Mobile, that you would use different names, you also don't want the Government to know that you're here because you're here illegally, correct?

A. Yes.

Q. So now you're in El Paso, and you're responsible for

El Paso for Chayo; is that correct?

A.   Yes.

Q.   Okay.  And the responsibility includes everything that Chayo does; is that correct?

A.   Yes.

Q.   You're responsible for the illegal drugs?

A.   I was aware.

Q.   So it is true.  You're responsible for the illegal drugs, the firearms, the money crossing back and forth.  Anything illegal that Chayo wanted you to do for her, you were responsible for El Paso specifically; is that correct?

A.   Yes.

Q.   And you were also responsible that once you got the drugs in El Paso, you would coordinate the drugs going to other parts of the United States; is that correct?

A.   Usually, yes.  On occasion.

Q.   You talked about certain other co-defendants, a Saul Quezada.

        Did he work under you and for you?

A.   No, not for me.

Q.   Okay.  But he would do jobs for you?

A.   No.

Q.   So he was under the direction of Chayo only?

A.   Yes.

Q.   But yet, he would deliver stuff that you had back to Chayo.

Is that what you testified?

A. Yes.

Q. Okay. And then was Pablo Delgado under you as well?

A. Yes.

Q. And Ramos. He was also under you as well?

A. No.

Q. Okay. He worked specifically under Chayo, but would do work for you, and deliveries?

A. I am not aware of that. The only thing I know is that he dealt with Chayo.

Q. Okay. But yet, you had items that he would come to pick up from you to take to Chayo; is that correct?

A. Yes.

Q. Okay. You also testified that there was different people that were carriers.

Do you remember that?

A. Yes.

Q. And part of your testimony was that you're expecting leniency in your sentencing, to be honest, right?

A. Yes.

Q. Okay. So can you tell me who the other pe- -- the different people are? Who are the names? Who are the other people who were carriers for you?

A. Well, couriers? How do you mean?

Q. Okay. People that would -- let's start off with people

that would bring you firearms.

Who were these people?

A. Well, usually, it was Saul and Pablo, and other different people. I don't know their information about them.

Q. Okay. How many other different people that you don't have the information of? Give me a number.

A. Well, it varied. I don't have an exact number. Sometimes I would see someone, and then the next time it was someone different.

Q. Okay. Would it be safe to say more than 10 people, other than Saul and Pablo or Ramos?

A. Yes. And Henano.

Q. And so how many others, besides those that you've mentioned? Roughly more than 10 people besides those four?

A. Probably a little more.

Q. Okay. Okay.

So more than 10 other people that you can't name, plus these that have been mentioned. Okay. Fair enough.

Is that fair?

A. Probably.

Q. Okay. That's the arms. Now, let's talk about the drugs.

You're selling drugs, and who would be the person that you would transfer these drugs over here in the U.S.?

A. Usually -- well, at times Saul would show up. And then the direction, that was not part of my business. He would set it

up with Rosario, and then he would prepare a vehicle and he would deliver it.

Q.   So Saul Orozco-Quezada, or Quezada-Orozco, was the only one that would be delivering drugs from you to anybody else?

A.   I didn't quite understand that.  Can you be more specific?

Q.   Sure.  Once you had the drugs at your stash house, and it was going to be transported to somewhere in the U.S., are you telling the Court it was only Saul that would do it?

A.   No, not just Saul.

Q.   Who else?

A.   One time it was Nano.  And other times different workers.

Q.   How many different workers?  More than 10 again?

A.   I'd be lying if I gave you an exact number.

Q.   Right.  I'm asking for an approximation.

     More than 10 or less than 10 others?

A.   Approximately.

Q.   Approximately 10?

A.   10, uh-huh.

Q.   Okay.  Thank you.

     I believe that they call those people that work for you a crew.

     Was this your crew?

A.   Well, I honestly have never heard them be called by that name.  But if you want to call them like that.

Q.   Okay.  You had direct communication to Chayo, correct?

A.   Yes.

Q.   And she had direct communication to you, correct?

A.   Yes.

Q.   There was nobody in between you and Chayo during the communication for orders for what needed to be done, right?

A.   Yes.

Q.   Let's go back to what you called the stash house, here in El Paso.

     You talked about having the kilos, preparing, collecting, and cure.

     Can you explain what you meant by preparing?

A.   Preparing the kilos and turn them into pounds, because what we sell here is pounds.  So we have to repackage them and cure them.  That's what it's called.

Q.   So preparing them and curing them is the same thing?

A.   Yes.

Q.   And during the first questioning, you kept talking about crystal.  Did you mean methamphetamines?

A.   Yes.

Q.   Now again, I need you to be honest.

     How was the drugs crossed from Mexico to the United States?

A.   That was up to the workers.  My task was only to receive them.  So each one of us had our methods.

Q.   But you know how the drugs get crossed, right?

A.  Well, in vehicles, usually.

Q.  Any other method that you know of?

A.  Well, there may be others, but that's the one I know.

Q.  When did you start working Fentanyl here in the United States?

A.  I usually wouldn't move that.  When I arrived, what they already had, what was taken away from me, that was it.

Q.  Okay.  So on March 30th you sold -- what did you sell on March 30th, 2023, to the undercover?

A.  Crystal.

Q.  Which is methamphetamines, correct?

A.  Yes.

Q.  And then when they went to your home and you signed consent, they found more methamphetamines and the Fentanyl in your house, correct?

A.  Correct.

Q.  What was your relationship to Pablo Delgado?

A.  Well, he was practically family.  That's what I would call him.

Q.  Your girlfriend was related to him; is that correct?

A.  He's her cousin.

Q.  And you mentioned earlier that you want to be with your daughter; is that correct?

A.  Correct.

Q.  So is this the same girlfriend that had your daughter?

A.   Yes.

Q.   And this is the same girlfriend that was living with you during the time of the arrest?

A.   Yes.

Q.   When they showed you your ledger -- do you recall that?

A.   Yes.

Q.   The green notebook?

A.   Yes.

Q.   Those were all your dealings, correct?

A.   Yes.

Q.   Those were all your responsibilities here in El Paso, Texas, correct?

A.   Yes.

Q.   And you were here in El Paso to manage everything from drugs to firearms to money, correct?

A.   Yes.

Q.   Was it Chayo that introduced you to Ramos?

A.   Yes.

Q.   In your ledger you used the word *feos* and *bonitos*.
     What does that mean?

A.   *Finos, perico.*  *Feos* is crystal.

Q.   What does *perico* mean?

A.   Cocaine.

Q.   How about *bonitos*?

A.   Cocaine.

Q.   *Feos*?

A.   Crystal.

Q.   So you didn't have a code for Fentanyl yet?

A.   No.

Q.   What did you call Fentanyl?

A.   Fentanyl.

Q.   Now you said when they did the delivery on March 30th, that it was unusual that it was the minimum of six kilos.

Do you recall that?

A.   Yes.

Q.   And then you said that normally it's between -- it's usually 20 kilos.

Do you recall that?

A.   Yes.

Q.   Okay.  How many kilos in a year would you be responsible for?

A.   I wouldn't know.  I'd be lying if I gave you a figure.

Q.   Okay.  How many kilos would you sell in a month or -- strike that.

20 kilos was your normal sell.  How many normal sells do you average in a month?

A.   Sometimes one, or every two or three months.  It was not a day-to-day thing.

Q.   Okay.  So on a low average, maybe 100 kilos in a year?

A.   Probably yes, or not.

Q.   Okay.  Do you know a Señora Ed Hardy?

A.   No.

Q.   So when you see a contact with that name, you have no idea who that is?

A.   No.

Q.   When you went missing, would you have expected Chayo, which you called your mom, to ask around to see what happened to you?

A.   Yes.

Q.   Let's talk about what the Government is offering you for your testimony here today.

A.   Okay.

Q.   You said that you're asking -- you're asking to see if you can get leniency on your sentencing, correct?

A.   Correct.

Q.   And obviously, your girlfriend with your baby was not charged during this event, correct?

A.   Excuse me?

Q.   Your girlfriend, that was living with you, was not being charged with any of the events that happened in your home?

A.   No.

Q.   Are you going to receive any type of papers to remain in the United States after you do your time?

A.   No.

Q.   So once -- whatever sentence you get, you're going to get deported back to Mexico?

A.   There's a chance.

Q.   Have you ever seen the defendant Rene Hernandez Cordero?

A.   No.

Q.   You've never spoken to this gentleman ever; is that correct?

A.   Correct.

        MR. GUTIERREZ:  Pass the witness, Your Honor.

        THE COURT:  Redirect?

        MR. MYERS:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. MYERS:

Q.   Mr. Muñoz, Mr. Gutierrez, the defense attorney, asked you if Chayo introduced you to Ramos, and you had said yes.

A.   Uh-huh.

Q.   How was that introduction made?

A.   Over the phone.

Q.   So it's not a personal introduction she made?

A.   No.  It wasn't until we did the job.

Q.   And when is the first time you met Mr. Ramos?

A.   Almost early on, when I first arrived.

Q.   Here in the United States?

A.   Yes.

Q.   Now, in regard to immigration benefits.  You had indicated that you might not be deported.  What did you mean by that?

A.   Well, I wasn't promised anything.  It's just simply that

there could be a benefit.  There's a chance.

Q.  If you continue to cooperate with the Government?

A.  Yes.

Q.  And in terms of a prison sentence, have you been given a specific promise about how many years you're going to do in prison?

A.  No.

Q.  It's the understanding -- what is your understanding, that I'll write a recommendation for you?

A.  Yes.

Q.  Ultimately, who decides your sentence?

A.  The judge.

Q.  Are you familiar with the term "perjury"?

A.  No.

Q.  Could lying before a jury get you more prison time?

A.  Yes.

Q.  And if you get caught lying here today, what is your understanding of the deal?

A.  Well, that things will get worse and there will be nothing for me.

        MR. MYERS:  Your Honor, I pass the witness.

        MR. GUTIERREZ:  No further questions, Your Honor.

        THE COURT:  Very well.  You may be excused.

        Call year next witness.

        MR. MYERS:  Your Honor, the Government calls Irma

Gamez to the stand?

(Witness duly sworn.)

THE WITNESS:  I do.

THE CLERK:  You may lower your hand.

Please have a seat.

MR. MYERS:  May I proceed, Your Honor?

THE COURT:  You may proceed.

MR. MYERS:  Thank you.

IRMA GAMEZ, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MYERS:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Will you please state your name for the record?

A.  Irma Gamez.

Q.  And, Ms. Gamez, where do you work?

A.  I'm a special agent with the Drug Enforcement
Administration.

Q.  And how long have you been a special agent with the Drug
Enforcement Administration?

A.  Just a little over eight years.

Q.  And what did it take for you to become a special agent with
the Drug Enforcement Administration?

A.  I went to a 20-week course in Quantico, Virginia, where I
learned various items, to include law, firearms, use of force,

the agency's policy and procedures, arrest procedures, drug identification.  Items like that at the academy.

Q.   And before your time in Drug Enforcement with DEA, did you have any other law enforcement experience?

A.   I did.

Q.   And what was that?

A.   I was an agent with the United States Border Patrol.

Q.   As a Special Agent with the DEA, what kind of cases have you worked on?

A.   I've worked on various investigations, from local distribution to international large complex investigations.

Q.   Have you ever testified as an expert in the area of drug trafficking organizations before?

A.   Yes, I have.

Q.   Part of your experience in these international, or larger organizations, do those involve Mexican cartels?

A.   Yes, it does.

Q.   What kind of experience do you have investigating Mexican cartels?

A.   So I have participated and been part of an investigation that targeted the members of the Sinaloa cartel and -- as well as investigations that involved members of the Juárez cartel.

Q.   And those two cartels, are they -- have any personal relationship or business relationship with the area in the Western District of Texas?

A.   Yes.

Q.   And how do you know this?

A.   One of the investigations that I participated in involved the drug war that occurred here in Juárez between the time of 2008 up to the 2012/2013 time, where the Sinaloa cartel was fighting with the Juárez cartel here locally, in the Juárez area.

Q.   For your participation in these investigations, have you received any awards or achievements?

A.   Yes, I did.  I received -- in the year of 2023, I received an award from the Executive Office of the United States Attorney's Office.

Q.   And why did you receive that award?  What was that award part of?

A.   It was for being part of a legislative team where I participated in a trial that occurred here in El Paso, where two individuals of the Sinaloa cartel went to trial, and I assisted in that trial.

Q.   Now, in part of your sp- -- as a part of being a special agent, have you received any specialized training when it comes to investigating Mexican cartels?

A.   I have.  I received various types of trainings.  Here more recently, I went to a three-month -- I would say course, where I participated in a counter-threat team specifically targeting the Sinaloa cartel and CJNG, which is actually known as the

Cartel Jalisco Nueva Generación.

Q.   Okay.   The -- you had mentioned the Sinaloa cartel and the Juárez cartel.

Are there other cartels in Mexico that you are familiar with or that you have investigated?

A.   Yes.

Q.   And what are those cartels?

A.   So that includes cartels like the Beltran Leyva cartel. Again, I can mention what's known as CJNG, which is Cartel Jalisco Nueva Generación, Gulf cartel, and the Sonora cartel.

Q.   Through your training and experience, have you become familiar -- have you familiarized yourself with how drug cartels operate?

A.   Yes, I have.

Q.   Have you familiarized yourself with how drug cartels compartmentalize themselves?

A.   Yes, I have.

Q.   Have you familiarized yourself of how drug cartels use firearms?

A.   Yes.

MR. MYERS:   Your Honor, I proffer Special Agent Gamez as an expert in the area of drug trafficking organizations.

THE COURT:   You may.

BY MR. MYERS:

Q.   Special Agent Gamez, basically, what is the whole point of

a drug trafficking organization?

A. So drug trafficking organizations is kind of like you can see it as a business. So for example, Walmart. Ultimately, what they want to do is be able to kind of monopolize what they specialize in. The drug trafficking organization, drugs is their speciality.

So you can kind of see it as a business module, where the drug trafficking organization operates kind of like a business. You have your CEO, which is the head of the cartel, down to its lowest level employee within the cartel.

Q. Now, how do higher-level members of the cartel protect themselves?

A. So typically, higher-level members usually have enforcement within their actual cartel. So they have what we refer to as *sicarios*, or security for themselves. These are armed individuals that pertain to the cartels.

Q. Now these armed individuals, are they necessary for the drug trafficking to continue?

A. Absolutely.

Q. And how so?

A. So in order to continue the drug trafficking organization, these organizations, or cartels, have to defend themselves from rival cartels, as well as law enforcement trying to intervene or stop them from their activities.

Q. Without firearms, would drug trafficking cartels still be

able to distribute narcotics within the United States?

A.  Absolutely not.

Q.  Why not?

A.  Again, it's because drug trafficking is a -- again, if we discuss it in a business module, there's always competition. And in that world, in order to eliminate the competition, you have to use force, some kind of enforcement.

In doing so, if you are unarmed, you are not a -- you would not be participating in the competition.

Q.  Now, are you familiar with the plaza system?

A.  Yes, sir.

Q.  What is the plaza system?

A.  The plaza system is predominantly seen here in the southwestern border.  So the border is seen as a commodity for cartels, because it is the primary way that the cartels get their drugs into the United States.

So what we typically see here in the border area is cartels assigning individuals that we refer to as plaza bosses. So they'll assign a particular individual to be the representative for the cartels in a particular area.  For example Juárez, or cities around the Juárez area, like Ojinaga, Aldama, those kind of areas.  Usually, typically, they assign an individual that assumes responsibility for the cartel in that area.

Q.  Now, the plaza system is something that's based in Mexico

or here in the U.S.?

A.   In Mexico.

Q.   In Mexico.  Now under the plaza boss, are there different specialized roles that people play?

A.   Yes.

Q.   Are you familiar -- in your investigations, have you become familiar with those who specialize in transportation?

A.   Yes.

Q.   Would you kind of explain transportation cells to the jury?

A.   So transportation cells are pretty much what we refer to as couriers.  They're individuals that are recruited and hired to transport a drug from a certain area to a different area.

So for example, a courier can transport and be paid to transport a specific drug load from El Paso, Texas, up to Chicago.

Q.   Now, is there anybody that's specifically in charge or designated in charge of couriers, typically?

A.   Yes.  So what you tend to see is on one side you'll see the recruiter, somebody who recruits the courier to be hired and can work for the organization.  And then ultimately, somebody is always responsible for assuring that that courier is doing it's job and that that courier completes the job.

Q.   So a coordinator?

A.   Correct.

Q.   Okay.  So is the -- are the couriers able to typically

perform or complete their tasks without this coordinator?

A.   No.   They -- they always have to respond to somebody. Somebody is always overseeing them.

Q.   And now typically on, like the hierarchy, where do couriers fall?

A.   Couriers tend to be the lowest level members.

Q.   Now would a courier have permission, within this kind of criminal organization, to ask questions?

A.   Typically, no.   Lowest level members are the least to be allowed to ask questions.   They're kind of given what they're given, and that's it.

Q.   Is that on purpose?

A.   Yes.

Q.   And why is that?

A.   It's kind of seen as in the less you know, the less you can give.   So couriers tend to run the highest risk.   They're the ones who are out on the streets with the drugs in hand.   So they tend to run the highest risk when it comes to members of the organization.

     For that reason, they're given less information.   So that if they are arrested, they don't give additional members -- or they're not allowed to -- or they don't have enough information to produce that will harm the organization.

Q.   Now, are you familiar -- I think you had testified earlier that you're familiar with the CJNG?

A.   Correct.

Q.   And the -- that cartel, primarily where are they based out of?

A.   So they are based out of the state of Jalisco, specifically, Guadalajara.

Q.   Does this CJNG have any particular rivalries when they work in that area, or down close next to the state of Jalisco?

A.   So yes.  They -- the state of Jalisco is in the middle of -- between the states of *Michoacán* and Nayarit.

     So currently, and historically, they've had rivals, especially in the area of *Michoacán*.

Q.   And when you say "in the area of *Michoacán*," that's not within the state of Jalisco, but in a neighboring state?

A.   Correct.

Q.   And have you ever heard of the circle of trust?

A.   Yes.

Q.   What is the circle of trust?

A.   So the circle of trust is kind of a -- members that are part of the organization are recruited because they have some form of trust.  So either they're recruited by or recommended by somebody who's already trusted within the organization, or has kind of proved their loyalty.

     So in this business, loyalty means a lot.  So if you were a trusted individual, trusted member, you're expected to have a certain degree of loyalty.  Because being disloyal in

this organi- -- in this type of business could lead to death.

Q.  Now, do -- these cartel criminal organizations, do they conduct countersurveillance on U.S. federal law enforcement operations?

A.  Absolutely.

Q.  Why do they do that?

A.  Again, so countersurveillance can be seen for a multitude of reasons.  One, maybe they're trying to determine if one of the individuals that they're working with is also working with law enforcement.

Another reason is to safeguard whatever product is being exchanged at the time.

So countersurveillance is actually a common practice within these organizations.

Q.  Does countersurveillance help promote the trafficking of narcotics?

A.  Yes.

Q.  How so?

A.  So again, countersurveillance is to safeguard themselves from trying to detect law enforcement and from trying to prevent their product being stolen or seized by law enforcement.

Q.  Now typically, where do cartels in Mexico get their firearms from?

A.  Commonly -- it's common for them to obtain their firearms

from the United States.

Q.  Why in the United States, and why not in Mexico?

A.  So what we've seen here is the availability.  That's the largest -- or the biggest reason why the cartels tend to reach out to the United States to obtain their firearms.  The availability and the type of weapons they can obtain in the United States.

Typically, cartels seek large-caliber weapons, military style weapons like explosives, grenades.  And so the availability is a lot higher here in the United States.

And also, just like drugs kind of come into the United States, as the United States, we have things like the ports of entry, United States Border Patrol checkpoints, to help seize or stop that from occurring.

However, on the other hand, items going south is not, I guess, prevented as much.  We don't have the checkpoints typically going back into Mexico.  So it makes it a lot easier for things to go from the U.S. down to Mexico.

Q.  And what is the whole goal of a criminal organization that traffics in drugs?  What are they trying to earn?

A.  So the reason -- again, the reason the organizations seek firearms is, again, for their safety or for power, potentially.  Firearms are used to supply their own members, and again, utilize to secure their members from rival cartels or from interference with law enforcement in Mexico.

Q.   All right.  The use of code words.

Have you investigated or done investigations into drug cartels using cellphones?

A.   Yes.

Q.   Are cellphones an important part of investigative technique?

A.   Absolutely.

Q.   Why is that?

A.   Cellphones are the key communication between members. Everybody communicates via phones, whether it be web-based applications or phone calls, e-mails, anything like that.  A cellphone is the way to communicate between one member to the other.

Q.   Would a drug trafficking organization be able to carry out their goals if they could not communicate?

A.   No, it would be very difficult.

Q.   Is WhatsApp a popular forum for drug trafficking cartels?

A.   Absolutely.

Q.   Why?

A.   It's a web-based application, and it is utilized because it is end-to-end encryption, so it makes it difficult for law enforcement to intervene.

Q.   So how do you see WhatsApp messages in an investigation if you can't intercept them?

A.   So typically, we don't see WhatsApp messages unless we --

so say for example, we arrest someone and we seize a phone and we have access, whether it be a search warrant or consent to get into that phone.  That's the easiest way, I guess you can say, to get access to actually seeing content between exchanged WhatsApp messages.

MR. MYERS:  Your Honor, I pass the witness.

THE COURT:  You may proceed.

MR. GUTIERREZ:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.  Okay.  You talked about an organiz- --

I'm sorry.  Can you hear me there?

A.  Yes.

Q.  You talked about an organization, such as a business as Walmart, right, having a CEO on top, correct?

A.  Correct.

Q.  Are you able to give us a list of top to bottom, all the way to a courier?

A.  Like a list of names?

Q.  No.  A list of positions.

A.  So I can give you a general visualization of what a cartel could look like, structure -- structure wise.

Q.  Okay.  And obviously, your whole testimony here is generalization, correct?

A.  It's -- some form, yes.

Q.  You have not had an opportunity to look at any evidence in this case, I guess my question is.

A.  No, I have not.

Q.  Okay.  Give us a general structure.

A.  So normally what you have within a cartel is, again, the head of the cartel.  An example, to make it a little easier, for the Sinaloa cartel you have Ismael Mayo Zambada.  He's the head of the Sinaloa cartel.

Underneath that you typically have what you call lieutenants, or captains.  Those individuals are a direct representation of the head of the cartel.  So they -- you typically have easier access to communicate with those individuals than the head of the cartel.

Underneath the lieutenants and captains you'll have regional leaders.  So these are leaders that are assigned to certain states or areas within Mexico.

Underneath that, typically -- or at the same level, is what I referred to earlier as the plaza bosses, where that's predominantly just in the border area.  Again, individuals assigned to certain areas along the border by the cartel to be the representatives.

Underneath all that is when you have your workers and individuals that kind of carry out the goals and objectives of the cartel.  These are either couriers, your stash house operators, security members, money launderers, recruiters,

coordinators.  Those are the individuals you start seeing underneath that.

Q.  Thank you.

A.  Yes, sir.

Q.  You talked about a -- oh, going back to the organizational structure, the general organizational structure.

A person that was responsible for El Paso, Texas, for distribution of guns and drugs and money, where would he fall in that chain that you gave us?

A.  Do you mean like a person that oversaw the entire distribution in the El Paso area?

Q.  Yeah.

A.  That sounds like a leader, typically.  Some form of leader. Whether it's a particular cell, I don't know, unless you get a little more specific whether he's in El Paso or Mexico or something like that.

But it sounds, based on what you're saying, maybe a leader within -- within the organization.

Q.  Okay.  And he -- what you mentioned was a regional leader.

Is that where you're placing this person?

A.  Well, it just depends.  I don't know what -- to what scale. I would have to get a little more specific- -- a little more information.

Q.  Okay.  Some type of leader position.  Is that more or less what you're trying to tell us?

A.   Some form of leader position within the organization.  The hierarchy, it just depends on his true power and what he controlled.

Q.   Okay.  Now your expertise with these organizations, the cartels.

Do they have people that they do contract work with?

A.   Yes.  So what you might see is certain cartels align or form some type of alliance with other cartels in order to facilitate their business.

Q.   Okay.  Do they have people that -- let's say that work as electricians?

Obviously, they have a lot of places.  Do they have electricians?  Do -- these electricians, are they part of this cartel, or are they just people that they pay to come do work for them?

A.   So it can kind of go both ways.  But typically again, going back to the level of trust and the reason they need to trust these individuals is because the exposure that they set themselves up to.

So if -- yes, absolutely.  They may have individuals that they need for communications or electricians, stuff like that.

But typically, they're individuals with a level of trust.  And typically, they're paid for their position or for their job, which ultimately makes them a member of the cartels.

Q.   So you're saying that if they needed a plumber, this plumber is part of the cartel?

A.   Well, it just depends.  I mean -- are we talking about Mayo Zambada needing a plumber?  I mean, you're going to know you're dealing with Mayo Zambada.  So it just depends on what you're talking about.

Q.   Okay.  So it could be a person, a plumber, they just -- that they call on Yellow Pages, to get this guy to come fix whatever a plumber -- a toilet?

A.   I mean, I guess it can happen, yes.

Q.   Are you familiar with Mexican laws as well?

A.   Not really.

Q.   Okay.  Let me pose a question.

     We had testimony that Mexico allows people to have a license to purchase and to sell firearms in Mexico.

     Are you familiar with that?

A.   I am not.

Q.   Okay.  Fair enough.

     Are you familiar with the mere association to a cartel member does not make them a cartel -- or conspirator?

A.   Mere association?  What do you -- I guess, what do you mean?

Q.   Okay.  I'm going to read this, and you tell me whether you agree to it or not.  Okay?

     "Mere presence at the scene of an event, even with

knowledge that a crime is being committed, or that the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy."

Do you agree with that statement?

A.  I guess I need a little more specific.  But if you're talking about, let's say, were meeting together to discuss a transaction that we're potentially going to commit, then yes, it could be part of a conspiracy.

Q.  So you do not agree with what I just read?

A.  Well, again, it just depends.  But I just feel like I need a little bit more information to determine that.

Q.  So if I just read you the law, you would have an issue with it?

A.  No, not necessarily.  Again, it just depends on the particular situation that you want me to apply that to.

Q.  Okay.  What methods do the cartels use to control or intimidate informants or their personnel?

A.  So there's various methods they can target, such as identifying who family members are, direct communication with this individual there are threats, threats to the family.

So intimidation can come in various forms to an individual.

Q.  Thank you for your time.

MR. GUTIERREZ:  Your Honor, I pass the witness.

THE COURT:  Redirect?

MR. MYERS:  No other questions, Your Honor.

May this witness be excused?

THE COURT:  You may be excused.

THE WITNESS:  Thank you.

THE COURT:  You're free to leave.

MR. MYERS:  Your Honor, may the Government read the stipulation into evidence?

THE COURT:  It's been marked as Government's Exhibit 7N.  Move to admit it, and then you can read it.

MR. MYERS:  Your Honor, the Government moves to admit Government's Exhibit 7N into evidence.

THE COURT:  There being no objection?

MR. GUTIERREZ:  No objections, Your Honor.

THE COURT:  Okay.  It's admitted.

You may read it to the jury, Mr. Myers.

MR. MYERS:  The United States of America versus Rene Hernandez Cordero.

The United States of America, by and through its United States Attorney for the Western District of Texas, the undersigned Assistant United States Attorneys, and the defendant in the above-entitled and numbered cause, by and through their attorneys, and file this Stipulation of Facts, and all parties represent to the Court that the following facts

are stipulated and not in issue.

That if Bradley Fleming and Rasmin Michael, both forensic chemists with the Drug Enforcement Administration, were present to testify, they would testify concerning substances seized on March 30th and 31st of 2023.

Collectively, they would testify that the Substance 1B1 is approximately 2,200 grams of methamphetamine.

Substance 1B2 is approximately 2,400 grams of methamphetamine.

And substance 1B3 is approximately 300 grams of Fentanyl.

Both Fentanyl and methamphetamine are controlled substances.

There is no dispute amongst the parties as to the chain of custody of the narcotics in this case from the seizing officers to the chemists.

The defendant agrees the Government may introduce the official chemist reports into evidence for the purpose of making the record complete.

This stipulation is not an agreement by the defendant as to guilt or knowledge about drug trafficking.  This stipulation is only an agreement that the substances obtained on March 30th and 31st, 2023, tested positive for methamphetamine and Fentanyl.

Signed and agreed by myself and Mr. Gutierrez.

Case 3:23-cr-01842-DB   Document 199   Filed 10/09/24   Page 127 of 172

Doolin - Direct by Ms. Holderfield          4 - 127

THE COURT:  Who's going to be your next witness?

MR. MYERS:  Patrick Doolin, Your Honor.

THE COURT:  We're just going to go for a few minutes because we're going to take a break at 2:20, a 10-minute break, and come back 2:30.  And we're going -- we're going to cut off early today, members of the jury.  By 3:30 we will be out of here hopefully, but you will have to come back Monday.

THE CLERK:  Please raise your right hand.

(Witness duly sworn.)

THE WITNESS:  I do.

THE CLERK:  You may lower your hand.

Please have a seat.

PATRICK DOOLIN, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. HOLDERFIELD:

Q.  Good afternoon.

Would you please state your name and spell it for the record?

A.  Yes, ma'am.  Patrick Doolin.  Last name, D-O-O-L-I-N.

Q.  Where do your work?

A.  I work with the FBI here in El Paso.

Q.  What's your current position?

A.  I'm a special agent on the Organized Crime Drug Enforcement Administration Task Force.

Q.  How long have you been an FBI special agent?

A.   Almost a year and a half.

Q.   Did you attend the training academy?

A.   Yes, ma'am.

Q.   What was that training?

A.   It was comprised of -- about four months -- a combination of firearms, defensive tactics, a little bit of drug case management, interviewing, and just general basic skills expected of special agents.

Q.   You said you were assigned to the organized crime unit.

          What are your duties and responsibilities as being part of that unit?

A.   We investigate criminal enterprises, particularly the cartel groups, focused on firearms and the drugs, bulk cash smuggling, and various parts of the cartel activity.

Q.   Did you receive specialized training for that?

A.   Not particularly.

Q.   What did you do before becoming an FBI special agent?

A.   I was an active duty air defense control officer in the United States Marine Corps.

Q.   And how long were you in the Marine Corps?

A.   Four years.

Q.   Are you -- are you familiar with this case?

A.   I am.

Q.   And when did you first become involved in this investigation?

A.   When I joined the Organized Crime Drug Enforcement Task Force in 2022.

Q.   And what has your role been in this investigation?

A.   Assisted just kind of a general investigation, including interviews, surveillance, source handling, and preparing some of the documents for the case.

Q.   So as a recap for the jury, who is the head of this organization that you've been investigating?

A.   Maria del Rosario Navarro, aka Chayo.

Q.   Who do we knew works for Chayo?

A.   We've identified several individuals over the course of this investigation: Saul Humberto Quezada-Orozco, Brian Alexis Muñoz-Castro, Rene Hernandez Cordero, Jesús Gerardo Ramos, and Pablo Delgado.

MR. GUTIERREZ:  Your Honor, I'm going to object to my defendant being named.  There's no evidence yet to substantiate.  That's why we're here.

THE COURT:  I'm overruling it.

MR. GUTIERREZ:  Thank you, Your Honor.

BY MS. HOLDERFIELD:

Q.   Agent Doolin, who is Pablo Delgado?

A.   Pablo Delgado is an El Paso-based straw purchaser of firearms.  He worked for Brian; and, therefore, Chayo.

Q.   Can you remind the jury what a straw purchaser is?

A.   A straw purchaser is basically someone who helps procure

firearms for someone who is not legally able to do so.

Q.  And who is Brian Muñoz-Castro?

A.  He is a coordinator based in the El Paso area, who was sent by Chayo to El Paso, to continue her work out here.

Q.  And how are -- how are Pablo -- Pablo Delgado and Brian Muñoz connected?

A.  In a professional sense, Pablo is a straw purchaser who obtains firearms for Brian.

And in a personal setting, Brian is the father of a child with Victoria Mora, who is the cousin of Pablo Delgado.

Q.  Who is -- who is Saul Quezada?

A.  Saul Quezada is a smuggler who's known to move firearms, cash, and drugs throughout the El Paso area.

Q.  And who is he connected to?

A.  He's connected to Brian.

Q.  Okay.  You mentioned Saul Quezada.

Were you involved in event -- in an event on March 31st of 2023?

A.  Yes, ma'am.

Q.  What was your role in that?

A.  I was assisting with surveillance, and a consent search as well.

Q.  Okay.  Could you tell the jury, like, how -- how March 31st started?

A.  Absolutely.  So my understanding, Task Force Cervantes was

monitoring a pen register.  He identified a number in frequent contact with Chayo.  He then used his database information to find the vehicle and knew when it had crossed, and identified that vehicle with Saul Quezada-Orozco.

At that point, the task force began doing surveillance on that vehicle.  Eventually, we saw Mr. Quezada go to various gun stores, culminating at Gun Central, in El Paso.  He purchased --

Q.  Let me stop you right there.

A.  Yes.

Q.  What color -- what color vehicle was Mr. Quezada driving?

A.  It was blue.

Q.  And where did you go?  When you were following Mr. Quezada, where did you end up?

A.  I ended up in a parking lot near Gun Central.

Q.  Okay.  And where did you park?

A.  I parked in the parking -- in a parking lot adjacent to it that would be going -- facing eastbound on I-10 near the Gateway.

Q.  Could you see Mr. Quezada?

A.  Yes, ma'am.

Q.  Okay.  I'm referring to Government's Exhibit 4J, which has not been admitted into evidence.

Agent Doolin, can you see the screen in front of you?

A.  No, but I can see it over there.

Oh, there it is.  Yes, I can see it now.

Q.   Do you recognize this?

A.   I do.

Q.   Is this a fair and accurate photograph of what you saw at Gun Central?

A.   Yes.

MS. HOLDERFIELD:  Your Honor, the Government moves to admit Government's Exhibit 4J into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 4J will be admitted.

MS. HOLDERFIELD:  And permission to publish, Your Honor?

THE COURT:  You may.

BY MR. MYERS:

Q.   Agent Doolin, would you please describe the photo, what's on your screen, to the jury?

A.   Yes.  So that is Saul Humberto Quezada-Orozco heading back to his blue Ford Fiesta, which is the vehicle we were conducting surveillance on at the time, coming back out of Gun Central carrying a cardboard triangular-shaped box and a bag, as well.

Q.   Did he make a purchase from Gun Central?

A.   Yes, he did.

Q.   All right.  Did you -- did you see Mr. Quezada get back into the blue vehicle?

A.   I did.

Q.   Did he drive -- did he drive off from the parking lot?

A.   Yes.

Q.   What did you do at that point?

A.   At that point I was instructed to go approach the employees of Gun Central, which I did.  I went inside and interviewed the cashier, one of the employees named Joshua Arellano.  And he provided me with the receipts that Saul made that day.

Q.   I'm referring to what's been marked as Government's Exhibit 4G.  It's not been admitted into evidence.

          Agent Doolin, do you recognize this?

A.   I do.

Q.   Is this a fair and accurate photograph of the receipt that you obtained?

A.   Yes, ma'am.

          MS. HOLDERFIELD:  Your Honor, the Government moves to admit Government's Exhibit 4G into evidence.

          MR. GUTIERREZ:  No objection.

          THE COURT:  Government's Exhibit 4G will be admitted.

BY MS. HOLDERFIELD:

Q.   I'm also referring to Government's Exhibit 4H, which has not been admitted into evidence.

          Agent Doolin, do you recognize this?

A.   I do.

Q.   Is this a fair and accurate receipt from Gun Central?

A.  Yes.

MS. HOLDERFIELD:  Your Honor, the Government moves to admit 4H into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 4H will be admitted.

MS. HOLDERFIELD:  Permission to publish 4G and 4H to the jury?

THE COURT:  You may publish.

BY MS. HOLDERFIELD:

Q.  Agent Doolin, can you please describe the photograph -- the receipt in this -- in this photograph?

A.  Yes.  So that one -- that one looks like the receipt from March 30th, on the day prior.  And that was purchased by Saul Humberto Quezada-Orozco.

Q.  And what about 4H?

A.  That was the receipt for the items purchased by Saul Humberto Quezada-Orozco on the 31st, while we were conducting surveillance.

Q.  And what items --

THE COURT:  Ms. Holderfield --

MS. HOLDERFIELD:  Yes, Your Honor.

THE COURT:  -- let me interrupt you.

We're going to take a -- hopefully, 10-minute break, and then we'll return.

MS. HOLDERFIELD:  Yes, Your Honor.

THE COURT:  For the last hour.

We'll be in recess.

(Recess taken 2:20 to 2:30 p.m.)

THE COURT:  Ms. Holderfield, you may continue.

MS. HOLDERFIELD:  Yes, Your Honor.

BY MS. HOLDERFIELD:

Q.  Agent Doolin, we left off with the receipts that you obtained from Gun Central throughout the day that ultimately led to agents talking to Brian Muñoz-Castro.

A.  Yes.

Q.  And was Brian arrested that day?

A.  No.

Q.  Why?

A.  So at that time we were looking to potentially use him to further our investigation.  So it made more sense to have him not be in custody at the time.

Q.  Okay.  But Brian -- Brian was cooperating with the FBI?

A.  Correct.

Q.  Okay.  And how long did he communicate with -- with law enforcement?

A.  For a couple of months after our first contact with him on March 31st.

Q.  And did he stop talking to agents?

A.  Eventually, yes.

Q.  Okay.  And while Brian was cooperating with the FBI, where

was Chayo in all of this?

A.   To our understanding, still in Mexico.

Q.   Okay.  And what was she doing?

A.   She's still trying to procure firearms the best she can.

Q.   Was Brian Muñoz an integral part of the organization?

A.   Yes, ma'am.

Q.   And he's no longer part of that picture?

A.   Correct.

Q.   Okay.  And was Chayo speaking with Brian at this point?

A.   Not to our knowledge.

Q.   Was she talking to anybody else?

A.   Yes.

Q.   All right.  What was she doing?

A.   She was attempting to get firearms for her organization in the absence of Brian.

Q.   Okay.  And how was she doing that?

A.   She was communicating with an FBI confidential human source.

Q.   All right.  And so she's still interested in firearms?

A.   Yes.

Q.   The discussions between her and the -- Chayo and the confidential human source, did she find somebody to purchase firearms?

A.   Eventually, yes.

Q.   Okay.  How did that happen?

A.   At that point the FBI and ATF were working together.  At that point the decision was made to introduce an ATF undercover agent to Chayo.

Q.   All right.  And was Toro -- was the undercover agent information passed to Chayo?

A.   Yes.

Q.   And what did she do?

A.   Eventually, Chayo and the undercover agent, known as Toro, began having discussions about firearms.  And that leads to setting up the logistics for making that deal happen.

Q.   All right.  Did Toro send pictures of guns to Chayo?

A.   Yes.

Q.   What kind of -- what kind of firearms?

A.   AK-47s and Barrett .50 calibers.

Q.   And how much were those?

A.   It was approximately $66,000.

Q.   Did Chayo agree to purchase those?

A.   Yes.

Q.   And what did -- what did the undercover agent communicate about payment?

A.   He said he was fine with having someone deliver bulk cash to him on the deal, which is pretty standard.  But he did ask for a -- approximately $3,000 storage fee on the front end.

Q.   And who made that -- and who did Chayo make a payment to?

A.   She made a payment to a Western Union account, which was

actually operated by the ATF.

Q.  All right.  And upon that down payment, did Chayo and Toro arrange a date and time to pick up the guns?

A.  Yes.

Q.  What date was that?

A.  It ended up being August 21st of 2023, which was a Monday.

Q.  All right.  At this point did we know who were -- who was going to meet Toro?

A.  Not precisely.

Q.  Did we later learn who met up with Toro?

A.  Yes.

Q.  And who was that?

A.  It was her -- Jesús Gerardo Ramos and Rene Hernandez Cordero.

Q.  Okay.  Had -- the undercover agent and Chayo, had they spoken previously to the August 21st date?

A.  Yes, they were in contact.

Q.  All right.  So the day of August 21st, 2023, which agency is overseeing the operation?

A.  The ATF, at this point, is the lead agency for that operation.

Q.  And where is the FBI?

A.  The FBI is out there with them.  We're more in a support role, mostly providing surveillance, to provide situational awareness to the takedown team.

Q.   Were you there that day?

A.   I was.

Q.   And where were you?

A.   I was on surveillance across the street from the Circle K on Dyer.  I believe it was in the parking lot of a Wienerschnitzel restaurant.

          MS. HOLDERFIELD:  I'm referring to what has already been admitted into evidence as Government's Exhibit 3B.

          Permission to publish, Your Honor?

          THE COURT:  It's been admitted?

          MS. HOLDERFIELD:  Yes, sir.

          THE COURT:  You may.

          MS. HOLDERFIELD:  I apologize, Your Honor.  It's a different map.

          One moment, Your Honor.

          Your Honor, I'm referring to Government's Exhibit 5B, which has already been admitted.

          Permission to publish?

          THE COURT:  You may publish.

BY MS. HOLDERFIELD:

Q.   Agent Doolin, where were you -- where were you parked on the day of August 21st, 2023?

A.   So I was in the -- if you look on the right, top right corner near the Fairbanks Drive and Dyer intersection, there's a Wienerschnitzel right there.  I was in that parking lot right

there.

Q.  Okay.  And so you have a direct line of sight to the Circle K?

A.  There are some vehicles there as well, but I can see what's happening at the Circle K.

Q.  Okay.  Before the meet up at the Circle K, were agents watching the pen register on Chayo's phone number?

A.  Yes.

Q.  And what was the pen register showing?

A.  It was showing numbers on the hot list, which is basically numbers in pretty frequent contact with Chayo at that particular time and day.

Q.  Okay.  And was there a number that was showing up more frequently than others that day?

A.  Yes.

Q.  And do you know who that number belonged to?

A.  It was our understanding it was Rene Hernandez Cordero.

Q.  Okay.  Did -- did ATF and FBI know anything about Mr. Hernandez Cordero, like, at that moment?

A.  Yes.

Q.  And what was that?

A.  So based on that number, they were able to correlate it with information from the Customs and Border Protection database obtained by TFO Cervantes.  We'll see basic biographical information and when this individual crosses.

Q.   All right.   Did agents know at that point, though, that Mr. Hernandez Cordero was coming to the Circle K?

A.   Not for sure, no.

Q.   Okay.   Did the white Ford Bronco pull into the Circle K?

A.   Yes.

Q.   Okay.   And did that Ford Bronco belong to Mr. Hernandez Cordero?

A.   Based on the information we received, yes.

Q.   Okay.   What did the undercover agent do?

A.   The undercover agent got out of the vehicle and interacted with the white Ford Bronco.

Q.   Did anybody else show up to the Circle K?

A.   Yes.

Q.   And who was that?

A.   It was a -- we saw a gray Ford truck, which we later understood to be driven by Jesús Herrera Ramos.

Q.   All right.   And did those three cars leave at some point?

A.   Yes.

Q.   Did you follow them?

A.   I did not, no.

Q.   Did you know where they were going?

A.   Based on what I was hearing over the radio, yes.

Q.   Where were they going?

A.   They were headed to a warehouse very close by in -- on Dyer.

Q.   And you didn't follow them?

A.   I did not follow them, no.

Q.   But you were just listening over the radio?

A.   Correct.

Q.   And what did you learn happened at the storage facility?

A.   Both individuals were later detained by the ATF's special response team.  The subjects were subsequently interviewed and later booked at the El Paso County Detention Facility.

Q.   Did you interview them?

A.   I did not interview them.

Q.   What was your involvement for the rest of the day?

A.   So after, I -- I stayed put in my surveillance posture.  I was instructed -- once the takedown went down, we were instructed to remain in the area, which I did, in case extra hands were needed.  Later that evening I assisted with the booking process, briefly, for the subjects.

Q.   Was a -- was a search warrant executed on Mr. Hernandez Cordero's phone?

A.   Yes.

Q.   Did you review the contents of those -- of that phone?

A.   I did.

Q.   And what was discovered on the phone?

A.   Evidence of drug trafficking, firearms trafficking, and communication with Chayo.

          MS. HOLDERFIELD:  Your Honor, I am referring to what's

been previously admitted as Government's Exhibit 15A and 15B.

THE COURT:  They have been admitted?

MS. HOLDERFIELD:  Yes, Your Honor.

THE COURT:  You may publish.

BY MS. HOLDERFIELD:

Q.  Agent Doolin, do you recognize this photograph?

A.  Yes.

Q.  And what's this a picture of?

A.  It's a screenshot from the cellphone associated with Rene Hernandez Cordero.

Q.  Okay.  And 15B.  Can you tell me what this is?

A.  The -- basically, a translation of what was on the phone.

Q.  All right.  And can you go ahead and read the conversation that appears on April 20th of 2023?

A.  Absolutely.  So heads up, the gray is the -- is Chayo talking.  The green side is Mr. Cordero talking.

So basically she says, Good morning.  What's up?  Usual greetings.

Rene Cordero replies.

At that point she asks, Hey, do you have anyone that can pick up some stuff with the neighbor, and how much, so I can tell them?

Mr. Cordero says, What stuff is it?

And she says, It's cold, or *son frio*.

Q.  I'm going to stop you right there.

A.   Yeah.

Q.   When she refers to *frio*, the English transaction is "it's cold"?

A.   Correct.

Q.   Based off of your experience and training, what does that mean?

A.   It's a -- I understood it to be a pseudonym or slang term for methamphetamine or illegal narcotics.

Q.   All right.  Go ahead and continue.

A.   Absolutely.  So at that point, after -- or Chayo says -- made that reference, he says -- Hernandez Cordero asks, Where are they going to drop it off, implying he's looking for the destination of those items.

     Do you want me to keep going?

Q.   Yes, please.

A.   Then Chayo replies, We'll take care of it for a few days while a driver gets here, implying they're waiting on a courier.

Q.   Okay.  Continue.

A.   At that point Mr. Cordero asks, How much is it?

     Chayo says, It's 9/5.

     Cordero asked, Is it what your buddy Juanito is crossing?

     And then she says, It comes in pounds, 22 packages.  It's our buddy, Juanito, is crossing.  You think if it was

someone -- I wouldn't ask someone.  It's because he doesn't want to work anymore, in case you had any doubt.

She follows up later, What did they say?  And multiple times.

Q.  All right.  I'm going to reference 22 packages.

A.  Yes.

Q.  What is -- what is that in reference to?

A.  My understanding, it's in reference to illegal narcotics.

Q.  And is -- 22 packages, is that a large amount?

A.  Yes.

Q.  All right.  Continue.  Go ahead and continue.

A.  So Cordero says, Let me see.

Chayo says, Okay.  If not, so I can tell them no, because they are annoying me.

Mr. Cordero says, I'll let you know.  No one wants to take care of that crap, and there's no answer, implying that he had difficulty obtaining couriers.

Q.  Okay.  Continue.

A.  Chayo says, Tell them only two days.

Cordero says, Let me see.

And then Chayo acquiesces and says, Okay.  Let's see what they say.

Mr. Cordero replies, They're seeing no one wants to. It's a useless crutch.

Chayo says, Not even for a fee?

And I think the page is blank.

Mr. Cordero says, No, it's too much of a hassle.

Eventually Chayo, soon after that, says, Found someone.

And then the conversation ends and he's saying, Okay. Good.

MS. HOLDERFIELD:  Your Honor, I'm referring to what's been previously admitted as Government's Exhibit 15C and 15D.

THE COURT:  You may publish.

BY MS. HOLDERFIELD:

Q.  Agent Doolin, there were other conversations with Mr.- -- on Mr. Hernandez Cordero's phone, correct?

A.  Yes, ma'am.

Q.  Who else was he talking to?

A.  An individual known as Ramos Rural.

Q.  And who -- what do we know about Ramos Rural?

A.  We understand him to be the brother of Jesús Gerardo Ramos.

Q.  Okay.  And do you recognize Government's Exhibit 15B?

A.  Yes.

Q.  Okay.  And is this a direct translation of the cellphone conversation?

A.  Yes, ma'am.

Q.  Okay.  Could you please read it to the jury?

A.  Absolutely.  So starting off, Hernandez initiates and says, What's up?  Good evening.

Ramos replies similarly.

At that point Mr. Hernandez Cordero asks, Good.  Hey, would there be someone who could take care of some material for two days?  They're with the neighbor.

Ramos asks, What is it?

At that point Mr. Cordero replies with a *frio*, with a kind of cold face emoji, blue.

He says, 11 kilograms *of frio*, or 11 kilograms, which I understood to be a reference to ice or methamphetamine or illegal narcotics.

At that point Ramos Rural says he's going to find out.

At that point Cordero says, Okay.  Let me know what's up.  Hey, no longer needed.  They found someone.

And which Ramos Rural copies that message.

Q.  Now based on your training and experience, what is -- what are the significance of these text messages?

A.  Well, firstly, there's an obvious reference to illegal narcotics, specifically methamphetamine, with ice, or the *frio* emoji.  There's the amounts, the 11 kilograms, as well.  And third is Mr. Cordero kind of performing a coordinating role of helping to find someone to move illegal narcotics.

MS. HOLDERFIELD:  Your Honor, may I have a moment to consult with co-counsel?

THE COURT:  You may.

(Ms. Holderfield conferring with Mr. Myers.)

MS. HOLDERFIELD:  Your Honor, I'm referring to what's been previously admitted as Government's Exhibits 15E and 15F.

THE COURT:  You may.

MS. HOLDERFIELD:  Permission to publish both?

THE COURT:  Yes, you may publish.

BY MS. HOLDERFIELD:

Q.  Agent Doolin, do you recognize this photograph?

A.  I do.

Q.  Is this also from Mr. Hernandez Cordero's phone?

A.  Correct.

Q.  Okay.  Do you recognize Government's Exhibit 15F?

A.  Yes.  It's an English translation of the conversation that we had previously.

Q.  Okay.  Can you please go ahead and read this conversation?

A.  So in this case, Señora Ed Hardy is speaking with Mr. Hernandez Cordero.  Based on that number and our previous knowledge, we understood that to be Chayo.

Chayo introduces the conversation saying, Hey, what's up?  How did it come out this weekend?

Mr. Cordero replies with, Well, just rims and shorts, but expensive.

And that sentence, I understood that to be a euphemism or slang for firearms.

Chayo then replies, Mmm.  And the boxes, when do they arrive?

Mr. Cordero says, Well, I have 300 here.

And Chayo acknowledges that.

Q.   Okay.  And continue reading on April 26th, 2023.

A.   Yes.  Mr. Cordero initiates this conversation.

Good afternoon.  Hey, do you have a client for the 2C-B or pink cocaine?

And Chayo says, Where?

There inside.

Hey, do me a solid search this person.

Q.   Continue.

A.   In the pages of El Paso.

Mr. Cordero asks her to clarify.

And then she listed the name of Brayan Alexi Muños-Castro, which we understood to be Brian Alexis Muñoz-Castro.

At that point, Mr. Cordero is asking for a date of birth.

And then she -- Chayo provides that date of birth.

And Mr. Cordero says, I'll search there.

And at that point Chayo says, Where do you have clients?

Mr. Cordero says that, If you have any, there's some here.

Chayo, That's why.  She asks him, Do you want the client in the USA?

Mr. Cordero says, Well, let's see what's in it.

Chayo says, Let's see.  We usually get whites, but let me tell them.

We understood "white" to be a reference to cocaine or otherwise illegal narcotics.

At that point Mr. Cordero says, Well, it seems to be becoming fashionable.

Ms.- -- Chayo says, That's old from Mexico City.  They bring someone dumb, and a snail emoji, here.

Snail emoji.  I understand that to be slow.

Q.   And continue?

A.   Yes.  Well, yes, there is a cook.  You don't want to contract them.

I understand the cook to be reference to someone who actually manufactures the drugs themselves.

Chayo says, Let me see.  And that it came out.

Mr. Cordero says, Nothing, just small stuff and rims, Rines 223 and 308.

The 223 and 308 I understood to be a reference to ammunition or caliber.

At this point Chayo says, But, *Pero el rin largo,* or, But the long rim.

I understood that to be a reference to a rifle, if you look at the context of 223 and 308.

The new one -- she also says, The new one?

And Mr. Cordero replies with, *Si largos,* yes, long, a reference to rifles.

MS. HOLDERFIELD:  Your Honor, may I have another moment?

THE COURT:  You may.

MS. HOLDERFIELD:  Nothing further, Your Honor.

Pass the witness.

THE COURT:  You may proceed, Mr. Gutierrez.

MR. GUTIERREZ:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.   Agent, you don't dispute that Brian Muñoz-Castro was the person in charge of here in El Paso for Chayo?

A.   Correct.  He's the coordinator in El Paso.

Q.   Okay.  And he had direct communication between Chayo and himself, correct?

A.   Yes.

Q.   Vice versa.  She had communication with him directly?

A.   Yes.

Q.   And you don't dispute that Brian Muñoz-Castro dealt with drugs, firearms, weapons, money, everything that needed to be done here in El Paso County for Chayo.

You don't dispute that, right?

A.   No, sir, I don't dispute that.

Q.   On March 30th, 2023, that was when they approached Brian

Muñoz-Castro, correct?

A.   No, sir.  That was March 31st.

Q.   Oh, I apologize.

That was when he did the trade, the buy/walk, correct?

A.   March 30th was the buy/walk, yes, sir.

Q.   You were present for that?

A.   I was.

Q.   And that was with Brian Muñoz-Castro, correct?

A.   Yes.

Q.   March 31st is when they approached him at his house?

A.   Correct.

Q.   2023?

A.   Yes.

Q.   And that's when he got -- gave consent, and they went into the home and they found all the other drugs, correct?

A.   Yes, sir.

Q.   March 30th, March 31st, 2023, you did not know of Rene Hernandez Cordero; is that correct?

A.   Correct.  Not at the time.

Q.   You did not become aware of Rene Hernandez Cordero until August 21st, 2023?

A.   Around that time, yes, sir.

Q.   Was it that time or was it after or before?  When?  Any -- exactly.

A.   We were briefed in the morning on the 21st of possible

individuals that might be coming in to pick up.

Q. Right. So August 21st, 2023, is when you first became aware of Rene Hernandez Cordero?

A. I became aware of him on the 21st, yes, sir.

Q. Now, we talked about -- you talked about August 21st, 2023, you were positioned at a Der Wienerschnitzel; is that correct?

A. Yes, sir.

Q. Were you -- you had a bird's-eye view of the Circle K, I would imagine?

A. Not a bird's-eye view. I was on the ground.

Q. Right. I apologize.

You had a direct view of the Circle K?

A. Yes, sir.

Q. Did you notice that Rene Hernandez Cordero left by himself for a moment?

A. Yes.

Q. And were you aware that he actually just drove a couple of streets and parked?

A. I don't know where he went after he left the first time.

Q. You didn't get any information, through the line of the air surveillance of Mr. Cordero, just going a couple of streets down and parking?

A. Not to my knowledge.

Q. Okay. And you said you did a pen trap? You had a pen trap during that time?

A.   We had a pen register.  I wasn't personally monitoring at the time.

Q.   Okay.  But you testified that during that time Rene Cordero was talking with another person?

A.   Yes.

Q.   Who was that other person?

A.   Chayo.

Q.   Chayo.  Okay.  And that was the time that he left by himself.  Is it safe to assume that he was ordered to go back?

A.   I don't know what his conversations were that he was having with Chayo.

Q.   So he left by himself.  He confirmed that there was a phone call, and then he went back?

Is that safe to say?

A.   I don't remember the exact order of the phone call.  And I knew during the day he was in contact with Chayo.

Q.   Okay.  And then you went through Exhibits 15A and 15B of communication between Rene Hernandez Cordero --

A.   Yes, sir.

Q.   -- with Chayo, correct?

A.   Yes, sir.

Q.   And after all the discussion she said, I found somebody. Forget it, basically; is that correct?

A.   For which day?

Q.   Oh.  15B.  Let me get the exhibit.  Hold on.

MR. GUTIERREZ:  Your Honor, may I publish already what's been admitted as 15B exhibit?

THE COURT:  You may.

BY MR. GUTIERREZ:

Q.  Do you see the date of April 20th, 2023?

A.  Yes, sir.

Q.  And this is the discussion that she was looking for somebody?

A.  I can't see that part of it.

Q.  Okay.  Let's --

A.  I'm not seeing the -- her asking to -- looking for somebody.  It looks like the discussion of *frio* and, What stuff is it?

Q.  All right.

A.  I don't see the question about looking for somebody.  It just says talking about the 22 packages, the Juanito.

She says, In case you had any doubt, what did they say?  What did they say?

Q.  Okay.  I'm just going through the whole exhibit.

A.  Good to go.

Basically, they're saying -- they are discussing where to -- what to do with the materials they have.

Q.  Well, she's asking, Find somebody, because I'm only here for two days, correct?

A.  Correct.

Q.   And then at the very last she tells him, I found somebody, right?

A.   Right.

Q.   So the conversation ends, correct?

A.   Yes.

Q.   So his involvement ended right there, correct?

A.   For that particular conversation on April 20th, 2023.

Q.   And information is not a crime, right?  The mere association, the mere talking, is not a crime itself, correct?

A.   Not to my understanding.

Q.   Good.  Okay.

        Then there was a discussion of firearms, correct?

A.   Yes.

Q.   Between Rene Hernandez Cordero and Chayo?

A.   Yes, sir.

Q.   Now, you said that you were able to pull the border crossings of Mr. Hernandez Cordero?

A.   Yes.  Task Force Officer Cervantes was then sending that to everyone participating.

Q.   Okay.  And during these conversations, when he's talking about guns, he's still in Mexico, correct?

A.   Who's still in Mexico?

Q.   Rene Hernandez Cordero.

A.   I didn't know where he was.  But to my understanding, yes, he was in Mexico.

Q.   Okay.  So he lives in Mexico, right?

A.   Yes.

Q.   And there was testimony that there's a possibility of him having a Mexican license to purchase and sell firearms.

Were you aware of that?

A.   No.

Q.   The possibility of him having a firearms license in Mexico, it would not be -- it would be lawful for him to talk about weapons in Mexico, correct?

A.   Yes.

Q.   Okay.  In fact, just talking about weapons alone is not a crime, right?

A.   I don't -- I don't know the laws of Mexico.

Q.   Even in the United States, if I text you about a weapon, it's not unlawful for us to talk about a weapon, right?

A.   Potentially.

Q.   So if I text you I want to sell a Glock to you, I have just committed a crime?

A.   No, sir.

Q.   I'm sorry?

A.   No, sir.

Q.   Okay.  It's not illegal for a person to search for another person in the United States?

A.   Not at all.

Q.   Do you know if it is legal to have 223 caliber and 308

caliber in Mexico?

A.  I don't know.

Q.  You do not know?

A.  No.

Q.  There is a possibility though, right?

A.  Again, I don't know the laws of Mexico.

Q.  Fair enough.

Did you get any assistance from the Mexican authorities to obtain any other information -- phone tracking, phone tapping -- in Mexico?

A.  Not to my knowledge, sir.

Q.  But there is that venue, right, to get concrete information?

A.  Yes.  Other agents may have done it, but I can speak to what I personally do.

Q.  But you didn't do it?

A.  I personally didn't do it.

Q.  You weren't aware if there was any voice comparisons or voice exemplary done on this case?

A.  At some point during the investigation we asked individuals that we interviewed to see if they recognized someone's voice.

But other than that, that was it.

Q.  But that is at the Government's disposal, right?

A.  To my understanding, yes.

Q.  Was that a yes?

A.   Yes.

MR. GUTIERREZ:  Pass the witness, Your Honor.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MS. HOLDERFIELD:

Q.   Agent Doolin, based on the text conversations between Chayo and Mr. Hernandez Cordero, based on your training and experience, is she consulting with him?

A.   Yes.

MS. HOLDERFIELD:  No further questions, Your Honor.

THE COURT:  Very well.

MR. GUTIERREZ:  May I have a cross, Your Honor?

THE COURT:  You may.

RECROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.   Is consultating [sic] information illegal, sir?

A.   Can you repeat the question?

Q.   You were asked if they were consulting.  Is that illegal?

A.   It's not illegal to consult with someone, no.

MR. GUTIERREZ:  Thank you, sir.

THE WITNESS:  Yes, sir.

MS. HOLDERFIELD:  No further questions, Your Honor.

THE COURT:  Very well.  You may leave, sir.  You're free to leave.

THE WITNESS:  Yes, sir.

THE COURT:  We have enough time for another witness.

MS. HOLDERFIELD:  Your Honor, the Government calls Jose Esqueda to the stand.

THE CLERK:  Please raise your right hand.

(Witness duly sworn.)

THE WITNESS:  I do.

THE CLERK:  You may lower your hand.

Please have a seat.

THE COURT:  You may proceed.

JOSE ESQUEDA, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. HOLDERFIELD:

Q.  Good afternoon, sir.

Would you please state and spell your name for the record?

A.  Jose, J-O-S-E; Esqueda, E-S-Q-U-E-D-A.

Q.  Where do you work, sir?

A.  Work for U.S. Customs and Border Protection here in El Paso, Texas.

Q.  And what is your position?

A.  I work with the office of field operations at the Paso del Norte Port of Entry.

Q.  How long have you been a Customs and Border Protection officer?

A.  I've been here 12 years.

Q.   What are your duties and responsibilities as a CBPO?

A.   My primary duties are passenger vehicle processing of travelers, and any cargo that they're bringing.  Also pedestrian processing.  I also am an NII trainer, and I perform some cargo inspection functions.

Q.   Do you have any other previous law enforcement experience or training?

A.   No, ma'am.

Q.   Have you held any other positions within Customs and Border Protection?

A.   No, ma'am.

Q.   Do you remember August 21st, 2023?

A.   Yes, ma'am.

Q.   Were you on duty?

A.   Yes, ma'am, I was.

Q.   What port of entry were you working at?

A.   I was at the Paso del Norte Port of Entry.

Q.   And what was your assignment that day?

A.   I was in vehicle passenger processing.

Q.   As part of vehicle processing, what are your -- what are your duties when you're assigned to that?

A.   My primary function, or task, with determining the admissibility of any travelers seeking admission into the United States and conducting inspections of the vehicles and any cargo that those travelers may be bringing.

Q.  Do you remember a man by the name of Rene Hernandez Cordero?

A.  Yes, ma'am, I do.

Q.  Do you remember what he drove?

A.  Yes, ma'am, I do.

Q.  What was that?

A.  It was a brand-new -- appeared to be brand-new Ford Bronco, white in color.

        MS. HOLDERFIELD:  Your Honor, I'm referring to Government's Exhibit 8B, which has not been admitted into evidence.

        THE COURT:  H3?

        MS. HOLDERFIELD:  8B.

        THE COURT:  8B.  I see.

        Okay.

BY MS. HOLDERFIELD:

Q.  Sir, do you recognize this?

        Is it showing on your screen?

A.  Yes, ma'am.

Q.  Do you recognize this?

A.  Yes, ma'am, I recognize the area.

Q.  Is it a -- is it a true and accurate video of the primary vehicle processing lane where you were assigned?

A.  Yes, ma'am.

        MS. HOLDERFIELD:  Your Honor, at this time the

Government moves to admit Government's Exhibit 8B into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 8B will be admitted.

MS. HOLDERFIELD:  And permission to publish?

THE COURT:  You may.

(Video played.)

BY MS. HOLDERFIELD:

Q.  Is this the white Ford Bronco that you were referring to?

A.  Yes, ma'am.

Q.  And are you in Lane 9?

A.  Yes, ma'am.

(Video played.)

MS. HOLDERFIELD:  I'm going to pause it right here.

BY MS. HOLDERFIELD:

Q.  When Mr. Hernandez approached your lane, did he provide you with documentation?

A.  Yes, ma'am.

Q.  What did he provide you?

A.  He provided me a legal permanent resident identification document.

Q.  Were you talking in English or Spanish with Mr. Hernandez Cordero?

A.  Spanish.

Q.  Are you a native Spanish speaker?

A.   No, ma'am.

Q.   Do you just become familiar with it based off training and experience?

A.   Yes, ma'am.

Q.   Were you able to communicate clearly with Mr. Hernandez Cordero?

A.   Absolutely.  Yes.

Q.   Okay.  I'm going to continue playing.

     (Video played.)

BY MS. HOLDERFIELD:

Q.   What are you doing in -- what are you doing right now?

A.   When the vehicle approached, I took the document from the traveler.  I'm performing a system query utilizing our query systems.

     At the same time I'm conducting a -- or obtaining an oral declaration from the traveler as to anything that they have to declare.

Q.   Did Mr. Hernandez Cordero declare anything?

A.   He did not.

     (Video played.)

BY MS. HOLDERFIELD:

Q.   What are you doing right now?

A.   I stepped out, and I was opening the rear door, driver's side, looked in the vehicle, to see if he had any items inside the vehicle that required inspection.

And at the same time I'm still conducting an interview with the subject.

Q. And did you find anything in his vehicle?

A. I found nothing in the vehicle.

Q. What else did you ask Mr. Cordero during your inspection?

A. Aside from obtaining an oral declaration, I asked him where he was traveling to that day.

He mentioned he was doing some shopping. He was not specific exactly where he was going to do the shopping at. He mentioned he was going to several different places.

And then I asked him if he was bringing any cash money with him.

He stated he did not have any cash, only credit cards.

Q. Let me stop you right there.

A. Yes, ma'am.

Q. What did you explain to him about cash?

A. I -- I asked him if he had any cash money specifically, so that he understood I'm not only asking him, that I was seeking if he had more than $10,000.

Q. Is that standard?

A. Yes, ma'am, it is, for me.

Q. Do you ask all travelers about making a declaration?

A. I do ask the money declaration in order to clarify to the traveler, if they're bringing any cash money, for the reason that there has been discrepancies that the travelers are not

educated, and they believe only that they have to declare $10,000 or more.

Q. Is that part of your training, to ask travelers about -- to make declarations?

A. Yes, ma'am.

Q. Did Mr. Hernandez Cordero -- or did you make a comment about his white Ford Bronco?

A. Yes, ma'am, I did.

Q. What did you tell him?

A. I told him it was a very nice vehicle, very clean.

Q. Did you ask him about his employment?

A. Yes, I asked him where he was employed.

Q. And what did he tell you?

A. He told me he was unemployed.

Q. And what else did you ask?

A. I asked him how is it that he could have such a nice vehicle if he was unemployed.

Q. And what did he tell you?

A. He responded by saying, that he had a really good job in Mexico prior to his getting his residency, and that's how he was able to obtain the vehicle.

Q. Did he elaborate any more on that?

A. No, ma'am.

Q. Did you -- and you searched his car under border search authority?

A.   Yes, ma'am.

Q.   And that is permissible?

A.   Yes, ma'am.

          MS. HOLDERFIELD:  No further questions, Your Honor.

          THE COURT:  Mr. Gutierrez?

          MR. GUTIERREZ:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.   Agent, how exactly did you -- what were your exact words when you're talking about the $10,000?  What's your presentation?  I'm sure you do it every day.  What exactly do you say?

A.   I initially asked the traveler if he had anything to declare.  And then during the interview, I asked him if he was bringing any cash money.

Q.   That was the extent of it?

A.   Yes, sir.

Q.   Because before, you had mentioned -- you testified that you talked specifically about cash money over 10,000.

          And so your testimony now is you didn't mention the 10,000?

A.   No.  I merely clarified that I asked, How much cash money are you bringing?  Because a lot of travelers are uneducated, and they believe that they only have to declare over $10,000.

Q.   Okay.  And I just want to be clear.

A.   Yes, sir.

Q.   Do you recall exactly what you told Rene Hernandez Cordero about the money?

A.   Yes, sir.  I asked him, Are you bringing any cash money today?

Q.   Okay.  That was it?

A.   Yes, sir.

Q.   Okay.  Did he declare that he had 3,800 on him?

A.   No, sir.

Q.   You don't recall that?

A.   No, sir.

Q.   Okay.  You don't recall it or you're not sure if it was said?

A.   No.  I -- he did not declare 3,800.  He told me he was bringing credit cards.

Q.   Okay.  If at any point you're suspicious, you can send him to secondary, correct?

A.   Yes, sir.

Q.   And you didn't feel that that was necessary here?

A.   My interview did not yield that.

Q.   Okay.  And you also looked at the vehicle, and there was nothing in the vehicle, correct?

A.   Correct.

Q.   There's -- there is language that is used by CBP officers that -- when they're suspicious of a person -- and they talk

about being nervous, the eyes, and all that.

Do you recall what I'm talking about?

A.  No, sir.

Q.  Okay.  What is it that you're looking for in a person when they come up to you and create suspicion for you?

A.  We're looking for certain indicators when we're conducting the oral interview.

Q.  Okay.  What are those indicators, sir?

A.  Some indicators could be slurred speech, change in pitch of voice, eyes facing forward, lack of eye contact, trembling in the hands, things of that nature.  Evasive answering of the questions.

Q.  Okay.  And Rene Hernandez Cordero did not trigger any of those to you?

A.  No, sir.  He was very nice.

MR. GUTIERREZ:  Pass the witness, Your Honor.

THE COURT:  Redirect?

MS. HOLDERFIELD:  No further questions, Your Honor.

THE COURT:  Very well.  You may be excused, sir.

THE WITNESS:  Thank you.

THE COURT:  We might as well break up for the evening -- for the week, I should say.

Ladies and gentlemen of the jury, I want to remind you how important it is for you to abide by all the instructions that I gave you.  Please don't do anything to jeopardize this

trial being completed.

We will reconvene Monday morning at 9:00.

The jury is being excused at this time.

(Outside the presence of the jury; open court.)

THE COURT:  I've counted 11 witnesses so far.  How many more do you anticipate?

MR. MYERS:  Two more.

THE COURT:  Two more?

MR. MYERS:  Two more.

THE COURT:  Out of three?

MR. MYERS:  Two.

THE COURT:  Two.  So we'll be finished with testimony on Monday.  Maybe we can get it to the jury then.  If not, by Tuesday.

Okay.  We'll be in recess until 9:00 Monday morning. You all may be excused.

(Proceedings concluded 3:18 p.m.; continued in Volume 5.)

* * * * *

I N D E X

GOVERNMENT EVIDENCE

WITNESSES:

JOSHUA WORTHY:

  Direct Examination by Ms. Holderfield .....................2
  Cross-Examination by Mr. Gutierrez ........................30

RAMON GUZMAN:

  Direct Examination by Ms. Holderfield ....................35
  Cross-Examination by Mr. Gutierrez ........................45

BRIAN MUÑOZ-CASTRO:

  Direct Examination by Mr. Myers ..........................47
  Cross-Examination by Mr. Gutierrez ........................91
  Redirect Examination by Mr. Myers ........................105

IRMA GAMEZ:

  Direct Examination by Mr. Myers  ........................107
  Cross-Examination by Mr. Gutierrez .......................119

PATRICK DOOLIN:

  Direct Examination by Ms. Holderfield ...................127
  Cross-Examination by Mr. Gutierrez .......................151
  Redirect Examination by Ms. Holderfield .................159
  Recross-Examination by Mr. Gutierrez .....................159

JOSE ESQUEDA:

  Direct Examination by Ms. Holderfield ...................160
  Cross-Examination by Mr. Gutierrez .......................167

Jury Excused for the Day .................................170

| NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| | GOVERNMENT'S EXHIBITS | |
| 4A | Map - El Paso Gun Exchange | 15 |
| 4B | Map - Gun Central | 19 |
| 4C | Map - Fox Plaza | 22 |
| 4D | Map - At Home Parking Lot | 6 |
| 4F | Map - Paraguay Court and Whataburger | 10 |
| 4G | Receipt 1 | 133 |
| 4H | Receipt | 134 |
| 4I | Photograph of Blue Ford Car | 17 |
| 4J | Photograph of S.Q. in Blue Car | 132 |
| 4K | Photograph of S.Q. Car | 43 |
| 4L | Photograph of S.Q. Car 2 | 43 |
| 4M | Photograph of S.Q. Car 3 | 43 |
| 4N | Photograph of S.Q. Car 4 | 43 |
| 4O | Photograph of Gun Parts | 43 |
| 4AP | Waiver of Rights Muñoz-Castro | 88 |
| 4AQ | Consent to Search Muñoz-Castro Ledger | 88 |
| 4AR | Consent to Search Paraguay and Car | 88 |
| 7N | Stipulation | 125 |
| 8B | Hernandez Entry Video | 163 |
| 12L | Muñoz Phone Contacts with Ramos Phone | 77 |