UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

UNITED STATES OF AMERICA     )   No. EP-23-CR-1842-DB
                             )
vs.                          )   El Paso, Texas
                             )
RENE HERNANDEZ CORDERO (3)   )   May 6, 2024


VOLUME 5 OF 6 VOLUMES

JURY TRIAL

BEFORE THE HONORABLE DAVID BRIONES

UNITED STATES DISTRICT JUDGE, and a jury.


A P P E A R A N C E S:

FOR THE GOVERNMENT:   MR. KYLE MYERS &
                      MS. SHANNON HOLDERFIELD
                      Assistant United States Attorneys
                      700 E. San Antonio, Suite 200
                      El Paso, Texas  79901


FOR THE DEFENDANT:    MR. RAY GUTIERREZ
                      Attorney at Law
                      11623 James Grant Drive
                      El Paso, Texas  79936


Proceedings reported by stenotype.  Transcript produced by computer-aided transcription.

(Esperanza Gallegos & Barbara Espinosa sworn to interpret Spanish into English.)

(Defendant present; open court.)

THE COURT:  Good morning, everyone.

And, members of the jury, I hope you had a good weekend.  And I'm going to presume that you followed all the instructions that I gave you previously.

So we will now continue.

Call your next witness.

MS. HOLDERFIELD:  Your Honor, the Government calls Ernesto Herrera to the stand.

THE CLERK:  Please raise your right hand.

(Witness duly sworn.)

THE WITNESS:  I do.

THE CLERK:  You may lower your hand.

Please have a seat.

ERNESTO HERRERA, JR., GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. HOLDERFIELD:

Q.  Good morning.

Will you please state and spell your name for the record?

A.  My name is Ernesto Herrera, Jr.  E-R-N-E-S-T-O, H-E-R-R-E-R-A.

Q.  Where do you work, sir?

A.   I work for ATF here in El Paso.

Q.   What is ATF?

A.   ATF is the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

Q.   What is your current position?

A.   I am a special agent.

Q.   How long have you held the position of special agent?

A.   I've been a special agent with ATF for four years now.

Q.   And what are your current duties and responsibilities as an ATF special agent?

A.   The major duties as an agent with the ATF, first, enforcing federal firearm laws and combating trafficking here in West Texas of firearms.

Q.   Did you receive training to become an ATF special agent?

A.   I did.

Q.   What training did that entail?

A.   That included three months at the academy.  First -- or, I'm sorry.  Six months.  The first portion is called the criminal investigator training program.  And the second six -- three months is the special agent training program.

Q.   Did you receive additional training on interstate nexus of firearms and ammunition?

A.   I did.

Q.   And what training is that?

A.   That was the training offered by the ATF.  It's called the

firearms nexus training.

Q.  Okay.  What is -- did you have to take an exam for training?

A.  We did, at the end of the course.

Q.  And what did the exam consist of?

A.  The exam consists of a practical -- including all the information that was given to us during the training, where we were -- we used all the information and resources that were provided to us to ultimately conduct an investigation on firearms and ammunition, that ultimately resulted in us determining where the firearms and ammunition were manufactured and if they did -- if they did cross state lines or federal lines.

Q.  What resources are you referring to?

A.  Resources that we used were ATF records and several other resources.  Publications, such as the Blue Book of Gun Values.

Q.  At the end of this exam, did you pass it?

A.  I did.

Q.  Did you receive a certification for you to become an expert in interstate nexus and firearms?

A.  I did.

Q.  And what are your duties as an interstate nexus firearms and ammunition expert?

A.  The duties of a nexus expert are to identify the -- any firearms that were given to us in any -- in the case, and

determine the origin of those firearms and ammunition.

Q.  What did you do prior to becoming an ATF special agent?

A.  Prior to working for ATF, I worked for the U.S. Marshal Service for nine years, and two years with the Federal Bureau of Prisons.

Q.  And what is your education?

A.  I have a bachelor's degree from Northern Arizona University in public administration.

Q.  Do you have military service?

A.  I do.  I have 19 years' service; 8 with the Army and 11 with the Air Force.

Q.  As an interstate nexus firearms and ammunition expert, are you required to stay updated on federal firearms regulations and laws?

A.  Yes, we are.

Q.  How do you stay updated?

A.  By periodically reading the resources that I mentioned before.  Those resources are updated annually.

And also staying in contact with other nexus experts who are out in the field doing the same thing I am.  Or as they -- as they -- as they find new resources, they share it throughout our community.

Q.  Have you testified before as an interstate nexus expert?

A.  I have not.

Q.  Since becoming certified as an interstate nexus expert, how

many firearms have you inspected?

A.   Approximately 500.

Q.   How many interstate nexus reports have you drafted?

A.   Approximately 30 to 50.

Q.   Do you work with other agencies and assist with interstate nexus reports?

A.   I do.

Q.   Are you regularly consulted by other law enforcement agencies?

A.   I am.

        MS. HOLDERFIELD:   Your Honor, at this time the Government moves to tender the witness as an interstate nexus expert in firearms and ammunition.

        MR. GUTIERREZ:   No objections.

        THE COURT:   You may.

BY MS. HOLDERFIELD:

Q.   Agent Herrera, can you tell the jury what an interstate nexus report is?

A.   An interstate nexus report is a report that identifies the firearms in question and identifies them by their make, model, serial number, and caliber.   And then it determines the origin of the manufacturer, and ultimately concludes to determine if those -- if that ammunition and firearms were being here in the state of Texas, or if they, in fact, crossed interstate commerce.

Q. What does -- what does interstate commerce mean?

A. Interstate commerce simply means, in this case, the firearms, that they crossed state lines or international boundaries.

Q. What information do you gather on a firearm to direct an interstate nexus report?

And I think you covered it, but if you could say it again.

A. The information I need from the firearm is the make, the model, and the caliber, and the serial number of the firearm.

Q. And do you research those -- those components that you just talked about?

A. Correct. With that information I can identify where it was made. A lot of manufacturers have several different locations of manufacturing, so I'll use that information to determine which location and what country of origin.

Q. Okay. Are you -- are you familiar with this case?

A. I'm familiar with the firearms in this case, yes.

Q. Okay. Did you receive a list of firearms to determine interstate nexus?

A. I did.

Q. If you remember, do you know what firearms were on that list?

A. I do remember. There were several -- there was a lot of firearms and a lot of different makes and models, yes.

MS. HOLDERFIELD:  Your Honor, at this time I'm referring to Government's Exhibit 7M, which has not been admitted into evidence.

BY MS. HOLDERFIELD:

Q.  Do you recognize this?

A.  I do.

Q.  Is it a true and accurate list of the firearms that you reviewed?

A.  It is.

MS. HOLDERFIELD:  Your Honor, at this time the Government moves to admit Government's Exhibit 7M into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 7M will be admitted.

BY MS. HOLDERFIELD:

Q.  Can you -- can you tell the jury what firearms were on this list?

A.  This list is -- I believe it goes to 40, 40-something, a list of the firearms that were involved in this case.

These firearms are an assortment of different manufacturers and type of firearms -- just pistols and rifles.

And this list also gives the type and the name and the -- in most cases, the serial number of each firearm.

Q.  Were you told anything about the firearms, as far as the -- as far as the investigation was concerned?

A.   I knew the name of the firearms, according to this list, and that they were involved in this case.

Q.   Did you physically examine any firearms in this case?

A.   I did not.

Q.   When you first received this list of firearms that's in front of you, to draft your report, what were you looking for to make your determination?

A.   The first and most important thing I'm looking for is just the make of the firearm, the actual company that makes the firearm.

That -- that's the biggest determining factor of where the firearm itself was -- was manufactured.

Q.   And what about serial number?

A.   Serial number helps with my conclusion that this is an actual firearm.  But if I don't have a serial number, I can still determine where it was made.

Q.   And what if you only have a serial number?

A.   If I only have a serial number, it would take a little more investigation, a little more time and effort.  But I can ultimately come -- I can locate what manufacturer made that serial number, through their records, and determine what type of firearm it was, and ultimately, determine where it was made.

Q.   Based on the list provided to you, were any of these firearms manufactured in the state of Texas?

A.   Based on the list, one of these firearms was manufactured

in the state of Texas.  But through my research, I determined that it also affected interstate commerce, as it was transported from the state of West Virginia.

Q.  And in your opinion, based on your expertise as an interstate nexus expert, did these firearms cross interstate commerce?

A.  Every one of them did, yes.

MS. HOLDERFIELD:  Pass the witness, Your Honor.

THE COURT:  Mr. Gutierrez?

MR. GUTIERREZ:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.  Good morning, Agent.

A.  Good morning.

Q.  Okay.  You talked about the firearms, and you talked about having four things for you to do your research, correct?

You testified that you needed the make, model, serial number, and caliber, correct?

A.  Correct.

Q.  And that's all that you were looking into, these firearms, correct?

A.  That's the minimum of things that I would need.

Q.  Okay.  You didn't physically handle these firearms, correct?

A.  I did not.

Q.   So you didn't physically see if these firearms could be fired, correct?

A.   I did not.

Q.   You did not physically see that -- if the firearms were missing parts, correct?

A.   I did not see the firearms.

Q.   So you're not testifying here today that these firearms were operational, correct?

A.   I am not.

Q.   And if these firearms were missing parts, they would not be a complete firearm, correct?

A.   They would still be a firearm.  They would be a firearm.

Q.   Okay.  But they wouldn't be operational, correct?

A.   If they're missing parts, they probably would not be operational.  They would still be firearms.

Q.   So you wouldn't know if the firearm's barrel was corroded or any other malfunction to any of these firearms, correct?

A.   No, I would not.

        MR. GUTIERREZ:  Your Honor, may I publish Exhibit 7M, that has already been admitted?

        THE COURT:  It's on already.

        You may.

        MR. GUTIERREZ:  Thank you.

BY MR. GUTIERREZ:

Q.   Agent, starting with Number 25 down.

Do you see those?

A.   I do.

Q.   Okay.  And here's the rest of the list.  Do you recognize all those?

A.   I do.

Q.   And do you have any personal knowledge that from 25 through 46 were the weapons that were furnished by the Government?

A.   I do.

MR. GUTIERREZ:  Pass the witness, Your Honor.  Thank you.

THE COURT:  Any redirect?

MS. HOLDERFIELD:  No, Your Honor.  No further questions.

THE COURT:  You may be excused.  You're free to leave.

Call the next witness.

MR. MYERS:  Your Honor, the Government calls Mark Cervantes.

THE CLERK:  Please raise your right hand.

(Witness duly sworn.)

THE WITNESS:  I do.

THE CLERK:  You may lower your hand.

Please have a seat.

THE WITNESS:  Thank you.

MR. MYERS:  May I proceed, Your Honor?

THE COURT:  You may proceed.

MR. MYERS:  Thank you, Your Honor.

MARK CERVANTES, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MYERS:

Q.  Good morning.

A.  Good morning.

Q.  Would you please state your name for the record?

A.  My name is Mark Cervantes.

Q.  Mr. Cervantes, where do you work?

A.  I work with U.S. Customs and Border Protection here in El Paso, Texas.

Q.  And how long have you worked with Customs and Border Protection?

A.  20 years.

Q.  And how does one become a Customs officer?

A.  You take a job application, you have a background investigation, you get medically cleared, you get an offer, you accept the offer, and then you're posted wherever they have openings for you.

Q.  Now, what are the essential duties as a Customs officer?

A.  We enforce the laws of the United States at entry and exits throughout the country.  And also elsewhere, outside of the United States boundaries.

Q.  Now in addition to being a Customs officer, do you have additional law enforcement experience?

A.   I do.

Q.   What is that?

A.   I'm also a task force officer previously.  And then I'm currently a task force officer now with the Federal Bureau of Investigation here in El Paso.

Q.   And what is a task force officer?

A.   I'm deputized with additional duties, just as much as an FBI agent.

Q.   Now, are you involved in the case of the United States of America versus Rene Hernandez Cordero?

A.   I am.

Q.   How are you so involved?

A.   I was an integral part of the investigation, as well as other law enforcement agents.

Q.   Now as a task force with the FBI, I guess do you bring, like, a special skill set to that FBI group?

A.   Yes, sir.

Q.   And what is that?

A.   Just as I explained, we have experience and common knowledge.  And also, we've been trained on laws and tactics and traits that we see at the borders, either it be northern border, southern border, or elsewhere in other countries.

Q.   Have you been involved in this investigation of Mr. Hernandez Cordero from the beginning?

A.   I have.

Q. Let's talk about the first start of your investigation.

Were you involved, I guess, on the March 30th and March 31st events of 2023?

A. Yes, I was.

Q. How were you so involved?

A. I was involved for various reasons for surveillance.

I've also interdicted phone numbers that we've encountered on Court-approved WhatsApp pen registers. WhatsApp pen registers are Court-approved records in which we can capture phone numbers of interest to law enforcement. And with those phone numbers, we can identify people which would help law enforcement combat criminal organizations.

Q. Now in this investigation, have you also had a chance to review cellphone evidence?

A. I have.

Q. What kind of evidence or -- let me see.

Which cellphones did you review in preparation for this investigation?

A. I reviewed cellphones that belonged to different people in the investigation, one of which belonged to Mr. Rene Hernandez Cordero, Mr. Brian Muñoz-Castro, and also Mr. Ramos.

Q. And how about Mr. Pablo Delgado?

A. As well, yes.

Q. Now, are there other parts of this investigation -- before you were aware of Mr. Hernandez, did you have a chance to

review Mr. Muñoz's and Mr. Delgado's cellphones?

A.   I did.

Q.   And why were you reviewing those cellphones?

A.   I was reviewing those cellphones to further investigate the organization, to further investigate how we could combat these -- this organization that was trafficking weapons and/or narcotics, and then also bulk cash smuggling.

Q.   Now specifically in the cellphones, were you looking for any particular kind of evidence in the cellphones of Mr. Delgado and Mr. Muñoz?

A.   Yes.  We were looking for weapons, serial numbers, anything that could help us investigate this -- this investigation.

Q.   Now, when you examined the weapon -- you examined the cellphones, what did you see with -- in regards to firearms?

A.   We saw a significant amount of weapons that were being passed from one person to another.  These weapons are high-caliber weapons typically seen being exported or being taken to Mexico that we, as law enforcement officers at the border, just as me, Customs and Border Protection officers, we need to stop going into Mexico.  Because we know that these weapons are being used essentially as a war in Mexico, for the drug war.

Q.   Now, were you able to identify every single weapon that's -- that was pictured or discussed within those cellphones?

A.  No, sir.

Q.  Did you create a list, or help create a list, of weapons that could be identified?

A.  I did.

MR. MYERS:  Your Honor, I'd like to show and publish to the jury Government's Exhibit 7M.

THE COURT:  It's been admitted?

MR. MYERS:  Yes, Your Honor.

THE COURT:  You may.

BY MR. MYERS:

Q.  Do you recognize Government's Exhibit 7M?

A.  Is it on the screen?

THE CLERK:  Just a second, please.

BY MR. MYERS:

Q.  Is it on your screen, sir?

A.  No, sir.

Now, I see it.

Q.  Okay.  How do you recognize Government's Exhibit 7M?

A.  So those weapons I was able to identify, just as it states here.

More importantly, we want to identify the serial number.  The serial number is very important.

As a law enforcement officer, we're able to see what the -- with the assistance of another agency called ATF, we're able to identify the make, model, and the serial number, that

can give us information on who purchased the firearm, and then the date and time of those firearms.

As you can see throughout the list, there's several firearms there.  And as I mentioned, there's several high-powered rifles, high-powered weapons, to include one that's gold-plated with a grenade launcher.

Q.  Now, how do you know that these aren't just toys that are pictured in the cellphones?

A.  Well, because like I said -- like I mentioned to you, these weapons are actually procured through individuals.  And these weapons have serial numbers, as well.

The make and model of these weapons is not something that you would see in a toy.  You would see actual represented firearms licensees.

Q.  So from the pictures, or from the videos, you're actually able to see the serial number on some of the weapons?

A.  Yes, sir.

Q.  Okay.  Now, those are -- that's true of the first 24 weapons, correct?

A.  That's correct.

Q.  Now the second set of the list, starting at Number 25, where did these weapons come from?

A.  These weapons came from an operation that we -- that we conducted with -- in addition to other law enforcement agencies, DEA and ATF.

These weapons were recovered at an operation inside a storage unit.  And as you can see, there's several high-powered rifles, to include the .50 caliber Barrett sniper rifles.

Q.  You're referring to the buy/bust on August 21st, 2023?

A.  Yes, I am.

Q.  And so to your knowledge, were these weapons actual functional weapons?

A.  Yes.

Q.  Okay.  Now, you had mentioned the gold-plated --

MR. MYERS:  I'd like to publish to the jury what's already been mentioned, Your Honor, as -- already been admitted, excuse me, as Government's Exhibit 12E.

THE COURT:  You may.

BY MR. MYERS:

Q.  Was this the weapon you were referring to?

A.  Yes.  So this is a video that was -- that I saw in the -- in the cellphones that I had mentioned that I was reviewing.

It took certain -- several attempts to pause and play to get the right image, to see the actual serial number on the cellphone.

Q.  I guess if we zoom in here at the beginning of Government's Exhibit 12E, is this kind of the process you went through to identify name and serial number?

A.  Yes.

Q.  Now going back to this -- this gun, I guess it's been

referred to as "el dorado."

Were you kind of familiar with this general transaction?

A.   Yes.

Q.   Okay.

MR. MYERS:   So if we refer to Government's Exhibit 2A, Your Honor.   It's already been admitted to the jury.

May I publish?

THE COURT:   You may.

BY MR. MYERS:

Q.   Here, do you recognize this photograph of Mr. Hernandez's cellphone?

A.   Yes.

Q.   And do you see here on March 26th, where Mr. Muñoz's calling card information is forwarded?

A.   I do.

Q.   Okay.   Are you kind of familiar with kind of like the steps of how these transactions occur?

A.   Yes, sir.

Q.   Okay.   So what was the first step?

A.   So the first step is a -- what we call a contact card. It's essentially somebody that you have listed on your phone under a name, and you pass that name with the contact card to another individual.   That's the first step.

So as you have that phone number with the contact

card, you pass that contact card to another individual, that mentions the name of the individual with the subsequent phone number to that particular individual.

Q.   And then in this first step, who is passing the contact card to Mr. Hernandez's cellphone?

A.   So in this first step, you'll see a contact card passed by this contact, by Ed Hardy 21.  The contact card belongs -- is of Brian, and then with the phone number there.  That contact card is subsequently sent to Mr. Hernandez Cordero.

Q.   Now, have you attempted to identify the Señora Ed Hardy?

A.   We have.

Q.   And who do you think Señora Ed Hardy is?

A.   Señora Ed Hardy is -- Señora Ed Hardy is a Mexican national who is based out of Jalisco, Guadalajara.  She -- her true name is Maria del Rosario Navarro-Sanchez.

Q.   And during your investigation, how did you know her as?

A.   I'm sorry?  Excuse me?

Q.   During your investigation, how did you know Ms. Navarro-Sanchez?  What nickname?

A.   Excuse me.  I can't --

Q.   Do you know the nickname of Ms. Navarro-Sanchez?

A.   Oh, excuse me.  Yes.

      We've had several nicknames.  One of them, obviously, is Ed Hardy.  Others are Chayo, Fer, or Fernanda.

Q.   Now the contacts in Mr. Hernandez's phone under Señora Ed

Hardy, did you know some of these contacts?

A.   I did.

Q.   And how did you know some of those contacts?

A.   Like I mentioned before, some of those phone numbers are of law enforcement officers.  We can look at those phone numbers, and we can identify numbers that are in that phone based on law enforcement databases.

So as you query those phone numbers we can, as law enforcement -- if it's in our databases, we can identify who that phone number belongs to.

Q.   And when you queried these, some of those phone numbers for Señora Ed Hardy, where were those numbers popping up?

A.   In various investigations and law enforcement databases.

Q.   The investigation you had into Chayo, for example?

A.   Yes.

Q.   Okay.  Now after Chayo, or Señora Ed Hardy, forwards Mr. Muñoz's contact information, what's the second step?

A.   The second step is an individual then passes that number to a second individual.

Q.   In this case, would that be Ramos Rural?

A.   In this case, yes, it would be Ramos Rural.

Q.   And who is a known relative or suspected relative of Ramos Rural?

A.   Mr. Ramos, the -- he's also indicted in this case.

Q.   Jesús Ramos?

A.  Yes, sir.

Q.  Okay.  So after that information is forwarded, then what would you see happening?

A.  We would then see a phone call, a phone call between this number of Brian 2132, ending in 2132 to Mr. Ramos -- Ramos and his phone.

MR. MYERS:  Your Honor, I would like to show a Government's exhibit, and it has already been admitted to the jury.

THE COURT:  You may.

MR. MYERS:  Thank you, Your Honor.  12L.

BY MR. MYERS:

Q.  If we look on Page 2, are these the contacts between Mr. Ramos's phone and Mr. Muñoz-Castro's phone that you were talking about?

A.  Yes.

Q.  Now, the last phone call between Mr. Muñoz's phone and Mr. Castro -- Mr. Ramos's phone, what time is that?  Can you see at the bottom?

A.  7:19 p.m.

Q.  Okay.  Now -- then after 7:19 p.m., what would you suspect that you would see?

A.  After that, then that's where, as a Customs and Border Protection officer, you can see whether Mr. Ramos actually crossed the border.

And as a law enforcement officer at the Customs and Border Protection, we have privilege to that information.  So then I would query Mr. Ramos and see if there was a subsequent entrance from the United States to Mexico.

And, sure.  In fact there's an entrance, and then a subsequent exit, in a vehicle that's registered to Mr. Ramos.

MR. MYERS:  Your Honor, I would like to show the witness an exhibit that has not yet been admitted.

THE COURT:  That's not been admitted?

MR. MYERS:  Has not been admitted.

THE COURT:  What's the number?

MR. MYERS:  Government's Exhibit 12N.

BY MR. MYERS:

Q.  Do you recognize, Mr. Cervantes -- or, Officer Cervantes, do you recognize Government's Exhibit 12N?

A.  I do.

Q.  And what is Government's Exhibit 12N?

A.  This exhibit basically entails what I mentioned, an exit and entrance into the United States.

It provides you with the time and date.  And then an image that's taken as you're crossing the border, either going into the United States or leaving the United States.

And again, as -- me, as a Customs and Border Protection officer, we are privileged to these cameras.

Q.  So this is the exit photograph of a car linked to

Mr. Ramos?

A.  Yes, it is.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 12N into evidence.

MR. GUTIERREZ:  No objection, Your Honor.

THE COURT:  Government's Exhibit 12N will be admitted.

MR. MYERS:  Permission to publish, Your Honor.

THE COURT:  You may.

BY MR. MYERS:

Q.  Are you familiar with Mr. Ramos's truck, the one with the license plate that had PBB on it?

A.  I did.  I am.

Q.  Were you there on the August 21st, buy/bust?

A.  I was.

Q.  Were there any other vehicles linked to Mr. Ramos?

A.  Yes.

Q.  Here in Government's Exhibit 12N, we see a truck.  But this one is SHY3179.

A.  That's correct.

Q.  How do you know that this is -- car is -- linked to this truck is linked to Mr. Ramos?

A.  This -- this vehicle, with that license plate and that particular make and model of vehicle is, in fact, registered to Mr. Ramos.

Q.  And you can see that -- because you're a Customs officer,

you have the ability to access those records?

A.   That's correct.

Q.   Okay.  Going back to your investigation in this case, were you -- were -- were you involved on the August 21st, 2023, buy -- buy/bust?

A.   I was.

Q.   How were you so involved?

A.   I was involved by participating in the operation and arrest.  I provided agents that were also part of the arrest with the -- my part of the investigation that I put forward, obviously, to include vehicles that I've already identified, people that I've identified, that were captured in the aforementioned WhatsApp pen register that we were up on.

So I provided all that information to the -- to the entire operation, so that we're prepared -- well prepared, as law enforcement officers, for that particular deal.

Q.   Now, on -- on August 21st, 2023, the undercover received a phone number from Fernanda.

Do you recall this?

A.   Yes.

Q.   When he received that phone number, I guess who was this phone number supposed to be?

A.   This phone number belonged to Mr. Hernandez.

Q.   Okay.  And now, when -- when the undercover agent relayed the information to the group, what do you do with that

information?

A.  I mention to the agents involved in the operation that we should -- we should be anticipating an arrival of Mr. Hernandez Cordero.

Q.  And what other information did you look up at that time?

A.  I looked at whether he had crossed the border, what vehicle he was going to be -- he crossed the border in, if he, in fact, crossed the border in a vehicle, and at what time.

Q.  Now after that, are you elsewise involved in the investigation, but the arrest of Mr. Hernandez?

A.  Yes.

Q.  How were you so involved?

A.  I was involved in a surveillance position.  And then I was also involved in the post-arrest interview of Mr. Hernandez Cordero.

        MR. MYERS:  Your Honor, I would like to -- to show the witness some exhibits that have not yet been admitted.  And these will be Government's Exhibits 6F, G, and H.

BY MR. MYERS:

Q.  Mr. Hernandez [sic], do you recognize Government's Exhibit 6F?

        Can you see it on your screen?

A.  Mr. Cervantes?

Q.  Oh, Mr. Cervantes, I'm sorry.  Not Mr. Hernandez.

        Mr. Cervantes, do you recognize Government's

Exhibit 6F?

A.   I do.

Q.   And how do you recognize this?

A.   This is an Advice of Rights that was provided to Mr. Hernandez Cordero.  And you see at the very top the address, the date, and time.

And then at the bottom you'll have his -- you'll see his signature.  You'll have the list of rights that -- that was provided to Mr. Hernandez.  And then you'll have two witnesses, and then time -- the timestamp of which the interview occurred.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 6F into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 6F will be admitted.

BY MR. MYERS:

Q.   6G is a recording.  Is that a recording of the post-arrest statement?

A.   Yes, it is.

Q.   And there are several people involved in that?

A.   Yes.

Q.   Are you one of them?

A.   Yes.

Q.   And have you listened to Government's Exhibit 6G?

A.   Yes.

Q.   Is it a fair and accurate recording of the post-arrest

statement?

A.   It is.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 6G into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 6G will be admitted.

BY MR. MYERS:

Q.   And Government's Exhibit 6H, the translation.

Have you reviewed that translation?

A.   I have.

MR. MYERS:  Your Honor, I also offer Government's Exhibit 6H into evidence.

MR. GUTIERREZ:  No objection, Your Honor.

THE COURT:  Government's Exhibit 6H will be admitted.

MR. MYERS:  Your Honor, permission to publish those exhibits to the jury?

THE COURT:  You may.

BY MR. MYERS:

Q.   Okay.  So now, I guess the -- this post-arrest statement, was it in Spanish or English?

A.   Spanish.

Q.   And are you a native Spanish speaker?

A.   I am a native Spanish speaker.

Q.   Okay.  Did you have any trouble communicating with Mr. Hernandez in the Spanish language?

A.   No.

Q.   Okay.   Now when we're looking at the Advice of Rights form here in Government's Exhibit 6F, what is -- there's some handwritten notes at the top here.

What are these handwritten notes that are highlighted?

A.   That is the address of which the interview took place, the date on which the interview took place, and also the time.

Q.   All right.   And here in this next section, it's in Spanish. But I guess in English, what would these generally be called?

A.   The Advice of Rights, or your *Miranda* rights.

Q.   You have the right to remain silent, consult an attorney, correct?

A.   Et cetera, yes.

Q.   Okay.   Now, are these rights explained to him?

A.   Yes.

Q.   And is that on the recording we're about to listen to?

A.   Yes.

Q.   Okay.   Now finally, I guess he gives his -- this consent part?

A.   Yes.

Q.   What is this section right here (indicating)?

A.   This is a consent to continue with the interview without the presence of an attorney.

Q.   And there's a signature right under that consent part.

Whose signature is that?

A.   That signature belongs to Mr. Hernandez Cordero.

Q.   Now here, there's two witness signatures on the bottom left-hand corner of Government's Exhibit 6F.

Who is the first signature down there?

A.   That belongs to a special agent that was also in the investigation.

Q.   And is that Special Agent Rubio, with the ATF?

A.   Yes.

Q.   And is he on that recording?

A.   He is.

Q.   And whose signature is below Special Agent Rubio's?

A.   That's mine.

Q.   And what's down at the bottom?

A.   The timestamp, in which we actually signed our names on.

MR. MYERS:   We're showing Government's Exhibit 6H to the jury.

BY MR. MYERS:

Q.   Is this the transcript?

A.   It is.

(Recording played.)

BY MR. MYERS:

Q.   Officer Cervantes, is that the point, I guess, where the interview terminates?

THE COURT:   Mr. Myers, we need to take our morning break at this time.

MR. MYERS:  Yes, sir.

THE COURT:  We'll be in recess for the next 15 minutes.

(Recess taken 10:35 to 10:53 a.m.)

THE COURT:  Mr. Myers, you may continue.

MR. MYERS:  Thank you, Your Honor.

BY MR. MYERS:

Q.  All right, Officer Cervantes.

In that recording the transcript refers to Rene.

Who is that person that you were interviewing?

A.  Mr. Rene Hernandez Cordero.

Q.  And is he in the courtroom today?

A.  Yes, he is.

Q.  Would you identify him by an article of clothing that he's wearing?

A.  Yes.  He's wearing a white long-sleeved button-collared shirt with a -- what appears to be a black tie.

Q.  Okay.  Now during this conversation with Mr. Hernandez, several times he's asking for what's in it for him.

But you're requiring some kind of offer of proof.

Well, why are you doing that?

A.  Because we want to make sure that he's honest and truthful with what information he's trying to provide.

In order for us to provide him with information or help, we'd like to know and test his honesty and whether he can

be honest in the duration of the interview.

Q.   Now in the first part of the interview, I think he asks -- he wants to make a phone call to his brother.

Do you recall that part of the interview?

A.   I do.

Q.   Why won't you let him call his brother?

A.   We don't really know if he's calling his brother.  As a law enforcement officer, we want to make sure that -- we have certain things that we do to protect ourselves.  And we want to make sure that we're calling people that we know he's calling.

So he could tell his brother, or anybody in the phone call, something that we don't want him to tell.  That he's been arrested or, quite frankly, we want to protect ourselves, you know, as law enforcement officers.

Q.   Now also during that, when you're trying to test to see whether he's honest -- I think it's Agent Davis asks several times, maybe, Are you dealing with a male or female?

Who were you hinting at, at that point in time?

A.   We're hinting at the female we've identified as Chayo, Fernanda.  The individual that's out of Guadalajara, Mexico.

Q.   Now, you know that it's Chayo that he's been talking to because of the undercover, correct?

A.   That's correct.

Q.   Why do you need him to say it?

A.   It's -- again, we -- it's a test of honesty.  It's a test

of whether he is, in fact, going to be truthful with us.  He's not going to lead is into somewhere that we know is a lie.

Q.  Now, the second part of the -- or the middle part of it, there's a long conversation of he's worried that his family will get killed.

A.  That's correct.

Q.  And there's an issue about whether to call his family?

A.  Yes, sir.

Q.  You know, did -- would you let them make an offer to call his wife?

A.  Yes.

Q.  Okay.  Now did you, in fact -- now, I think there was a certain point where you're a Customs officer, and you talk about that you can bring them in, correct?

A.  That's correct.

Q.  Kind of explain that process.

A.  So we know -- you know as customs and Border Protection officers, and me being a task force officer with other agencies that deal with our target investigation -- it's complex investigations.  We know that there's people in Mexico that need to be protected.  It's not their fault that individuals that are -- that they're related to or they're family with, are doing things that, quite frankly, are against the law.

So we want to make sure that we want to preserve life.  So if there's any way we can, to do that, we'll offer that

opportunity, because all they've got to do is go to the border. I can make a phone call and we can allow those people to stay at the border until we provide further -- further help.

Q.   Now, I think two of his family members are United States citizens.  But the -- one of his sons, or maybe a daughter, was not a U.S. citizen?

A.   Correct.

Q.   Can you help bring in non-U.S. citizens --

A.   Yes.

Q.   -- into the United States?

A.   Yes.

Q.   Now at a certain point in time, he doesn't want to take YOU up on that offer, because he doesn't want to tell you anything, correct?

A.   Correct.

Q.   I think he does give you a counteroffer, in which you would allow him to travel to Mexico to deliver the weapons.

        Is that something that's even possible?

A.   No.

Q.   Okay.  What are the many reasons why that was not possible?

A.   One of the reasons is that once he's in Mexico, he's without our reach.  He's not within our reach anymore.  He'll be in Mexico and we'll never see him again.

        We can't trust him with that, when he's not even --
when he's not even being upfront with us to begin with.

Another is, obviously, if he's fearing for other people's lives, well, he could -- he could -- it's up to him if he wants to go to Mexico, but we're not going to allow him to do that.  He's just not being upfront with us.

Q.   Do you have any law enforcement capabilities within Mexico?

A.   Very little.

Q.   Okay.  Are you -- can you actually enforce any laws in Mexico?

A.   No.

Q.   All right.  So any law enforcement presence that the FBI or Customs might have in Mexico is -- what is it?

A.   Reaching out to our partners that are, in fact, in other countries, that can help us -- help us in situations.

Q.   Now, are -- also, you're worried about corruption in Mexico?

A.   Absolutely.

Q.   And Mr. Hernandez -- I guess, was there indication that he might have been part of that corruption?

A.   Yes.

Q.   And what was that?

A.   Well, he was a former police officer.  He was working with an individual that we've identified to be one of the heads of a cartel in Mexico, which we all know -- or as law enforcement knows is -- is facilitating drugs, weapons, and bulk cash to facilitate their -- their business.

Q.   Now, in -- I guess in kind of the other less substantive parts of the conversation at the very beginning, someone asks Mr. Hernandez how he makes money.

And what did he say?

A.   He says that he has rental properties.

Q.   Did he say anything about having a license to export or having a license to sell weapons in Mexico?

A.   No.

Q.   Did he mention about being a weapons seller, a legal weapons seller in Mexico at all?

A.   No.

Q.   Now as a Customs officer, have you had any experience with the exportation of firearms from the United States?

A.   Yes.

Q.   And kind of generally, what's your experience?

A.   I've participated in -- I've participated in outbound examinations, both here in the southern border and also in the northern border.

As a Customs -- as a Customs officer, we make sure and ensure certain items are not exported into Mexico without our knowledge, to include bulk cash.

It's not illegal to take currency into Mexico; however, you need to report that to a Customs officer.

In addition to that, weapons, firearms, explosives, things of that nature, need to be declared.  We know that those

particular items are exported to Mexico continuously to support

cartels in Mexico.

Q.   Hypothetically, if I did have a license to own firearms in the United States -- or in Mexico, and I'm leaving the United States with one of those firearms, what would happen once I tried to leave the United States?

A.   We don't -- we don't recognize foreign licenses, because we're not law enforcement officers in Mexico.  We don't have any authority in Mexico.

We only work with licenses that are part of the United States.  The weapons would be seized.

Q.   So do I need a different license in order to export firearms from the United States?

A.   Yes.

Q.   Did Mr. Hernandez or Mr. Ramos have those licenses?

A.   No.

Q.   And here, is Mr. Hernandez indicating the plan, ultimately, what would happen with those weapons that were used on the 21st?

A.   Yes.

Q.   What was that plan?

A.   The plan was for him to --

Q.   Who's the "him"?

A.   I'm sorry.

The plan was to -- for Mr. Hernandez to deliver the

money for the weapons.  Then, there was going to be another individual, who we now know is Mr. Ramos, physically taking possession of the weapons.

At that point, Mr. Ramos would then exit the United States and take those weapons into Mexico.

Once they're in Mexico, Mr. Hernandez Cordero would then receive those weapons and hand them over to the person that sent him to begin with.

Q.  Have you ever seen this kind of scheme before, where someone else physically crosses contraband, and then -- apart from somebody else?

A.  Yes.

Q.  And in what context have you seen that?

A.  We -- we label them as coordinators.  They're individuals that don't necessarily get their hands dirty.  They delegate work to other people.  Even though they're not actually possessing the actual items, they're delegating work to other people.  And then we call them as coordinates.

In this -- in this -- in this instance, you see that in Mr. Hernandez.  He coordinates individuals to do the dirty work for him.

Q.  If we look on Government's Exhibit 6H, do you recall when someone had asked Mr. Hernandez about crossing the money?

A.  Yes.

Q.  Now, we're here at Page 9.  Someone specifically asks him,

That the money was placed in a Jeep and crossed over to El Paso?

And how does Mr. Hernandez respond?

A.   In the affirmative.  Yes.

Q.   Okay.  Now originally, did you think Mr. Hernandez was the one that crossed the money into the United States?

A.   Yes.

Q.   But did you find evidence to indicate otherwise?

A.   Yes.

Q.   Okay.  So first, let's start off.

Were you able to view Mr. Hernandez's cellphones?

A.   Yes.

Q.   Did you see a conversation from August 21st, 2023, that he had with Señora Hardy, or Chayo or Fernanda?

A.   Yes.

Q.   And would you guys generally explain about that conversation?

A.   So in that conversation, which took place actually on August 21st of 2023, it begins with a new number that is given to Mr. Hernandez Cordero.

Señora Hardy advises Mr. Hernandez to maintain this number.  What's unique about that number is that it has a prefix of 656.  That prefix -- that prefix is unique to the Ciudad Juárez Mexico area.

As I explained to you earlier, she's based out of

Guadalajara, Mexico.  So when she received that phone number, she provides that number to Mr. Hernandez.

Then they talk about the deal that was going to be taking place on August 21, to include currency that's going to be needed to be brought over to purchase the weapons.

Q.  Now, what do they talk about in terms of crossing the money?

A.  In terms of crossing the money, they talk about having -- or delegating somebody to cross that money over into the United States.

Q.  Now, did you do further research into Mr. Hernandez's phone?

A.  I did.

Q.  Did you find any information about Mr. Hernandez utilizing somebody else to cross the money?

A.  Yes.  Again, in a separate conversation with a separate individual.  That individual has a contact in Mr. Hernandez's phone as Meny Gel.

In that particular conversation, which is also taking place on the day of the deal, August 21, 2023, you'll see a coordination between Meny Gel and Mr. Hernandez Cordero.

What's unique about that conversation is the timestamps in which those text conversations occurred.

As a law enforcement officer at the port of entry, I can find out the day and time and the manner in which you cross

the border.  And I can look at and cross-reference the timestamp on the message to a timestamp in which a person actually crosses the border.

Q.  Let me stop you right there.

A.  Excuse me.  Sorry.

Q.  I'd like to show you some exhibits that have not yet been offered into evidence, and I would like to start off with Government's Exhibit 8A.

Are you familiar with Government's Exhibit 8A?

A.  I am.

Q.  And is this an example of how a person would declare money at the port of entry?

A.  It is.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 8A into evidence:

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 8A will be admitted.

BY MR. MYERS:

Q.  I would like to show you what's been marked as Government's Exhibit 8C.

Do you recognize Government's Exhibit 8C?

A.  I do.

Q.  Is this the crossing of a person known as Meny Gel, or Manny González?

A.  It is.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 8C into evidence.

MR. GUTIERREZ:  No objection.

THE COURT:  Government's Exhibit 8C will be admitted.

BY MR. MYERS:

Q.  I'm going to show you what has been marked as Government's Exhibit 8D.

Is this a conversation between a contact of Meny Gel and Mr. Hernandez Cordero?

A.  It is.

Q.  And these are photographs from his phone?

A.  It is.

Q.  Fair and accurate representations?

A.  They are.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 8D into evidence.

MR. GUTIERREZ:  No objections, Your Honor.

THE COURT:  Government's Exhibit 8D will be admitted.

MR. MYERS:  And I'd also like to show you Government's Exhibit 8E.

BY MR. MYERS:

Q.  Sir, is this a translation of that conversation?

A.  It is.

MR. MYERS:  Your Honor, I'd offer Government's Exhibit 8E into evidence.

MR. GUTIERREZ:  No objections.

THE COURT:  Government's Exhibit 8E will be admitted.

MR. MYERS:  Permission to publish to the jury, Your Honor?

THE COURT:  You may.

BY MR. MYERS:

Q.  All right.  Government's Exhibit 8A.

What is -- this is known as a CMIR?

A.  Yes.

Q.  What is a CMIR?

A.  It's a Currency and Monetary Instruments Report.  Any negotiable instruments, to include bulk cash or any cash whatever, needs to be declared at the port of entry.  Both -- either entering the United States or exiting the United States.

It's not -- it's against the law to import or export any currency in excess of $10,000.  It just needs to be properly reported, and that's one of the duties, as a CBP officer, enforces.

Q.  Now here, I think you had said that this -- there's a -- before it potentially becomes illegal into -- there's a currency amount, correct?

A.  Correct.

Q.  And what is that currency amount?

A.  $10,000.

Q.  Now, it's not illegal to walk in the United States with a

hundred, two hundred, $2 million, is it?

A. Not at all.

Q. As long as it's what?

A. Properly reported.

Q. Okay. And how would someone properly declare currency at the port of entry?

A. At the port of entry, you can come to the Customs and Border Protection officer, let them know that you are there to declare that amount of money. Possibly, as CBP officers, we then take you to a secure and private area. We do not count the money right in front of everybody. It's a matter of privacy at that point.

We make sure that the person that is actually reporting the money is the person that is, in fact, at the port of entry. We take you to a secure area, we verify the currency. All you do is fill out the form. If you're bringing it on behalf of somebody else, there's an appropriate box that you can do that, and you identify who the person that you're actually doing it for.

We then, like I said, verify the amount. And then we take it to a supervisor, at which point he verifies the amount. And then that's the end of the -- that's the end of the reporting requirements.

Q. And that person is let happily upon their way?

A. They're free to go wherever they need to.

Q.   Now, did you examine the -- or look for a -- a CMIR for Mr. Hernandez on August 21st, 2023?

A.   Yes.

Q.   Were you able to find one?

A.   I did not.

Q.   Now, you reviewed that video.  In fact, you're the one that got the video of the cross- -- Mr. Hernandez's crossing into the United States?

A.   I did.

Q.   Have you reviewed that video?

A.   I did.

Q.   From that video, could you tell whether a CMIR or other reporting was done?

A.   No.

Q.   And why don't you think a report was done?

A.   Several -- a couple of things.  Mr. Hernandez Cordero was subsequently admitted into the United States.

        When you're somebody that actually has that type of cash and you're reporting it, like I had mentioned, we need to refer you to a private and secure area.  Even if you have this document filled out, we still need to verify the amount.

        In the systems that I use, like I mentioned, Mr. Hernandez Cordero was admitted.  In no way, shape, or form would somebody be admitted when they have that much money.  We need to approp- -- we need to properly document this, this --

this cash.

So if someone were to come to the port of entry and actually provide that documentation, the report that you are carrying that money, we would refer you to a secondary inspection, which would be reflected in my system.

Q.   And in the video and in your system, is Mr. Hernandez sent to a secondary?

A.   He is not.

Q.   Okay.  And so if Mr. Hernandez were to declare it out, this would the form that he would have to fill out?

A.   Yes.

Q.   Now, if we look to -- you had mentioned one thing in Government's exhibit -- a conversation between Meny Gel and the defendant Mr. Hernandez Cordero?

A.   Correct.

Q.   And here, we see this is a conversation that begins on what date?

A.   On August 21, 2023.

Q.   And what times are reflected here?

A.   So it starts at 1500 which, in military time, it would be 3:00 p.m.

Q.   Now, you've reviewed the crossing history for Mr. Hernandez?

A.   I did.

Q.   And at this point in time, was Mr. Hernandez in Mexico or

in the United States?

A.  He is in Mexico.

Q.  Now, are you familiar with the picture of the money that was sent to the undercover?

A.  I am.

Q.  And what was important about that text message, or that photograph?

A.  What was important is the timestamp that I had mentioned when that photo was taken, and when it was sent to the undercover.

MR. MYERS:  Your Honor, I would like to publish to the jury what's already been admitted as Government's Exhibits 8F and 8G.

THE COURT:  8F and 8G?

MR. MYERS:  Yes.

THE COURT:  You may.

BY MR. MYERS:

Q.  Do you recognize this photograph?

A.  I do.

Q.  Okay.  What's important about this photograph?

A.  What's important?  Well, first of all, it was taken on the day of the operation, August 21, 2023.

This is a visual -- a visual of the interior of Mr. Hernandez Cordero's white Ford Bronco.

Q.  And what's standing out to you?

A.   It's the outline -- the orange outline that you see just on the center cons- -- just on the bottom console, where the gearshift is.

MR. MYERS:   Your Honor, I'd like permission to show the jury what's already been admitted as Government's Exhibit 8H.

THE COURT:   You may.

BY MR. MYERS:

Q.   This is a conversation the undercover had with Fernanda?

A.   Yes, it is.

Q.   All right.  And what sticks out to you about Government's Exhibit 8H?

A.   Again, it's the orange outline and the white Ford Bronco. And then to just -- just hugging that white -- that orange --

MR. GUTIERREZ:   Your Honor, I'm going to object that he's trying to elude and try to tie this to Mr. Cordero's vehicle, which this yellow can be on multiple Ford units.

THE COURT:   Overruled.

BY MR. MYERS:

Q.   And what else do you see that sticks out to you?

A.   What sticks out to me is the -- the cash that you see just to the left of that orange outline.

Q.   Now, what time is this video sent to the undercover agent?

A.   This has a timestamp of 1:40 p.m.

Q.   And at that point in time, where would Mr. Hernandez be?

A.   He's still in Mexico at this time.

Q.   Okay.  Now if we go back to the conversations, the translations with Meny Gel.

        The -- let's, I guess, start on the left-hand side.

        What is -- what does Meny -- Mr. Gel, or Mr. González, say?

A.   They're talking about meeting somewhere in five minutes, or a different time frame, asking where they're going and whether it can be -- where they can -- they can meet.

Q.   And now, have you looked at the crossings for Mr. González?

A.   I have.

Q.   And at this point in time, has Mr. González crossed into the United States?

A.   Not yet.

Q.   So your indication is that both Mr. Hernandez and Mr. González are in Mexico?

A.   Yes.

Q.   Now when he says he'll be there, Mr. González says he'll be there in five minutes, how does Mr. Hernandez respond?

A.   He replies in the affirmative.  I can pick you up where I see you.

Q.   And what does Mr. González say?

A.   Where are you going?

Q.   And how does Mr. Hernandez respond?

A.   Downtown.

Q.  And what does Mr. González reply?

A.  Do I see you there or wait for you at the house?

Q.  And how does Mr. Hernandez reply?

A.  He asks that he comes to Juárez.  Mr. Hernandez asks that Mr. Gel go to Juárez, and then they'll leave at once.

Q.  And then what does Mr. Hernandez say?

A.  He says, Envelope -- Tell Toño to come out to give him the folders.

Q.  All right.  Now, this is a literal translation of *sobres*?

A.  Yes.

Q.  All right.  Do you know what they're talking about?

    For sure, you don't know?

A.  I'm sorry?

Q.  Do you what they're talking about?

A.  No.

Q.  Okay.  Later, what does Mr. González ask?

A.  Where are you by?

Q.  And what did Mr. Hernandez say?

A.  And the reply is, Both Juárez and Mejia.

Q.  And what does Mr. González say?

A.  I'm turning on 16.

Q.  And what does Mr. Hernandez respond?

A.  Where the four-way stop is.

Q.  And Mr. González, what does he say?

A.  With my ex.

Q.   And then again, at 1618 hours -- or no, I'm sorry.

          On the right-hand side, Mr. Hernandez -- what message does he send at 1540 hours?

A.   He sends a message that, There's a dentist here.

Q.   Okay.  Now at 1540 hours, is Mr. Hernandez yet in the United States?

A.   No.

Q.   Okay.  The next message is at 1618 hours?

A.   Correct.

Q.   And what does Mr. Hernandez say?

A.   I'm at the Burger King.

Q.   Now if you look at the video, is there a timestamp on the video of Mr. Hernandez's crossing?

A.   There is.

Q.   Has Mr. Hernandez made it into the United States?

A.   Yes, he has.

Q.   Now, if we look here at Government's -- let's say in the Government's translation -- what does Mr. Gonzales reply to that?

A.   He says that he's five minutes from crossing.

Q.   Now at the end, there's a question about -- oh, at what time did he say that?

A.   This is at 1618, the same time that Mr. Hernandez mentioned that he's at Burger King.

Q.   Okay.  Now at this point in time, has Mr. González crossed

into the United States?

A.  Not yet.

Q.  Okay.  Then the next thing is the voice note sent at what time?

A.  1645, or 4:45 p.m.

Q.  And at this point in time, are both Mr. González and Mr. Hernandez in the United States?

A.  They are.

Q.  Okay.  Now if we look at Government's Exhibit 8C, this is the crossing history for whom?

A.  This is the crossing history for Manny González, Meny Gel.

Q.  Is Mr. González someone that you've met?

A.  Yes.

Q.  And you've interviewed?

A.  Yes.

Q.  And have you confirmed that his phone number is the same phone number as Meny Gel's?

A.  I have.

Q.  Now here, what we're looking at, does it -- the crossing date and time, it's in Eastern Standard Time?

A.  That's correct.

Q.  And at -- what would that be in El Paso time?

A.  Just two hours -- local time, just two hours behind.

Q.  Okay.

A.  So it would be 4:29.

Q.  All right.  So what was -- and what port of entry did he cross there?

A.  If you look at the middle portion of this exhibit where it says "site," you'll notice that it says "PDN CBP," which is El Paso, Paso del Norte.  And then you have a unique code that is associated to the actual port.

Q.  Now, what port of entry did Mr. Hernandez cross through to the United States?

A.  The same port.

Q.  The time difference between Mr. Hernandez's crossing and Mr. Gonzales's crossing?

A.  More or less about 15, 16 minutes.

Q.  Now, have you looked at the -- looked for a declaration for Mr. González?

A.  I did.

Q.  On August 21st, 2023, did Mr. González declare any money at the port of entry?

A.  He did not.

Q.  Was he referred to secondary?

A.  He was not.

Q.  So there would have been no opportunity for him to declare that money?

A.  No.

MR. MYERS:  Your Honor, I'd also like to show what's already been admitted into evidence as Government's Exhibit 5S.

THE COURT:  You may.

BY MR. MYERS:

Q.  Do you recognize this translation?

A.  I do.

Q.  And what's this?  What are we looking at?

A.  Okay.  So you're looking at the translation between Mr. Hernandez Cordero and the speaker of SA4155, which is the undercover agent with ATF.

Q.  And here, the highlighted time.  Would you note the time?

A.  4:34 p.m.

Q.  And at this point in time, have Mr. Hernandez and Mr. González crossed into the United States?

A.  Yes.

Q.  And here, Mr. Hernandez -- would you read the translated section to the jury that he tells the undercover agent?

A.  Yes.  He says, Well, we just barely crossed, because they hadn't told us that we had to take the money to you.  I barely crossed.  I'm about to take the 10, parenthesis 10, so the time it takes me to get from downtown to over there.

Q.  Now were you also involved, I guess, in the takedown of what happened on August 21st, 2023?

A.  Yes.

Q.  So you saw the final results?

A.  Yes.

MR. MYERS:  Your Honor, I'd like to show the witness

some photographs that have not yet been admitted.

BY MR. MYERS:

Q.  I'd like to show you Government's exhibits -- well, let me ask you this.

Do you recognize Government's Exhibit 5AJ?

A.  I do.

Q.  Whose truck is that?

A.  That's Mr. Ramos's truck.

Q.  Do you recognize Government's Exhibit 5AL?

A.  I do.

Q.  As well as 5AM?

A.  I do.

Q.  Government's Exhibit 5AN?

A.  I do.

Q.  Government's Exhibit 5AO?

A.  I do.

Q.  Government's Exhibit 5AP?

A.  I do.

Q.  Government's Exhibit 5AQ?

A.  I do.

Q.  And Government's Exhibit 5AR?

A.  I do.

Q.  Do these exhibits fairly and accurately represent Mr. Ramos's truck and the contents of his truck on August 21st, 2023?

A.  It does.

MR. MYERS:  Your Honor, I'd offer into evidence Government's Exhibits 5AL through AR into evidence.

MR. GUTIERREZ:  No objections, Your Honor.

THE COURT:  Government's Exhibits 5AL, AM, AN, AO, AP, AQ and 5AR -- not Q.  I'm sorry.

All the other ones are hereby admitted.

MR. MYERS:  Your Honor, I'll also offer 5AQ into evidence.  Is that one admitted?

THE COURT:  There being no objection, Mr. Gutierrez?

MR. GUTIERREZ:  No objections, Your Honor.

THE COURT:  5AQ will be also be admitted.

MR. MYERS:  Permission to publish to the jury, Your Honor?

THE COURT:  You may.

BY MR. MYERS:

Q.  5AJ -- or excuse me.

5AL, what is the jury looking at here?

A.  You're looking at the rear -- rear end, the second cabin of the Ford truck, that is registered to Mr. Ramos.

Q.  Okay.  And is there anything of significance within the truck?

A.  You'll see the boxes laying on the floorboard.

Q.  If we look at Government's Exhibit 5AM, are these the boxes that you're researching?

A.   Yes.

Q.   And what is now ultimately going to be inside these boxes?

A.   They're weapon parts.

Q.   5AN.  Is this a photograph of one of those boxes?

A.   Yes.

Q.   And how about Government's Exhibit 5AO?

A.   Also weapon parts.

Q.   And if we look at Government's Exhibit 5AP?

A.   It's a layout of the multiple firearms parts that were in the box.

Q.   And how about Government's Exhibit 5AQ?

A.   More weapon parts that were found in the second box.

Q.   And Government's Exhibit 5AR?

A.   More weapon parts.

        MR. GUTIERREZ:  Your Honor, I'm going to object.  I don't believe 5AR was admitted.  I think you stopped at 5AQ.

        THE COURT:  Yeah.  5- -- yeah, it was admitted.

        MR. MYERS:  It was not or it was, Your Honor?

        THE COURT:  No.

        MR. MYERS:  Okay.

BY MR. MYERS:

Q.   5AR.  Does that fairly and accurately represent the parts that were inside the box?

A.   5AR?

Q.   5AR.

A.   Can you show me --

Q.   5AR.

A.   Yes.

          MR. MYERS:  Your Honor, I'd offer 5AR into evidence.

          MR. GUTIERREZ:  No objections, Your Honor.

          THE COURT:  I have it as being already admitted.

          MR. MYERS:  Okay.

BY MR. MYERS:

Q.   All right.  Now, these parts -- can you make a firearm out
of these parts?

A.   Not a complete.  Not complete.

Q.   Okay.  What's missing?

A.   The lower -- the lower receivers.

Q.   Now were you involved in the operation on May 31st, 2023,
when Mr. Quezada, Saul Quezada, attempted to export firearms
from the United -- export weapon parts from the United States?

A.   Yes, I was.

Q.   At that point in time was Mr. Quezada placed under arrest?

A.   He was not.

Q.   And the parts that he had with him, those two parts, was it
illegal for him to export those two particular parts?

A.   No.

Q.   And why not?

A.   There's a spending -- a spending limit in which you can
actually spend money on weapon parts that's exempt from

exporting to Mexico, and which is just more or less $500.

Q.   And how much were those weapon parts?  Do you know how much those two weapon parts were that Mr. Quezada had?

A.   It was under $500.

Q.   All right.  And in fact you, or maybe Special Agent Doolin, had collected the receipts from gun stores to show that?

A.   We did.

Q.   Now at that point in time, did you know how important Mr. Quezada was to the organization?

A.   We did not.

Q.   Okay.  Now during the post-arrest statement, did Mr. Hernandez express any fear that he had been threatened to perform this -- this job, or pick up these weapons and pay for this money?

A.   No, he did not.

Q.   What fear was he expressing?

A.   Just fear from his family -- for his family.

Q.   But why was he afraid that his family might be hurt?

A.   He was afraid of being a rat.  He was afraid of the people in Mexico finding out that he had cooperated.

Q.   Now during your investigation, had you had any evidence that Mr. Hernandez was also similarly involved in investigating people who potentially cooperated?

A.   Yes.

Q.   What is that evidence?

A.   There's evidence that -- in Mr. Hernandez's phone, where he's in contact with Señora Hardy.  And Ms. Señora Hardy is asking if Mr. Hernandez can look into an individual by the name of Brian Muñoz Alexis Castro [sic], on whether he had been arrested or not, or whether he's cooperating with law enforcement.

Q.   And who does Mr. Hernandez look -- reach out to to help him carry out that task?

A.   He's -- he's communicating with an individual, Manny González, Meny Gel, the individual that he was texting to bring the money over from Mexico.

        MR. MYERS:  Your Honor, I would like to show the jury what's already been admitted into evidence as Government's Exhibit 15G.

        Permission to publish?

        THE COURT:  You may.

BY MR. MYERS:

Q.   Are these the conversations you're discussing?

A.   Yes.

Q.   Is this the same phone number, the same Manuel González that crossed with the defendant on August 21st?

A.   Yes.

Q.   And the same one you suspected of actually crossing the money?

A.   Yes.

MR. MYERS:  Your Honor, may I have a moment with co-counsel?

THE COURT:  You may.

(Mr. Myers and Ms. Holderfield confer.)

BY MR. MYERS:

Q.  And if we look on Page 3 of Government's Exhibit 15G, does Mr. Hernandez indicate why Mr. Muñoz had been arrested or stopped by the FBI?

A.  Yes.

Q.  And what is that reason?

A.  He's mentioning something about going to a house and whether they had -- whether they had found *methamphetamina*, or methamphetamine.  Or a code word for that would be *crystal* or *pastillas* M30, which law enforcement knows as -- they're Fentanyl pills.

Q.  And in fact, on March 31st, 2023, were you involved in that law enforcement operation?

A.  I was.

Q.  And what was seized from Mr. Muñoz-Castro's house?

A.  Those two items, in addition to others.

MR. MYERS:  Your Honor, I pass the witness.

THE COURT:  Mr. Gutierrez?

MR. GUTIERREZ:  Thank you, Your Honor.

Can we set up the Elmo, please?

THE CLERK:  Yes, sir.  Yes.

CROSS-EXAMINATION

BY MR. GUTIERREZ:

Q.  Good morning, Mr. Cervantes.  Can you hear me?

A.  Good morning.  Yes, I can.

Q.  Okay.  All right.

You started off talking about Exhibit 7M.

MR. GUTIERREZ:  Your Honor, may I publish 7M?  It's already been admitted.

THE COURT:  You may.

MR. GUTIERREZ:  Thank you, Your Honor.

BY MR. GUTIERREZ:

Q.  Sir, do you recognize Government's Exhibit 7M?

A.  I do.

Q.  And this, basically, is the list of weapons that were involved in this case, correct?

A.  Yes.

Q.  And in -- and in 7M, the weapons 1 through 24 were associated with Brian Muñoz-Castro; is that correct?

A.  Can you go up to 1 and then progress down to 24, please?

Q.  Yes, I can.

A.  Thank you.

Okay.

Okay.

To 24.

Q.  (Switching pages.)

A.  Yes, sir.

Q.  Okay.  And then the weapons 25 through 46 were the weapons that were the sting on August 21st, 2023, correct?

A.  Yes.

Q.  Okay.  And the weapons 25 through 46 are weapons that were provided by the Government, correct?

A.  That's correct.

Q.  You then went to Exhibit 2A, where Señora Hardy gave a contact card to the defendant Rene Hernandez Cordero.

      Do you recall that?

A.  May I see the exhibit?

      MR. GUTIERREZ:  Your Honor, may I publish 2A, that has already been admitted?

      THE COURT:  You may.

      (Exhibit shown on Elmo.)

A.  Yes, sir.

BY MR. GUTIERREZ:

Q.  And it is not illegal to be sending contacts to anybody; is that correct?

A.  Correct.

Q.  And then you had a discussion of crossing the border, the entrance and exit of crossings of Jesús Ramos.

      Do you recall that testimony?

A.  I do.

Q.  And basically, you were using the timeline and the phone

calls to try to pinpoint an event, correct?

A.   Correct.

Q.   But during those times, you do not have any physical proof of anything that ever crossed to Mexico; is that correct?

A.   Correct.

Q.   In fact, there was no arrest, there was no photos as the vehicle is crossing over of any items in the vehicle, correct?

A.   Correct.

Q.   So it's basically a guess of what, or if anything, had been crossed, correct?

A.   A guess?

Q.   Or you have no knowledge, correct?

A.   No knowledge.

Q.   You agree with me?

A.   I agree.

Q.   And then your next testimony was the post-arrest of defendant Rene Hernandez Cordero, correct?

A.   What was that again?

Q.   The next testimony you gave was about the post-arrest of defendant Rene Hernandez Cordero?

A.   That's correct.

Q.   Okay.  And have you had a chance to go through the exact entire exhibit translation and hear the recording?

A.   I have.

Q.   Okay.  And I counted 10 times that he was concerned about

his family and his own life.

Is that an estimate that you would agree to?

A.   More or less.

Q.   Now during that time, you and the other agents are trying to figure out some kind of scheme, or a lie for him to present, in order to continue the case; is that correct?

A.   A scheme, or what he was involved with, what he was doing?

Q.   The optional ways that you can try to cover him was actually a lie that you wanted him to present so that you can continue the investigation; is that correct?

A.   He had provided us what he was willing to be part of.

Are you referring to lies in that manner or...

MR. GUTIERREZ:  Objection, nonresponsive, Your Honor.

THE COURT:  Well, clarify it.  What are you asking?

MR. GUTIERREZ:  Thank you.

BY MR. GUTIERREZ:

Q.   Okay.  You started to give him Option 1 and Option 2.

Do you recall that?

A.   I do.

Q.   And then Option 2 was kind some kind of scheme, or lie that you wanted him to continue telling the people in Mexico, so they can continue this type of investigation; is that correct?

A.   I'm not sure if it was a lie at that time.  There was options that we were putting in front of him that could have happened.  I'm not sure if this was a lie.

Q.   Okay.  So are we saying a white truth?  Is that what you're saying?

A.   I'm not sure what a white truth is.

Q.   Okay.  The Option 2 did not happen.  But you wanted him to tell the people in Mexico it did, correct?

A.   Correct.

Q.   Okay.  Option 2 had not happened.  So in my definition, that would be a lie.

        Would you agree with me?

A.   We were -- we were attempting to do that.

Q.   Attempting to do what?

A.   Option 2, to make -- to have the phone call made.

Q.   Which is not the truth?

A.   I'm not sure -- I'm not following you.  We were trying to do that.  It wasn't a lie.

Q.   What you wanted Mr. Cordero to do, to tell in Option 2, had not occurred?

A.   It did not occur.

Q.   And it's not the truth?

A.   It did not occur because he did not want it to occur.

Q.   But if he proceeded, it would not be the truth; is that correct?

A.   No.

Q.   Agents are allowed to lie in order to get further information on a criminal case; is that correct?

A.   That's correct.

Q.   Okay.  Is it possible that when the money was transferred, that Rene Hernandez Cordero did tell the truth, that it was a man?

A.   Can you repeat the question?

Q.   Is it possible that when defendant Rene Hernandez Cordero received the money, that it was from a man?

MR. MYERS:  Objection.  Calls for speculation.  Lack of personal knowledge.

THE COURT:  I'll sustain the objection.

BY MR. GUTIERREZ:

Q.   You testified that you could bring Mr.- -- defendant Rene Hernandez Cordero's family into the United States; is that correct?

A.   Yes.

Q.   Could you guarantee that his family would have received legal documents to live in the United States?

A.   I can't guarantee that.

Q.   So the fact that they would have crossed over to the United States, and you could not guarantee that they live in the United States, they would be forced to go back to Mexico; is that correct?

A.   That's not correct.

Q.   How would his family remain in the United States if they did not have permission to live in the United States?

A.   If someone seeks asylum or they have fear of being killed, tortured in Mexico, we don't return those people to Mexico.

Q.   Okay.  But you do not have that authority, correct?

A.   No.

Q.   You testified that Rene Hernandez Cordero was a former law enforcement officer; is that correct?

A.   That's what he said.

Q.   Okay.  And you said that -- do you have any proof or evidence that he was a corrupted law enforcement officer in Mexico?

A.   No.

Q.   In the post-arrest, you recall that defendant Rene Hernandez Cordero was actually shocked?

A.   Do I recall that?

Q.   Do you recall that?

A.   No.  I wasn't there during that time.

Q.   Okay.  Did he ever complain to you that his foot or his ankle was injured?

A.   Yes.

Q.   Okay.  And did he get any medical attention at this post-arrest while -- before you interviewed him?

A.   No.

Q.   And this post-arrest, it seems like you guys were opening and closing a door.

         Was it in a van?

A.   Yes.

Q.   Do you have any kind of medical background?

A.   Me?

Q.   Yes.

A.   No.

Q.   You would not know if, because of the injury, that he was going into some type of shock, would you?

A.   No.

Q.   While you were interviewing him, you basically said, I don't know anything about your family and I don't know anything about you.

          Do you recall that?

A.   I do.

Q.   So up until August 21st, 2023, you knew nothing of defendant Rene Hernandez Cordero, correct?

A.   I knew a little.

Q.   What date did you become aware of Defendants Rene Hernandez Cordero?

A.   I don't remember the exact date.

Q.   Was it the briefing that morning?

A.   No.

Q.   Is it standard for you to offer to bring family over for protection for Defendants to testify for the Government?

A.   Is it -- what was the term that you used?

Q.   Standard.

A.   Standard?  No.

Q.   Would you know if this offer was extended to Brian Muñoz-Castro?

A.   For his family?

Q.   For his family, or for him to remain in the United States.

A.   For him.

Q.   So there was an offer for the defendant Brian Muñoz-Castro to remain in the United States?

A.   Yes.

Q.   Did defendant Rene Hernandez Cordero tell you that he was just there to deliver the money?

A.   No.

MR. GUTIERREZ:  Your Honor, may I publish, which has already been admitted, Exhibit 6H, Page 4?

THE COURT:  6H?

MR. GUTIERREZ:  Yes, Your Honor.

THE COURT:  Yes, you may.

(Exhibit shown on the Elmo.)

BY MR. GUTIERREZ:

Q.   And I'll refer to this line right here (indicating).

Do you see that?

A.   Yes.

Q.   What does it say?

A.   "I was just delivering some money."

Q.   Do you recall now that he said that?

A.  He said that, yes.

Q.  Very good.

        (Exhibit shown on Elmo.)

BY MR. GUTIERREZ:

Q.  After he said that "I was just there to deliver the money," what was the further conversation in that same line, if you can read that please?

A.  We're going to turn in some money?  He was going to turn in some money.

        And receive what?  What were you getting in return?

        I was not going to get anything.  But the two people told me to throw things in there because they didn't have time, and I saw that it was weapons.

        Uh-huh.  So you weren't going to grab anything?

        No, I was just dropping off the money.

        Okay.  And which two people told you to put those guns in the car?

Q.  Okay.  So his involvement was to just drop the money and go, basically; is that correct?  Is that your understanding of what he was telling you?

A.  According to what he said, that's what he said.

Q.  Do you recall that he did not know the person who was supposed to pick up the weapons?

A.  That's what he said.

Q.  There was communication of, We're not going to throw you to

the wolves.

Can you enlighten me what you meant by that?

A.   We're not going to throw him to the wolves.  We're not going to just -- if he cooperates, we're not just going to just take advantage of him.

Q.   Okay.  But if he did not cooperate, would that mean that you would throw him to the wolves?

A.   Not necessarily.

Q.   But it was a form of threat, right?

A.   No.

Q.   Explain this to the jurors, why this was said:

We can offer you -- we can offer you because we are not local police.  We are federal agents.

What's that supposed to mean?

A.   There's things that federal agents can do that local police departments can't do.

Q.   And one of them would be bringing his family over to the U.S. temporarily?

A.   One of them, yes.

Q.   And at this point, temporarily was the only thing really being offered, correct?

A.   I'm not sure if that's correct.

Q.   At this point you did not have the authority to say, Your family can live here in the U.S., correct?

A.   Right.  Correct.

Q.   Okay.  On page 24, it seems that you and the agents left the van, and there was a lengthy pause which was not recorded.

Did you turn off your mics at that point?

A.   I don't believe we did.

Q.   So you guys leave the van, there's a lengthy pause, and then you come back into the van and then you start asking questions.

Do you recall that?

A.   Yes.

Q.   And during that lengthy pause nothing was said?

A.   Correct.

Q.   Okay.  Now, you testified that Rene Hernandez Cordero did not have a license to export weapons, correct?

A.   Correct.

Q.   But you did not perform those -- the investigation on the licenses, correct?

A.   No.

Q.   There was another person that did that, correct?

A.   Yes.

Q.   And you were not here for the testimony.  But if he testified that he did not look at the State Department to check to see if the defendant had requested a license, you would have no information opposing that, correct?

A.   Can you rephrase the question?

Q.   Okay.  It was lengthy.  I apologize.

Another person testified about researching licenses, correct?

A.   I don't know.

Q.   Okay.  So you don't know anything about how the search of the license occurred, correct?

A.   About how it was searched?

Q.   About the defendant.

A.   No.  The request was made.  I'm not sure how he did it.

Q.   Okay.  So when you're here to testify that they had no license, that would be inaccurate because you have no personal knowledge, correct?

A.   I know -- I know that there was no license.  I don't know how it was done, how it was conducted.  I'm sorry.

Q.   Okay.  And you also don't know that the State Department was not researched for that license either, do you?

MR. MYERS:  I'm going to object as lack of personal knowledge.  He's already testified he doesn't know.

THE COURT:  I'll sustain the objection.

BY MR. GUTIERREZ:

Q.   Okay.  Are you telling the jurors that defendant Rene Hernandez Cordero did not cross the money to the United States?

A.   Yes.

Q.   So he did not have to fill out any form about currency, correct?

A.   That's incorrect.

Q.   If he's not crossing the money, why would he have to fill out a form?

A.   As I had mentioned, on the CMIR form, if you're bringing some money on someone's behalf, you need to mention who that person is.

Q.   Okay.   If you're bringing the money for some other person's behalf you would have to have the money, right?

A.   Can you rephrase the question?

Q.   You would have to have the money in order to say you're bringing the money in for somebody else's behalf?

A.   Correct.

Q.   Okay.   And you just testified Rene Hernandez Cordero did not have the money, correct?

A.   That's correct.

Q.   So he would not have to fill out this form, correct?

A.   If you look on the CMIR, it mentions that the individual, which the money was delivered on behalf of them, would need to report that.

Q.   Okay.   The individual would have to be the person that is actually in possession of the money, correct?

A.   Once they cross the border.

Q.   Possession of the money, correct?

A.   Correct.

Q.   You testified that you saw the picture, or the money, by the Ford Bronco with the orange lining, or accent on the

handle.

Do you recall that?

A.  Yes.

Q.  Have you done an investigation that that is standard on all Broncos that year?

A.  No.

Q.  Would it surprise you if it was?

A.  It's possible.

Q.  So there's no way to say that Bronco with the money was actually the defendant Rene Hernandez Cordero, correct?

A.  No, sir.

Q.  So you're telling the jurors that you know for a fact that that was his vehicle?

A.  That was sent from Mr. Hernandez Cordero.

Q.  What -- what proof or evidence were you able to -- to say that?

A.  Mr. Hernandez Cordero utilized the phone number --

Q.  No.  No.  No.  That's --

MR. MYERS:  I'm going to object, Your Honor.  He asked a question.  The witness would now like to explain.

MR. GUTIERREZ:  Objection, nonresponsive.

THE COURT:  Overruled.

A.  Okay.  Mr. Hernandez Cordero utilized a telephone number throughout the investigation.  That number was on his person the day of his arrest.  He was in possession of that phone when

we arrested him on August 21, 2023.

The picture that was taken was in that Ford Bronco. He was -- that was sent to the undercover agent from Mr. Hernandez Cordero.

BY MR. GUTIERREZ:

Q. The fact that a Ford Bronco -- it could be any Ford Bronco. You've established that, correct?

A. Any Ford Bronco has -- could possibly have that outline.

Q. In -- Exhibits 5AJ through AR are pictures of Ramos's truck.

Do you recall those pictures?

A. I do.

Q. With all the parts?

A. I do.

Q. Are all those parts illegal to cross?

A. Yes.

Q. Okay. Do we know for a fact that those parts were going to be crossed?

A. Yes.

Q. Do we know that those parts were going to go to different people or exactly to a certain person?

A. We know that they were going to Señora Hardy, Chayo. Those weapons and previous weapons as well.

Q. Okay. And defendant Ramos has pled guilty to that already, correct?

A.   Correct.

Q.   You're not saying that it's illegal or unlawful to look for a person that's arrested, correct?

A.   Can you rephrase the question?

Q.   It is not illegal to look for a person that has been arrested; is that correct?

A.   That's correct.

        MR. GUTIERREZ:  Pass the witness, Your Honor.

        THE COURT:  Redirect, Mr. Myers?

        MR. MYERS:  Yes, Your Honor.

        THE COURT:  Will you try to keep as it as brief as possible?

        MR. MYERS:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. MYERS:

Q.   Officer Cervantes, the Defense asked you if Mr. Ramos had pled guilty.

A.   Yes.

Q.   He pled guilty to firearms trafficking?

        Well, let me ask it this way.

        Mr. Ramos didn't have a license to export weapons, did he?

A.   No.

Q.   From the State Department or anywhere else?

A.   No.

Q.  Because he pled guilty?

A.  Correct.

Q.  And in this scenario, who was going to be the person physically crossing the weapons across the border?

A.  Mr. Ramos.

Q.  And how do you know that?

A.  Because he told us he was.  And Mr. Hernandez Cordero also mentioned that as well.

Q.  Now if I don't have any money to declare at the port of entry, I guess I don't have to fill out that form, correct?

A.  At that time, no.

Q.  Okay.  Can I hire or conspire with someone else to cross the money for me?

A.  Yes.

MR. GUTIERREZ:  Objection, Your Honor.  Speculative.

THE COURT:  I'm sorry.  What's the objection?

MR. GUTIERREZ:  That it's speculative.  He's assuming facts not in evidence.

THE COURT:  Overruled.

BY MR. MYERS:

Q.  Would it be illegal for me to conspire with someone else to avoid the reporting requirements at the port of entry?

A.  Yes.

Q.  Okay.  Now, I'd like to show you what's been admitted as Government's Exhibit 12I.

MR. MYERS:  May I publish to the jury, Your Honor?

THE CLERK:  Just a second, Mr. Myers.

THE COURT:  12I?

MR. MYERS:  12I.

THE COURT:  It has not been admitted.

I'm sorry.  I stand corrected.  It has been.

MR. MYERS:  Thank you, Your Honor.

THE COURT:  It has been admitted.

You may publish.

BY MR. MYERS:

Q.  Do you recognize these photographs?

A.  I do.

Q.  This is a conversation between which two people?

A.  This is between Hardy -- Señora Hardy, or Chayo, and Mr. Hernandez Cordero's cellphone.

Q.  Okay.  Do you see the date on Page 5 of that Government's exhibit?

A.  March 26th of this year -- or last year.  I'm sorry.

Q.  And this is when you suspected the el dorado, that golden weapon, had been crossed?

A.  Yes.

Q.  I would like you to read the highlighted section and tell me how Mr. Hernandez talks to Chayo, or Señora Ed Hardy.

A.  It says, Pass me the number so that they can pick up right now 450 *largo*, large, and 250 *cortas*, which is what we believe

is handguns, *y no bore,* like erase.

And she replies, *Hay le va.*

Q.  And that would be, like, no crying?

A.  I'm sorry?

Q.  And that would be, like, no crying?

A.  Yes.

Q.  All right.

A.  *No llore.*

Q.  So he's setting the price and telling her not to cry.

A.  Don't cry.

Q.  Don't cry.  All right.

I'd like to show you what's been marked as Government's Exhibit 9A, previously admitted.

May I publish?

THE COURT:  It has been admitted?

MR. MYERS:  Yes.

THE COURT:  You may publish.

BY MR. MYERS:

Q.  This is a conversation between Mr. Rural Ramos and Mr. Hernandez?

A.  That's correct.

Q.  If we look on page -- Page 4 of that exhibit.

How did Mr. Hernandez, when he's -- in the highlighted section, how does Mr. Ramos Rural talk to Mr. Hernandez?

A.  He says, Everything.  Everything arrived, *Señor.*

Q.   With respect?

A.   Yes.

Q.   Okay.  He doesn't tell him no crying?

A.   No.

        MR. MYERS:  If we look at Government's -- same, publish Government's Exhibit 10A, already been admitted, Your Honor?

        THE COURT:  You may.

BY MR. MYERS:

Q.   Here again on Page 3, how did Mr. Ramos Rural talk to Mr. Hernandez, the defendant?

A.   Again, They're already here, your products, *Señor*.

Q.   With respect?

A.   Yes.

        MR. MYERS:  Your Honor, permission to publish Government's Exhibit 11A, already admitted.

        THE COURT:  You may.

BY MR. MYERS:

Q.   During this conversation, does Mr. Hernandez -- or excuse me -- Ramos Rural, does he talk with disrespect towards Mr. Hernandez?

A.   No.

Q.   And would you read the highlighted section of how Mr. Rural talks to Mr. Hernandez?

A.   He says, I have your tools, Mr. Señor -- Mr.

Q.   Again, with respect?

A.   Yes.

Q.   Okay.  Now Mr. Hernandez's family, some of them were United States citizens, correct?

A.   That's correct.

Q.   So you didn't need to help to get them to stay in the United States?

A.   No.

Q.   And even after you offered to make that phone call, what else does Mr. Hernandez want?

A.   He wanted protection.

Q.   He wanted something in it for him?

A.   Yes.

Q.   And is that the way those --

THE COURT:  Mr. Myers, I was hoping we would be finished with this witness.

MR. MYERS:  Oh.  Actually, I'll stop it right there, Your Honor.  I'll --

THE COURT:  Yeah, but Mr. Gutierrez may have some cross.

MR. MYERS:  That's true.

THE COURT:  And I'm informed that the meal for the jurors is here.  So...

MR. MYERS:  Yes, Your Honor.

THE COURT:  We need to break up for lunch at this

time.

It's 5 after 12:00.  We'll be in recess until 1:20 in the afternoon.

You all please remain in the courtroom.

(Outside the presence of the jury; open court.)

THE COURT:  You may be seated.

Have you had an opportunity to look at the final version of the Charge?  I've got a problem.

MR. MYERS:  Yes.

THE COURT:  He's not charged with conspiracy to smuggle the money.  He's charged with the action of doing it.

MR. MYERS:  In the Superseding, Your Honor, he should be charged with Count 8 should be conspiracy.

THE LAW CLERK:  Your Honor, I can print the most recent version of the --

THE COURT:  Superseding Indictment.  I have it right here.  Superseding Indictment.

MR. MYERS:  It's a 371 conspiracy.

THE COURT:  Well, I stand corrected.  I stand corrected.  You're right.  In the Superseding it is.  I was looking at the actual Indictment.

Okay.  Now, have had an opportunity to review the final version of the Charge?

MR. MYERS:  I think the only thing we're missing is there were exhibits that we haven't double-checked yet.  I mean

we've talked about, but we haven't reviewed that draft.

We got everything else, as far as --

THE COURT:  Okay.  Look it over during lunch.

MR. MYERS:  Yes, sir.

THE COURT:  And before the jury comes back after lunch, I want to get your all's objections or corrections you may have.

MR. MYERS:  Will do.

THE COURT:  Okay.  I want to print it as soon as possible.

We'll be in recess until 1:20.

(Recess taken 12:08 to 1:20 p.m.)

(Outside the presence of the jury; defendant present.)

THE COURT:  Counsel, I hope you had an opportunity to review the proposed Charge.

I'm ready to take up any objections, requests, corrections, or whatever.

On behalf of the Government.

MR. MYERS:  Nothing on behalf of the Government, Your Honor.

MR. GUTIERREZ:  I have one request, Your Honor, on Page 7.

THE COURT:  Where?

MR. GUTIERREZ:  Page 7.

THE COURT:  Yes, sir.

MR. GUTIERREZ:  The second paragraph, second sentence. "On the contrary, the testimony of such witness may alone" --

THE COURT:  Talk into the microphone please.

MR. GUTIERREZ:  I'm sorry, Judge.

Second paragraph, second sentence.  "On the contrary, the testimony of such witness may alone be of sufficient weight to sustain a verdict of guilty."

I would ask for that to be removed.

THE COURT:  You're objecting to that?  That's pattern. That's pattern stuff, Mr. Gutierrez.

MR. GUTIERREZ:  I understand that, Your Honor.  I'm just putting my objection on the record.

THE COURT:  Okay.  Your objection is overruled.  We're going to print them.

Ready for the jury?

Okay.  Bring them.

(Jury in at 1:21 p.m.)

THE COURT:  Mr. Gutierrez, do you have any cross -- I'm sorry.

Mr. Myers?

MR. MYERS:  Sorry.  I pass the witness, Your Honor.

MR. GUTIERREZ:  Your Honor, I also pass the witness. I pass the witness.

THE COURT:  Oh, okay.  You're free to leave.

THE WITNESS:  Thank you.

MR. MYERS:  Your Honor, the Government rests.

MR. GUTIERREZ:  We would like to have the Court listen to our motion for acquittal.

THE COURT:  Okay.  So you need -- you get another break, members of the jury, while we go over some items here.

We're working on the last set of instructions.  But we also print them, because each one of you will get a copy.  So it may take, maybe, half an hour or so.

LAW CLERK:  They're right there.

THE COURT:  Okay.  So try to get it done as soon as possible.

So the jury is being excused at this time.

(Outside the presence of the jury; open court.)

THE COURT:  You may be seated.

Do you have a motion, Mr. Gutierrez?

MR. GUTIERREZ:  I do, Your Honor.  May I approach?

THE COURT:  You may.  Let me hear from you on your motion.

MR. GUTIERREZ:  Your Honor, the defendant requests a Motion for Judgment of Acquittal pursuant to Rule 29.

I'll give a moment for the Court to review it.

Basically, Counts One and Two, we believe that there has not been sufficient evidence to prove an overt act.

Count Three, as well.  All the conspiracy charges, they need an overt act, and we believe that there is not

sufficient evidence to prove it.

Again, we refer to *United States v. Bostic*. The Court stated that the mere knowledge of approval without participation does not make one party to a conspiracy.

In the alternative -- no. I scratched that term. It's already in the jury charge.

Therefore, we're asking the Court for an acquittal, because all the conspiracy charges have -- the element of the overt act of the defendant has not been proven.

THE COURT: Motion for Judgment of Acquittal is overruled.

Now, you rest and close, Mr. Myers?

MR. MYERS: Rest and close.

THE COURT: You rest and close?

MR. GUTIERREZ: Yes, Your Honor.

THE COURT: Okay. We'll take a short break.

I see the Charge has already been printed, so we don't need half an hour, maybe 15 minutes.

We'll be in recess for 15 minutes.

(Recess taken 1:26 to 1:39 p.m.)

THE COURT: Members of the jury, you have heard all of the evidence in the case. Now before you may start your deliberations, I need to give you the last set of instructions. It's going to be lengthy, but please follow me as I read it to you.

Mr. Myers, I'm going to give you 20 minutes.  How do you want to divide that?

MR. MYERS:  Ms. Holderfield will take the first 10 minutes and I'll take the second 10 minutes.

THE COURT:  10 and 10?

MR. MYERS:  10 and 10.

THE COURT:  And I'll give you a minute warning.

THE LAW CLERK:  It's right here.

THE COURT:  I see it.

Five minutes and one minute?

MR. GUTIERREZ:  Yes.  Yes, Your Honor.

THE COURT:  Okay.  You got it.

MR. GUTIERREZ:  Thank you.

THE COURT:  As I've indicated, I'm going to read it to you.  Please follow me as I read it to you.

(Charge of the Court read.)

THE COURT:  I think we should take a short break.  Otherwise, I'll be interrupting your final argument.

So let's take a 10-minute break.  We'll be in recess for 10 minutes.

(Recess taken 2:54 to 3:04 p.m.)

THE COURT:  Is the Government ready to proceed with closing?

MS. HOLDERFIELD:  Yes, Your Honor.

THE COURT:  You may.

MS. HOLDERFIELD:  Your Honor, before we begin, I just want to note for the record that the Government intends to use Government's Exhibit 1A for -- as a demonstrative for closing argument.  It's not been admitted into evidence.

THE COURT:  You may.

MS. HOLDERFIELD:  Your Honor, Counsel, Members of the Jury.

<u>CLOSING STATEMENT</u>

<u>BY MS. HOLDERFIELD</u>:

At the beginning of this trial, I told you that this case was about guns, drugs, and money.  You sat through the testimony of 13 witnesses and saw evidence that proved beyond a reasonable doubt that Rene Hernandez Cordero is guilty of the five counts in the Superseding Indictment.

All five counts in this Indictment are conspiratorial. So for all the counts the elements are the same, but vary slightly, depending on the crime.

A conspiracy is an agreement between two or more people to join together to accomplish some unlawful purpose. There does not need to be a formal agreement nor written document, a contract, or a handshake.  This can be proven through acts, through coordination, through planning, through an arrangement.

Now, there's some things to keep in mind with the conspiracy.  A person may become a member of a conspiracy

without knowing all of the details.

Now, I wanted to turn your attention to venue.  And we discussed this in the jury instructions.

The events presented in this trial happened in various places.  There's no requirement that the entire conspiracy take place in the Western District of Texas.

The Government must prove by a preponderance of the evidence that the agreement or an overt act took place in this district, even if the defendant never stepped foot in the district.

Now, let's discuss what we know thus far.

We have the boss.  Maria del Rosario Navarro-Sanchez, Chayo, Fernanda, or Señora Ed Hardy, she's a member of the CJNG cartel that smuggles guns into Mexico and methamphetamine and Fentanyl into the United States.

Brian Muñoz-Castro served as the narcotics and firearms stash operator sent to El Paso by Chayo.

Pablo Delgado, a straw purchaser of firearms, purchased them for Brian.  Brian would then provide those firearms to Jesús Ramos, who would then smuggle them into Mexico.

There's also Saul Quezada, a drugs, guns, and money courier for Chayo.  He would deliver weapons and narcotics to Brian.

We also have Ramos Rural, Jesús Ramos's brother, who

coordinated with the defendant the shipment of firearms. Ramos Rural would then send his brother Jesús to pick them up in the United States from Brian.

And then the defendant would communicate directly with Chayo and coordinate the shipment of firearms into Mexico, which furthered the drug trafficking organization that she serves as a member of.

Now, I'm going to move through the counts of the indictment chronologically.

For Count Three, conspiracy to straw purchase firearms.

You heard about conspiracy. But if you look at the third element, we see that in furtherance of the felony language, we have the smuggling goods from the United States, or a drug trafficking crime.

As Judge Briones instructed you, smuggling goods from the United States, or a drug trafficking crime, is a felony. But the Government does not have to prove both. Proof beyond a reasonable doubt on one is enough. But you all must agree that the same one has been proven.

ATF Special Agent Gus Benavides testified that days before August 21st, 2023, Chayo coordinated with him to purchase twenty AK-47s and two .50 caliber Barretts for $66,000 and sent a payment -- sent a down payment of $3,000.

You heard telephone calls, you saw text messages, and

you saw the receipt of the down payment.

As part of that coordination and shipment of firearms, Chayo sent the Defendant's phone number with a frog picture to the undercover agent, so that he and the defendant would make further arrangements to pick up the firearms.

You also heard that phone call between the defendant and Agent Benavides.

You saw video evidence that the defendant crossed into El Paso at the Paso del Norte Port of Entry.  He drove to the Circle K in Northeast El Paso to meet the undercover agent, and Jesús Ramos arrived in his gray F150.

All three -- the undercover, the defendant, and Jesús Ramos -- drove to that storage facility.

At the storage facility, you saw the defendant examine the firearms and pay for them.  He also pulled another $3,000 from his pocket.  He then loaded the firearms into a plastic storage bin and put them into his white Ford Bronco.

HSI Special Agent Charles Bachhuber also testified that the firearms required a license to export them to Mexico, and that the defendant nor any other co-conspirator or defendant in this case had one.

Count Four, conspiracy to traffic in firearms.

Again, we have a conspiracy.

Now, like, Count Three and Count Four, the Government does not have to prove both smuggling goods from the

United States or a drug trafficking crime.  Proof beyond a reasonable doubt on one is enough, but you all must agree that the same one has been proven.

The defendant knew that the firearms were going to be smuggled into Mexico and given to Chayo's drug trafficking organization.

How did he know?

Because we've seen the text messages between Chayo and the defendant.

Agent Zayas, Officer Cervantes, and the other agents in this case walked you through the phone evidence retrieved from the Defendant's phone records to show how the trafficking of the firearms worked.

For example, on September 11th, 2022, Chayo sent Brian Muñoz-Castro's contact information to the defendant.  The defendant then sent Brian's information to Ramos Rural, the brother of Jesús Ramos.

Ramos Rural would then coordinate with his brother to pick up the firearms and send them, as a courier, into El Paso. Jesús Ramos would call Brian to pick up the firearms, and then Ramos would cross into El Paso to pick them up from Brian and then cross them back into Mexico later.

This happened also on September 13th, 2022.  And this was not a one-time event.  It happened in September of 2022, October 2022, and March of 2023.

The defendant would have you believe that he is simply a mere associate of this organization, and that he is not part of this conspiracy.

Members of the Jury, these conversations with Chayo are not small talk.  These are conversations of coordinating, planning, and arranging the shipment of high-caliber powerful firearms to support the drug trafficking cartel.

The defendant offered to sell a .50 caliber bolt action rifle to Chayo, who told him that she didn't want it because they didn't work.

Well, in this conversation, he told her that the Michoacans used them and kicked the butts of the people she is associated with.

You heard Brian, the Michoacans are a neighboring cartel organization.  You see it clear as day.  The defendant directly communicates with Chayo to get the firearms.

We know who she is, we know who she works for, you heard testimony about her, and you heard her communicate with undercover agents to purchase the firearms.

You've also seen countless messages asking for firearms from the defendant.

Ladies and gentlemen, this defendant served as an integral part of this organization's acquisition of firearms.

For Counts One and Two, conspiracy to possess a controlled substance with intent to distribute.

Again we have a conspiracy, but we have two additional elements that you must also ask yourself.

The fourth element, that the overall scope of the conspiracy involved at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, and did the defendant know or should have known that the conspiracy involved at least 500 grams of methamphetamine.

You would also ask yourself the same question for Count Two regarding the Fentanyl.  You have a fourth, and you have a fifth element.

We saw the Defendant's text communications about the narcotics.  On April 20th of 2023, Chayo asked the defendant if she knew someone to pick up *frio*.  You heard testimony throughout this entire trial from multiple agents and expert witnesses about code words and how drug trafficking organizations use them.  A code word for methamphetamine is *frio*.

You see another conversation between --

THE COURT:  You have one minute.

MS. HOLDERFIELD:  -- defendant Ramos Rural and the defendant.

Defendant asks Ramos Rural if there was someone who could take care of 11 kilograms of *frio* for two days.

You also saw a discussion about Fentanyl, where Chayo asked the defendant to find Brian.  When defendant asked Ramos

Rural about -- about Meny Gel to look for Brian, those texts revealed that the defendant knew about the Fentanyl seized from Brian's stash house and the Fentanyl belonged to Chayo's drug trafficking organization.

Now lastly, you heard about the conspiracy to bulk cash smuggle.  You heard Agent -- Officer Cervantes testify.

You saw text messages that Chayo sent to Agent Benavides.  Those text messages include a picture of money sitting in front of a console with a car -- of a car with a black and orange handle.

At that time the defendant had $60,000 in Mexico.  We know this because he had not crossed into El Paso yet.

He sent that picture to Chayo, and then Chayo sent that picture to the undercover agent.

The defendant did not declare anything at the port of entry.  And you saw the text messages between the defendant and Meny Gel about coordinating the money and picking it back up at the Burger King here in El Paso, once they crossed.

Members of the Jury, what does all this evidence and testimony mean?  Guns, drugs, and money.  This is proof beyond a reasonable doubt that the defendant is guilty of all five charges.  Thank you.

THE COURT:  Mr. Gutierrez?

MR. GUTIERREZ:  Thank you, Your Honor.

Ladies and gentlemen of the jury, esteemed members of

the Court, and Honorable Judge.

CLOSING STATEMENT

BY MR GUTIERREZ:

At the start of my opening statement, I told you that the Government had a lack of direct evidence, and the Government's case relied heavily on circumstantial evidence: Phone calls, text messages, co-defendant testifying in order to get leniency.

The summary of the evidence.

Agent Gus Benavides testified of having 24 years of experience and stated that if the courier doesn't do as he was supposed to do in, his life -- that his life and his family are threatened.

He testified that in Mexico a person who obtains a license to purchase and sell firearms -- he testified that it is possible the defendant Rene Hernandez Cordero could have a Mexican license to purchase firearms.

He testified that all the communication of texting, phone calls, occurred when defendant Rene Hernandez Cordero was in Mexico.

He testified that defendant Rene Hernandez Cordero told him that he was just doing a favor of dropping off the money, and he didn't want to know anything or what it was for.

He testified defendant Rene Hernandez Cordero only took possession of five firearms that were placed in the

vehicle, and the remaining firearms were still in control of the Government.

He stated that the Government was in 100 percent control of the storage facility.

The Government's video, 5AA, shows defendant Rene Hernandez Cordero fired upon with no reason.

Agent Martha Zayas testified to having two years' experience, and stated that a private person selling a firearm did not have to fill out the form, ATF 4473 Form, which would not fall under the straw purchase conspiracy.

Here, the guns were sold privately, not store bought.

She testified that Pablo Delgado was at the direction of Brian Castro-Muñoz [sic].

Pablo Delgado would buy firearms from Brian Muñoz-Castro.

Further, testified that Brian Muñoz-Castro had direct communication with Chayo, and Chayo had direct communication with Brian.

She testified that Brian Muñoz's cellphone records had no communication between himself and the defendant Rene Hernandez Cordero.

She testified that the defendant Rene Hernandez Cordero lives in Mexico and did not have any significant crossings into the United States.

She testified that when defendant Rene Hernandez

Cordero was communicating, while in Mexico about firearms, that it was legal.

Then she talked about Ramos Rural crossing into the United States and exiting the United States on the following dates.

But yet, there was no physical evidence of what Ramos Rural had in his possession.

She testified that they had no arrests, no pictures of crossings with items.  In fact, she said that there was no physical evidence at all.

The agent testified that she did believe that defendant Rene Hernandez Cordero did have a license in Mexico to purchase and sell firearms, because she saw in his phone a -- SEDENA credentials in Mexico.

Then I asked her if she had reached out to the Mexico authorities to assistance and cooperation.

She stated no, because of the corruption.

There was a lot of discussion that defendant Rene Hernandez Cordero, with Chayo, talking about guns and prices, and on two occasions of a possible code for drugs.

However, the agent testified that just talking about the drugs and guns is legal.

Agent Janowski testified that -- having six years' experience -- he testified that he was a person who was approached by Brian Muñoz-Castro to become an informant on

March 31st, 2023.

He testified that Brian Muñoz-Castro was a person who sold them $6,000 worth of meth.

He testified that Brian Castro gave consent to search his house, where they found additional meth and the Fentanyl and guns and ledgers and illegal -- and other illegal transactions.

The agent testified that Brian Muñoz-Castro was also using courier Saul Quezada.

The agent testified, on March 31st, that the defendant Rene Hernandez Cordero was not a target.  In fact, after pen trap registration of Brian Muñoz-Castro's phone, the defendant Rene Hernandez Cordero never, ever, communicated with Brian Muñoz-Castro.

He testified that Brian Muñoz-Castro's ledger also had no information dealing with the defendant Rene Hernandez Cordero.

He also testified that Chayo had asked defendant Rene Hernandez Cordero to look to see if Brian Castro had been arrested.

The agent testified that this was legal, to search for a person that has been arrested.

Officer Charlie Bachhuber, an expert in firearms license, testified that he did a search for a license and found none for the defendant.

He also testified that it is possible to request a license through the State Department, which he did not do a search on.

Agent Casey Thompson testified, on March 30th, 2023, the drug sale with Brian Muñoz-Castro for $6,000 for the meth, testified defendant Rene Hernandez Cordero was not a target or anything to do with the buy/walk deal that day.

Joshua Worthy, FBI, five years' experience. He was an agent that followed Brian Muñoz-Castro on March 30th, 2023, to a Barcelona residence in a brown sedan.

The following day, March 31st, a blue car was driven by Pablo Delgado to two different gun shops and to the Paraguay address, where he was arrested.

He testified on these dates defendant Rene Hernandez Cordero was not a target.

That on August 21st, 2023, he was parked across the street from the storage unit. But yet, he was not there all the time. He testified that it was raining and drizzling.

See the video. It was a clear day.

Even agents have faulty memories and remember what they want to remember.

Ramon Guzman, 12 years' experience, testified that on March 21st, 2023, he was at the Port of Entry of Americas, where Saul Quezada, in a blue sedan, crossed into the United States. He suspected something. And on his own gut

feeling, he took the Defendant's car to secondary for further inspection, and found the hidden guns in the engine.

If you recall Agent Janowski, he testified that he gets an alert to, Hey, just stop the vehicle.

Again, agents are humans and have faulty memories and remember what they want to remember.

Then asked -- then I asked him if those guns and parts were illegal to cross, and he said no.

Brian Muñoz-Castro, 21 years of age, in the drug world since he was 14.  At 15 years, he was moved to the office, where he knew of torturing people, killing, drug preparation, and guns.  He was brought into the system at a young age and knew Chayo as his mom.

At the age of 17, he was ordered to cross illegally into the United States, and he would be charged -- in charge of El Paso, Texas, for drug smuggling, sales, money collection, and gun smuggling.

He kept a ledger of all the actions.  He had people under him to buy and sell either guns or drugs.

He stated that usually sales were 20 kilos of meth.  Sometimes once a month, twice a month, and sometimes several months would go by.

I made a low figure of 100,000 kilos of meth per year, and he still couldn't say.

He stated that he had direct communication with Chayo,

and that he had -- and she had direct communication with him. There was no need for a middle person.

He testified that El Paso was his responsibility.

He testified that the meth and Fentanyl in the case were his responsibility, which were found in his house.

He testified of multiple guns being purchased and sent to Mexico.

He stated -- he stated that the drugs, he had over 15 people to deal with, but could not remember their names.

He stated for the guns, he had over 10 people he dealt with, but he could not remember their names.

He testified that he had pled guilty for the drugs case and the firearms.

He testified that he was cooperating with the Government to be able to see his daughter. His daughter.

His girlfriend, living with him at the time, was not charged, which was the mother of the child.

He's hoping for leniency at sentencing. He's also hoping that, at sentencing, that he could probably stay in the United States.

He testified that the defendant Rene Hernandez Cordero is not in his ledger. Most importantly, he never met or talked to the defendant Rene Hernandez Cordero.

Irma Gamez, eight years' experience, basically testified of general information. She never reviewed any

evidence in this case.

She did testify of Brian Muñoz-Castro's responsibility, that in his position it was a leader position.

She did testify that contract workers, such as plumbers and electricians, can be both; either in the organization or out of the organization.

We did stipulate on the weight and confirmation of the drugs which were associated to Brian Muñoz-Castro, which he pled guilty to.

Patrick Doolin identified Saul Quezada's blue car at the Whataburger and followed him to the gun shop.

Then he was -- he did surveillance on August 21st, 2023, located across the street from the Circle K.

He remembered the defendant Rene Hernandez Cordero leaving by himself and then later returning.

He testified of the pen trap of the defendant Rene Hernandez Cordero's phone, but could not remember if defendant Rene Hernandez Cordero made a phone call and then had to drive back and return to the location.

He testified that before that day, the defendant Rene Hernandez Cordero was not a target or a person of interest.

He testified of communication of defendant Rene Hernandez Cordero with Chayo, of drugs to hold for her.

Defendant said he would -- or he said he would look into it.

Then later, she told him that she found somebody.

The agent testified this was not a crime.

The agent testified the defendant Rene Hernandez Cordero with Chayo, talking about guns, is not -- is not illegal.

He testified defendant Rene Cordero lived in Mexico, and communication was legal.

He also testified that defendant Rene Hernandez Cordero was asked by Chayo to look to see if they could find Brian Castro, if he had been arrested.

Again, the agent testified this is still legal.

Jose Esqueda, 12 years of experience.  He was present at the port of entry August 21st, when defendant Rene Hernandez Cordero crossed into the United States.

The video shows the agents speaking with defendant Rene Hernandez Cordero and searching his vehicle and found nothing and let him pass.

Today you heard Ernesto Herrera.  He testified that he had no physical -- that he was the expert -- firearms expert, that he did not do any physical check of the weapons.

Mark Cervantes testified today that -- testified weapons 1 through 24 belonged to Brian Muñoz-Castro.

He testified that having contacts or sending contact cards is legal.

He testified that no physical evidence or proof of

crossing into Mexico by Jesús Ramos, that they had no physical -- no physical evidence of such.

He testified of Hernandez Cordero's concern for his family and himself at post-arrest.

Testified it is legal to communicate with Chayo.

He testified that it was legal to search for a person that had been arrested.

The Government has solid proof on Brian Muñoz-Castro, Pablo Delgado, Jesús Ramos, Saul Quezada.

They have the drugs that Brian sold to the undercover.

They have drugs in Brian Muñoz-Castro's home.

They have proof of firearms being purchased and delivered for Brian Castro through Pablo Delgado, Jesús Ramos, and Saul Quezada.

In fact, Brian Castro was 100 percent responsible for the El Paso, Texas, area.

Now, the evidence on defendant Rene Hernandez Cordero, is that he delivered money for firearms and took control of five firearms.

The rest of the evidence is a stretch against him. That he communicated with Chayo, which is legal.  Evidence that he communicated about firearms, which is legal.

There's no evidence that whatever communication was followed by an overt act.  Communication alone is legal.

Remember that a conspiracy typically includes an

agreement, intent, and an overt act.

Where was the agreement?  Where was the intent?  Where was -- most importantly, what was the evidence of the overt act?

I know that I've said this a thousand times, and you probably could repeat this back me.

"The mere presence at the scene of the event, even with knowledge that a crime is being committed, or the mere fact that a certain person may have association with another and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.  A person who has knowledge of a conspiracy but who happened to act in a way that advances some purpose of the conspiracy does not, thereby, become a conspirator."

Furthermore, pay attention to the use of the word "and" in the charges.  When you see that there's an element of the crime, both sides of the "and" must be proven beyond a reasonable doubt.  If not, then you must acquit.

For example, Count Four, trafficking firearms, has an "and."  They must prove that he both did smuggle in the firearms and there was a drug trafficking crime.

MR. MYERS:  I'm going to object as to improper argument.  That's against the instructions and the unanimity theory listed in the instructions.

THE COURT:  Overruled.

MR. GUTIERREZ:  If you have any doubt of the drug trafficking crime, then you must acquit.

Reasonable doubt.

The burden of proof lies with the Prosecution.  It is their -- if there's any reasonable doubt of the Defendant's guilt, then you must acquit.  Thank you.

THE COURT:  You may.

MR. MYERS:  May I proceed, Your Honor?

Thank you.

CLOSING STATEMENT

BY MR MYERS:

I think you heard Mr. Gutierrez make reference to his questions of Special Agent Gamez about, Being a plumber for a cartel, does that make you a part of a drug conspiracy?

Mr. Hernandez is not a plumber.  He's not an electrician.  He's a coordinator for weapons, and those weapons are used to further drug trafficking activities.

Multiple witnesses testified how firearms are a fundamental part of that conspiracy, and that conspiracy could not get carried out if they don't have those firearms.

He might not be using them here in the U.S., but they are surely using them in Mexico.  And that makes him guilty of both the drug conspiracy, the smuggling of firearms, and the straw purchasing of firearms.

But I'll walk through that step-by-step.

If you look on your jury charge, on Page 13 at the bottom, you'll see this phrase over and over again.

You know, that the -- the alleged Indictment were agreed upon or carried out, nor must it be proved that all the persons that have been members of the conspiracy were such, or -- and this is on the next page -- that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

So when we're seeing what the crime is here, it is the conspiracy.  It is the agreement to break the law, and that's what the crime is.  And I want to walk these through.

And if you look on page -- go back to Page 12, I'll walk you through one of the charges.

And you'll see Count One.

Those elements, those are the only things we have to prove.  Those are the five things, is the Count One.

So are there two or more persons?  Yeah.  Well, there's Mr. Muñoz, Mr. Delgado, Mr. Hernandez, Fernanda -- Chayo, whatever her real name is -- they reached an agreement to possess with intent to distribute a controlled substance.

Now, how did Mr. Hernandez know that him getting firearms was part of this scheme?

Well, one, it's the nature of the beast, right?  I mean those firearms, we all understood what they're being

carried out for.

If you recall in Government's Exhibit 13G, it's a translation.  He said like, Hey, those people you're with, these weapons, they work.  They kicked your asses with them.  Right?

He knows what these weapons are being used for. Violence.

But more importantly, the text messages.  The text messages aren't necessarily the crimes themselves; they're evidence of his knowledge.

And so when she says, Like, hey, I've got methamphetamine to move.

Well, he knows that this crime that they're a part of involves methamphetamine.  It's written right there.  *Son frio*. Not a question.

He goes out and tries to find couriers for them.

He might not succeed.  He may not have found couriers, but there was an agreement, and he knew what the unlawful purpose of that agreement was.  It's there in writing.

The defendant knew of the unlawful purpose.  He joined in it willfully.  That is with the intent to further its unlawful purpose.

You heard his post-arrest statement and a mention about a lot of threats.  He was not threatened to commit these crimes.  That is not a defense in this case.  If it were, you

would have been instructed about it.  You would have had a specific duress instruction.  It's not in there.

He's afraid of threats that they can carry out if they find out that he's a cooperator.

Now, fourth and fifth.  That the overall scope of the conspiracy involves 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine.

We know it did.  The FBI seized 5 kilograms, more than 500 grams.

And finally, the defendant knew or reasonably should have known that the scope of the conspiracy involved at least 500 grams of methamphetamine.

Remember that conversation with this little ice emoji? It's 11 kilograms.  Okay?

He knows this is over 500 grams.  So that's a guilty.

Now, do we have to prove it was actually trafficked or there were overt acts?  No.  It's the agreement.  It's not that they succeeded.

But they had Brian here, and he was trafficking those narcotics.  And that methamphetamine did make it into the United States.  We caught a very, very small portion of it, but he knew about it.

And he knew when Brian was busted, he knows that it's meth, and he knows that it's Fentanyl.  There's no question about that.  Those are in the text messages.  His knowledge.

That's what's important.

But now he wants to sit here and say, Like, well, you know, look.  I'm sitting in Mexico.  I'm allegedly a licensed gun dealer out there.  I can do what I want, I guess.

I'd like you to turn to one of the very last pages, when we talk about venue in the Indictment.

And it's going to start on page 23 and continue on page 24.

There's no requirement that the entire conspiracy take place here in the Western District of Texas.  The stuff that happens in Mexico, that's part of this crime here, and we have jurisdiction, even if he had never set foot in Texas.

Chayo never set foot here, but yet we have jurisdiction to prosecute her.

Now an overt act is performed to effect the object of the conspiracy, although it remains separate and distinct from the conspiracy itself.  So the overt act need not be of a criminal nature, it must be done in furtherance of the object of the conspiracy, not need be criminal in nature.

So this whole line of questioning of, Well, it's not illegal to look someone up.  It's not illegal to talk or text message or do these things.

No.  Per se, no.  But if you're doing it in furtherance of the conspiracy, yeah, you're going to be guilty of the conspiracy.

So then we jump over to the weapons conspiracy.  And I have to draw strong disagreement from what Mr. Hernandez [sic] said about when you see "and," that means we have to prove it both, because the Court specifically instructs you otherwise.

And each section -- and it's in both.  It's called unanimity of theory.  And it says, like, Look.  The ultimate purpose can be one of two things.  Either it can be in furtherance of a drug trafficking crime or the illegal exportation of crimes.  One or the other.  It does not need to be both.  That's specifically in here.

So what are the crimes of straw purchasing?  And this is one of the ones that get more confusing.

It's those first elements that are listed under each one, Count Four and Count Three.  It'll tell you it's the conspiracy first, second, third.

Two or more persons, they knew the unlawful purpose, and they joined in it willfully.

Now there are other definitions in here given to you to help you understand, What does it mean to traffic firearms? What does it mean to export without a license?

He's not specifically charged with those actual substantive crimes.  He's charged with the agreement, with the conspiracy.

Remember, conspiracy.  You don't need to actually accomplish the objective.  You have conspired with someone

else; you tried.  You got busted.  He doesn't get benefit because the Government actually did its job and stopped some of these weapons from going to Mexico or some of the drugs from going north.

Now I want you to think about Special Agent Gamez and her testimony of how drug trafficking organizations work, because it's very important.

It's -- you know, when Mr. Gutierrez argued, he said, Look.  You've got enough against Pablo Delgado, Saul Quezada, Jesús Ramos, and Brian Muñoz-Castro.

The two people he left out are the two people at the top of the chart, his client and Chayo.

It's just the little guys that get caught with the stuff that get pounded.  They're the only ones that accept responsibility.  They're the only ones that have to eat the prison time in terms of this crime.

The same evidence against them is the same evidence against this guy right here.  Okay?

He knew what he was doing.  He knew the unlawful purpose.  He got busted.  It's on video.

He looks.  Are there weapons in the rental unit?  Are there weapons?  Then I'll give you my cash.

He does not have a license, State Department or otherwise, because he's not acting like that.

If he did have a license he would have declared the

cash.  He would have taken the weapons down south.  The cash is illegal drug proceeds.  That's why Meny Gel crosses it north.

THE COURT:  You have one minute.

MR. MYERS:  Thank you, Your Honor.

The guns are illegal to export.  That's why he's using people like Jesús Ramos to do the dirty work themselves.

Brian Muñoz-Castro gave you the same thing when he talked about his phone.  I don't want to put my name on paper. I don't want to be connected to anything.  It's a way to protect myself, and that's what he's doing.

This man is guilty of the elements of the crimes charged.  He's in furtherance of this drug trafficking conspiracy.  He knows it involved drugs, he knows how much drugs are involved, and what type of drugs.  And he knows exactly what these firearms are being used for.  It's in front of you.  It's in the evidence.

I wish you Godspeed, and I thank you for your time on this.  And we hope you return verdicts of guilty on all counts. Thank you.

THE COURT:  Ladies and gentlemen of the jury, now you must deliberate.

Ms. Quintana and Mr. Han, I'm going to excuse you. Since all the other jurors are here, they're going to deliberate.  You cannot deliberate with them.  But -- so as soon as you get to the jury room, you're excused.

Members of the Jury, the first thing you should do is select your foreperson and fill out that form and give it to the Court Security Officer of who the foreperson is.

So we'll be in recess awaiting the jury's verdict.

(Jury retired to deliberate; continued in Volume 6.)

I N D E X

GOVERNMENT'S EVIDENCE

<u>WITNESSES</u>:

<u>ERNESTO HERRERA, JR.</u>:

Direct Examination by Ms. Holderfield  .....................2
Cross-Examination by Mr. Gutierrez ........................10

<u>MARK CERVANTES</u>:

Direct Examination by Mr. Myers  .........................13
Cross-Examination by Mr. Gutierrez ........................63
Redirect Examination by Mr. Myers ........................79

Objections to the Charge ..................................86

Government Rests .........................................88

Motion for Judgment of Acquittal ..........................88

Parties Rest and Close ...................................89

Charge of the Court ......................................90

Closing Statement by Ms. Holderfield ......................91

Closing Statement by Mr. Gutierrez ........................99

Closing Statement by Mr. Myers ...........................110

Jury out to deliberate ...................................118

GOVERNMENT'S EXHIBITS

| NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| 5AL | Photograph of Boxes in Ramos's Truck | 57 |
| 5AM | Photograph of Boxes (up close) | 57 |
| 5AN | Photograph of Box 1 open | 57 |
| 5AO | Photograph of Box 2 open | 57 |
| 5AP | Photograph of Firearm Parts | 57 |
| 5AQ | Photograph of Firearm Parts | 57 |
| 5AR | Photograph of Firearm Parts | 57 |
| 6F | Rene Hernandez Cordero Advice of Rights | 28 |
| 6G | Rene Hernandez Cordero Interview | 29 |
| 6H | Translation of 6G | 29 |
| 7M | Firearms Information | 8 |
| 8A | Currency Reporting | 42 |
| 8C | M.G. Crossing Information | 43 |
| 8D | Conversation between Hernandez and Meny Gel | 43 |
| 8E | Translation of 8D | 44 |
| 12N | Jesús Reyes Crossing Information | 25 |